1       UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3      HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

4

5  UNITED STATES OF AMERICA,              )
                                          )
6                    PLAINTIFF,           ) CASE NO.
                                          ) CR 14-259-RGK-1
7          VS.                            )
                                          )
8  SYLVIA OGBENYEANU WALTER-EZE,          )
                                          )
9                    DEFENDANT.           )
   _____)

10

11

12

13

14            REPORTER'S TRANSCRIPT OF
              JURY TRIAL - DAY 2
15               (P.M. SESSION)
            THURSDAY, MARCH 12, 2015
16                 1:04 P.M.
            LOS ANGELES, CALIFORNIA

17

18

19

20

21

22   _____

23        KHOWOONSUN CHONG, CSR 12907, CRR, RMR
             FEDERAL OFFICIAL COURT REPORTER
24          255 EAST TEMPLE STREET, ROOM 181-G
              LOS ANGELES, CALIFORNIA 90012
25                 kchong12907@yahoo.com

UNITED STATES DISTRICT COURT

1                    **APPEARANCES OF COUNSEL:**

2

3    **FOR THE PLAINTIFF:**

4        UNITED STATES DEPARTMENT OF JUSTICE
         CRIMINAL DIVISION - FRAUD SECTION
5        BY:  BLANCA QUINTERO
              ALEXANDER PORTER
6        Assistants United States Attorney
         4811 Airport Plaza Drive, Fifth Floor
7        Long Beach, California 90815

8

9    **FOR THE DEFENDANT:**

10       LAW OFFICES OF CHRISTOPHER A. DARDEN
         BY:  OMA N. NKELE
11            CHRISTOPHER DARDEN
         Attorneys At Law
12       11500 West Olympic Boulevard
         Suite 400
13       Los Angeles, California 90064

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

```
1                          I N D E X

2                  Thursday, March 12, 2015

3         -------------------------------------------------------

4              CHRONOLOGICAL INDEX OF WITNESSES

5

6    WITNESSES                                        PAGE

7    BRENT PERSON
            DIRECT EXAMINATION BY MR. PORTER           74
8           CROSS-EXAMINATION BY MR. DARDEN           113
            REDIRECT EXAMINATION BY MR. PORTER        129
9           RECROSS-EXAMINATION BY MR. DARDEN         131

10   ALISON DAVIS
            DIRECT EXAMINATION BY MS. QUINTERO        133
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**

1    **INDEX OF EXHIBITS**

2

3                    RECEIVED INTO EVIDENCE

4    1                                                    86

5    3                                                    81

6    4                                                    93

7    5                                                    97

8    6                                                    99

9    7                                                    101

10   8                                                    102

11   9                                                    103

12   10                                                   111

13   11                                                   104

14   12                                                   112

15   13                                                   156

16   14                                                   156

17   15                                                   139

18   16                                                   162

19   19                                                   144

20   20, 21 AND 68                                        147

21   23 AND 24                                            150

22

23

24

25

```
 1            LOS ANGELES, CALIFORNIA; THURSDAY, MARCH 12, 2015

 2                              1:04 P.M.

 3                              -oOo-

 4

 5            (Jury in at 1:04 P.M.)

 6            (The following proceedings were held in the

 7            presence of the jury:)

 8            (Call to order.)

 9            THE COURT:  Ladies and gentlemen, thank you very

10  much for being on time.  It makes a big difference because we

11  can get started, and we can be very efficient and can utilize

12  your time much more efficiently.  So I really appreciate

13  everybody taking that into consideration and being here, ready

14  to start right on time.

15       We're going to read you some instructions at this time,

16  and then we're going to proceed with the trial.  So let me read

17  those instructions to you at this time.

18            You now are the jury in this case, and I

19         want to take a few minutes to tell you

20         something about your duties as jurors and to

21         give you some preliminary instructions.

22            You'll notice a lot of this we talked about earlier

23  in the voir dire of the jury.

24            At the end of the trial, I'll give you

25         more detailed written instructions that will
```

```
1        control your deliberations.  When you
2        deliberate, it will be your duty to weigh and
3        evaluate all the evidence received in this
4        trial and in that process to decide the facts.
5        To those facts, as you find them, you will
6        apply the law that I give to you whether you
7        agree with that law or not.
8            You must not decide this case solely --
9        you must decide this case solely on the
10       evidence and the law before you and must not
11       be influenced by any personal likes, dislikes,
12       opinions, prejudice, or sympathy.
13           Please do not take anything that I may
14       say or do during the trial to indicate that I
15       think -- what I think of the evidence or what
16       the verdict should be.  That is entirely up to
17       you.
18           This is a criminal case brought by the
19       United States Government.  The Government
20       charges the defendant with conspiracy to
21       commit health care fraud, health care fraud,
22       and conspiracy to pay and receive illegal
23       health care kickbacks.
24           The charges against defendant are
25       contained in the Indictment.  The Indictment
```

```
1        simply describes the charges the Government

2        brings against the defendant.  The Indictment

3        is not evidence and does not prove anything.

4             The defendant has pled not guilty to the

5        charges and is presumed to be innocent until

6        and unless the Government can prove the

7        defendant guilty beyond a reasonable doubt.

8             In addition, the defendant has a right to

9        remain silent and never has to prove innocence

10       or to present any evidence.

11            Now, we mentioned several times proof

12       beyond a reasonable doubt.  Proof beyond a

13       reasonable doubt is proof that leaves you

14       firmly convinced that the defendant is guilty.

15       It is not required that the Government prove

16       guilt beyond all possible doubt.  Reasonable

17       doubt is a doubt based upon reason and common

18       sense and is not based purely on speculation.

19       It may arise from a careful and impartial

20       consideration of all of the evidence, or the

21       lack of evidence.

22            If, after a careful and impartial

23       consideration of all of the evidence, you are

24       not convinced beyond a reasonable doubt that

25       the defendant is guilty, it is your duty to
```

1          find the defendant not guilty.  If, on the

2          other hand, after a careful and impartial

3          consideration of all the evidence, you are

4          convinced beyond a reasonable doubt that the

5          defendant is guilty, it is your duty to find

6          the defendant guilty.

7               Now, we've talked about these things before, but let

8     me go over it again.

9               Evidence that you are to consider in

10         deciding the facts consists of three things:

11         The sworn testimony of witnesses here under

12         oath, exhibits which are received into

13         evidence during the course of the trial, and

14         any fact or stipulations that the parties

15         enter into.

16              The following things are not evidence,

17         and you must not consider them as evidence in

18         deciding the facts of this case:  Statement or

19         arguments of attorneys, not evidence.

20         Questions or objections by the attorneys, not

21         evidence.  Anything you may see or hear when

22         the court is not in session, even if what you

23         see or hear is done or said by one of the

24         parties or one of the witnesses, not evidence.

25              Evidence may be either direct or

1       circumstantial.  Direct evidence proves a

2       fact -- excuse me -- direct evidence is direct

3       proof of a fact such as the testimony of a

4       witness about what that witness personally saw

5       or heard or did.  Circumstantial evidence is

6       indirect evidence.  That is, it is proof of

7       one or more facts from which you may -- from

8       which you can find another fact to be true.

9           You are to consider both direct and

10      circumstantial evidence.  Either can be used

11      to prove any fact.  The law makes no

12      distinction between the weight to be given to

13      either circumstantial or direct evidence.  It

14      is for you to decide how much weight is to be

15      given to any evidence.

16          There are rules of evidence that control

17      what can be received into evidence.  When a

18      lawyer asks a question or offers an exhibit

19      into evidence and the lawyer on the other side

20      thinks that it is not permitted by the rules

21      of evidence, that lawyer may object.

22          If I overrule the objection, the question

23      may be answered, or the exhibit received.  If

24      I sustain the objection, the question cannot

25      be answered, or the exhibit cannot be

1          received.  Whenever I sustain an objection to

2          a question, you must ignore that question and

3          must not guess as to what the answer might

4          have been.

5               The common example of that is, "Have you stopped

6    beating your wife yet?"  The question is not evidence.  You are

7    not to assume somebody beat their wife just because somebody

8    asked the question.

9               Sometimes I may order that the evidence

10         be stricken from the record or that you

11         disregard or ignore that evidence.  That means

12         that, when you are deciding this case, you

13         must not consider as evidence that, that I

14         told you to disregard.

15              In deciding the facts of the case, you

16         may have to decide which testimony you believe

17         and which testimony not to believe.  You may

18         believe everything that a witness says, or

19         part of it, or none of it.

20              In considering the testimony of any

21         witness, you may take into account, No. 1, the

22         witness's opportunity and the ability to see

23         or hear or know the things testified to;

24         No. 2, the witness's memory; No. 3, the

25         witness's manner while testifying; No. 4, the

1          witness's interest in the outcome of the case,

2          if any; No. 5, a witness's bias or prejudice,

3          if any; No. 6, whether other evidence

4          contradicts the witness's testimony; No. 7,

5          the reasonableness of a witness's testimony in

6          light of all the other evidence; or any other

7          factor that bears on believability.

8               The weight of the evidence as to any fact

9          does not necessarily depend on the number of

10         witnesses who have testified about that fact.

11           Let me take some time to say a few words about your

12     conduct as jurors.  We've gone over this also in the past.

13               First, keep an open mind throughout the

14         trial and do not decide what the verdict

15         should be until you and your fellow jurors

16         have completed your deliberation at the end of

17         the case.

18               Second, because you must decide this case

19         based only on the evidence received in this

20         trial and not -- and on my instructions as to

21         what the law applies, you must not be exposed

22         to any other information about this case or to

23         the issues it involves during the course of

24         your jury duty.

25               Thus, until the end of the case or unless

1          I tell you otherwise, do not communicate with

2          anyone in any way and do not let anyone else

3          communicate with you in any way about the

4          merits of this case or anything to do with the

5          case.  This includes discussing the case in

6          person, in writing, by phone, by electronic

7          means such as e-mail, text messages, or any

8          other Internet chat room, blogs, Web sites, or

9          other features.  This applies to

10         communications with your fellow jurors until I

11         give the case to you for your deliberation.

12             Remember I talked about that before.  Don't talk

13     about the contents of the case with your fellow jurors until

14     you're back there to deliberate.  And it applies to

15     communication with everyone else, including your family

16     members, your employer, the media, the press, and people

17     involved in the trial.

18         Although you may notify your family that -- and your

19     employer that you have been seated on a jury in this case,

20     don't talk to them about the merits of the case or the contents

21     of the case.  But if you are asked or approached in any way

22     about your jury service or anyone about this case, you must

23     respond that you have been ordered not to discuss the case and

24     must report it to this Court.

25             Because you will receive all the evidence

1          and the legal instructions you properly may

2          consider to return a verdict, do not do any

3          research on your own such as consulting

4          dictionaries, searching the Internet, or using

5          other reference materials; and do not make any

6          investigation or in any other way try to learn

7          about the case on your own.

8          Sometimes we have problems with that.  You don't go

9   on the Internet or look in dictionaries or try to solve the

10  case yourself.  You're here to tell us what the evidence says.

11  You are not the attorneys in this case.  You are not to present

12  the case.  You are to tell us what the evidence says as it

13  comes to you.

14          The law requires these restrictions to

15          ensure that the parties have a fair trial

16          based on the same evidence that each party has

17          had an opportunity to address.

18          A juror who violates these restrictions

19          jeopardizes the fairness of the proceedings,

20          and a mistrial could result that would require

21          the entire trial process to start over again.

22          If any juror is exposed to any outside

23          information, please notify the Court

24          immediately.

25          At the end of the trial, you will have to

```
1        make a decision based on what you recall of

2        the evidence.  You will not have a written

3        transcript of the trial.  So I urge you to pay

4        very close attention to the testimony as it is

5        being given.

6             In fact, you may wish to take notes to

7        help you remember the evidence.  If you do

8        take notes, please keep in mind -- or keep

9        them to yourselves until you and your fellow

10       jurors go back into the jury room to decide

11       this case.  Do not let note-taking distract

12       you from being attentive.  Sometimes people

13       will start taking notes, and they won't hear

14       what the witness is saying.  It's more

15       important that you see and hear everything

16       than taking notes.  When you leave the court

17       for recess, your notes should be left here in

18       the courtroom on your seats.  No one will read

19       your notes.

20            Whether or not you take notes, you should

21       rely on your own memory of the evidence.

22       Notes are only there to assist your memory.

23       You should not be overly influenced by notes

24       or those of your fellow jurors.

25          Sometimes we have problems with that.  You'll go
```

1  back to the jury room, and somebody says, "I think it's A."
2  Somebody else says, "No, no.  My notes show it's B."  That has
3  no more weight to it than the person who says it's A.  It's
4  only your memory that controls.  Notes are there just to
5  assist, and you don't want to give them any undue weight.
6          The next phase of the trial will begin
7          now.  First, each side will make an opening
8          statement.  An opening statement is not
9          evidence.  It is simply an outline to help you
10         understand what the parties expect the
11         evidence will show.  A party is not required
12         to make an opening statement.
13         After opening statements the Government
14         will then present evidence, and counsel for
15         the defense may cross-examine.  Then, if the
16         defendant chooses to offer evidence, counsel
17         for the Government may cross-examine.
18         After the evidence has been presented and
19         the attorneys have had an opportunity to make
20         their closing arguments, I will instruct you
21         on the law that applies to this case.  After
22         that, you will go back to the jury room and
23         deliberate on your own verdict.
24         Any questions you might have before we get started?
25         JUROR NO. 12:  No.

1          THE COURT:  Counsel, would you like to make an

2     opening statement?

3          MS. QUINTERO:  Yes, Your Honor.  Thank you very

4     much.

5          Ladies and gentlemen, as Judge Klausner commented on

6     Tuesday, this case involves the United States of America versus

7     the defendant, Sylvia Ogbenyeanu Walter-Eze, sitting right

8     there before you today.  It involves allegations, ladies and

9     gentlemen, that we will prove of Medicare fraud, that the

10    defendant defrauded the Medicare program of millions of

11    dollars.

12         Good afternoon, ladies and gentlemen.  My name is Blanca

13    Quintero, and I'm a federal prosecutor with the United States

14    Department of Justice.  Sitting here at counsel table with me

15    today is co-counsel Alex porter, our paralegal Nellie Yu, and

16    United States Department of Health and Human Services Special

17    Agent Alison Davis.  Together we will be presenting this case

18    to you on behalf of the United States.

19         Now, what is this case about?  To put it simply, this

20    case, this trial will center around a company by the name of

21    Ezcor-9000, which was located just north of here in Valencia,

22    California, and which was owned and operated by the defendant.

23         During this trial you will hear a great deal about this

24    company, Ezcor.  You will learn that Ezcor made its millions of

25    dollars off of the federal health care benefit program known as

1    Medicare, which provides free or below-cost insurance to the

2    blind, the disabled, and the elderly.  And you will learn that

3    Ezcor made its millions of dollars by providing Medicare

4    beneficiaries -- Medicare beneficiaries are simply individuals

5    that are eligible for Medicare benefits -- and supplying them

6    with durable medical equipment, or DME for short.

7         Durable medical equipment is simply medically necessary

8    equipment that's durable in nature.  In other words, it's

9    intended for repeated use, such as hospital beds, canes,

10   walkers.  And the durable medical equipment that will be at the

11   center of this case, power wheelchairs -- power wheelchairs,

12   much like this one, sitting right here in front of you.

13        And if you've never heard of durable medical equipment and

14   you're not sure how the process works, it's very much like any

15   drug prescription.  For instance, you get sick.  You go to your

16   doctors.  Your doctor gives you a prescription for an

17   antibiotic, and you take that prescription and you fill it at

18   your neighborhood Walgreens or CVS or Rite Aid.  Basically, you

19   fill that prescription at the pharmacy of your choice.

20        So just the same way, in the legitimate world, when a

21   Medicare beneficiary needs a power wheelchair to do their

22   day-to-day activities within their home, that Medicare

23   beneficiary can go to the regular doctors.  Okay?  And that

24   doctor can identify a medical need for that power wheelchair

25   and write the appropriate prescription.  In the legitimate

1    world, that Medicare beneficiary can take that prescription and

2    fill it at the DME store of their choice.

3        That DME supplier can review the prescription, confirm

4    that it's legitimate, and provide the Medicare beneficiary with

5    the power wheelchair.  In the legitimate world, that DME

6    supplier can then turn around and submit a claim to Medicare

7    and be reimbursed by Medicare for supplying that Medicare

8    beneficiary with that power wheelchair.

9        Again, this is how things work in the legitimate world.

10   You only have three parties.  You have the Medicare

11   beneficiary.  You have the Medicare beneficiary's doctor.  And

12   you have the DME supplier.  No more and no less.

13       And more importantly in this, no one in this three-party

14   equation is paying or receiving illegal kickbacks to facilitate

15   this process.  No money is being exchanged, and only legitimate

16   services are being provided.

17       Now, against this backdrop of what is legitimate, I want

18   you to consider what was occurring or what the evidence will

19   show was occurring at the defendant's world at Ezcor.  And I

20   want you to consider the extreme contrast between how things

21   work in the legitimate world and how they worked at the

22   defendant's company, Ezcor.  And to help illustrate this, I

23   want us to look at this slide which will help explain exactly

24   how things worked at the defendant's company, Ezcor.

25       First, if you look at the slide, at the very center of

1    this slide is the defendant herself, Sylvia Walter-Eze and her

2    company.  And, in fact, the evidence will show that the

3    defendant was at the very center of this whole scheme.

4         And if you look at the very top right-hand corner of that

5    slide, the evidence will show that the defendant used patient

6    recruiters or marketers, individuals to go out on the streets

7    in search of Medicare beneficiaries -- to go out on the streets

8    in search of Medicare beneficiaries to convince them to get

9    these power wheelchairs that they did not medically need and to

10   convince them to go to a doctor with them so that they could be

11   prescribed power wheelchairs that they did not medically need.

12        And the doctors, the doctors that the Medicare

13   beneficiaries were taken to by these patient recruiters, were

14   the same exact doctors that the defendant herself would

15   instruct the patient recruiters to take the Medicare

16   beneficiaries to and the very same doctors that the defendant

17   paid illegal kickbacks to.

18        And speaking of illegal kickbacks, let's not forget about

19   the dollar signs that we see there.  Okay?  The evidence will

20   show that the defendant herself personally paid illegal

21   kickbacks, anywhere from 500 to $700, to the patient

22   recruiters, the marketers, for every single Medicare

23   beneficiary that they recruited that got a power wheelchair.

24   500 to $700 for every Medicare beneficiary that they recruited.

25        And the prescriptions, those prescriptions went directly

1  from Ezcor -- I'm sorry -- from the doctors, directly into

2  Ezcor.  And that's because, ladies and gentlemen, in the

3  defendant's world, each of those prescriptions were just as

4  good as cash.  Okay?  And these doctors, the evidence will show

5  that the defendant paid illegal kickbacks to these same doctors

6  for those bogus prescriptions, and those prescriptions were

7  just as good as cash because, with each of those prescriptions,

8  the defendant was able to submit claims to Medicare for

9  thousands and thousands of dollars for every power wheelchair.

10  Each of those little pieces of paper was worth literally

11  thousands of dollars.

12      And once the claims were submitted to Medicare, if

13  everything at least on paper appeared fine, Medicare would

14  reimburse the defendant thousands and thousands of dollars for

15  every single one of the power wheelchairs that she submitted a

16  claim to.  And, in fact, the evidence will show that the

17  defendant submitted more than $3.5 million in claims to

18  Medicare and that Medicare paid the defendant, her company

19  Ezcor, more than $1.9 million.

20      Now, throughout this trial you will have an opportunity to

21  hear testimony from various witnesses.  In fact, you will hear

22  testimony from two witnesses that were part of this entire

23  scheme as I have just explained it to you.  And one of these

24  witnesses is Mr. Wilmer Guzman, and Mr. Guzman was one of these

25  patient recruiters that was paid illegal kickbacks by the

1    defendant.

2          And he will come in here and testify before you and

3    explain to you exactly how he would do it, how he would recruit

4    Medicare beneficiaries for the defendant, how he would

5    literally go out and scour the streets in search of Medicare

6    beneficiaries.  He would go to your local doughnut shops, to

7    your local billiards, even to your neighborhood Walmart,

8    anywhere he could find individuals who appeared to him to be 65

9    years or older, because he knew that at 65 years or older they

10   would have Medicare.

11         And he will admit to you, ladies and gentlemen, that the

12   defendant herself personally paid him anywhere from 500 to $700

13   for every single Medicare beneficiary that he recruited to her.

14   And he will admit to you, ladies and gentlemen, that while he

15   was out recruiting these Medicare beneficiaries and getting

16   these payments from -- from the defendant, he knew these

17   Medicare beneficiaries didn't need the power wheelchairs.  He

18   found them out on the streets, walking.  All right?

19         And he will admit to you that, at the end of the day, he

20   didn't care.  What he cared about is the 5- to $700 that he was

21   getting paid by the defendant for every single Medicare

22   beneficiary that he got that got one of these power

23   wheelchairs.  And you will be able to see those illegal

24   kickbacks.  You will see them yourself, check after check after

25   check, all signed by the defendant herself, money paid to

1   Mr. Guzman.

2          And then you will also hear from Dr. Edna Calaustro, one

3   of these doctors that was paid illegal kickbacks to write her

4   bogus prescriptions for Ezcor, for the defendant.  And

5   Dr. Calaustro will explain to you that a patient recruiter for

6   the defendant would bring her patients, Medicare beneficiaries.

7   And these were Medicare beneficiaries, Dr. Calaustro herself

8   will tell you, that she had never seen before.  And the only

9   time she ever saw these Medicare beneficiaries is when she

10  wrote her bogus prescription.

11         And she will admit to you that these Medicare

12  beneficiaries did not need these power wheelchairs.  And she

13  will admit to you, ladies and gentlemen, that she was paid a

14  hundred dollars for every bogus prescription that she wrote,

15  bogus prescription that she knew those Medicare beneficiaries

16  did not need these power wheelchairs.

17         Defendant knew these Medicare beneficiaries that her

18  patient recruiters were bringing did not need the power

19  wheelchairs.  And at the end of the day, Dr. Calaustro, what

20  she cared about was not that those Medicare beneficiaries

21  needed the power wheelchairs but the $100 that she was getting

22  paid for each of those prescriptions.

23         And the prescriptions, Dr. Calaustro herself will tell

24  you, she didn't give them to the Medicare beneficiaries.  She

25  sent them directly into Ezcor, not to the Medicare

1    beneficiaries to fill at the DME store of their choice, but

2    directly into Ezcor.  And you will be able to see

3    Dr. Calaustro's prescriptions, and you will be able to see all

4    of the paperwork that she filled out in support of those

5    prescriptions and sent directly into Ezcor.

6         And the evidence will show that, just based on

7    prescriptions from Dr. Calaustro alone, the defendant billed

8    Medicare almost half a million dollars just on prescriptions

9    from Dr. Calaustro alone.

10        Now, ladies and gentlemen, I want to make something very

11   clear.  Dr. Calaustro and Mr. Guzman, they're no angels.  Okay?

12   We're not here to sell you a bill of goods on either of them.

13   But at the end of the day, you will see the checks, the

14   payments to Mr. Guzman, check after check after check, all

15   signed by the defendant herself.

16        And you will be able to see the prescriptions and all the

17   paperwork completed and filled out and sent directly into Ezcor

18   by Dr. Calaustro, and you will hear and you will see all of the

19   other evidence that will corroborate their testimony.  And at

20   the end of the day, through their testimony, you will get a

21   clear picture of this entire scheme as I have explained it to

22   you.

23        And on top of those two witnesses, ladies and gentlemen,

24   you will also hear from Mr. Aguilar, Ed Aguilar.  Mr. Aguilar

25   was the delivery technician for Ezcor for four years.  And as

1     the delivery technician for Ezcor, Mr. Aguilar was the one that

2     was going out and delivering these power wheelchairs and other

3     DME to the Medicare beneficiaries.

4          And Mr. Aguilar will share with you that, when he would go

5     out and deliver these power wheelchairs to the Medicare

6     beneficiaries, these Medicare beneficiaries were walking around

7     just fine, sometimes with a cane or a walker, but nevertheless

8     they were walking around with no apparent need for a power

9     wheelchair.  And, in fact, he will share with you that

10    sometimes these Medicare beneficiaries lived on the second

11    floor of an apartment complex with no elevator access.  And the

12    only way to go from the first floor to the second floor was to

13    walk up some stairs.

14         And he will even share with you that, at times, these

15    Medicare beneficiaries' homes were so small, so small that the

16    power wheelchairs couldn't even fit, let alone be maneuvered

17    within that Medicare beneficiary's home and that it was clear

18    to him that these Medicare beneficiaries were not using these

19    power wheelchairs.

20         And to top it off, ladies and gentlemen, when he brought

21    all of this to the defendant's attention, the defendant just

22    made excuses, made him feel like it was none of his business,

23    and just insisted that he deliver the power wheelchairs and the

24    DME, even if it meant that he had to move furniture around in

25    order to make it fit.

1      And you will also hear from some of these Medicare
2  beneficiaries themselves, Medicare beneficiaries that will walk
3  into this courtroom, walk up to that stand on their own two
4  feet, and share their stories with you, how they were taken to
5  a doctor by a person they didn't even know and who, despite the
6  clear fact that they could walk, were given a power wheelchair.
7  A power wheelchair that they didn't need, a power wheelchair
8  that they oftentimes didn't even want, and some of these
9  Medicare beneficiaries will even tell you they were even too
10 afraid to use the power wheelchair.
11     And you will also hear from some of these Medicare
12 beneficiaries' own primary care physicians or treating doctors,
13 doctors who had legitimately been practicing in or around
14 Los Angeles area and have treated -- long, extensive history
15 treating these Medicare beneficiaries.  And in their treatment
16 of Medicare beneficiaries, those primary care physicians have
17 never prescribed them a power wheelchair.
18     And lastly, ladies and gentlemen, you will also hear from
19 Special Agent Davis.  Okay?  Special Agent Davis interviewed
20 the defendant multiple times throughout the -- her
21 investigation.  And during her first interview of the
22 defendant, the defendant acknowledged -- the defendant
23 acknowledged that she knew that it was illegal to pay people
24 money to refer patients to her.  I'll repeat that again, ladies
25 and gentlemen.  She acknowledged that it was illegal to pay

1    people money to refer patients to her.

2         In fact, in her own words, she called that a kickback.

3    And I say in her own words, ladies and gentlemen, because you

4    will hear her in her own words call it a kickback.  And she

5    denied paying people money to refer patients to her.  She

6    denied it.  And, in fact, she even said it's not morally right.

7    It's not morally right because you've been influenced by money.

8    And again, ladies and gentlemen, you will be able to hear these

9    words yourself, uttered by the defendant herself.

10        And then Special Agent Davis will testify about how,

11   months after this initial interview, months later, almost eight

12   months later, she interviewed the defendant again.  And this

13   time -- you will hear from Special Agent Davis, this time you

14   will hear how she changed her story, how she changed her story

15   because she finally admitted that she paid money to people to

16   refer patients to her.  But she only -- but she called it only

17   a commission.

18        Now, ladies and gentlemen, this is only a brief summary of

19   some of the evidence that we will be -- that we will be

20   presenting to you today.  It is by no means all of the

21   evidence.  And at the end of this trial, we will ask that you

22   return the only verdict that is consistent with this evidence,

23   and that is that the defendant is guilty, guilty beyond a

24   reasonable doubt of all of the counts as charged in the

25   Indictment.

69

```
1            Thank you very much, ladies and gentlemen.  Appreciate
2    your time and your attention.
3            THE COURT:  Thank you.
4        Counsel, when you're using the visuals there, if you're
5    speaking, you have to speak from the podium.  I don't know if
6    you want to pull that closer to you or you just want to take a
7    break and speak while you walk over there.  There you go.
8    That's better.  Thank you very much.
9            MS. NKELE:  Good afternoon, ladies and gentlemen.
10   My name is Oma Nkele, and I'm counsel for Sylvia Ogbenyeanu
11   Walter-Eze.  My co-counsel over there is Chris Darden.  Then is
12   our paralegal, and we have an investigator over there.
13       I just want to take a minute, just a second to say thank
14   you, thank you to all of you that are sitting over there.  It's
15   because of people like you that we can feel justice, that we
16   can bring justice to the table.  It's not easy.  I know that
17   there's a lot of things you can be doing, rather than sitting
18   in that box.  But you took the time from your very busy
19   schedules to come here today and do what you have to do, honor
20   your civic duty so that we can have liberty and justice for
21   all.  That is the American way.  And for that, I thank you.
22       You know, there's going to be a lot of testimony and
23   evidence in this case.  But at the end of the day, you realize
24   one thing, that this case is really about a thin line.  This
25   thin line.
```

**UNITED STATES DISTRICT COURT**

1          You will hear evidence about Center for Medicare &
2   Medicaid Services.  What they do is they provide a partnership
3   for patients.  They provide an avenue where patients can get
4   care.  These are patients over here, and this is the CMS,
5   Center for Medicare & Medicaid Services.  They're partners for
6   the provision of care for patients.
7          Patients are not described or defined as old and crippled
8   and blind.  Patients are anybody who needs care and that
9   qualify for benefits on that CMS.  You will hear all about
10  that.  Once you qualify, then the next thing is, after Medicare
11  qualifies you, they send you over here, this area surrounded by
12  thin lines.
13         And that thin line, you will find healthcare providers,
14  supply side of the program.  You will see the products and
15  services.  This is where the doctors come in, Center for
16  Disease Control.  It's just a big circle of care for patients.
17  And in providing the supply side of it, you get legitimate
18  companies like Ezcor nine hun- -- 9000, that provide medical
19  equipment.
20         Now, medical equipment is not necessarily the wheelchair.
21  No, no, no, no, no, no.  That's not what it is.  It has
22  wheelchairs.  It has back braces.  It has leg braces.  Students
23  in high school can break a leg, and they need a knee walker or
24  they need crutches.  An old person can need cane, and when they
25  are too weary to use it because their hands are weak or tired,

1    or they can no longer move themselves with manual wheelchair,

2    they might qualify for powered wheelchair, because it makes

3    life easy.

4         Powered wheelchair, you will find out from the testimony

5    that you receive in this matter, is not for the dying.  It's

6    not for people who cannot even stand up and walk.  It's for

7    people whose life has become so difficult that they need a

8    little bit of help.

9         Again, like I said, it's a thin line.  A great scholar

10   once wrote that there's a thin line in which you can cross over

11   and make legitimate conduct seem criminal.  That is this thin

12   line because this thin line has been pulled around the

13   suppliers.  They have to work together to take care of

14   patients.  The rules are set over here of what they can do over

15   here.  They don't set the rules for themselves.  Over here they

16   give them the rules, the thin line that surrounds them, and

17   they tell them, "You want to give a wheelchair?  You need a

18   wheelchair for a patient?"  You have to get a prescription.

19        Nowhere in the rules does it tell you who has to give the

20   prescription except it has to be a doctor, a qualified person

21   who sees the patient and makes that determination based on

22   their education and their specialty that this person has issues

23   in their life which makes it necessary to improve their quality

24   of life by giving them the wheelchair or a cane or a back brace

25   or whatever is medically necessary for them to live a better

**UNITED STATES DISTRICT COURT**

1    life, and that better life is for them to be able to walk.

2    Maybe perhaps they can walk 20 steps.  Okay?  20 minutes.  And

3    now they can practically run on the scooter.

4        And, now, the rules set by Medicare, CMS, as you will find

5    out in all the evidence that will be presented to you, there

6    will be no single rule that will tell you how many steps a man

7    or a woman needs to take before they get a wheelchair.  That's

8    the thin line.  That's the thin line that can be crossed by the

9    Government.

10       I'll tell you something.  They don't make the decision as

11   to who is sick.  The doctors make the decision.  They are

12   trained to do that.  The medical suppliers are trained to do

13   that -- are not trained to do that.  They can only follow the

14   guidelines.

15       Now, it will be wrong for a doctor to say that someone

16   needs an equipment, and someone who is not in any position to

17   tell you if they are sick or not would say no.  They can only

18   follow the rules.  If you say this person needs an equipment,

19   show me how.  I'm not doubting your expertise, but you have got

20   to show me why, because up here they need to know why.

21       And that's what it is.  That's what it's simply about,

22   that thin line, that very thin line where legitimate business

23   owners, while they're trying to do their business and follow

24   all the rules.  I'm not saying this case is going to be easy.

25   No, no, no, no, no.  I'm not saying that at all.

UNITED STATES DISTRICT COURT

1          There will be lots of evidence.  You are going to see lots

2     of documents.  There will be one, two, three, four, five, six,

3     seven -- exhibits, lots of them.  You will hear testimony.

4     Listen carefully because you are neutral.  You came here

5     forming no opinion of this case.

6          So listen carefully to the testimony of Guzman.  He's

7     supposed to be a recruiter.  Now, listen carefully to his

8     testimony.  I'll also -- also ask you to listen carefully to

9     Calaustro and the doctors of the patients who probably never

10    had any contact with Ezcor and see what conclusion you will

11    come to.

12         The one thing I'm sure, the end of the day, you will

13    understand that Ezcor, a business, was involved in its own

14    legitimate business practice.  Perhaps along the way,

15    unfortunately, people who are not exactly nice people walked

16    across her path, and for some reason there's mistaken --

17    mistaken facts here that she knew that they were unsavory.

18         You've already been told that you're going to hear the

19    testimony of people who are not so nice, but please make a note

20    of it.  Those people are not Ezcor.  And keep an open mind.  At

21    the end of the day, you will see the thin line.  Thank you.

22              THE COURT:  Thank you, Counsel.

23         Government ready to proceed?

24              MR. PORTER:  Yes, Your Honor.  Government calls its

25    first witness, Brent Person.

```
 1              THE COURT:  While they're getting that witness,
 2    ladies and gentlemen, I know you already know, but let me just
 3    reemphasize.  We have heard the opening statement now, not
 4    evidence.  Now we get to the evidence.  Now we get to the
 5    testimony of witnesses, exhibits, and any stipulation, and this
 6    is what you determine the facts from.
 7                              BRENT PERSON,
 8    called as a witness by the Government, was sworn and testified
 9    as follows:
10              THE CLERK:  Good afternoon.  Right here to be sworn,
11    please.
12              THE WITNESS:  Hello.
13              THE CLERK:  Raise your right hand.  Do you solemnly
14    swear the testimony that you are about to give in the matter
15    now before the Court shall be the truth, the whole truth, and
16    nothing but the truth so help you God?
17              THE WITNESS:  I do.
18              THE CLERK:  Thank you.  You may be seated.  State
19    your full name for the record and spell your last name.
20              THE WITNESS:  Brent David Person, P-e-r-s-o-n.
21              THE CLERK:  Thank you.
22                         DIRECT EXAMINATION
23    BY MR. PORTER:
24    Q    Mr. Person, where do you currently work?
25    A    I currently work for CMS.  That's the Centers for Medicare
```

UNITED STATES DISTRICT COURT

```
 1   & Medicaid Services.
 2   Q    And can you explain to the jury what CMS is and what it
 3   does.
 4   A    CMS administers the Medicare and the Medicaid program, the
 5   federal Medicare program and then the State-run Medicaid
 6   program.  California is called Medi-Cal.
 7   Q    What is your position with CMS?
 8   A    I'm currently -- I'm in a small office in Santa Ana, and I
 9   am a senior investigator in -- for CMS.
10   Q    As a senior investigator what are some of your
11   responsibilities?
12   A    We have -- we develop our own investigations out of our
13   office.  We do a lot of data analysis.  We conduct
14   investigations.  We have contractors that also work for
15   Medicare that conduct investigations, and we do a lot of
16   contract oversight and working with our contractors to do the
17   investigations.
18   Q    How long have you personally worked for CMS?
19   A    I've been with CMS for ten years.
20   Q    And before working for CMS, did you work for the Medicare
21   program or any entities affiliated with the Medicare program?
22   A    I did.  For about 14 years prior to that, I worked for one
23   of the contractors, a Medicare contractor doing various medical
24   review and fraud investigations and that sort of thing.
25   Q    Is it fair to say that, based on your experience working
```

1    at CMS, plus your experience before that working with CMS, that

2    you are very familiar with the Medicare program?

3    A    Yeah, I am.

4    Q    Okay.  So based on your knowledge of the Medicare program,

5    how is the Medicare program funded?

6    A    It's funded entirely through our paychecks.  It's taken

7    out as taxes out of our -- out of our paychecks.

8    Q    Can you explain to the jury how the Medicare program is

9    structured in terms of the different parts that Medicare is

10   divided into.

11   A    Sure.  Medicare is divided basically into four parts in

12   terms of benefit payments, and they're lettered A, B, C, and D.

13        Part A is what we call -- we refer to as hospital

14   insurance.  That's institutional claims.  When Medicare

15   patients are in the hospital or a skilled nursing facility,

16   that's all covered under Part A.

17        Part B is the big piece of Medicare.  That's what we call

18   professional services.  That's when you go see a doctor, office

19   visits.  It's lab work, diagnostic tests.  It's medical

20   equipment.  It's that -- that sort of thing, what we call

21   professional-type services.

22        Part C is our -- the managed care piece of Medicare.

23   That's when a beneficiary elects to have an HMO.

24        And then Part D is the prescription drug piece of

25   Medicare.

1  Q    What individuals are covered by Medicare?

2  A    For the most part, it's those individuals that have worked

3  and paid into the system, and they're -- they've reached the

4  age of 65, and they become covered Medicare beneficiaries.

5  Q    And in addition to individuals who are 65 and older, are

6  other people covered by Medicare?

7  A    Yeah.  We have disabled individuals.  After you are

8  completely disabled for a certain period of time, you become

9  eligible for Medicare.  Also, people that are on dialysis,

10  renal dialysis that have kidney problems are covered under

11  Medicare.

12  Q    And the people that receive Medicare benefits, are they

13  referred to as Medicare beneficiaries?

14  A    They are.

15  Q    You mentioned Part B of the Medicare program.  Is durable

16  medical equipment covered under Part D -- Part B?  Excuse me.

17  A    It's covered under Part B, right.

18  Q    Can you explain to the jury what are some types of medical

19  equipment that comes within that category of durable medical

20  equipment, or DME for short?

21  A    Sure.  It covers a wide assortment.  Typically we say any

22  medical item that could be used over and over.  For example, a

23  hospital bed or a cane, crutches, arm supports, those types of

24  things, things that are pieces of equipment that can be used

25  over and over again.

```
 1   Q    So that DME that you just described, who actually provides
 2   that DME to the Medicare beneficiaries?
 3   A    We have what we call DME suppliers that -- that provide
 4   the equipment to Medicare beneficiaries.
 5   Q    And if a company wants to become a DME supplier and be
 6   able to bill Medicare, what is the process that the company has
 7   to go through in order to become enrolled?
 8   A    To be a Medicare DME supplier, they have to submit an
 9   enrollment application to Medicare.
10   Q    How would a DME supplier find the enrollment application
11   that they have to fill out?
12   A    Nowadays it's on-line.  You can download it, or you can do
13   it on-line.
14   Q    So once they fill that out, the enrollment application,
15   where is that then submitted?
16   A    It's submitted to a contractor that we use to enroll DME
17   suppliers.  And that contractor, the company is Palmetto, and
18   they're known as the national supplier clearinghouse.
19   Q    So once they submit that application, they're approved to
20   be a Medicare supplier.  How is that DME supplier then
21   identified down the road when they submit claims to Medicare?
22   A    Once the application is submitted and processed, it takes
23   a length of time to check everything.  But once it's completed
24   and it's approved, then the DME supplier is issued a provider
25   identification number.
```

1    Q     And that provider identification number, is that unique to

2    that one specific supplier?

3    A     Correct.  It's how Medicare identifies that one supplier.

4    Q     Okay.  So, Mr. Person, if you can look here to this item

5    to my left which has been marked as Government's Exhibit 2, can

6    you explain to the jury what this item is here.

7    A     It looks like what we typically call a power wheelchair.

8    It's a motorized battery-powered wheelchair that's controlled

9    by the little joystick thing on the -- on the armrest.

10   Q     And so this power wheelchair that's been identified as

11   Government's Exhibit 2, is that substantially similar to the

12   type of a power wheelchair that a DME supplier would seek

13   reimbursement from Medicare?

14   A     Yeah.  That's the typical type of wheelchair.

15   Q     Okay.  So we talked about how a supplier becomes enrolled.

16   They have to submit an enrollment application.  But after they

17   become enrolled, and then they want to submit claims to

18   Medicare for reimbursement, can you explain to the jury what a

19   DME supplier has to do before they can submit a claim to

20   Medicare for reimbursement.

21   A     Well, what starts the process is -- is obviously for a

22   beneficiary to provide it to.  The beneficiary sees a doctor,

23   the doctor writes a prescription, and that begins the process

24   to supplying the wheelchair to the beneficiary.

25   Q     So beneficiary goes to their doctor?

**UNITED STATES DISTRICT COURT**

1    A      Uh-huh.

2    Q      Get a prescription, and then they take that prescription

3    to a DME supplier?

4    A      That's correct.

5    Q      Does the DME supplier have to actually provide that

6    service before they can submit a claim for reimbursement?

7    A      They have to provide the equipment.  Correct.

8    Q      Okay.  And that DME that the supplier provides, does that

9    DME have to be medically necessary for Medicare to pay for it?

10   A      It does.  We don't pay for anything that's not medically

11   necessary.

12   Q      Why is that?

13   A      Well, the Medicare trust fund is a limited fund.  It's

14   like all of our bank accounts.  We need to preserve it so that

15   it's there when it's needed by the beneficiaries that qualify

16   for Medicare.

17   Q      In terms of determining whether something is medically

18   necessary, does Medicare publish coverage criteria specifically

19   with respect to power wheelchairs?

20   A      We -- we -- Medicare publishes it on the government Web

21   site, Medicare's Web site, as well as our contractors issue a

22   lot of publications and updates and educational-type material

23   to the suppliers.

24   Q      So those coverage criteria for power wheelchairs, here in

25   Southern California where would those be located?

1    A    Easiest place to find would be on the Internet.

2    Q    Are you familiar with the local coverage determinations?

3    A    For the power wheelchairs, yes.

4    Q    Let's -- can you -- if you can turn to Exhibit 3 in the

5    binder, I believe there are binders behind you.

6    A    Oh.

7    Q    It would be the first volume, Exhibit 3.

8    A    Okay.

9    Q    Looking at Exhibit 3, do you recognize that document?

10   A    Yes, I do.

11        MR. PORTER:  Your Honor, the parties have a

12   stipulation regarding this document at this time.  I would move

13   to introduce Government's Exhibit 3.

14        THE COURT:  So stipulated?

15        MR. DARDEN:  So stipulated, Your Honor.

16        THE COURT:  Okay.  It may be received, and you may

17   publish.

18        (Exhibit 3 received into evidence.)

19   Q    BY MR. PORTER:  Let's put Exhibit 3 up on the screen here,

20   Exhibit 3, page 3.  And there are some highlighted portions

21   here, if we can blow up the highlighted portions so we can see

22   it a little more clearly.  There we go.

23        So looking at this document, does this document explain

24   when Medicare will cover or pay for a power wheelchair?

25   A    It does, yes.

1   Q    And based on your experience, does this accurately reflect

2   those conditions under which Medicare would pay for a power

3   wheelchair?

4   A    It does, yes.

5   Q    Okay.  So looking here, the first subsection (a), can you

6   explain what it sets out there in subsection (a).

7   A    Basically it says that -- that the patient must have what

8   we call a mobility limitation.  It's a -- something that

9   impairs their activities of daily living.  They can't get

10  around their house.  They can't go to the bathroom.  They can't

11  go to the bedroom or the kitchen to cook food.  If they have a

12  limitation in one of those areas, that would be a start for

13  consideration for a wheelchair.

14  Q    So the mobility related activities of daily living, are

15  those also called ADLs?

16  A    They are.

17  Q    So those activities of daily living, the ADLs, are those

18  inside the home or outside the home?

19  A    It's inside the home.

20  Q    Is Medicare going to pay for a power wheelchair if someone

21  just wants to use it outside?

22  A    No.  It's strictly for inside the home.

23  Q    If we go down to Subsections B and C that are highlighted

24  there, can you explain what is set forth there in those

25  subsections.

```
 1  A     Yeah.  B and C, they -- the --
 2            THE COURT:  Counsel, you may want to enlarge that if
 3  you can.  I don't know if you can or not.
 4            MR. PORTER:  Yes, Your Honor.  We'll see if we can.
 5            THE COURT:  Okay.
 6            THE WITNESS:  Medicare coverage is based on the
 7  least costly method to handle the mobility limitation.  And so
 8  this is saying that -- that the use of a cane or a walker must
 9  first be ruled out.  And if a cane or walker can't be used,
10  then the use of a manual wheelchair must first be ruled out.
11  And if the patient isn't able to use any of that type of
12  equipment, then we can consider a power wheelchair.
13  Q     So if the beneficiary can use a cane to get around, is
14  Medicare going to pay for a power wheelchair?
15  A     No.
16  Q     If they can use a walker to get around, is Medicare going
17  to pay for a power wheelchair?
18  A     No.
19  Q     If they can use a manual wheelchair, one they can push
20  themselves, is Medicare going to pay for an expensive power
21  wheelchair?
22  A     Not if they can use a manual wheelchair, no.
23  Q     Based on this criteria, is it fair to say that a power
24  wheelchair is an option of last resort?
25  A     It is.  Once patients get into a power wheelchair, they
```

UNITED STATES DISTRICT COURT

1    don't tend to get out.  That's why we like to see those

2    prescribed only if it's -- it's absolutely necessary.

3    Q    So these coverage rules, where are these coverage rules

4    published again?

5    A    They're published on our contractor's Web site as well as

6    on Medicare's Web site.

7    Q    Okay.  You also mentioned that the supplier has to deliver

8    the power wheelchair to the beneficiary before they can bill

9    Medicare.

10   A    That's correct.

11   Q    So in the case of a power wheelchair, is there anything

12   that the DME supplier is supposed to do when they deliver the

13   item in terms of paperwork that they have to fill out before

14   they can bill Medicare?

15   A    There's one item specifically that -- that has to be

16   completed when they deliver the wheelchair, even before they

17   deliver the wheelchair.  It's called an environmental

18   assessment, and they have to make sure that this power

19   wheelchair, which is rather large, can be used by the

20   beneficiary and can be used within their home.

21        They might have doorways or they might have stairs or they

22   might have something else within the house that they simply

23   won't be able to use as power wheelchairs.  So that assessment

24   has to be done, and it must be documented in the record.

25   Q    And that home assessment, is that part of the coverage

```
 1  criteria that we were looking at just a second ago?
 2  A    It's part of the criteria, yes.
 3  Q    And that home assessment form, is the DME supplier
 4  required to keep a copy of that completed form in their
 5  records?
 6  A    They are.
 7  Q    Is the information on that home assessment form required
 8  to be true and accurate?
 9  A    Yes, it is.
10  Q    If Medicare was to find out a supplier was putting false
11  information on one of those home assessment forms, would
12  Medicare pay for that claim?
13  A    If we know it, we wouldn't pay for that claim.
14  Q    Now, the majority of claims that are submitted to
15  Medicare, are they submitted manually by paper or
16  electronically?
17  A    Nowadays the majority are submitted electronically.
18  Q    And how does that occur, the electronic submission of
19  claims?
20  A    Usually one or two ways.  The Medicare provider might have
21  their own software that they submit directly to Medicare, or
22  there will be a billing service that collects the claims from
23  the providers or suppliers and submits them as a batch to
24  Medicare.
25  Q    And when a claim is submitted, is there a standard form
```

UNITED STATES DISTRICT COURT

```
 1   that a supplier has to fill out and use in order to submit a
 2   claim for reimbursement to Medicare?
 3   A    Yeah.  The claim, whether it's on paper or electronic,
 4   it's based on a standard claim form, the fields.  That needs to
 5   be filled out and completed.  It's based on a standard form.
 6   Q    So if you could please turn to Exhibit 1 in the binder in
 7   front of you.
 8        And, Your Honor, I believe the parties have a stipulation
 9   regarding this document.
10             THE COURT:  That is?  That it be admitted, you mean?
11             MR. PORTER:  Yes, Your Honor, that this document --
12             THE COURT:  Any objection to it being admitted?
13             MR. DARDEN:  Nope.  Sorry.  No objection, Your
14   Honor.
15             THE COURT:  Thank you, Counsel.  It may be admitted
16   and published.
17             (Exhibit 1 received into evidence.)
18   Q    BY MR. PORTER:  Okay.  So Exhibit 1, looking at this
19   document, what is this document?
20   A    It's what we refer to as a CMS 1500 claim form.
21   Q    What purpose does this claim form serve?
22   A    It's the basis for filing a claim with Medicare --
23   actually, any insurance company.  It identifies who the patient
24   is, who the provider is, dates, and then the type of equipment
25   or service that's being billed and requested -- reimbursement
```

1  is being requested for.

2  Q    Okay.  So let's look at a couple fields here on this form.

3  So the first is field A -- or sorry.  1 at the very top?

4  A    Uh-huh.

5  Q    What information is requested there in that -- in that

6  area?

7  A    That's the type of insurance.  So they should check off

8  whatever type of insurance they're billing with this -- this

9  form.

10  Q    And then right next to that, there's Section 1-A.  What is

11  that information?

12  A    It says the insured's I.D. number.  That's -- Medicare's

13  case, that's the number that Medicare identifies the patient

14  by.

15  Q    So Medicare beneficiary's I.D. number?

16  A    Correct.

17  Q    Okay.  So now let's go and let's look down at 2 through 13

18  here.  Can you explain what information generally -- without

19  going through every single area here, what information is

20  requested in fields 2 through 13?

21  A    It's basically the patient's information.  We've got the

22  beneficiary's address, telephone number, policy numbers, date

23  of birth, and that type of information, insurance information.

24  Q    Okay.  Now, if we could zoom out, take this off the

25  screen, let's go back to the form.

1        Now, let's highlight Item 24.  Okay.  Item 24, what

2   information is requested there on Item 24?

3   A    This would identify the equipment that's being billed.

4   It's -- the date of service would be the date the equipment is

5   delivered.  There's a place of service.

6        Procedure codes, that's what we use to identify the type

7   of equipment, and that's what we base payment on.  That's

8   called a HCPCS code.

9        The modifiers, those are codes that are added just to tell

10  Medicare something about the equipment, whether it's rental or

11  purchase or something like that.

12       There's a diagnosis code that goes, and then there's

13  charges, what the provider is charging for that piece of

14  equipment.

15  Q    So the procedure codes, does each piece of DME have its

16  own unique code?

17  A    It does, yes.

18  Q    For a power wheelchair, what is the procedure code for a

19  power wheelchair?

20  A    Typical power wheelchair similar to that one is a K0823.

21  Q    Okay.  And what role does that procedure code play in

22  determining how much the supplier is going to be reimbursed?

23  A    If the claim is approved, then that code tells us how much

24  to pay, and it tells the supplier how much to expect in payment

25  from Medicare.

```
 1   Q    Okay.  And can you give us some general idea of the -- how
 2   much a supplier would be reimbursed for a power wheelchair?
 3   A    Roughly the typical type of wheelchair, it's about $5,000,
 4   depending on accessories.  Sometimes they bill it with extra
 5   batteries or footrests, but roughly about $5,000.
 6   Q    Based on that number, $5,000, is it fair to say that a
 7   power wheelchair is a pretty big ticket item --
 8   A    It is.
 9   Q    -- for Medicare?
10   A    It is, yes.
11   Q    Now, at a certain point, though, did Medicare change so
12   that it would only pay for a rental fee for a power wheelchair
13   instead of paying the full amount up front?
14   A    That's correct.
15   Q    And approximately when did that change happen?
16   A    That was the begin -- January 2011 when we started that.
17   Q    So how did that change then change how the suppliers were
18   reimbursed for a power wheelchair?
19   A    Well, they were billed -- power wheelchairs were billed as
20   rental items so that we wouldn't pay one lump sum up front.  We
21   would pay what we call a rental amount for 13 months; so it
22   would be a portion of that total amount, roughly a 13th of that
23   total amount.
24   Q    Why did Medicare make that change in early 2011?
25        MR. DARDEN:  Objection.  Irrelevant.
```

1          THE COURT:  Sustained.

2    Q    BY MR. PORTER:  Okay.  So after that change, though, from

3    the full reimbursement amount to the rental program, did the

4    same coverage criteria that we spoke about earlier in terms of

5    the walker, the cane, the manual wheelchair -- did that same

6    coverage criteria stay in effect?

7    A    It did.  Nothing changed as far as coverage criteria.

8    Q    Okay.  So going back to the form we were just looking at,

9    if we can go down to Section 31 there, which is highlighted,

10   and we all see the words there, "Signature of physician or

11   supplier, including degrees or credentials."  And it says, "I

12   certify that the statements on the reverse apply to this bill

13   and are made a part thereof."

14        When a DME supplier is submitting a claim to Medicare, who

15   signs this part of the form?

16   A    It would be the person responsible for submitting the

17   claim, which is usually the owner of the company.

18   Q    Now, let's go to page 2 of this form.  Now, there are a

19   couple lines highlighted down there, if we can blow those up.

20   It's a little bit hard to see, but the first one says, "I

21   certify that the services listed above were medically

22   necessary -- medically indicated and necessary to the health of

23   this patient and were personally furnished by me or my employee

24   under my personal direction."

25        So what is the purpose of this certification on the claim

1   form?

2   A    Well, it's -- it's an assurance to Medicare that the claim

3   is for a valid piece of equipment.  It's for something that is

4   covered and that it's been delivered and that all the

5   requirements of Medicare have been met.

6   Q    And just below that portion, it says, "Note, this is to

7   certify that the foregoing information is true, accurate,

8   complete."  It says, "I understand that payment satisfaction of

9   this claim will be from federal and state funds and that any

10  claims, statements or documents, or concealment of material

11  fact may be prosecuted under federal or state law."

12       What is the purpose of that certification?

13  A    Well, it's -- again it's an attestation that the

14  individual responsible for this claim knows what the penalties

15  are for submitting a false claim or a claim that isn't true.

16  Q    Okay.  So why do suppliers submit these claims to

17  Medicare?

18  A    Why do suppliers submit them to Medicare?  They submit

19  them to receive payment.

20  Q    Once a claim is submitted, and all the information on this

21  electronic form, is that captured and stored electronically by

22  Medicare?

23  A    It is, yes.

24  Q    And if that -- if that claim is paid, is payment then

25  issued to the supplier?

```
 1  A     It is.
 2  Q     And does Medicare reimburse the supplier electronically or
 3  by check?
 4  A     Again, these days it's mainly electronically.
 5  Q     And if the funds are deposited electronically, how does
 6  Medicare know where to send the money?
 7  A     Well, the supplier tells us.  There's another agreement or
 8  there's another form that's submitted that tells us their bank
 9  account and where they want the money deposited.
10  Q     Does Medicare maintain a record of every single claim
11  that's submitted?
12  A     Yes.
13  Q     And every single claim that's paid?
14  A     Yes.
15  Q     Do you have any idea how many claims are received and
16  processed on a daily basis by Medicare?
17  A     In 2014 there was over 5 -- I'm sorry.  It's about
18  4 million a day, little over 4 million a day.
19  Q     As a result, as a result of that large volume, is Medicare
20  able to prescreen every single claim before they make payment
21  on those claims?
22  A     No.
23  Q     As a result of that volume, does Medicare require the
24  suppliers to provide all supporting documentation up front with
25  every single claim?
```

```
1    A     No.

2    Q     Why is that?

3    A     The claims would never get processed.  If everything was

4    mailed in along with the documentation that supports it, we

5    would never be able to process the claims.

6    Q     So to what extent is the Medicare program then a

7    trust-based system?

8    A     I would say it's a hundred percent based on trust.

9    Q     What do you mean by that?

10   A     Well, we -- we rely on the claim and the statements on the

11   back of that claim that suppliers and any -- any provider that

12   submits a claim to Medicare, we rely on their statement that

13   what's on the front of that claim is true and accurate.

14   Q     Okay.  Let's discuss some of the Medicare documentation

15   related to Ezcor-9000.  The first document I want to look at is

16   Government's Exhibit 4.

17         And, Your Honor, I believe we have a stipulation regarding

18   Government's Exhibit 4, and I would move at this time to admit

19   Exhibit 4 into evidence.

20             THE COURT:  Any objection?

21             MR. DARDEN:  May I have one moment, Your Honor.

22             THE COURT:  Sure.

23             MR. DARDEN:  No objection, Your Honor.

24             THE COURT:  It may be received and published.

25                  (Exhibit 4 received into evidence.)
```

1  Q     BY MR. PORTER:  Let's look at page 1 of Exhibit 4.

2  Exhibit 4, page 1.  So looking at Exhibit 4, what is this

3  document?

4  A     This is a -- it's an enrollment application, an initial

5  enrollment application for a DME supplier.

6  Q     So looking at that highlighted portion, that suggests this

7  is the initial application for the supplier?

8  A     Correct.

9  Q     Let's go to page 3 of this document.  So looking at this

10  page, what's the name of this company that the application was

11  for?

12  A     The company name is Ezcor-9000, Inc.

13  Q     What type of supplier was Ezcor-9000?

14  A     Type of supplier, medical supply company.

15  Q     Okay.  So let's go to page 15 of this document, Exhibit 4,

16  page 15.  Does this document identify the owners of the

17  company?

18  A     Yes.  It identifies -- yes, it does.

19  Q     So on this page, page 15, who is listed here?

20  A     It lists Walter C. Eze.

21  Q     What is this individual's role at the company?

22  A     They have as title here, director/owner.

23  Q     Okay.  Let's go next to page 17 of this document.  So does

24  the document list another person who is an owner of the

25  company?

1    A      Yes, it does.  This one lists Sylvia Walter-Eze.

2    Q      What is her role, Sylvia Walter-Eze's role at Ezcor?

3    A      They list her as an owner, partner, and managing employee.

4    Q      Let's go to page 23.  So an enrollment application, do

5    enrollment applications contain certain certification

6    statements?

7    A      That's correct.

8    Q      So if we look first at Section 3 that's highlighted there,

9    can you explain what's set forth there in Section 3.

10   A      Section 3 is a certification statement, among others,

11   that -- that states that the signer of this document agrees to

12   abide by all Medicare laws and regulations and that they

13   understand that the payment for the claim is based on the

14   underlying transaction being in compliance with -- with all the

15   Medicare laws and regulations, which includes the federal

16   Anti-Kickback statute and the Stark law.

17   Q      And Section 3 here, what is set forth there in section --

18   sorry.  Section 6, excuse me.

19          What is set forth in Section 6?

20   A      Again, it's a certification statement saying that the

21   signer will not -- will not knowingly or willingly present or

22   cause to be presented a false or fraudulent claim.

23   Q      Why are these provisions included in the enrollment

24   applications?

25   A      Well, again, Medicare is based on trust.  We enroll

1    providers and suppliers, and we obtain these certifications in

2    an effort to make sure that the claims that are submitted are

3    true and honest and accurate claims.

4    Q     If we take that magnification off the screen, whose name

5    is listed at the bottom of the certification statement?

6    A     This lists Walter C. Eze.

7    Q     Let's go next to page 25 of this document where it says

8    "delegated official" there.  So the sentence that's highlighted

9    says, "By his or her signature, the delegated official

10   certifies that he or she has read the certification statement

11   in Section 15 and agrees to adhere to all of the stated

12   requirements."

13        So is that saying they agree to the certification we just

14   looked at?

15   A     That's correct.

16   Q     And then below that, whose name is listed here?

17   A     That has Sylvia O. Walter-Eze.

18   Q     And does this certification include the certification to

19   comply with Medicare rules and not to pay kickbacks?

20   A     Yes.

21   Q     Does it include certification not to present false claims

22   to Medicare?

23   A     Yes.

24   Q     What's the date on this original enrollment application?

25   A     This one is dated August 29, 2003.

```
 1   Q    Okay.  Let's look at the next enrollment application.
 2        Your Honor, I believe there is a stipulation regarding
 3   Government's Exhibit 5, and I would move that into evidence at
 4   this time.
 5              THE COURT:  Any objection?
 6              MR. DARDEN:  No objection, Your Honor.
 7              THE COURT:  It may be received.
 8                  (Exhibit 5 received into evidence.)
 9   Q    BY MR. PORTER:  So looking at Exhibit 5, page 1, quickly.
10   Okay.  So what is this document?
11   A    It's a similar -- same document, Medicare enrollment
12   application for DME supplier.
13   Q    Let's go to page 5 of this exhibit.  So on page 5 here,
14   what does it indicate the purpose of this application is?
15   A    This indicates that they're changing something on the
16   original application.
17   Q    Okay.  So let's now go to the ownership section of this
18   application on page 21.  So page 21, who is listed as the owner
19   of Ezcor?
20   A    This lists Sylvia O. Walter-Eze.
21   Q    And what is Sylvia Walter-Eze's title or role at the
22   company?
23   A    They have the roles checked as owner, partner, managing
24   employee, and then they've written in chief executive officer.
25   Q    And what's the date of this application?
```

1    A     That's April 13, 2007.

2    Q     And on this application from April of 2007, is Walter Eze

3    listed as an owner?

4    A     I don't know if he's -- I don't believe he's listed, but

5    I'd have to look through all the pages.

6    Q     Let's go next to the certification.  So let's go quickly

7    to page 24.  All right.  These are some of the certifications

8    that were in the other application; is that right?

9    A     They are the same, yes.

10   Q     Page 25, page 26, and then page 27, and there's some

11   highlighted there on page 27.  We're not going to go through

12   all of these, but these are similar to the certifications we

13   looked at on the 2003 application?

14   A     They are, yes.

15   Q     Now, let's go to page 28 of this application.  And do you

16   see the name of Sylvia Walter-Eze there?

17   A     Yes.

18   Q     So by signing this, did they affirm those certification

19   statements that we just went through?

20   A     She did, yes.

21   Q     And if we zoom out a little bit there, is -- is Walter Eze

22   listed on this page?

23   A     He is also listed, yes.

24   Q     Let's take that off the screen.  Okay.  He's listed there.

25   Is he listed as the second authorized official?

1    A    That's correct.

2    Q    Who is listed as the first authorized official?

3    A    That would be Sylvia Walter-Eze.

4    Q    Okay.  So after this 2007 application, was there one more

5    application to Medicare?

6    A    There was, yes.

7            MR. PORTER:  Your Honor, I believe the parties have

8    a stipulation regarding Government's Exhibit 6, and I would

9    move that into evidence at this time.

10            THE COURT:  Any objection?

11            MR. DARDEN:  No, Your Honor.

12            THE COURT:  It may be received and published.

13            (Exhibit 6 received into evidence.)

14    Q    BY MR. PORTER:  Okay.  Exhibit 6, go to page 1.  Is this

15    another enrollment application?

16    A    It is, yes.

17    Q    Let's go to page 6.  What's the purpose of this enrollment

18    application here?

19    A    This is what we call a revalidation of their Medicare

20    enrollment.

21    Q    Why would a provider revalidate their Medicare enrollment

22    application?

23    A    At the time, DME suppliers were required to revalidate

24    their enrollment every three years.

25    Q    Okay.  So they needed to revalidate in order to continue

1    to be able to bill Medicare?

2    A    That's correct.

3    Q    Let's go to page 24 of this document.  What's the date of

4    this application?

5    A    The date is March 16th, 2012.

6    Q    And who is listed as the owner of Ezcor?

7    A    Ownership, this is Sylvia O. Walter-Eze.

8    Q    Let's go to the next page, 24.  So does this

9    application -- we'll skip page 24.

10        Then let's look at pages 30, page 31, page 32, page 33.

11   Are those similar certification statements that we looked at on

12   the previous two applications?

13   A    They are, yes.

14   Q    And if we go to page 34, whose name is listed as signing

15   this application?

16   A    That is Sylvia Walter-Eze.

17   Q    And what's the date on this application?

18   A    That is March 21, 2012.

19   Q    Okay.  And on this certification statement on this page,

20   did anyone else sign this?

21   A    No.  That's the only signature.

22   Q    Okay.  So we talked about the enrollment applications.

23   Now let's talk a little bit about how DME companies get paid by

24   Medicare.  So first I want to talk about Government's

25   Exhibit 7.

1        Your Honor, I believe the parties have a stipulation

2   regarding Exhibit 7, and I would move Government's Exhibit 7

3   into evidence at this time.

4            MR. DARDEN:  No objection.

5            THE COURT:  It will be received.  You may publish.

6              (Exhibit 7 received into evidence.)

7   Q    BY MR. PORTER:  Looking at Exhibit 7, page 1, can you

8   please explain to the jury what this document is.

9   A    Yeah.  This is an agreement for electronic funds transfer,

10  or EFT.

11  Q    And what does this tell Medicare?

12  A    This is the form that -- that a Medicare supplier submits

13  to tell Medicare where to -- to send their money to, what --

14  what their bank account is basically.

15  Q    Okay.  And if we look at this page, the first page of this

16  document, what company is this EFT for?

17  A    It is for Ezcor Medical Supply.

18  Q    And what bank account is this EFT directing Medicare to

19  send the reimbursements to?

20  A    It's Bank of America in Valencia, and the last four digits

21  of the account is 2800.

22  Q    Okay.  So let's go to the second page of this document,

23  and here on the signature line, who is listed as the official

24  for Ezcor?

25  A    That is Sylvia Walter-Eze.

1    Q     What's the date of this application?

2    A     August 23, 2006.

3    Q     Did anyone other than the defendant Sylvia Walter-Eze sign

4    this form?

5    A     No.

6    Q     And so as a result of this application, where would

7    Medicare send the Medicare money to?

8    A     To that bank account, that Bank of America bank account.

9    Q     Okay.  Let's look next at Government's Exhibit 8.

10         Your Honor, I believe the parties have a stipulation

11   regarding Exhibit 8, and I would move that into evidence at

12   this time.

13              MR. DARDEN:  No objection, Your Honor.

14              THE COURT:  Be received.

15                 (Exhibit 8 received into evidence.)

16   Q     BY MR. PORTER:  Exhibit 8, page 1.  Is this another EFT

17   agreement for Ezcor?

18   A     That's another agreement, yes.

19   Q     Let's go to the second page here.  Whose name is listed on

20   the signature line of this page?

21   A     Sylvia Walter-Eze.

22   Q     In what capacity?

23   A     As the CEO.

24   Q     What's the date of this application?

25   A     January 11, 2010.

1    Q     If we go back one page to Exhibit 8, page 1, where does

2    this direct the money to?

3    A     This is to a Capital One bank account in Houston, Texas.

4    The last four digits of the account are 4585.

5    Q     Now, you mentioned earlier that most Medicare providers

6    submit claims to Medicare electronically; is that right?

7    A     That's correct.

8    Q     When they do that, in order to have the ability to submit

9    claims electronically, do they have to fill out any type of

10   agreement?

11   A     We have another agreement called EDI, or electronic data

12   interchange agreement, that they need to submit in order to

13   submit claims electronically.

14         MR. PORTER:  Your Honor, the parties have a

15   stipulation regarding Government's Exhibit 9.  I would move

16   that into evidence at this time.

17         MR. DARDEN:  No objection, Your Honor.

18         THE COURT:  It will be received.

19         (Exhibit 9 received into evidence.)

20   Q     BY MR. PORTER:  So looking at Exhibit 9, page 1, is this

21   the EDI you were referring to?

22   A     That is, yes.

23   Q     Let's look at the first section that has been highlighted

24   here.  What is that -- what's the supplier agreeing to there?

25   A     It states the provider agrees that it will be responsible

1    for all Medicare claims submitted to CMS by itself, its

2    employees, or its agents.

3    Q     Now, if we go down to Section 8, which has also been

4    highlighted, what are they agreeing to there?

5    A     The supplier agrees that it will submit claims that are

6    accurate, complete, and truthful.

7    Q     And if we go to page 3 of this exhibit, Exhibit 9, page 3,

8    what's the date on this?

9    A     The date of the signature here is March 19, 2004.

10   Q     Let's go next to Exhibit 11.

11         Your Honor, the parties have a stipulation regarding

12   Government's Exhibit 11, and I would move that into evidence at

13   this time.

14              MR. DARDEN:  May I have one moment, Your Honor.

15              THE COURT:  Certainly.

16              MR. DARDEN:  No objection, Your Honor.

17              THE COURT:  It may be received.

18              (Exhibit 11 received into evidence.)

19   Q     BY MR. PORTER:  So prior to trial did you have the

20   opportunity to review the claims data for the claims that Ezcor

21   submitted to Medicare?

22   A     I did.

23   Q     Now, looking at the claims data contained in Exhibit 11,

24   can you please tell the jury what type of durable medical

25   equipment, or DME, the defendant's company primarily submitted

1   claims to Medicare for.

2   A     Primarily the -- the -- it was for power wheelchairs.

3   They also submitted claims for hospital beds and I believe

4   ankle and back braces.

5   Q     Okay.  And ultimately how much did Ezcor submit in claims

6   to Medicare from the first -- January 1st, 2007, through May of

7   2012?

8   A     It was approximately $3.4 million.

9   Q     And based on that amount, how much did Medicare pay Ezcor

10  on those claims?

11  A     Medicare paid roughly $1.8 million.

12  Q     Okay.  So obviously some discrepancy there between

13  3.4 million and 1.8 million.  Can you explain why there would

14  be that type of discrepancy.

15             MR. DARDEN:  Objection, Your Honor.  Irrelevant.

16             THE COURT:  At this time, ladies and gentlemen,

17  we're going to be taking a break anyway because it is 2:30.

18  We're going to have you come back in, in 15 minutes.  We'll

19  take it up at that time.  And we'll be breaking at 4:00; so you

20  can make your arrangements accordingly.  I'm going to be

21  talking to the attorneys a little bit here; so leave quietly,

22  please.

23             THE CLERK:  All rise.

24             (Jury out at 2:30 P.M.)

25             (The following proceedings were held out of the

**UNITED STATES DISTRICT COURT**

1          presence of the jury:)

2          THE COURT:  Record will reflect all the jurors have

3    left the courtroom.  The objection was to the question as to

4    what is the difference between what is being billed and what

5    was paid?

6        And your question was why is there a difference?

7          MR. PORTER:  Yes, Your Honor.

8          THE COURT:  Is that the -- the objection?

9          MR. DARDEN:  Yes, Your Honor.

10         MR. PORTER:  Simply, Medicare pays 80 percent of

11   claims that are submitted.  There can also be claims that are

12   denied.  It's just a simple, general description.

13         THE COURT:  You could ask it generally, not as to

14   this claim, but you can ask, are all claims paid a hundred

15   percent or not?  If not, why?

16         MR. PORTER:  Okay.

17         MR. DARDEN:  Thank you, Your Honor.

18         THE COURT:  Thank you.  We'll be in recess.

19             (Recess taken.)

20             (Jury in at 2:47 P.M.)

21             (The following proceedings were held in the

22             presence of the jury:)

23         THE COURT:  The record will reflect that all the

24   members of the jury are in their respective seats in the jury

25   box.  The witness is on the witness stand.

1      Counsel, you may continue.

2  Q    BY MR. PORTER:  Before the break, Mr. Person, you had

3  noted that there's a discrepancy between the amount that was

4  billed to Medicare and the amount that was paid to Medicare; is

5  that right?

6  A    That's correct.

7  Q    Now, without going into the specifics of this specific

8  company, can you explain in general to the jury why there might

9  be a difference between the billed amount and the paid amount.

10 A    Usually the paid amount is less than what is billed.  A

11 company can bill basically whatever they want, but we pay based

12 on the procedure code that they bill.  So we have an allowed

13 amount that we will allow for that piece of equipment or that

14 service, and we pay 80 percent of that allowed amount.  So we

15 always knock that down 20 percent.

16      And there's also claims that are denied.  There are

17 patients that aren't eligible for Medicare.  So those all

18 equate to denials, and that makes the paid amount much smaller

19 than the billed amount.

20 Q    Going back to the enrollment applications, the three

21 enrollment applications that we've looked at, all of those

22 documents contain certain certification statements; is that

23 right?

24 A    That's correct.

25 Q    And certain of those certification statements we looked at

1   were signed by the defendant; right?

2   A     That's correct.

3   Q     And in those certification statements, what was the

4   defendant certifying?

5   A     Basically that claims submitted by her were truthful and

6   accurate and contained no false statements or false

7   information.

8   Q     And was the defendant certifying that the power

9   wheelchairs were medically necessary?

10  A     Yes.

11  Q     To what extent was Medicare relying on that certification

12  by the defendant?

13  A     Medicare relies on that 100 percent.

14  Q     Can you explain the significance of that.

15  A     Well, we get a claim.  As I said before, we get over

16  4 million claims a day; so we can't verify each one.  They're

17  submitted into our Medicare system.  There's certain edits that

18  are performed on the claims, and if those edits are passed,

19  then the money is paid to the provider.

20        So we rely on the fact that the claim, as submitted, is a

21  valid claim and it meets all Medicare regulations.

22  Q     So knowing that, if a DME supplier submits a claim to

23  Medicare that's not actually medically necessary, would

24  Medicare pay that claim?

25  A     If we knew it was not medically necessary, we would not

1    pay that claim.

2    Q    And if a supplier submitted a claim to Medicare based on

3    something that was procured by a kickback, would Medicare pay

4    that claim?

5    A    We would not pay that claim.

6    Q    Let's talk briefly about the Medi-Cal program and how the

7    Medi-Cal program relates to the program a little bit.  In

8    general, what is Medi-Cal?

9    A    Medi-Cal -- it's called Medicaid in the rest of the

10   country, but California is called Medi-Cal.  And that's

11   basically for individuals that are below a certain income

12   level.  The State provides -- the State and the federal

13   Government provides health care for those individuals.

14   Q    Does CMS, the agency that you work for, does it have a

15   role in administering the Medi-Cal program?

16   A    Yes.  It's -- the Medi-Cal program is approximately half

17   funded by the federal government, by CMS.  And we also have

18   oversight in how the State administers the program.

19   Q    How does the funding work?  You mentioned half federal.

20   Where does the other half come from?

21   A    The other half comes from State Medi-Cal funds that are,

22   again, taken out of paychecks.

23   Q    And who qualifies in general for Medi-Cal?

24   A    It's individuals that are below a certain income level,

25   basically.

1    Q     Are there individuals who receive both Medicare and

2    Medi-Cal?

3    A     Yes.

4    Q     And how can that happen?

5    A     Well, if you have an individual that qualifies for

6    Medicare that's over 65 years old and their income is below a

7    certain level, then they would also qualify for Medi-Cal.  And

8    in those situations, Medicare is the primary payer, and

9    Medi-Cal pays the 20 percent coinsurance.

10   Q     So in the case of a power wheelchair, how much would be

11   paid by Medicare, how much by Medi-Cal?

12   A     Medicare would pay 80 percent of the allowed amount, and

13   then Medi-Cal would pay the remaining 20 percent.

14   Q     In order for a DME supplier to be able to submit claims to

15   Medicare -- to -- excuse me -- to submit claims for

16   reimbursement to Medi-Cal, does a provider like Ezcor have to

17   submit an application?

18   A     Very similar to Medicare.  They have a Medi-Cal enrollment

19   application that has to be submitted and processed.

20          MR. PORTER:  Your Honor, the parties have a

21   stipulation regarding Government's Exhibit 10.  At this time I

22   would move Exhibit 10 into evidence.

23          MR. DARDEN:  If I can have one moment, Your Honor.

24      No objection, Your Honor.

25          MS. NKELE:  No objection.

```
 1              THE COURT:  It may be received.
 2                  (Exhibit 10 received into evidence.)
 3    Q    BY MR. PORTER:  Okay.  So let's go to Exhibit 10, page 1,
 4    and put that up on the screen.  Is this an application to
 5    Medi-Cal?
 6    A    This is a Medi-Cal enrollment application, yes.
 7    Q    And what's the date on this application?
 8    A    This is dated June 25th, 2009.
 9    Q    What company is this application for?
10    A    I'm sorry.  I've got two dates on here.  The effective
11    date of the application is April 2003.  The date it was
12    submitted is 2009.
13         The company is Ezcor Medical Supply.
14    Q    Gotcha.  So there are two dates here.
15    A    Yeah.
16    Q    The date it was submitted appears to be what?
17    A    The 2009, 6/25/2009.
18    Q    Gotcha.  Okay.
19         So let's go to page 25 of this document.  There's a
20    highlighted portion there, if we can just blow that up a little
21    bit.  Without reading the whole thing, what does this generally
22    set forth here?
23    A    It's basically like we have on the Medicare enrollment
24    application.  It's a statement that whoever is submitted this
25    document is promising to comply with all rules and regulations
```

1    as they apply to the Medi-Cal program.

2    Q    Okay.  Let's go to the next page, page 26.  And who is --

3    who is listed as signing this document on behalf of Ezcor?

4    A    It says Sylvia Walter-Eze.

5    Q    Okay.  Now, the last document I want to talk about --

6         Again, Your Honor, I believe we have a stipulation

7    regarding Government's Exhibit 12, and I would move that into

8    evidence at this time.

9              MR. DARDEN:  No objection, Your Honor.

10             THE COURT:  It may be received.

11             (Exhibit 12 received into evidence.)

12   Q    BY MR. PORTER:  So before today did you have a chance to

13   review the Medi-Cal claims data for Ezcor?

14   A    I did.

15   Q    Based on your review of that claims data, what were the

16   total amount of claims that Ezcor submitted to Medi-Cal for

17   reimbursement?

18   A    They submitted -- the total was approximately $89,000.

19   Q    And how much did Medi-Cal pay?

20   A    Medi-Cal paid approximately $73,000.

21   Q    Okay.  So that would typically be for that 20 percent

22   deductible that Medicare didn't pay?

23   A    That is correct.

24   Q    When you combine the Medi-Cal billings with the Medicare

25   billings we talked about a little while ago, what was the total

1  amount that Ezcor submitted to Medicare and Medi-Cal?

2  A     Rounded, the submitted amount would be about $3.5 million.

3  Q     And approximately how much was Ezcor paid by Medicare and

4  Medi-Cal?

5  A     About $1.9 million.

6            MR. PORTER:  No further questions, Your Honor.

7            THE COURT:  Cross-examination.

8            MR. DARDEN:  Thank you.

9                         CROSS-EXAMINATION

10 BY MR. DARDEN:

11 Q     Good afternoon, sir.

12 A     Good afternoon.

13 Q     I'm sorry.  Who did you say you worked for exactly?

14 A     We call it CMS.  It's Centers for Medicare & Medicaid

15 Services.

16 Q     And I know you described your responsibilities before, but

17 one of your responsibilities is also testifying in court; is

18 that correct?

19 A     One of my responsibilities is testifying when needed,

20 yeah.

21 Q     And you have testified a number of times in this federal

22 judicial district; true?

23 A     Yeah.  Probably six, I think.

24 Q     And you've testified in other federal districts in the --

25 in the State of California?

1    A    No.  I think this is the only one.

2    Q    So you think you've only testified six times about

3    Medicare and Medi-Cal and what's -- and what's involved in it?

4    A    I think about six trials, yes.

5    Q    And one of the things you talked about today is you talked

6    about Exhibit 2, the wheelchair here in court; correct?

7    A    Uh-huh.

8    Q    Is that right?

9    A    Yes, I did.

10   Q    And did you say that that was a typical type of

11   wheelchair?

12   A    Yes.

13   Q    And what did you mean when you indicated it was a typical

14   type of wheelchair?

15   A    It's -- size-wise, there's various sizes, and there's

16   various types of wheelchairs that lift the patient, tilt the

17   patient.  And this is the typical type that I've seen in my

18   experience.

19   Q    So in this case did you conduct an analysis of Ezcor's

20   wheelchair prescriptions to see whether or not this was a

21   wheelchair they most often delivered?

22   A    I looked at the data.  I didn't look at the prescriptions

23   themselves.

24   Q    In fact, Ezcor delivered most often some other kinds of

25   wheelchairs; is that right?

```
 1   A     I don't believe so, no.
 2   Q     Did you examine the data to see whether or not Ezcor
 3   typically delivered a wheelchair that cost much less than
 4   Exhibit 2?
 5   A     Did I examine it to see if it --
 6   Q     If they delivered wheelchairs --
 7   A     No.
 8   Q     -- that cost much less than Exhibit 2 here.
 9   A     Based on the procedure codes submitted, it was a typical
10   chair like that one.
11   Q     What does "typical" mean?  Does it mean that 50 percent of
12   the time Ezcor submitted --
13   A     The majority of the time.  Most of the wheelchairs that
14   were submitted.
15   Q     So more than 50 percent of the time?
16   A     Yes.
17   Q     75 percent of the time?
18   A     The majority of the wheelchair codes were the K0823.
19   Q     75 percent of the time?
20   A     Roughly, yeah.
21   Q     Now, you talked about the certifications that
22   Ms. Walter-Eze signed; is that right?
23   A     Uh-huh.
24   Q     You have to answer "yes" or "no."
25   A     Yes, I did.
```

1    Q     And on occasion my client would sign the certification

2    indicating that she would comply with all the rules and

3    regulations --

4    A     Yes.

5    Q     -- of Medi-Cal and Medicare; right?

6    A     Yes.

7    Q     Including anti-kickback; right?

8    A     Yes.

9    Q     And in those certifications, did they define the term, the

10   legal definition of "anti-kickback"?

11   A     No.  I think it was just said, Anti-Kickback statute.

12   Q     And then it referred to a federal law; correct?

13   A     I believe so, yes.

14   Q     And to run a DME or operate a DME, one does not have to be

15   a lawyer; correct?

16   A     That's not a requirement, no.

17   Q     Does one have to be proficient in the English language to

18   run a DME and submit claims to Medicare?

19   A     Well, you have to deal with Medicare.  They would submit

20   applications and claims and that sort of thing.

21   Q     Is there a rule or regulation anywhere in the Social

22   Security Act or anywhere that says you have to be proficient in

23   English to --

24   A     I don't believe so, no.

25   Q     When my client signed some of the certifications, she was

```
 1   required to certify that the wheelchairs, for instance, were
 2   medically necessary; is that correct?
 3   A    That's correct.
 4   Q    Is my client required to have gone to medical school?
 5   A    No.
 6   Q    And when a DME operator certifies that an item is
 7   medically necessary, is that DME operator required to meet the
 8   patient?
 9   A    They are -- yes, they are.
10   Q    And where is that written?  Where in the regulations is it
11   written that the DME operator, like the CEO of this company, is
12   required to meet each and every patient they service?
13   A    It would be the operator or their agent or employee would
14   meet the -- the patient.
15   Q    And their employee would be required to meet the patient
16   when the employee delivered the wheelchair; correct?
17   A    Sure.
18   Q    And that is the time in which the employee would fill out
19   this home assessment form you talked about earlier; correct?
20   A    When they delivered the wheelchair.  Correct.
21   Q    You wouldn't expect the CEO of a company to go out and
22   meet each and every patient, would you?
23   A    Not to go to their home, no.
24   Q    Now, in this case were you able to identify an individual
25   who delivered wheelchairs on behalf of Ezcor?
```

1    A     No.  I didn't look at that information.

2    Q     Did you ever locate any information that indicated that

3    this woman, my client, delivered personally wheelchairs to

4    anyone?

5    A     I haven't looked at any of the medical records.

6    Q     In her certification, my client's certification that a

7    wheelchair is medically necessary -- and, of course,

8    understanding that she is not a doctor and is not required to

9    go to medical school -- I take it that that certification is

10   supposed to be based on information or documents in her

11   possession; correct?

12   A     I'm sorry.  I don't understand the question.

13   Q     Well, if she's not a doctor; right?

14   A     Correct.

15   Q     Doesn't have to be a doctor; right?

16   A     To be a DME supplier, no.

17   Q     She doesn't have to be a doctor to make that certification

18   that you described earlier; right?

19   A     No.

20   Q     And she doesn't have to examine the patient -- that is, my

21   client, as CEO of the company -- right?

22   A     No.  But she attests that her agent or employee does.

23   Q     When my client or any operator of the DME certifies that

24   the wheelchair is medically necessary, isn't it true that most

25   often they rely on the prescription provided them by the

```
1    patient or the doctor?
2    A    They don't rely solely on that, no.
3    Q    Did you examine the patient files in this case?
4    A    No.
5    Q    Did you ever look to see whether or not in each of the
6    files at issue in this case, whether or not there were
7    prescriptions from licensed physicians, prescribing
8    wheelchairs --
9    A    I hadn't seen the files.
10   Q    You also talked about DMEs doing revalidations every three
11   years; correct?
12   A    Correct.
13   Q    What is the purpose of that revalidation?
14   A    Well, it was just to verify that we had the correct
15   information on file for suppliers.
16   Q    And, of course, suppliers were allowed to change
17   information every three years; correct?
18   A    Sure.
19   Q    A supplier could change his or her bank account number?
20   A    Sure.
21   Q    Change banks; correct?
22   A    Sure.
23   Q    With respect to the revalidations that you saw and
24   testified about in this case, in each one of those
25   certifications or revalidations, is my client's name on those
```

1    documents?

2    A     I believe on two of them, yes.

3    Q     Is her address there?

4    A     Is her address there?

5    Q     Yes.

6    A     Not on the pages that we looked at, no.

7    Q     Is her address known to Medicare?

8    A     Are you talking about her residence?

9    Q     Her residence, her business.

10   A     The business address is on the application.

11   Q     Is her Social Security number on some of those

12   applications?

13   A     Yes.

14   Q     Is her identity or personal identifying information on

15   those applications or revalidations?

16   A     The Social Security number would be personally

17   identifiable information; so that's on there, yes.

18   Q     And is all that information correct as far as you know?

19   Her name, her Social Security number, her address, the

20   residence, her business address -- is all of this information

21   on these applications correct as far as you know, relative to

22   my client?

23   A     I don't know.  I didn't verify any of that information.  I

24   only know what's on the application.

25   Q     In reviewing the application that you looked at, did there

```
 1   appear to be any attempt to conceal my client's true identity?
 2   A     I have no -- no.
 3   Q     To go back to the issue of medical necessity, is it your
 4   testimony that the DME operator determines or is responsible
 5   for making the determination as to whether or not a wheelchair
 6   is medically necessary?
 7   A     Yes.
 8   Q     And so in a situation where a doctor prescribes a
 9   wheelchair, is it your testimony that the DME operator can
10   overrule the doctor's prescription?
11   A     With regards to a chair being submitted to Medicare for
12   reimbursement, yes.
13   Q     So what is a DME operator like my client, who's a CEO of a
14   company, required to do, that is, to determine whether or not
15   the doctor's prescription ought to be overruled, overridden?
16   A     If the information isn't there that Medicare requires,
17   they shouldn't provide that wheelchair.
18   Q     Well, a person doesn't have to be near death to get a
19   wheelchair from Medicare; correct?
20   A     Near death, no, they don't.
21   Q     And a person who otherwise qualifies for Medicare doesn't
22   have to be unable to stand to get a wheelchair paid for by
23   Medicare; correct?
24   A     Doesn't have to be unable to stand --
25   Q     Doesn't have --
```

```
 1   A     -- no.  They could stand up and still qualify.
 2   Q     Okay.  Person doesn't have to be paralyzed to get a
 3   wheelchair?
 4   A     No.  Their mobility has to be limited to an extent.
 5   Q     Not to a full and complete extent; correct?
 6   A     Doesn't have to be, no.
 7   Q     If a person could not perform some daily task -- I think
 8   you described them as ADLs --
 9   A     Right.
10   Q     -- in a reasonably timely manner, they might be eligible
11   for a wheelchair; right?
12   A     After other conditions were met.
13   Q     And in this process that you described earlier, I mean,
14   initially you have a beneficiary who is a patient who sees a
15   doctor; right?
16   A     Correct.
17   Q     And then the doctor writes a prescription; right?
18   A     Correct.
19   Q     And you expect to see -- in any claim or wheelchair
20   reimbursement, you expect to see a prescription from a licensed
21   physician; correct?
22   A     That would be one of the pieces of information.
23   Q     And you would expect the physician to be licensed;
24   correct?
25   A     I would.
```

1    Q    And would you expect the physician to have had a

2    face-to-face meeting or examination of the patient?

3    A    I would.

4    Q    And you mentioned before that there -- that there are

5    other steps that ought to be pursued before a wheelchair is

6    actually prescribed, like a cane or a walker, for instance;

7    correct?

8    A    Correct.

9    Q    And you would expect the doctor to -- to -- to follow

10   those steps first, that is, before prescribing a wheelchair;

11   correct?

12   A    Yeah.  I think we allow them a certain period of time

13   after prescribing to do that, but it has to be obtained by the

14   DME supplier, yes.

15   Q    Now, once the prescription for the wheelchair is written,

16   it's either taken to a DME by the patient, or it can be

17   submitted to the DME by a doctor; true?

18   A    Yeah.  I believe that's true.

19   Q    And when the doctor submits the prescription for the

20   wheelchair to the DME, is the doctor required to submit also

21   the patient's entire medical history?

22   A    They have to submit a good part of the medical history.

23   That face-to-face has to include, you know, diagnostic tests

24   that -- that show the -- you know, the mobility problems of the

25   patient and his examination of the patient and ruling out the

```
 1    cane and all of that.  That should be on the record.
 2    Q     And if that is on the record and contained in the
 3    prescription, this is the kind of information a DME may rely
 4    upon in deciding that the wheelchair is medically necessary;
 5    right?
 6    A     That's part of the information, yes.
 7    Q     Now, as far as the issue of home assessments are
 8    concerned, when did Medicare begin requiring DMEs to perform
 9    home assessments?
10    A     It's been quite a while.  Probably 2006 or -7, around
11    there.
12    Q     Isn't it true that they didn't begin until 2009, that is,
13    requiring home assessments?
14    A     I don't know if it was that late or not.
15    Q     Do you have any way of checking any document in front of
16    you or behind you that might indicate to you that --
17    A     I don't believe so, no.
18    Q     But it certainly wasn't required in 2006?
19    A     I can't answer that a hundred percent.  I believe it came
20    in around 2006, 2007.
21    Q     And you believe it was in operation in 2008?
22    A     I do.
23    Q     And these are rules and regulations you work with every
24    day; right?
25    A     Back then, yes.
```

1    Q    And even now; correct?

2    A    Yeah.  Now if I have a DME case that I'm working on, yeah.

3    Q    And so -- and you know for sure that in 2006 DMEs were

4    required to perform home assessments; correct?

5    A    No.  I just told you I wasn't sure of the exact date.

6    Q    Now, when we were talking about typical wheelchairs, I

7    think -- I think you indicated that, with respect to Exhibit 2

8    here, a wheelchair prescribed by a DME might be smaller than

9    the one here; correct?

10   A    No.  I said I -- I know there's different sizes of

11   wheelchairs, but this one looks like a typical, average size

12   wheelchair.

13   Q    There are smaller ones?

14   A    Are there smaller ones?

15   Q    Yes.

16   A    I don't believe so.  Manual wheelchairs are smaller.

17   Q    And so you think that -- as far as power wheelchairs are

18   concerned, you think this is about as small as they get?

19   A    I can't say for certain.  The sizes are -- you know, the

20   sizes has to do with the support on the chair and the width of

21   the chair.  This looks like an average size wheelchair.

22   Q    Well, when a DME delivers a wheelchair, they should

23   deliver a wheelchair that, well, fits the home where the

24   patient resides; correct?

25   A    Yeah.  That's the purpose of the assessment.

```
1   Q      And so you would assume then that any wheelchair delivered
2   by a DME and paid for by Medicare after home assessment is the
3   kind of wheelchair that will fit the environment where the
4   patient lives; right?
5   A      If the home assessment was done, sure.
6   Q      So if -- looking at Exhibit 2, if this wheelchair was a
7   little too large for a beneficiary's home, you would expect the
8   DME to provide a smaller wheelchair; correct?
9   A      Well, all other things being equal, if the patient fit
10  into a smaller one, sure.
11  Q      Did you say that the -- that the DME is required to
12  purchase the wheelchair and then bill Medicare?
13  A      I didn't say that, I don't think.
14  Q      You mentioned something about reimbursement; correct?
15  A      From Medicare, yes.
16  Q      What is the DME being reimbursed for?
17  A      The wheelchair.
18  Q      So prior to being paid by Medicare, is the DME required to
19  obtain, purchase, and then deliver the wheelchair?
20  A      Obtain and deliver.  I don't know about their financial
21  agreements with suppliers.  I don't know if they purchase them
22  or take them on a loan.  I don't know.
23  Q      So in any event, Medicare doesn't pay the money up front,
24  that is, for a wheelchair.  Medicare reimburses the DME;
25  right?
```

**UNITED STATES DISTRICT COURT**

```
 1   A      They --

 2   Q      After they obtain the wheelchair?

 3   A      After they submit a claim.

 4   Q      Do you know how much profit there is in a wheelchair?

 5   A      I know a wholesale price several years ago was about 900

 6   to a thousand dollars.

 7   Q      So is it your belief that this particular wheelchair

 8   wholesale goes for $900?

 9   A      I don't know if that particular one, because I haven't

10   been over there to examine it.  But an average wheelchair when

11   I -- several years ago, when I was doing the investigations,

12   was 900 to a thousand dollars.

13   Q      Is that ten years ago or more?

14   A      No.  Probably five years ago.

15   Q      You've looked at a lot of wheelchairs in your time; right?

16   A      Yeah, but never closely examined them.  I've seen a lot of

17   wheelchairs.

18   Q      Any chance in your mind that you might consider this

19   wheelchair wholesale going for about $3,000?

20   A      No.

21   Q      2,000?

22   A      No.  I would say 1,000.

23   Q      Different wheelchairs have different features; true?

24   A      Yes.

25   Q      Kind of like cars, you can get different options; right?
```

1    A      Correct.

2    Q      What kinds of different options can you get out of a

3    powered wheelchair?

4    A      Well, they have wheelchairs for people that are completely

5    paralyzed, and those, they lift and they tilt, and those are

6    the most expensive.

7          They have swivel chairs.  They have different types of leg

8    supports, different types of arm supports.  You can get them

9    with spare batteries.  Larger wheelchairs cost more, of course.

10   Q      And looking at this wheelchair, can you tell us what the

11   features are on this wheelchair that you described as a typical

12   wheelchair?

13   A      I don't see anything non-standard on it.  I see a footrest

14   and the regular controls, and it's about average size.

15   Q      So pretty much a basic model, then?

16   A      It appears to be from here.

17              THE COURT:  The record should reflect you're about

18   30 feet away from the chair at this time.

19   Q      BY MR. DARDEN:  But you saw the wheelchair before you

20   testified; right?

21   A      I did.

22              MR. DARDEN:  Can I have one moment, Your Honor.

23              THE COURT:  Yes.

24              MR. DARDEN:  Thank you, Your Honor.  Thank you,

25   Your Honor.  No further questions.

UNITED STATES DISTRICT COURT

 1          THE COURT:  Thank you very much, Counsel.

 2     Redirect.

 3                    REDIRECT EXAMINATION

 4  BY MR. PORTER:

 5  Q    Mr. Person, defense counsel asked you a couple questions

 6  about how ill or how disabled a person has to be to qualify for

 7  a power wheelchair.  I think the question he asked you was, "Do

 8  they have to be completely disabled to qualify for a power

 9  wheelchair?"

10     Now, going through the Medicare coverage criteria, I mean,

11  how bad do you have to be to get a power wheelchair?

12  A    Well, like I said earlier, you -- you have to have a

13  severe limitation in your ability to get around your home.

14  Q    And that limitation can't be met with a cane or a walker

15  or a manual wheelchair; is that right?

16  A    Correct.  The patient is unable to use a cane or a walker

17  or a -- doesn't have the upper body strength to wheel

18  themselves around the house.

19  Q    And we're talking about inside use; right?

20  A    That's correct.

21  Q    So if somebody wants it to go out to the store or church,

22  Medicare is not going to cover that use of a power wheelchair;

23  right?

24  A    No.

25  Q    Defense counsel also asked you a couple questions about --

1    about doctors and doctors' prescriptions.  And he asked you

2    whether a DME supplier is supposed to overrule a doctor.

3         Based on your experience, can you provide some

4    circumstances when it's appropriate for a DME supplier to not

5    bill a claim even though they might have a prescription?

6    A    One obvious example that I've seen in the past is a

7    patient has a prescription, but they're able to walk.  They

8    walk into the DME supplier with the prescription.  They're

9    obviously not limited in any of their mobility functions.

10   Q    What if the supplier has paid a doctor a kickback to get

11   that prescription?

12              MR. DARDEN:  Objection.

13              THE COURT:  I don't understand the question.

14   Q    BY MR. PORTER:  Well, if a supplier has paid the doctor a

15   kickback for that prescription, is the DME supplier allowed to

16   submit a claim for reimbursement based on that prescription?

17              THE COURT:  Overruled.

18              THE WITNESS:  I'm sorry.  No, it wouldn't --

19              THE COURT:  If I say sustained, you don't say

20   anything.  If I say overruled, you can answer.

21              THE WITNESS:  I've got to watch more Court TV.

22        No.  In that situation it would be based on a financial

23   arrangement, not on a medical necessity.

24   Q    BY MR. PORTER:  What about with markers?  If the DME

25   supplier is using marketers to go out and recruit patients and

```
 1   pay those marketers kickbacks, can the DME supplier submit a
 2   claim for reimbursement based on that prescription?
 3               MR. DARDEN:  Objection.  Calls for a legal
 4   conclusion, Your Honor.
 5               THE COURT:  Sustained.
 6   Q    BY MR. PORTER:  If Medicare knew that a supplier was doing
 7   that using marketers, would Medicare pay for that claim?
 8   A    Not if the prescriptions were based on a payment.
 9               MR. PORTER:  No further questions, Your Honor.
10               THE COURT:  Thank you.
11        Any recross?
12               MR. DARDEN:  Just a couple, Your Honor, if I may.
13               THE COURT:  Sure.
14                         RECROSS-EXAMINATION
15   BY MR. DARDEN:
16   Q    In your experience, have you noted that many DMEs have
17   employees?
18   A    They do have employees, yes.
19   Q    And does Medicare forbid DMEs from paying its employees?
20   A    No.
21   Q    And in your experience, have you noted that many DMEs have
22   employees who help to market the DME?
23   A    Not in my experience, no.
24   Q    So you've never heard of a situation where a DME might
25   have employees who go to doctors' offices and leave flyers or
```

UNITED STATES DISTRICT COURT

```
 1   business cards or --
 2   A    Yeah.  I've seen -- I was referring to the term "market."
 3   Yeah.
 4              MR. DARDEN:  Thank you.  That's all.
 5              THE COURT:  You may step down.
 6         May this witness be excused?
 7              MR. PORTER:  Yes, Your Honor.
 8              MR. DARDEN:  Thank you, Your Honor.
 9              THE COURT:  You're free to go.  Thank you very much
10   for coming in.
11         Next witness.
12              MS. QUINTERO:  Yes, Your Honor.  The Government
13   calls its next witness, United States Department of Health and
14   Human Services Special Agent Alison Davis.
15                          ALISON DAVIS,
16   called as a witness by the Government, was sworn and testified
17   as follows:
18              THE CLERK:  Do you solemnly swear the testimony you
19   are about to give in the matter now before the Court shall be
20   the truth, the whole truth, and nothing but the truth so help
21   you God?
22              THE WITNESS:  I do.
23              THE CLERK:  Thank you.  You may be seated.  May I
24   please ask that you state your full name for the record and
25   spell your last name.
```

```
 1                THE WITNESS:  Alison Davis, D-a-v-i-s.
 2                THE CLERK:  Thank you.
 3                THE COURT:  You may inquire, Counsel.
 4                MS. QUINTERO:  Thank you, Your Honor.
 5                     DIRECT EXAMINATION
 6   BY MS. QUINTERO:
 7   Q    Agent Davis, where do you currently work?
 8   A    I work for the United States Department of Health and
 9   Human Services, Office of the Inspector General, office of
10   investigations.
11   Q    Okay.  That's a pretty long name.  Is that also referred
12   to as HHS OIG?
13   A    Yes, it is.
14   Q    Can you please explain to the jury what HHS is.  In other
15   words, what does it administer?
16   A    HHS is a federal agency that administers over 300
17   government benefit programs, including the Medicare and
18   Medi-Cal programs.
19   Q    What about your branch of HHS?  What does the Office of
20   Inspector General, office of investigation, do?
21   A    The OIG investigates civil and criminal allegations
22   relating to those programs administered by HHS, including
23   Medicare and Medi-Cal.
24   Q    And what is your title within HHS OIG?
25   A    I'm a special agent.
```

1   Q    And as a special agent with HHS OIG, what are your typical

2   duties and responsibilities?

3   A    As a special agent I investigate potential violations of

4   federal law, specifically healthcare fraud related to the

5   Medicare and Medi-Cal programs.

6   Q    And how long have you held this position as a special

7   agent with HHS OIG?

8   A    About 13 and a half years.

9   Q    And during your 13 and a half years as a special agent

10  with HHS, what area or region have you primarily worked out of?

11  A    Los Angeles and Orange counties.

12  Q    And during your 13-plus years with HHS in the Los Angeles

13  and Orange County areas, has your focus always been healthcare

14  fraud?

15  A    Yes, it has.

16  Q    And what type of healthcare fraud cases have you been

17  involved in investigating over the years that you've been with

18  HHS?

19             MR. DARDEN:  Objection.  Irrelevant.

20             THE COURT:  Overruled.

21             THE WITNESS:  Various Medicare providers, durable

22  medical equipment companies, home health agencies, hospice

23  agencies, and general practitioners.

24  Q    BY MS. QUINTERO:  Let's -- let's talk about this case now.

25  During the years that you've been with HHS OIG, have you ever

```
 1   had the occasion to investigate the defendant and her company
 2   Ezcor-9000, doing business as Ezcor Medical Supply?
 3   A     Yes, I have.
 4   Q     Roughly when HHS OIG become involved in this
 5   investigation?
 6   A     Early 2011.
 7   Q     Can you explain to the jury the circumstances that led to
 8   your investigating the defendant and her company, Ezcor.
 9          MR. DARDEN:  Objection.  Calls for hearsay,
10   Your Honor.
11          THE COURT:  Sustained.
12          MS. QUINTERO:  Your Honor, may I.  It's not intended
13   for the truth of the matter, just the overall circumstances of
14   her investigation, initiating the investigation.
15          THE COURT:  I don't know why that's relevant.  I
16   think his objection is also relevancy.
17          MS. QUINTERO:  Okay.
18          THE COURT:  You started an investigation.  Why, it's
19   not that relevant.  Okay.
20          MS. QUINTERO:  Okay.
21   Q     BY MS. QUINTERO:  And did you, in fact, begin an
22   investigation into Ezcor and the defendant?
23   A     Yes.
24   Q     And was the -- the substance of your initial investigation
25   received through complaints, referrals, or anything along those
```

UNITED STATES DISTRICT COURT

```
 1   lines?
 2              MR. DARDEN:  Objection.
 3              MS. NKELE:  Objection.
 4              THE COURT:  Overruled.
 5              THE WITNESS:  Yes.  We received a hotline --
 6              THE COURT:  The only portion is was it received
 7   through communications.  Nobody is asking you what they said.
 8              THE WITNESS:  Yes.
 9              THE COURT:  Okay.
10   Q    BY MS. QUINTERO:  Okay.  Was it through hotline
11   complaints?
12   A    Yes.
13              MR. DARDEN:  Objection.
14              THE COURT:  Overruled.
15   Q    BY MS. QUINTERO:  Was it through referrals from SGS?
16              MR. DARDEN:  Objection.  Leading.  Calls for
17   hearsay.  Irrelevant.
18              THE COURT:  Overruled.
19              THE WITNESS:  Yes.
20   Q    BY MS. QUINTERO:  And when I mention SGS, what is SGS?
21   A    SGS stands for -- it's SafeGuard Services, and SafeGuard
22   Services is a Medicare contractor who investigates fraud within
23   the Medicare program.
24   Q    Okay.  And as -- as a Medicare contractor, SGS, they do
25   initial investigations of Medicare providers?
```

1    A     Yes.  Yes.  When SafeGuard Services --

2              MR. DARDEN:  Objection.

3              THE COURT:  It's been answered.  Next question.

4    Q     BY MS. QUINTERO:  And after SGS does an initial

5    investigation, is that investigation later on referred, if you

6    will, to HHS OIG?

7    A     Yes.  If SGS feels that their investigation --

8              MR. DARDEN:  Objection.

9              THE COURT:  The answer is "yes."

10             THE WITNESS:  Yes.

11   Q     BY MS. QUINTERO:  Now, when is the most recent referral

12   from SGS that you received?

13   A     April of 2012.

14   Q     And did this SGS referral involve specifically the

15   defendant's company, Ezcor?

16   A     Yes, it did.

17   Q     Now, at some point, other than HHS OIG's involvement, did

18   other state and federal agencies become involved in the

19   investigation?

20   A     Yes.  The California Department of Justice and the Federal

21   Bureau of Investigation, the FBI.

22   Q     And to your knowledge, when did the California Department

23   of Justice and FBI become involved?

24   A     Early 2011 as well.

25   Q     And at what point did you personally become involved in

1    this investigation?

2    A    Early 2011.

3    Q    So roughly about four years ago by now?

4    A    Yes.

5    Q    Now, when you're beginning a Medicare fraud investigation

6    like this one, are there certain documents you always want to

7    obtain at the beginning?

8    A    Yes.

9    Q    And -- go ahead.

10   A    We obtain corporate records, Medicare records, the

11   Medicare claims data, and bank records.

12   Q    Okay.  So what you've just described, are there like --

13   are those bare essentials, if you will, of a new investigation?

14   A    Yes.

15   Q    Why would you as a criminal investigator want to obtain

16   that documentation?

17   A    Well, that information tells us just the basics about the

18   company, where the company is located, who the owners and

19   operators of the company are, what types of services the

20   company is providing, who the contacts of the company are.

21   Q    Let's talk about some of those documents, the corporate

22   records, for instance.  Did law enforcement obtain and review

23   Ezcor's corporate records in this case?

24   A    Yes, we did.

25   Q    And how was that done?

```
1    A    We obtained certified copies of Ezcor's corporate records
2    from the State of California.
3              MS. QUINTERO:  Your Honor, I think we have a
4    stipulation as to Exhibit 15, for the admission of Exhibit 15.
5              MR. DARDEN:  No objection, Your Honor.
6              THE COURT:  It may be received.
7                   (Exhibit 15 received into evidence.)
8              MS. QUINTERO:  Thank you, Your Honor.
9    Q    BY MS. QUINTERO:  Can you explain to the jury what we have
10   on Government Exhibit 15.
11   A    Yes.  These are the corporate records for Ezcor, obtained
12   through the State of California.
13   Q    And based on your review of the corporate records, when
14   was Ezcor first incorporated?
15   A    January 1st, 1999.
16   Q    Now, if we look at page 2 of Government Exhibit 15, who
17   are the individuals listed as officers and directors of Ezcor?
18   A    Walter Eze and Sylvia Walter-Eze, the defendant.
19   Q    What role is the defendant listed as having with Ezcor on
20   this corporate record?
21   A    The defendant is listed as being the secretary and
22   director officer.
23   Q    According to this document here, when was the corporate
24   document filed here?
25   A    April 27, 1999.
```

```
 1   Q    Now, the other individual listed on page 2 of Government
 2   Exhibit 15, other than defendant, the person's name is
 3   Walter Eze.  Did your investigation reveal what, if any,
 4   relationship that individual had with the defendant?
 5   A    Yes.  He was her husband.
 6   Q    And if you look at page 3 of Government Exhibit 15, can
 7   you describe for the jury what that document is.
 8   A    Yes.  This is a statement of information filed by Ezcor to
 9   the -- through the Secretary of State for the State of
10   California.
11   Q    When was this document filed?
12   A    January 23rd, 2011.
13   Q    According to the statement of information, who filed this
14   document on behalf of Ezcor?
15   A    The defendant, Sylvia Walter-Eze.
16   Q    And in what capacity was this filed by the defendant?
17   A    CEO.
18   Q    Now, is that ownership information that we see here on
19   this corporate filing, is that consistent with the Medicare
20   enrollment application that Mr. Person testified to on
21   Exhibit 2?
22   A    Yes, it is.
23   Q    And, again, the purpose of you obtaining and reviewing
24   these corporate records was why?
25   A    To show at least on paper who the owner of the company
```

1   was.

2   Q     Okay.  And you said that, in addition to obtaining and

3   reviewing corporate records, that you also want to do the same

4   for Medicare records; is that right?

5   A     That's correct.

6   Q     And what type of documentation are we talking about when

7   you say Medicare records?

8   A     Mainly the Medicare enrollment applications.

9   Q     Okay.  Now, obviously we just heard about the Medicare

10  enrollment application from Mr. Person.  But for your purposes

11  as a criminal investigator, why would you want to obtain and

12  review the Medicare enrollment application from Ezcor?

13  A     Well, the Medicare enrollment application states what type

14  of provider the company is.  In this case, a durable medical

15  equipment provider.  It says where the company is located, the

16  types of services it will be providing, the types of equipment,

17  and who the owners and operators of the company are.

18  Q     And did you review the Medicare records for Ezcor?

19  A     Yes, I did.

20  Q     And generally what did you learn?

21  A     Ezcor was located in Valencia, California.  And the

22  defendant, Sylvia Walter-Eze, was the main person listed on

23  those Medicare applications from at least the 2007 application

24  through the most recent revalidation application in March of

25  2012.

```
1   Q     Now, in addition to reviewing the Medicare enrollment
2   application, what else from Medicare do you typically look at?
3   A     The Medicare claims data.
4   Q     And generally speaking, why as a criminal investigator
5   would you want to obtain or review the claims data?
6   A     We want to look for billing trends to see what types of
7   equipment the supplier is billing Medicare for and getting paid
8   by Medicare for, who the referring physicians are on those
9   claims, and the amount of money that the supplier is billing
10  Medicare for and getting paid by Medicare for.
11  Q     Okay.  And if you can look there at the binder,
12  Government Exhibits 11 and 12, which have already been admitted
13  into evidence, before today did you have the opportunity to
14  look at Government Exhibits 11 and 12?
15  A     Yes, I did.
16  Q     And did you review Ezcor's Medicare and Medi-Cal claims
17  data?
18  A     Yes, I did.
19  Q     And why did you want to obtain and review the Medicare and
20  Medi-Cal claims data for Ezcor?
21  A     Again, we wanted to see if there was any billing trends,
22  if there was a certain type of equipment that was billed most
23  often by the company, who the referring physicians were on
24  those claims, and how much money Ezcor billed Medicare and was
25  paid for by Medicare.
```

1    Q    Now, I'm going to get back in a few minutes to the claims

2    data, but right now I want to talk about some other records

3    that you indicated that you would look at in an investigation,

4    the bank records, for instance.

5         Did law enforcement obtain and review in this case any

6    bank records?

7    A    Yes.

8    Q    And what are some of the bank records that you obtained

9    and reviewed?

10   A    We obtained and reviewed Ezcor's corporate bank records

11   from Bank of America, Capital One, and Wells Fargo as well as

12   the personal accounts for Wilmer Guzman from JPMorgan Chase.

13   Q    You mentioned Wilmer Guzman.  Based on your investigation,

14   who is Wilmer Guzman?

15   A    Wilmer Guzman was a patient recruiter for the defendant

16   and Ezcor, who was paid --

17            MR. DARDEN:  I'm going to object.

18            THE COURT:  I think she's already answered the

19   question.  He worked for Ezcor.  Next question.

20   Q    BY MS. QUINTERO:  How did law enforcement obtain these

21   bank records?

22   A    Via grand jury subpoena.

23   Q    If you turn to Government's Exhibit 19 there --

24        Your Honor, I believe we have a stipulation as to

25   Government Exhibit 19, for the admission of --

```
 1          MR. DARDEN:  No objection, Your Honor.

 2          THE COURT:  Be received.

 3          MS. QUINTERO:  Thank you, Your Honor.

 4              (Exhibit 19 received into evidence.)

 5   Q    BY MS. QUINTERO:  Now, before today did you have an

 6   opportunity to look at Government Exhibit 19?

 7   A    Yes, I did.

 8   Q    And if you will, please explain to the jury what

 9   Government Exhibit 19 is.

10   A    Government Exhibit 19 is a CD containing the electronic

11   bank records for Ezcor's corporate accounts from Bank of

12   America, Capital One, and Wells Fargo as well as Wilmer

13   Guzman's personal accounts from JPMorgan Chase.

14   Q    And if you will, can you explain to the jury why you as a

15   criminal investigator would want to obtain and review all of

16   these bank records for Ezcor.

17   A    We want to see the flow of money, basically, where the

18   money is coming from -- in this case, Medicare -- and where is

19   the money going, especially if there's a lot of cash

20   transactions.

21   Q    Okay.  And in your review of the Medi- -- in the bank

22   records, did you see where the money was primarily coming from?

23   A    Yes.  Medicare.

24   Q    And where was that money being deposited into for Ezcor?

25   A    The money from Medicare was deposited into Ezcor's
```

1   corporate Bank of America bank account ending in 2800 and the

2   Capital One bank account ending in 4585.

3   Q    And those are the same two accounts that we saw were

4   designated on Government Exhibits 7 and 8, with Brent Person on

5   the EFTs?

6   A    Yes.

7   Q    Now, with respect to the Bank of America accounts, the one

8   ending in 2800, was the defendant a signatory on this bank

9   account?

10  A    Yes, she was.

11  Q    And what about the Capital One account, the one ending in

12  4585?  From your review of the bank records, who was the

13  signatory on this bank account?

14  A    The defendant, Sylvia Walter-Eze, was the sole signatory

15  on that bank account.

16  Q    Now, looking at the bank records for the Bank of America

17  account and the Capital One account, what, if anything, did you

18  notice about where the money from these accounts were going --

19  was going?

20  A    The money from those two accounts went to an Ezcor --

21  another Ezcor corporate account at Bank of America ending in

22  3951 and a Wells Fargo account for Ezcor ending in 8707.

23  Q    And once the money got into those accounts, where did that

24  money go?

25  A    A lot of checks were written out, and there were a lot of

1   cash transactions.

2   Q    You mentioned cash transactions.  Let's talk a little bit

3   about that.  For -- for you as a criminal investigator, what

4   problems do these cash transactions cause?

5   A    When money is taken out in cash, we can no longer follow

6   the money.  We don't know what the money is being used for and

7   where it's going.

8   Q    When you saw these cash transactions in Ezcor's bank

9   records, just by looking at the bank records alone, did you

10  have any idea where that cash was going?

11  A    No.

12  Q    And what about what it was being used for?  Just by

13  looking at the bank records, did you have any idea what that

14  cash was being used for?

15  A    No.

16  Q    In light of everything else, were these cash transactions

17  concerning to you as a criminal investigator?

18             MR. DARDEN:  Objection.  Irrelevant.

19             THE COURT:  Overruled.

20             THE WITNESS:  Yes.

21  Q    BY MS. QUINTERO:  Why?

22  A    Well, like I mentioned, once money is taken out in cash,

23  you can't follow the cash.  And most -- in my experience, most

24  legitimate companies don't deal with a lot of cash.  You will

25  see money going out in checks; so you know exactly who they're

```
 1   paying and where that money is going.
 2        And there was just a lot of money coming out in cash that
 3   we couldn't follow.
 4   Q    Now, if you can take a look at the binder in front of you,
 5   Government Exhibits 20, 21, and 68 --
 6        I believe we have a stipulation for the admission of these
 7   bank records.
 8             MR. DARDEN:  I'm sorry.  Was that 20, 21, and 60?
 9             THE COURT:  Could you repeat it again.  I didn't
10   hear it either.
11             MS. QUINTERO:  Yes, Your Honor.  Exhibits 20, 21 and
12   68.
13             THE COURT:  And 68?
14             MS. QUINTERO:  Yes, Your Honor.
15             THE COURT:  Okay.
16             MR. DARDEN:  Can I have one moment, Your Honor.
17             THE COURT:  Sure.
18             MR. DARDEN:  No objection as to 68, Your Honor.
19             THE COURT:  Okay.
20             MS. NKELE:  No.  No objection as to 20 and 21.
21             THE COURT:  Okay.  They may be received.
22             MS. QUINTERO:  Thank you, Your Honor.
23                 (Exhibits 20, 21 and 68 received into evidence.)
24   Q    BY MS. QUINTERO:  Can you please describe for the jury
25   what we have there on Exhibits 20, 21, and 68.
```

1    A    These are checks drawn from Ezcor's corporate accounts,

2    written to various individuals.

3    Q    Okay.  For the sake of time, we're not going to publish

4    those right now, but just let me ask you, for Government

5    Exhibit 20 specifically, what is the significance of these

6    checks?

7    A    These are checks drawn from Ezcor's corporate accounts,

8    written to Wilmer Guzman, who we identified as a patient

9    recruiter for Ezcor.

10             MR. DARDEN:  Objection.  Motion to strike.

11             THE COURT:  The last part will be stricken after the

12   name Guzman.

13             MS. QUINTERO:  Okay.

14   Q    BY MS. QUINTERO:  And how much did all of these checks to

15   Mr. Guzman total up to?

16   A    Approximately $18,870.

17   Q    And what about Government Exhibit 21?  What do we have

18   there?

19   A    These are checks drawn from Ezcor's corporate accounts,

20   written to Judith Estrella.

21   Q    How much did all of these checks to Ms. Estrella total up

22   to?

23   A    Approximately $15,000.

24   Q    What about Government Exhibit 68?

25   A    These are checks drawn from Ezcor's corporate account,

```
 1    written to Jean Aves.
 2    Q     These checks that are part of Government Exhibits 20, 21,
 3    and 68, was the defendant a signatory on the bank accounts that
 4    these checks were drawn from?
 5    A     Yes, she was.
 6    Q     Now, were these checks here concerning to you as a
 7    criminal investigator?
 8    A     Yes.
 9    Q     Why?
10            MR. DARDEN:  Objection.  Irrelevant.
11            THE COURT:  Overruled.
12            THE WITNESS:  Wilmer Guzman, Judith Estrella, and
13    Jean Aves were patient recruiters for --
14            THE COURT:  I'm going to sustain the objection.
15    Q     BY MS. QUINTERO:  Now, let's look at Government
16    Exhibit 23.  You mentioned Judith Estrella and Wilmer Guzman.
17    A     Yes.
18    Q     What is Government's Exhibit 23?
19    A     Government's Exhibit 23 is a certified record from the
20    California Department of Motor Vehicles for Wilmer Guzman.
21    Q     What about Government Exhibit 24?  What do we have there?
22    A     Government Exhibit 24 is a certified record from the
23    California Department of Motor Vehicles for Judith Estrella.
24            MS. QUINTERO:  Your Honor, I believe we have
25    stipulation to admit these into evidence.
```

```
1              MR. DARDEN:  No objection.

2              THE COURT:  What are the exhibits again?

3              MS. QUINTERO:  23 and 24.

4              THE COURT:  Okay.  Thank you.  23 is --

5              THE WITNESS:  Guzman.

6              THE COURT:  Guzman.  Okay.

7                  (Exhibits 23 and 24 received into evidence.)

8    Q    BY MS. QUINTERO:  Now, going back to your review of the

9    claims data, how much roughly did Ezcor end up submitting in

10   claims to both Medicare and Medi-Cal for durable medical

11   equipment?

12   A    Ezcor submitted approximately $3.5 million to Medicare and

13   Medi-Cal.

14   Q    And how much were they paid, was Ezcor paid?

15   A    Ezcor was paid approximately $1.9 million by Medicare and

16   Medi-Cal.

17   Q    And that money from Medicare, what bank accounts was it

18   deposited into?

19   A    The Bank of America account ending in 2800 and the Capital

20   One account ending in 4585.

21   Q    Now, in reviewing the Medicare claims data, what type of

22   DME was Ezcor primarily providing?

23   A    Ezcor primarily billed Medicare for power wheelchairs and

24   related accessories.

25   Q    Is there -- can you give an -- the jury an idea of how
```

```
 1   much approximately?

 2   A    Approximately 50 percent or half of their billing was for

 3   power wheelchairs and accessories.

 4   Q    Now, was this concerning to you during your investigation?

 5   A    Yes.

 6   Q    Why?

 7             MR. DARDEN:  Objection.  Irrelevant.

 8             THE COURT:  I don't know yet.  So overruled, subject

 9   to a motion to strike.

10             THE WITNESS:  Based on my experience, you -- we

11   would expect to see a wire -- wider variety of durable medical

12   equipment being billed and provided.  And the huge markup and

13   the huge profit margin in the power wheelchair is concerning.

14   The supplier can go and buy a power wheelchair for 900 or a

15   thousand dollars wholesale, and then Medicare reimburses

16   upwards of $5,000 for that same power wheelchair.

17             THE COURT:  Objection will be overruled.

18   Q    BY MS. QUINTERO:  Now, other than this, was there anything

19   else that was concerning to you in the claims data?

20   A    Yes.  The majority of the claims billed to Medicare by

21   Ezcor were based off of referrals from only four -- four

22   physicians.

23   Q    And why was this concerning to you?

24             MR. DARDEN:  Objection.  Irrelevant.

25             THE COURT:  Overruled.
```

```
1              THE WITNESS:  Well, that's a lot of prescriptions
2    for just four -- four physicians, especially when we're dealing
3    with power wheelchairs.  In my experience, after interviewing
4    many doctors, most physicians go their entire careers and only
5    prescribe one or two power wheelchairs.  And here are four
6    physicians who are prescribing wheelchairs in the double-digits
7    in only a few years.
8    Q    BY MS. QUINTERO:  Now, based on these concerns that law
9    enforcement had, did you go out and do interview -- go out and
10   do interviews of a bunch of beneficiaries who Ezcor was
11   providing power wheelchairs to?
12   A    Yes.
13   Q    Why did you go out and interview these beneficiaries?
14   A    Well, first, we want to see if the beneficiaries
15   actually -- actually received the power wheelchairs.
16        Second, we want to see if they, the beneficiaries,
17   medically needed the power wheelchairs.
18        Third, we wanted to see who prescribed the power
19   wheelchairs for the beneficiaries and if it was their primary
20   care physician.
21        And, fourth, we want to find out how the beneficiaries
22   heard about Ezcor in the first place.
23   Q    Okay.  Let's break that down.  I think I heard four
24   things; right?
25   A    Yes.
```

1   Q    Okay.  So why did you want to go out and see if these

2   beneficiaries actually received the power wheelchairs that

3   Ezcor claimed to have provided to them?

4   A    Well, if the beneficiaries did not receive the power

5   wheelchairs, then that would be a false claim.

6   Q    And let's talk about the next point.  Why did you want to

7   go out and see if the beneficiaries actually needed the power

8   wheelchairs that Ezcor was supposedly providing?

9   A    Well, if the beneficiaries did not medically need the

10  power wheelchairs, then that would also be a false claim.

11  Q    And when you interviewed these beneficiaries, based on

12  your observations, generally did these beneficiaries appear to

13  need these power wheelchairs?

14  A    No.

15           MR. DARDEN:  Objection.

16           THE COURT:  Overruled.

17           THE WITNESS:  No.

18  Q    BY MS. QUINTERO:  Why do you say that?

19  A    Generally these --

20           THE COURT:  Are you saying every beneficiary you

21  checked up on did not need the wheelchairs or just some of

22  them?

23           THE WITNESS:  All of them.

24           THE COURT:  Okay.  Go ahead.

25  Q    BY MS. QUINTERO:  Okay.  And why do you say that?

1   A      Well, the patients were generally walking.  They were

2   ambulatory.  Some of them even had stairs in their homes,

3   either leading up to their home or inside their house.  Some of

4   the beneficiaries lived on the second floor or third floor of

5   apartment buildings, and these apartment buildings didn't have

6   elevators.

7         So it begs the question, if a person can walk up and down

8   stairs, why do they need a power wheelchair.  And when patients

9   showed us their power wheelchairs, if they still had it, the

10  power wheelchairs were literally collecting dust, like in a

11  corner of a room or in a garage.  They weren't being used.

12        The patients who did use their power wheelchairs told us

13  that they used the power --

14              MR. DARDEN:  Objection.  Hearsay.

15              THE COURT:  Sustained.

16  Q     BY MS. QUINTERO:  Okay.  Now, as a criminal investigator,

17  were some of these beneficiaries that you interviewed --

18  because of the reasons you listed, were they concerning to you?

19  A      Yes.  The --

20              MR. DARDEN:  Objection.  The question is answered.

21              THE COURT:  And we've got to be very careful not to

22  get into what they may have told you.  That would be hearsay.

23              MS. QUINTERO:  Right.  Right.

24  Q     BY MS. QUINTERO:  As relates to the claims data or

25  anything along those lines --

```
 1              THE COURT:  Why don't you ask the question again.
 2   Q    BY MS. QUINTERO:  Were these Medicare beneficiaries
 3   concerning to you as it relates to claims that the defendant
 4   was submitting to Medicare?
 5   A    Yes.
 6   Q    Why?
 7   A    Because Ezcor was submitting claims to Medicare for power
 8   wheelchairs that were not medically necessary.
 9   Q    Now, did you or other agents --
10              MR. DARDEN:  Objection, Your Honor.  No foundation.
11   Motion to strike.
12              THE COURT:  Overruled.
13   Q    BY MS. QUINTERO:  Now, did you or other agents end up
14   taking some pictures of some of the beneficiaries and their
15   power wheelchairs?
16   A    Yes.
17   Q    And if you will take a look at Government Exhibits 13 and
18   14, are these some of the photographs that agents along -- as
19   well as yourself took of the beneficiaries and their power
20   wheelchairs?
21   A    Yes.
22   Q    Now, with respect to Government Exhibit 13, who took these
23   photographs?
24   A    I did.
25   Q    And do these photographs fairly and accurately depict the
```

```
 1  beneficiaries or the power wheelchairs that you photographed?
 2  A     Yes, they do.
 3             MS. QUINTERO:  Your Honor, at this time we would
 4  like to introduce into evidence Government Exhibit 13 for
 5  admission.
 6             THE COURT:  It may be received.
 7             MS. QUINTERO:  Thank you, Your Honor.
 8                 (Exhibit 13 received into evidence.)
 9  Q   BY MS. QUINTERO:  Now, looking at Government Exhibit 14,
10  what are these photographs?
11  A    These are photographs of beneficiaries and power
12  wheelchairs taken by Special Agent Eric Froeschner.
13             MS. QUINTERO:  Your Honor, at this time we would
14  like to request that these photographs of Government Exhibit 14
15  be conditionally admitted pending a later witness that will lay
16  the additional foundation.
17             THE COURT:  Any objection?
18             MR. DARDEN:  No objection to a conditional.  Excuse
19  me.
20             THE COURT:  Okay.  It will be conditionally
21  received.
22             MS. QUINTERO:  Thank you, Your Honor.
23                 (Exhibit 14 received into evidence.)
24  Q   BY MS. QUINTERO:  Okay.  Let -- let's move along.
25         Now, let's talk about the third point that you mentioned
```

1    about the referring physicians, I believe it was, of -- of

2    these power wheelchairs.  Why did you want to see if the

3    referring physicians that were prescribing the power

4    wheelchairs were the beneficiaries' primary care physicians?

5    A    Well, the beneficiary's primary care physician would be in

6    the best position to know the patient's history and the

7    patient's need for a power wheelchair as opposed to a physician

8    who only saw the beneficiary one time.

9    Q    And when you interviewed these beneficiaries, did you

10   confirm either way whether the physicians who had prescribed

11   their power wheelchairs were the actual primary care

12   physicians?

13   A    Yes.  They were not their primary care physicians.

14   Q    And were any of these beneficiaries ever seen by the

15   primary care physician for a power wheelchair?

16   A    No.

17   Q    Now, as a criminal investigator, would this be concerning

18   to you?

19   A    Yes.

20   Q    Why?

21   A    Well, we have physicians who are writing prescriptions for

22   power wheelchairs for these beneficiaries when they saw them

23   only one time.  And their primary care physicians, who have a

24   history with the patient, never found it necessary and never

25   prescribed power wheelchairs for them.

1    Q    Now, you mentioned before that there were only, I believe,
2    four physicians that accounted for roughly more than half of
3    Ezcor's claims; is that right?
4    A    That's correct.
5    Q    Now, who were these physicians?
6    A    Dr. Calaustro, Dr. Azinge-Obasi, Dr. Okoye, and
7    Dr. Kelly-Dokubo.
8    Q    Now, did agents interview each of these four physicians?
9    A    All but Dr. Okoye.
10   Q    And what was the purpose of agents interviewing the three
11   physicians?
12            MR. DARDEN:  I'm going to object as irrelevant,
13   Your Honor.
14            THE COURT:  Overruled.
15            THE WITNESS:  We wanted to see why the physicians
16   wrote so many power wheelchair prescriptions.
17   Q    BY MS. QUINTERO:  Just so that -- just so I'm -- I'm clear
18   here, you mentioned Dr. Edna Calaustro; right?
19   A    Yes.
20   Q    Did you interview Dr. Calaustro?
21   A    Yes, I did.
22   Q    And is Dr. Calaustro cooperating with the Government in
23   this case?
24   A    Yes, she is.
25   Q    And is Dr. Calaustro expected to testify in this case?

```
1   A      Yes.
2   Q      What about Dr. Azinge-Obasi?  Did agents interview her as
3   well?
4   A      Yes.
5   Q      How long ago was she interviewed?
6   A      In February.
7   Q      Did Dr. Azinge-Obasi account for a large percentage of
8   Ezcor's claims?
9   A      Yes.  Approximately 30 percent of the claims.
10  Q      And the last referring physician that you mentioned,
11  Dr. Kelly-Dokubo, did you interview him as well?
12  A      Yes, I did.
13  Q      And how long ago was that interview?
14  A      Also in February.
15  Q      Now, in terms of interviews, your investigation did not
16  stop with just beneficiaries and these referring physicians;
17  right?
18  A      That's correct.
19  Q      And did you interview any primary care physicians or
20  treating doctors of the beneficiaries?
21  A      Yes.  We interviewed the primary care physicians for the
22  substantive counts in our Indictment.
23  Q      And what do you mean substantive count in beneficiaries?
24  A      Those are the Medicare beneficiaries that are listed in
25  Counts 2 through 6 of the Indictment.
```

1   Q    Now, what was the purpose of you interviewing these

2   primary care physicians?

3   A    Again, we wanted to see if the primary care physicians

4   ever saw the patients for a power wheelchair and if they ever

5   prescribed a power wheelchair for the patients.

6   Q    Generally, what did they confirm?

7            MR. DARDEN:  Objection.  Hearsay.

8            THE COURT:  Sustained.

9   Q    BY MS. QUINTERO:  Now, let's go back to talking about

10  other Medicare records that you obtained as part of your

11  investigation involving the defendant and her company, Ezcor.

12  Through your review of the Medicare records for Ezcor, did you

13  learn about an audit of Ezcor by Medicare?

14  A    Yes.  Medicare conducted an audit of Ezcor in March of

15  2012.

16  Q    And this audit, what did it pertain to specifically?

17  A    The audit requested patient charts for 100 Medicare

18  beneficiaries that Ezcor submitted claims to Medicare for.

19  Q    When you say "patient charts," is it like patient files

20  and so forth?

21  A    Yeah.  It would be the -- the patient files that Ezcor

22  would have for the patient, not necessarily the doctors' files.

23  Q    Okay.  And based on your knowledge and experience, why

24  would Medicare audit its providers?

25            MR. DARDEN:  Objection.  Irrelevant.

```
 1              THE COURT:  Sustained.
 2  Q    BY MS. QUINTERO:  What is the purpose of auditing Medicare
 3  providers?
 4              MR. DARDEN:  Same objection.
 5              THE COURT:  Overruled.
 6              THE WITNESS:  Well, like Mr. Person explained
 7  earlier, Medicare is a trust-based system that's operated on
 8  the honor system, if you may.  So because of the sheer amount
 9  of claims that Medicare receives all day, once a supplier
10  submits a claim to Medicare, Medicare automatically pays that
11  claim and doesn't require supporting documentation to be
12  submitted with that claim.
13      So Medicare requires its suppliers to keep their records
14  for six years and three months after the claim is paid.  So
15  they could go back and look, to make sure that the claims that
16  they paid for were appropriate.
17              MS. QUINTERO:  And, Your Honor, I believe we have a
18  stipulation as to Government Exhibit 16.
19              THE COURT:  Is that 16?
20              MS. QUINTERO:  Yes, Your Honor.
21              MR. DARDEN:  May I have one moment, Your Honor.
22              THE COURT:  Certainly.
23              MR. DARDEN:  There is no stipulation as to 16,
24  Your Honor.
25              THE COURT:  16?
```

UNITED STATES DISTRICT COURT

```
1              MR. DARDEN:  Yes.

2              THE COURT:  Okay.

3              MS. QUINTERO:  We have a 902.11 certification for

4    Government Exhibit 16 that we provided Mr. Darden.

5              THE COURT:  Do the two of you want to talk?

6              MS. QUINTERO:  Sure.

7              THE COURT:  See if you can resolve it.

8                  (Counsel confer sotto voce.)

9              MR. DARDEN:  Thank you, Your Honor.

10             MS. QUINTERO:  Do we have a stipulation, Mr. Darden?

11             MR. DARDEN:  Conditional, yes, Your Honor.

12             THE COURT:  It will be received conditionally.

13             MS. QUINTERO:  Thank you, Your Honor.

14                 (Exhibit 16 received into evidence.)

15   Q    BY MS. QUINTERO:  Can you explain to the jury what we have

16   on Government Exhibit 16.

17   A    Yes.  This is a letter from Medicare to Ezcor regarding a

18   notice of audit.

19   Q    Okay.  And if --

20        May we publish, Your Honor.

21             THE COURT:  Yes.

22   Q    BY MS. QUINTERO:  Okay.  If we can look at page 1 of this

23   notice of audit, what is the date here that's on this notice of

24   audit?

25   A    March 27th, 2012.
```

**UNITED STATES DISTRICT COURT**

1    Q    And who is the Medicare provider on that letter -- that

2    letter?

3    A    Ezcor-9000.

4    Q    Now, the claims that Medicare was auditing, were they

5    specific to certain beneficiaries?

6    A    Yes.  They were specific to 100 Medicare beneficiaries --

7    beneficiaries that were listed on an attachment to the letter

8    in the back of the letter.

9    Q    Okay.  And let's look at page 5 and 6 of Government

10   Exhibit 16.  Is that the -- the list of the 100 beneficiaries

11   that this audit was specific to?

12   A    Yes, it is.

13   Q    Okay.  And if you look at page 4 of Government Exhibit 16,

14   what specific -- just generally, what specific documentation

15   was requested of Ezcor with respect to each of these 100

16   Medicare beneficiaries?

17   A    Information regarding the identity of the beneficiaries,

18   certificates of medical necessity, physicians notes related to

19   the need for the item, and other documentation that shows the

20   medical need for the item.

21   Q    Did you mention the certificate of medical necessity?

22   A    Yes.

23   Q    What is that?

24   A    A certificate of medical necessity is a form filled out by

25   the physician that certifies the medical need for the power

1    wheelchair for the beneficiary.

2    Q    If we go back to page 1 of Government Exhibit 16, based on

3    this audit notice, when were the requested documents due?

4    A    They were due April 24th, 2012.

5    Q    And that April 24th, 2012, date, was that the defendant's

6    final deadline to submit the documents in response to this

7    audit?

8    A    No.  The defendant requested an extension and received 45

9    extra days to turn in those records.  So the due date was

10   May 11, 2012.

11   Q    Now, during the course of your investigation, did you

12   determine whether or not the defendant complied with the audit

13   and submitted any documents in --

14           THE COURT:  I'm sorry, Counsel.  Maybe I missed it.

15   Would you go back to the last exhibit.

16           MS. QUINTERO:  Yes, Your Honor.

17           THE COURT:  Didn't you say the due date was April?

18           MS. QUINTERO:  Well --

19           THE WITNESS:  Yeah, originally it was April 24th.

20           THE COURT:  Then you said a 45-day extension to May?

21   Is that what you said?  Am I missing something here?

22           MS. QUINTERO:  No, Your Honor.  Just so -- I can

23   clarify.

24           THE COURT:  Okay.

25   Q    BY MS. QUINTERO:  What's the date of this letter?  As far

UNITED STATES DISTRICT COURT

1    as the date of this letter, when were the records due?

2    A    April 24th, 2012.

3    Q    Did the defendant ultimately get an extension?

4    A    Yes.

5    Q    And based on the extension that the defendant got to

6    submit the paperwork, when were the records due?

7    A    May 11, 2012.

8    Q    Now, during the course of your investigation, did you

9    determine whether or not the defendant actually complied with

10   the audit and submitted any documents in response to the notice

11   of audit?

12   A    Yes.  The defendant did not comply with the audit, and she

13   did not submit any required documentation to Medicare in

14   response to the audit.

15   Q    If you can please look at Government Exhibit 17 --

16            THE COURT:  You can have a long time to look at it

17   because we're going to break right now.

18       Ladies and gentlemen, it's four o'clock.  We're going to

19   break at this time.  Remember the admonishment not to discuss

20   the case among yourselves or with anybody else or form or

21   express any opinions about the matter until it's submitted to

22   you and you retire to the jury room.

23       Have a pleasant evening today.  I don't know what's on TV.

24   Watch American Idol, whatever you're going to watch.  Don't

25   think about this case.  And make sure that you come back in

1    tomorrow, and what time are we going to come in tomorrow?

2             THE JURY:  8:30.

3             THE COURT:  Come right in at 8:15 so we can get

4    started right at 8:30.

5        We'll be in recess.

6             THE CLERK:  All rise.

7                 (Matter adjourned at 4:00 P.M.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                CERTIFICATE OF OFFICIAL REPORTER

 2

 3

 4

 5           I, KHOWOONSUN CHONG, FEDERAL OFFICIAL REALTIME

 6   COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

 7   THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

 8   PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

 9   FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10   STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11   ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

12   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

13   THE UNITED STATES.

14

15                     DATED THIS 26TH DAY OF MAY, 2015.

16

17

18                     /S/ KHOWOONSUN CHONG

19                     _____
                       KHOWOONSUN CHONG, CSR NO. 12907, CRR
20                     FEDERAL OFFICIAL COURT REPORTER

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**