1          UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3      HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

4

5   UNITED STATES OF AMERICA,          )
                                        )
6                    PLAINTIFF,         ) CASE NO.
                                        ) CR 14-259-RGK-1
7          VS.                          )
                                        )
8   SYLVIA OGBENYEANU WALTER-EZE,       )
                                        )
9                    DEFENDANT.         )
    _____)

10

11

12

13

14              REPORTER'S TRANSCRIPT OF
                 JURY TRIAL - DAY 3
15             FRIDAY, MARCH 13, 2015
                      8:33 A.M.
16             LOS ANGELES, CALIFORNIA

17

18

19

20

21

22   _____

23        KHOWOONSUN CHONG, CSR 12907, CRR, RMR
           FEDERAL OFFICIAL COURT REPORTER
24        255 EAST TEMPLE STREET, ROOM 181-G
           LOS ANGELES, CALIFORNIA 90012
25             kchong12907@yahoo.com

UNITED STATES DISTRICT COURT

1               **APPEARANCES OF COUNSEL:**

2

3   **FOR THE PLAINTIFF:**

4       UNITED STATES DEPARTMENT OF JUSTICE
        CRIMINAL DIVISION - FRAUD SECTION
5       BY:  BLANCA QUINTERO
             ALEXANDER PORTER
6       Assistants United States Attorney
        4811 Airport Plaza Drive, Fifth Floor
7       Long Beach, California 90815

8

9   **FOR THE DEFENDANT:**

10      LAW OFFICES OF CHRISTOPHER A. DARDEN
        BY:  OMA N. NKELE
11           CHRISTOPHER DARDEN
        Attorneys At Law
12      11500 West Olympic Boulevard
        Suite 400
13      Los Angeles, California 90064

14

15  ALSO PRESENT:

16      JULIE DRUCKER, SPANISH INTERPRETER

17

18

19

20

21

22

23

24

25

1           **I N D E X**

2           **Friday, March 13, 2015**

3       --------------------------------------------------------

4           <u>**CHRONOLOGICAL INDEX OF WITNESSES**</u>

5

6   WITNESSES                                          PAGE

7   ALISON DAVIS
            DIRECT EXAMINATION (RESUMED) BY MS. QUINTERO    173
8           CROSS-EXAMINATION BY MS. NKELE                  254
            REDIRECT EXAMINATION BY MS. QUINTERO            300
9           RECROSS-EXAMINATION BY MS. NKELE                319

10  WILMER GUZMAN
            DIRECT EXAMINATION BY MS. QUINTERO              322
11          CROSS-EXAMINATION BY MR. DARDEN                 358

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1                  **<u>INDEX OF EXHIBITS</u>**

2           <u>MARKED FOR IDENTIFICATION</u>

3                  (NONE)

4

5            <u>RECEIVED INTO EVIDENCE</u>

6 <u>EXHIBITS</u>                         <u>PAGE</u>

| EXHIBITS | PAGE |
|---|---|
| 17 | 177 |
| 25, 26, 27, 28, and 29 | 187 |
| 30 | 212 |
| 31, 32, 33 | 221 |
| 34 and 35 | 223 |
| 36 and 37 | 226 |
| 38 | 217 |
| 43 | 237 |
| 44 | 203 |
| 45 | 353 |
| 69, 70, 71, 75 | 232 |
| 72, 73, 74 | 243 |
| 76, 77, 78, 79 | 222 |

```
 1              LOS ANGELES, CALIFORNIA; FRIDAY, MARCH 13, 2015

 2                              8:33 A.M.

 3                               -oOo-

 4

 5              (Jury in at 8:33 A.M.)

 6              (The following proceedings were held in the

 7              presence of the jury:)

 8              THE COURT:  The record will reflect that all the

 9     members of the jury are in their respective seats in the jury

10     box, including the alternates.

11         Ladies and gentlemen, I want to thank you very much for

12     being right on time.  This is just a good jury so far.  That

13     way we can get a full day in.  I appreciate that, and we can be

14     more efficient on the trial.

15         We had a witness on the witness stand.

16              MS. QUINTERO:  Yes, Your Honor.

17              THE COURT:  Why don't you retake the stand.

18     Remember, you are still under oath.

19         Why don't you swear her in again because it's a new day.

20              THE CLERK:  Mrs. Davis, you are reminded you remain

21     under oath, having been previously sworn.

22              THE WITNESS:  Yes.

23              THE CLERK:  Please be seated.

24              THE COURT:  You may inquire, Counsel.

25              MS. QUINTERO:  Thank you, Your Honor.
```

1          ALISON DAVIS,

2    called as a witness by the Government, was sworn and testified

3    as follows:

4               DIRECT EXAMINATION (RESUMED)

5    BY MS. QUINTERO:

6    Q    Good morning, Special Agent Davis.

7    A    Good morning.

8    Q    Yesterday we admitted into evidence some photographs of

9    the substantive count beneficiaries.

10   A    Yes.

11   Q    And I just want to briefly have us look at those

12   photographs, but first let me ask you, can you remind the jury

13   what you mean by "substantive count beneficiaries."

14   A    Those are the Medicare beneficiaries referenced in our

15   Indictment in Counts 2 through 6.

16   Q    Okay.  If you can please look at the binder in front of

17   you, we can go ahead and publish page 1 of Government

18   Exhibit 14-A, which already has been admitted into evidence.

19        This is page 1 of Government Exhibit 14.  Who is depicted

20   on this photograph?

21   A    This is Medicare beneficiary Mariano Mendoza.

22   Q    Okay.  And what count is he referenced in the Indictment?

23   A    Count 2.

24   Q    Is Mr. Mendoza expected to testify in this trial?

25   A    Yes, he is.

```
1    Q     And let's go ahead and go now to page 2 of Government

2    Exhibit 14.

3          Who is depicted on this photograph?

4    A     This is Medicare beneficiary Vilma Cruz Munar, who is

5    referenced in Count 3 of our Indictment.

6    Q     And is Munar expected to testify in trial?

7    A     Yes, she is.

8    Q     And now as to Count 4 is referenced Nazario Gutierrez.

9    We'll look at a photograph of him later on, but is he expected

10   to testify in trial?

11   A     No.  His nephew by marriage will be testifying.

12   Q     And that's Javier Calderon?

13   A     Yes.

14   Q     Now, if you can publish page 4 of Government Exhibit 14,

15   if you can tell the jury who is depicted here on page 4 of

16   Exhibit 14.

17   A     This is Medicare beneficiary Mary Winston, who is

18   referenced as Count 5 in our Indictment.

19   Q     And is Ms. Winston expected to testify in trial?

20   A     Yes.

21   Q     And lastly, if you can look at page 1 of Government

22   Exhibit 13, who is depicted in this photograph?

23   A     This is Medicare beneficiary Maria Garibay, who is

24   referenced as Count 6 in the Indictment.

25   Q     Is Ms. Garibay expected to testify in this trial?
```

1    A      Yes, she is.

2    Q      Now, if we can turn to a couple of other exhibits that

3    were admitted yesterday, we can go ahead and publish Government

4    Exhibit 23.  Who is depicted in Government Exhibit 23?

5    A      That is Wilmer Guzman.

6    Q      Okay.  And if we can turn to Government Exhibit 24, who is

7    depicted in Government Exhibit 24?

8    A      Judith Estrella.

9    Q      Now, yesterday -- let me ask you, based on your

10   experience, are you familiar with the term "patient recruiter"

11   or "marketer" in the context of DME?

12   A      Yes.

13   Q      And can you explain to the jury what's meant by that.

14   A      A patient recruiter or marketer for a DME company is a

15   person who literally goes out on the streets -- Walmarts,

16   shopping malls, senior centers -- and tries to recruit

17   Medicare-eligible beneficiaries and convince them to go to

18   physicians' offices with them in order to obtain prescriptions

19   for durable medical equipment, mostly power wheelchairs.

20   Q      And these patient recruiters, are they paid oftentimes?

21   A      Yeah.  The patient recruiters are paid a kickback payment

22   from the DME supplier.

23           MR. DARDEN:  I'm going to object.  No foundation.

24   No relevance.

25           THE COURT:  Overruled.

1              THE WITNESS:   In consideration for each prescription

2    that the Medicare beneficiary that they refer to the company

3    gets.

4    Q    BY MS. QUINTERO:   Again, based on your experience in

5    investigating these type of cases so forth, what are we talking

6    about as far as type of kickbacks?

7    A    The kickbacks --

8              MR. DARDEN:   Objection.   Irrelevant.

9              THE COURT:   Overruled.

10             THE WITNESS:   The kickback payments usually range

11   from about $300 to a thousand dollars, depending on the type of

12   equipment that the Medicare beneficiary gets a prescription

13   for.

14   Q    Now, yesterday we were talking about Medicare's audit of

15   Ezcor that was in March of 2012.

16   A    Yes.

17   Q    And that's where Medicare requested that Ezcor provide

18   certain documents pertaining to a hundred beneficiaries.   Do

19   you remember that?

20   A    Yes.

21   Q    Now, during the course of your investigation, did you

22   determine whether or not the defendant actually complied with

23   Medicare's audit and submitted any of the requested documents?

24   A    Yes.   The defendant did not comply with the audit and did

25   not submit any requested documents in response to the audit.

**UNITED STATES DISTRICT COURT**

```
 1  Q    Okay.  If you can please turn to the binder in front of
 2  you and look at Government Exhibit 17, please.
 3       I believe we have a stipulation with regards to
 4  admissibility of Government Exhibit 17, pursuant to 902.11
 5  certification.
 6            MR. DARDEN:  May I have one moment, Your Honor.
 7            THE COURT:  Certainly.
 8       Talking about Exhibit 17?
 9            MS. QUINTERO:  Yes, Your Honor.
10            MR. DARDEN:  No objection, Your Honor.
11            THE COURT:  It may be received.
12            MS. QUINTERO:  Thank you, Your Honor.
13                (Exhibit 17 received into evidence.)
14            MS. QUINTERO:  Also, Your Honor, yesterday I believe
15  Government Exhibit 16 was conditionally admitted.  At this
16  point, now that we've moved on from Government Exhibit 16, can
17  we get it admitted into evidence.
18            THE COURT:  Any objection?
19            MR. DARDEN:  Yes, Your Honor.
20            THE COURT:  I'll have to go back and look at the
21  notes of that, Counsel.  16 was what?
22            MS. QUINTERO:  I'm sorry.  Government Exhibit 16.
23            THE COURT:  Was what?
24            MS. QUINTERO:  It was yesterday conditionally
25  admitted.
```

```
 1              THE COURT:  What was Exhibit 16?

 2              MS. QUINTERO:  It's the audit notice, Your Honor.

 3              THE COURT:  I'm going to take that under submission.

 4    I'll take a look at the notes.

 5              MS. QUINTERO:  Thank you, Your Honor.

 6    Q    BY MS. QUINTERO:  Let's go ahead and publish Government

 7    Exhibit 17.  What is the date of this letter?

 8    A    April 9, 2012.

 9    Q    Just briefly, can you explain to the jury what Government

10    Exhibit 17 is.

11    A    This is a letter from the defendant, Sylvia Walter-Eze, to

12    Medicare, notifying them of a voluntary termination of Ezcor's

13    supplier number.

14    Q    And let's -- if we can go ahead and zoom in on paragraph 2

15    there, the second paragraph, can you please read the second

16    paragraph there of that letter that's highlighted, "Please

17    note."

18    A    "Please note that, after due consideration, we have

19    decided to withdraw our revalidation application with effect

20    from and including May 1st, 2012."

21    Q    Whose name appears down below?

22    A    The defendant, Sylvia Walter-Eze.

23    Q    Now, the fact that the defendant withdrew from being a

24    Medicare provider and was no longer a Medicare provider as of

25    May 1st, 2012, did that absolve Ezcor of its obligations to
```

```
 1   comply with the audit?

 2   A     No.

 3   Q     Why is that?

 4   A     Medicare requires its suppliers to keep documentation for

 5   six years and three months after Medicare pays the claim.

 6   Q     And does a Medicare provider still have this obligation

 7   even if the business is no longer operating?

 8   A     Yes.

 9   Q     And what if the business is no longer a Medicare provider,

10   do they still have that obligation to maintain those documents

11   for that period of time?

12   A     Yes.

13   Q     Now, the fact that Ezcor voluntarily deactivated its

14   Medicare provider number, was this during your investigation

15   concerning to you?

16   A     Yes.

17   Q     Why is that?

18              MR. DARDEN:  Objection.  Irrelevant.

19              THE COURT:  Sustained.

20   Q     BY MS. QUINTERO:  During your investigation, did you learn

21   of the defendant's deactivation of the Medicare provider

22   number?

23   A     Yes, I did.

24   Q     As a result of that, did you have any concerns --

25              MR. DARDEN:  Same objection.
```

**UNITED STATES DISTRICT COURT**

1           THE COURT:  Well, I think it's one question

2    premature; so it will be overruled at this time.

3       Did have you any concerns?

4           THE WITNESS:  Yes.

5           THE COURT:  Okay.

6    Q    BY MS. QUINTERO:  And what were those concerns?

7           THE COURT:  Sustained.

8       I'm sorry, Counsel.  Did you want to make an --

9           MR. DARDEN:  Objection.

10          THE COURT:  Sustained.

11   Q    BY MS. QUINTERO:  Now, prior to this letter of April 9,

12   2012, had the defendant just submitted their re-enrollment

13   application?

14   A    Yes.  I believe that was March 21st, 2012.

15   Q    So approximately how much time before deciding to

16   voluntarily deactivate its Medicare provider number?

17   A    Just a few weeks, maybe three weeks.

18   Q    So three weeks before this letter, if we can keep that

19   letter up, please -- so three weeks before that letter, the

20   defendant had revalidated its Medicare provider number;

21   correct?

22   A    That's correct.

23   Q    And some time after revalidating that Medicare provider

24   number, was the notice of audit sent to Ezcor?

25   A    Yes.  The notice of audit was dated March 27th, 2012.

```
 1   Q    And some time -- how long after that March 27, then, was
 2   this letter that we're looking at, Government Exhibit 17?
 3   A    About two weeks.
 4   Q    Okay.  That sequence of events, if you will, that
 5   timeline, was this concerning to you during your investigation?
 6   A    Yes.
 7   Q    And just -- we're talking about the re-enrollment
 8   application of March 2012; right?
 9   A    Yeah.
10   Q    That's the one we saw in Government Exhibit 6 with
11   Mr. Person?
12   A    Yes.
13   Q    Now, as a result of the concerns that you had, because of
14   the defendant's voluntary deactivation of her Medicare provider
15   number, what did law enforcement do?
16   A    We prepared and executed a search warrant at Ezcor's
17   offices on May 25, 2012.
18   Q    Now, we'll discuss the execution of the search warrant at
19   Ezcor a little later, but in the meantime let me ask you, as it
20   relates to the audit, during your investigation did you learn
21   the final status of the audit?
22   A    Yes.
23   Q    And what was the final status of the audit?
24             MR. DARDEN:  Objection.  Calls for conclusions.
25             THE COURT:  Sustained.
```

```
 1              MS. QUINTERO:  Okay.  If we can turn to Government
 2    Exhibit 18, do we have a stipulation on that subject to 902.11
 3    certification?
 4              MS. NKELE:  (Inaudible.)
 5              THE REPORTER:  I can't hear her, Your Honor.
 6              MS. NKELE:  What is it?
 7              MS. QUINTERO:  It's the final audit notice, final
 8    results of the audit notice pursuant to the 902.11
 9    certification.
10              MR. DARDEN:  May I have one moment, Your Honor.
11              THE COURT:  Please.
12              MR. DARDEN:  Your Honor, we continue to object to
13    Exhibit No. 18.
14              THE COURT:  Okay.
15              MS. QUINTERO:  Your Honor, we do have a 902.11
16    certification for business record of Government Exhibit 18.
17              THE COURT:  Why don't you lay the foundation --
18              MS. QUINTERO:  Okay.
19              THE COURT:  -- if you can.  I don't know if this
20    witness can do it or not.
21              MS. QUINTERO:  Okay.
22    Q    BY MS. QUINTERO:  During your investigation, Special Agent
23    Davis, did you become aware of the final result of the Medicare
24    audit?
25    A    Yes.
```

```
 1   Q     And what did you ultimately learn was the final result of
 2   that audit?
 3              MR. DARDEN:  Objection.  Calls for a conclusion.
 4   And hearsay.
 5              THE COURT:  Sustained.
 6              MS. QUINTERO:  Okay.
 7              THE COURT:  If it's a business record, if the
 8   results of the audit is part of the business record, you can
 9   introduce it as a business record if you lay the foundation.
10              MS. QUINTERO:  Okay.
11              THE COURT:  I just don't know if this witness can
12   lay the foundation.
13              MS. QUINTERO:  No, Your Honor.  She's not the
14   custodian of records of this.
15              THE COURT:  Okay.
16   Q    BY MS. QUINTERO:  Now, to your knowledge, was any type of
17   overpayment assessed to the defendant?
18   A     Yes.
19              MR. DARDEN:  Objection, Your Honor.  Motion to
20   strike.
21              THE COURT:  Overruled.
22              THE WITNESS:  Yes.
23   Q    BY MS. QUINTERO:  Now, let's talk about the search warrant
24   that you mentioned.  In the midst of its investigation, law
25   enforcement executed a federal search warrant at Ezcor?
```

**UNITED STATES DISTRICT COURT**

```
 1   A     Yes.

 2   Q     Again when -- when was this?

 3   A     May 25th, 2012.

 4   Q     And where did you execute that search warrant?

 5   A     At Ezcor's offices located at 25383 Wayne Mills Place in

 6   Valencia, California.

 7   Q     And why did law enforcement execute the search warrant at

 8   Ezcor's office in Valencia?

 9   A     We had probable cause to believe that Ezcor was committing

10   Medicare fraud.  And because the provider had deactivated her

11   Medicare number, we were worried that we weren't going to be

12   able to get those medical records.

13   Q     And were you personally involved in executing the search

14   warrant at Ezcor?

15   A     Yes, I was.

16   Q     And during the course of executing the search warrant, did

17   law enforcement seize a fair amount of documentation from

18   Ezcor?

19   A     Yes.

20   Q     And has law enforcement maintained that documentation in

21   its custody since the search of Ezcor?

22   A     Yes.

23   Q     Okay.  Let's briefly talk about some of that

24   documentation.  Okay?

25   A     Okay.
```

1    Q     When you were at Ezcor's offices, did you locate and

2    recover patient files and patient records?

3    A     Yes.

4    Q     And when we're talking about patient files here, are we

5    talking about Ezcor's patient files or the patient files of the

6    physicians, if you will?

7    A     We're talking about Ezcor's patient files.

8    Q     And why, as a criminal investigator, would you want to

9    obtain Ezcor's patient files and records during a search?

10   A     Well, the patient files should contain information

11   supporting the claim and medical necessity by Ezcor to

12   Medicare, or it might contain -- supporting the allegations

13   that Ezcor billed Medicare for services that were not medically

14   necessary.

15   Q     If you will go ahead and open the binder in front of you

16   and just look at Government Exhibits 25 through 29.

17   A     Okay.

18   Q     And can you describe for the jury what we're -- what we

19   have there on Government Exhibits 25 through 29.

20   A     These are the patient records seized from Ezcor during the

21   execution of the search warrant for our substantive count

22   beneficiaries.

23   Q     The beneficiaries in the photographs we just saw

24   earlier --

25   A     Yes.

```
 1   Q     -- today?

 2   A     Yes.

 3             MS. QUINTERO:  Your Honor, at this time I would like

 4   to introduce and admit into evidence Government Exhibits 25,

 5   26, 27, 28, and 29.

 6             MR. DARDEN:  May I have two moments, Your Honor.

 7             THE COURT:  Yes, you can.

 8         While he's talking, these are documents that were

 9   recovered in your presence?

10             THE WITNESS:  Yes.

11             THE COURT:  Okay.

12             MR. DARDEN:  No objection to 25.  No objection to

13   26.  Objection to 27.  No objection to 28.  Finally, no

14   objection to 29, Your Honor.

15             THE COURT:  Objections to which one of them?

16             MR. DARDEN:  No objections to 25 through 29.

17             THE COURT:  No objection to 25, 29.  There is an

18   objection to --

19             MS. NKELE:  No.

20             MR. DARDEN:  No objections to any of the --

21             THE COURT:  Okay.

22             MR. DARDEN:  25 through 29.

23             THE COURT:  I didn't hear whether you said no

24   objection or objection.

25             MR. DARDEN:  Thank you.
```

```
 1              THE COURT:  Okay.  They may be received.
 2              MS. QUINTERO:  Thank you, Your Honor.
 3                  (Exhibits 25, 26, 27, 28, and 29 received into
 4                  evidence.)
 5   Q    BY MS. QUINTERO:  Let's go through a couple of these
 6   files, just to give the jury an idea of what documentation is
 7   located inside of it.  What type of documents usually make up a
 8   patient file for a DME supplier like Ezcor?
 9   A    Prescriptions, face-to-face examinations, home assessment
10   evaluations, physician's history, physicals, notes, delivering
11   tickets.
12   Q    Let's talk about Mariano Mendoza.  What count is he
13   referenced in the Indictment?
14   A    Count 2.
15   Q    Now, let's look at page 8 of government Exhibit 25.  What
16   do we have here?
17   A    This is a detailed product description for power mobility
18   device form for Mr. Mendoza.
19   Q    What's the significance of a document like this?
20   A    The supplier is supposed to complete this form.  It shows
21   the -- the items that the -- the supplier is going to deliver
22   to the beneficiary, and it's given to the physician to sign.
23   Q    And according to this document, what are some of the items
24   to be delivered to Mr. Mendoza?
25   A    Power wheelchair with accessories, such as a battery,
```

1  reclining back, and an armrest.

2  Q    And if you will turn now to page 5 of Government

3  Exhibit 25, what is this that we're looking at?

4  A    This is the home assessment evaluation form for

5  Mr. Mendoza.

6  Q    And what exactly is a home assessment evaluation form?

7  A    Prior or at the time of delivering a power wheelchair to

8  the beneficiary, the supplier is required to complete a home

9  assessment of the patient's home.  So basically to look at the

10 home and make sure there's enough room in the home for the

11 patient to adequately maneuver the power wheelchair throughout

12 their home.

13 Q    And why is it important that the home is such that a power

14 wheelchair can fail to be properly maneuvered within the

15 beneficiary's home?

16 A    Well, Medicare pays for power wheelchairs for

17 beneficiaries to complete their daily living activities within

18 their home.

19 Q    And when you're talking about daily living activities,

20 what are you talking about?

21 A    Grooming, bathing, cooking, things like that.

22 Q    And the power wheelchair needs to be -- I'm sorry.  The

23 home needs to be sufficiently big enough to be able to maneuver

24 the power wheelchair within the house?

25 A    Yes.

1    Q    Okay.  If we can turn to page 7 of Government Exhibit 25,
2    what are we looking at here?
3    A    This is a prescription for Mr. Mendoza for a power
4    mobility device.
5    Q    And who is the prescribing physician on this prescription
6    that we're looking at here?
7    A    This is Dr. Mezia Azinge-Obasi.
8    Q    This is one of the top referring physicians that we
9    previously talked about?
10   A    That's correct.
11   Q    Based on this prescription, what is Mr. Azinge-Obasi
12   prescribing?
13   A    A power wheelchair.
14   Q    If we can turn to page 9, can you explain to the jury what
15   we're looking at here.
16   A    This is a history and physical note to be completed by the
17   physician for Mr. Mendoza.
18   Q    And this is something that's typically completed by the
19   physician, you said?
20   A    Yes.
21   Q    In looking at this form, was there something that stood
22   out to you within this form?
23   A    Yes.
24   Q    We can blow up that part there.  What exactly -- what is
25   it we're looking at here?

1   A     This is a note within the history and physical.  It says

2   cataract in both eye, good vision.

3   Q     Okay.  And why did this stand out for you?

4   A     Well, Mr. Mendoza is legally blind and had limited vision

5   at the time of this exam.  So good vision is not an accurate

6   statement for Mr. Mendoza.

7   Q     And was this concerning to you as a criminal investigator?

8   A     Yes.

9   Q     Why?

10  A     The physician completing this form put in information in

11  this form that's not correct.  So, to me, either the physician

12  did not actually examine Mr. Mendoza, or the physician wrote

13  false information in the form in order to support the necessity

14  for the power wheelchair.

15  Q     And the last document I want to show you on this exhibit,

16  if we can look at pages 11 and 12, what do we have here?

17  A     This is a face-to-face exam for the power mobility device.

18  Q     Can you just briefly explain to the jury what a

19  face-to-face is -- examination form is.

20  A     A face-to-face is an exam conducted by the ordering

21  physician of the beneficiary.  It's a list of questions they go

22  through to determine the medical necessity for the power

23  wheelchair.

24  Q     Now, these documents that we've briefly looked at in

25  Mr. Mendoza's patient file, for the most part were these

```
 1   documents something that law enforcement found customary
 2   throughout Ezcor's patient files?
 3   A    Yes.
 4   Q    Let's talk about another patient file, Vilma Cruz Munar.
 5   What count is she referenced in the Indictment?
 6   A    Count 3.
 7   Q    Let's look at Government Exhibit 26, page 15.  What is it
 8   that we're looking at here?
 9   A    This is a Medicare eligibility printout form for Ms. Cruz
10   Munar.
11   Q    Now, at the very top do you see the name Judy there?
12   A    Yes.
13   Q    Blow that up.  What's the significance of that notation?
14   A    We learned through our investigation that Judy referred to
15   Judith Estrella, who was a patient marketer, patient recruiter
16   for Ezcor.
17   Q    And just to be clear, did you and agents review all of the
18   patient files seized from Ezcor?
19   A    Yes.
20   Q    Did a lot of the patient files appear to have the name of
21   Judy or some other individuals known to agents as patient
22   recruiters as we see here?
23   A    Yes.  Over two-thirds of the patient charts had names such
24   as Judy, Wilmer, Candi, Heidi, and other patient recruiters.
25   Q    Any others that you --
```

```
 1   A      No.

 2   Q      -- found as you reviewed the patient files?

 3   A      Jean Aves, Emilio Lagasca.

 4   Q      If you look at page 16 of Government Exhibit 26, what do

 5   we have here?

 6   A      This is a contact memo sheet found in Ms. Munar's patient

 7   file.

 8   Q      If we can blow up that portion there, what specifically

 9   was significant to you in what's here on this contact sheet?

10   A      These are handwritten notes that appear to be written by

11   two different people, talking about a complaint that came in to

12   Ezcor about a -- the patient recruiter Judy, and that Judy had

13   offered to pay the Medicare beneficiary's son $400 to keep the

14   power wheelchair that Ezcor delivered.

15   Q      And why was this significant to you?

16   A      It says in this memo that Sylvia, the supervisor Sylvia,

17   was notified of this.  So Sylvia was the defendant, was aware

18   that Judy, who was a patient recruiter for Ezcor --

19              MS. NKELE:  Objection.

20              THE COURT:  Sustained as to whether or not she was

21   aware.

22       Next question.

23              MS. QUINTERO:  Okay.

24              THE COURT:  It's conclusory as to whether or not she

25   was aware or not.
```

1          MS. QUINTERO:  Okay.

2    Q    BY MS. QUINTERO:  Taking out whether or not the defendant

3    was aware, what specifically was significant as far as what

4    we're looking at there on that notation?

5    A    The notation says that Judy, the patient recruiter --

6          MS. NKELE:  Objection.

7          THE COURT:  Overruled.

8          THE WITNESS:  -- offered to pay a kickback to the

9    beneficiary to keep a power wheelchair.

10   Q    BY MS. QUINTERO:  Is there a name "Sylvia" there?  Can you

11   read that portion?

12   A    Yes.  It says "I reported this to my supervisor, Sylvia."

13   Again, it says "Sylvia, who was contacted" -- I think is what

14   it's supposed to say.

15   Q    Okay.  And why was this significant to you?

16   A    Well, according to this note, Sylvia the supervisor was

17   told about Judy offering the $400 kickback to the Medicare

18   beneficiary in September of 2010.  However, according to the

19   bank records, we know that the defendant continued to pay Judy,

20   Judith Estrella, up until at least June of -- June of 2011.

21   Q    So well after this notation that we're looking at here in

22   this contact memo?

23   A    Yes.

24   Q    Now, let's look at Nazario Gutierrez, this patient file.

25   What count is he referenced in the Indictment?

1    A    Count 4.

2    Q    Now, looking at his patient file, we can look at

3    Government Exhibit 27, page 10.  What do we have here?

4    A    This is another Medicare eligibility printout form for

5    Mr. Gutierrez.

6    Q    So similar to what we saw just a minute ago?

7    A    Yes.  It's similar to the one we saw in Ms. Munar's file,

8    only this printout just shows that Mr. Gutierrez is eligible

9    for Medicare benefits, whereas the other one we saw details

10   more of what Medicare -- which Medicare benefits Ms. Munar was

11   eligible for.

12   Q    On the top right-hand corner, again we see a name.  What

13   is that?

14   A    Wilmer.

15   Q    So again that's similar to the name of Judy that we saw in

16   the other Medicare eligibility form?

17   A    Yes.

18   Q    Why was this notation significant?

19   A    We learned through our investigation that Wilmer was

20   Wilmer Guzman, who was a patient recruiter for Ezcor.

21   Q    Now, let's briefly look at another patient file.  What do

22   we have on Government Exhibit 28?

23   A    This is a patient file for Mary Winston, who is Count 5 in

24   the Indictment.

25   Q    Now, looking at her patient file, page 18 of Government

```
 1   Exhibit 28, what are we looking at here?
 2   A    This is the Medicare eligibility printout for Ms. Winston.
 3   Q    Somewhat similar to what we saw, I guess -- is it
 4   Ms. Munar's?
 5   A    Yes.
 6   Q    And again on the very top right-hand corner, we see a name
 7   again, Wilmer; is that right?
 8   A    That's correct.
 9   Q    And now underneath the name Wilmer, what do we see there?
10   A    It says Azinge.
11   Q    And based on your investigation, did you have an
12   understanding as to what that referred to?
13   A    Yes.  Azinge refers to --
14            MR. DARDEN:  Objection.  That's a conclusion,
15   Your Honor.
16            THE COURT:  Why don't you lay the foundation.
17            MS. QUINTERO:  Okay.
18   Q    BY MS. QUINTERO:  During -- during -- during the course of
19   your investigation, did you learn of the identity of an
20   individual by the name of Azinge?
21   A    Yes.
22   Q    And what is -- what is the complete name of Azinge?
23   A    Mezia Azinge-Obasi.
24   Q    Based on your investigation, who was Azinge-Obasi?
25   A    She was one of the top referring physicians for Ezcor and
```

1    was --

2    Q    Go ahead.

3    A    And was the referring physician on Mary Winston's claim.

4    Q    And were -- were these notations, Wilmer, again

5    significant?

6    A    Yes.

7    Q    Why were they significant?

8    A    Again, Wilmer Guzman was a patient marketer for Ezcor.

9            MS. NKELE:  Objection.  Assuming facts not in

10   evidence.  There's no --

11           THE COURT:  Sustained.  Sustained.

12   Q    BY MS. QUINTERO:  Now, I'll move on.  One last thing that

13   I wanted to show you on Ms. Winston's patient file, if you look

14   at page 19, what do we have here?

15   A    This is a photograph of Ms. Winston, sitting on a power

16   wheelchair.

17   Q    Was this something that law enforcement saw that was

18   customary throughout Ezcor's patient files?  In other words,

19   pictures of the beneficiaries sitting on the power wheelchairs?

20   A    Yes.

21   Q    And while I didn't show it to you, in Mr. Gutierrez's and

22   Ms. Munar's patient files are there similar pictures of them

23   either sitting on the power wheelchair or sitting next to it?

24   A    Yes.

25   Q    And I'm not going to go into Maria Garibay's patient file,

1   but is Ms. Garibay also a substantive count beneficiary?

2   A    Yes.  She's referenced in Count 6 of the Indictment.

3   Q    Okay.  Is Ms. Garibay expected to testify in trial?

4   A    Yes, she is.

5   Q    Does her patient file also contain one of these Medicare

6   eligibility printouts that we saw with Ms. Munar and

7   Ms. Winston and so forth --

8   A    Yes.

9   Q    -- the beneficiaries?

10  A    She has one that says "Wilmer" on top.

11  Q    Now, other than these patient files we briefly looked at,

12  were there other patient files that were seized by agents

13  during the execution of search warrant?

14  A    Yes.  We seized over 200 patient files from Ezcor.

15  Q    And did you personally review all of these other patient

16  files?

17  A    Yes, I did.

18  Q    And from your review of these patient files, did other

19  patient files have the name Judy, Wilmer, or other individuals

20  known to law enforcement as patient recruiters?

21  A    Yes.  More than two-thirds of them had that information in

22  it.

23  Q    On a Medicare eligibility form or elsewhere?

24  A    Yes.

25  Q    Now, we're going to come back to some other patient files

1   in a little bit and other documents seized from Ezcor during

2   the search warrant.

3       But first let me ask you, at some point during your

4   investigation, did you interview the defendant?

5   A    Yes.

6   Q    Other than yourself, who was involved in this interview of

7   the defendant?

8   A    Special agent Eric Froeschner.

9   Q    And Agent Froeschner is with which agency?

10  A    The California Department of Justice.

11  Q    And when did you first interview the defendant?

12  A    We first interviewed the defendant right before the

13  execution of the search warrant on May 25th, 2012, and then

14  again on that same day during the execution of the search

15  warrant.

16  Q    Okay.  And then after -- so there's two interviews

17  there -- right? -- on the day of the search warrant?

18  A    That's correct.

19  Q    That was May 25th, 2012?

20  A    Yes.

21  Q    The first, one you said, was immediately before -- before?

22  A    That's correct.

23  Q    And the second one was during the execution; right?

24  A    Yes.

25  Q    Now, the first interview, the one immediately before, who

**UNITED STATES DISTRICT COURT**

```
 1   was present when you interviewed the defendant?
 2   A     It was Special Agent Froeschner, the defendant, and I.
 3   Q     Okay.  Were any other agents there at that time when you
 4   were interviewing the defendant for the first time?
 5   A     No.
 6   Q     Were any other agents present there during the interview
 7   that were going to be executing the search warrant?
 8   A     No.
 9   Q     Okay.  Was there any indication, by yourself or otherwise
10   during this interview, as you were interviewing the defendant,
11   that you, in fact, were going to be executing the search
12   warrant?
13   A     Yes.  At the end of the interview, we informed the
14   defendant that we were going to be conducting a search warrant.
15   Q     Okay.  But that was at the end of the interview; is that
16   right?
17   A     That's correct.
18   Q     No indication before that?
19   A     No.
20   Q     Okay.  And after these two interviews on May 25th, 2012,
21   was there a subsequent interview?
22   A     Yes.  We again interviewed the defendant at her residence
23   about eight months later on January 24th, 2013.
24   Q     So we have three interviews?
25   A     Yes.
```

1    Q     One immediately before the search warrant on May 25th,

2    2012; a second one during the execution of the search warrant;

3    and a third one on January of the following year, 2013; right?

4    A     That's correct.

5    Q     Eight months later or so?

6    A     Yes.

7    Q     Now, during these interviews did the defendant agree to

8    talk to you in those instances?

9    A     Yes.

10   Q     Now, when you interviewed the defendant on the day of the

11   search warrant, combined, those two interviews that we talked

12   about -- the one immediately before and one during the

13   execution -- how long roughly would you say that those two

14   interviews combined lasted?

15   A     About an hour and a half.

16   Q     And those two interviews, were those two interviews

17   recorded?

18   A     Yes, they were.

19   Q     If you can turn to your binder there and look at

20   Government Exhibit 44, and before today did you have an

21   opportunity to review that CD?

22   A     Yes.  Yes.

23   Q     What does that CD contain?

24   A     This CD contains the recording of the interviews done of

25   the defendant on May 25th, 2012.

```
1    Q    And that's the -- both interviews?

2    A    That's correct.

3    Q    And does that contain the entire roughly one and a half

4    hour or so long interviews of the defendant on that day?

5    A    Yes, it does.

6    Q    Does that audio recording fairly and accurately reflect

7    the interviews that you had of the defendant on May 25th, 2012?

8    A    Yes.

9              MS. QUINTERO:  Your Honor, at this time I would like

10   to introduce and move into evidence Government Exhibit 44.

11             MR. DARDEN:  We object, Your Honor.

12             THE COURT:  And the grounds of the objection is

13   hearsay or --

14             MR. DARDEN:  Yes, Your Honor.  Hearsay and relevancy

15   as to some parts.

16             THE COURT:  Overruled at this time.  Overruled.

17             MS. QUINTERO:  Okay.

18             MR. DARDEN:  May I be heard further at the break,

19   Your Honor.

20             THE COURT:  Certainly.

21             MS. QUINTERO:  Your Honor, at this time I would like

22   to publish just a very small portion of the recording for the

23   jury to listen.  We have --

24             THE COURT:  And I'm assuming that part of the

25   objection -- we'll talk about it at the recess.  Part of the
```

```
 1    objection is that you may object to parts of it?

 2              MR. DARDEN:  Yes.

 3              THE COURT:  Why don't you talk with him right now

 4    and find out if that's a part that may be objected to.

 5                   (Counsel confer sotto voce.)

 6              MS. QUINTERO:  Can it be admitted?

 7              MR. DARDEN:  I have no objection to the small

 8    portion that counsel is about to play, Your Honor.

 9              THE COURT:  You can play that small portion,

10    Counsel.

11              MS. QUINTERO:  Yes, Your Honor.  Thank you.

12              THE COURT:  Are you going to be playing it?

13              MS. QUINTERO:  Yes, Your Honor, we are.

14              THE COURT:  Ladies and gentlemen --

15              MS. QUINTERO:  If --

16              THE COURT:  Sometimes you can hear it, sometimes you

17    can't.  But what is being played for you, listen as carefully

18    as you can and see if you can understand it.

19              MS. QUINTERO:  Your Honor --

20              THE COURT:  Also, I'm assuming, if it's going to be

21    played, there's no need to have the reporter transcribe the

22    evidence being played.

23              MS. QUINTERO:  I'm sorry, Your Honor?

24              THE COURT:  Anytime we have audio or video, we

25    normally don't have the reporter transcribe it because it's
```

 1   part of the evidence.

 2            MS. QUINTERO:  That's fine, Your Honor.

 3        And if we may, we have some transcripts that we would like

 4   to have them handed to the jury.

 5            THE COURT:  Have you shown them to counsel?

 6            MS. QUINTERO:  Yes, we have, Your Honor.

 7            THE COURT:  It's just those portions?

 8            MS. QUINTERO:  Yes, Your Honor.

 9            THE COURT:  Again, these are transcripts of what was

10   recorded, to help you listen to the tape.  What you hear

11   actually is what is the evidence, not the transcripts.

12            MS. QUINTERO:  And it has been admitted, Your Honor?

13            THE COURT:  Yes.

14            MS. QUINTERO:  Thank you, Your Honor.

15            (Exhibit 44 received into evidence.)

16   Q    BY MS. QUINTERO:  Now, Special Agent Davis, before we get

17   started on it, are we going to be listening to --

18            THE REPORTER:  Slow down, Counsel.

19            THE COURT:  You're going to fast.  Slow down.

20   Q    BY MS. QUINTERO:  Are we going to be listening to the

21   entire recording?

22   A    No.

23   Q    Why aren't we listening to the whole recording?

24   A    The whole recording is about an hour and a half long.

25   Q    That being said, were there some portions of these

```
 1    interviews that were particularly important?
 2    A     Yes.
 3    Q     And what specifically was particularly important in these
 4    two recordings?
 5    A     In these portions the defendant admits that she was aware
 6    that it was illegal to pay individuals money to refer her
 7    patients.  She calls it a kickback, and she says she would --
 8    she did not do that and never would do that.
 9    Q     Now, we're going to go ahead and play the first clip.
10          First, let me ask you -- there's two clips here -- in this
11    first clip, what happens in this first clip?
12    A     The defendant admits that she's aware it's illegal to pay
13    somebody to refer her patients.  She calls it a kickback, and
14    she says she did not do that.
15                MS. QUINTERO:  Let's go ahead and play that.
16                  (Playing audio recording.)
17    Q     BY MS. QUINTERO:  Now, do you recognize the voices on this
18    recording?
19    A     Yes.
20    Q     Whose voice is it that says or asks, "Are you aware it's
21    illegal to pay somebody?"
22    A     Special Agent Eric Froeschner.
23    Q     And whose voice do you recognize that responded "Of
24    course"?
25    A     The defendant, Sylvia Walter-Eze.
```

1    Q    Whose voice is it that says, "It's illegal to pay somebody

2    money to refer patients to you.  You understand that; right?"

3    A    Special Agent Froeschner.

4    Q    Whose voice do you recognize that says "I mean, that's

5    kickback.  Why would I do that?  Why would I do that?"

6    A    The defendant, Sylvia Walter-Eze.

7    Q    Again, whose voice do you recognize that said "It's not

8    morally right" and says also "It doesn't give you the good

9    judgment to be able to decide to refer the person to me"?

10   A    The defendant, Sylvia Walter-Eze.

11   Q    And then the same voice, "because then you're influenced

12   by money"?

13   A    Yes, the defendant.

14   Q    Now, were these statements by the defendant significant?

15   A    Yes.

16   Q    And why were they significant to you?

17            MR. DARDEN:  Objection.  Irrelevant.

18            THE COURT:  Sustained.

19   Q    BY MS. QUINTERO:  What was concerning to you about these

20   statements?

21            MR. DARDEN:  Same objection, Your Honor.

22            THE COURT:  Overruled.  Excuse me.  Sustained.

23   Q    BY MS. QUINTERO:  What did you understand her statements

24   to mean?

25            MR. DARDEN:  Objection.  Irrelevant.

1          THE COURT:  Again.  Those are jury determinations.

2    Q     BY MS. QUINTERO:  Now --

3          THE COURT:  Sustained.

4    Q     BY MS. QUINTERO:  We heard the defendant calling it a

5    kickback; right?

6    A     Correct.

7    Q     And we heard the defendant say it's a kickback?

8    A     Yes.

9    Q     Now, prior to that -- okay.  During this interview but

10   prior to this, what we just heard, had either you or Special

11   Agent Froeschner even mentioned the word "kickback" to the

12   defendant at all?

13   A     No.

14   Q     So first time that word is uttered, the word "kickback,"

15   it's from the defendant which we just heard?

16   A     Yes.  The defendant brings it up on her own.

17   Q     In your questions or in Special Agent Froeschner's

18   questions prior to this, had you ever mentioned the word

19   "kickback"?

20   A     No.

21   Q     So now let's continue with the second clip.  What happens

22   in the second clip?

23   A     The defendant continues to deny that she ever paid anybody

24   money to refer her patients.

25          MS. QUINTERO:  And let's go ahead and play that

 1   clip.

 2              (Playing audio recording.)

 3   Q    BY MS. QUINTERO:  Whose voice is it that you recognize

 4   that said, "I think you've been paying people money to refer

 5   patients"?

 6   A    Special Agent Froeschner.

 7   Q    Whose voice is it that we heard that responded, "Certainly

 8   not"?

 9   A    The defendant, Sylvia Walter-Eze.

10   Q    And also the voice that said, "I am not paying anybody any

11   money," whose voice is that?

12   A    The defendant, Sylvia Walter-Eze.

13   Q    And what was significant about these statements to you?

14              MR. DARDEN:  Objection.  Irrelevant.

15              THE COURT:  Sustained.

16   Q    BY MS. QUINTERO:  During your investigation, did you come

17   across evidence that was inconsistent with these statements by

18   the defendant?

19   A    Yes.

20              MR. DARDEN:  Objection.  Calls for a conclusion.

21   Motion to strike.

22              THE COURT:  Overruled.  Overruled.

23              THE WITNESS:  Yes.

24   Q    BY MS. QUINTERO:  And what is it that you came across that

25   was inconsistent with these statements?

```
 1                MR. DARDEN:  Same objection, Your Honor.

 2                THE COURT:  Court will treat it as a continuing

 3     objection.

 4           This is what you thought was inconsistent?

 5                THE WITNESS:  Yes.  That's correct.

 6                THE COURT:  Okay.  There's a difference between --

 7     in other words, what is inconsistent, that's what counsel is

 8     objecting to, that you make a conclusion it's inconsistent.  It

 9     may or may not be.  It's what we understand is your opinion.

10           You thought it was inconsistent; so you did something

11     else; is that correct?

12                THE WITNESS:  That's correct.

13                THE COURT:  Okay.  Go ahead.

14                THE WITNESS:  Yes.  These statements were

15     inconsistent, seemed to be inconsistent with the evidence of

16     our case, especially because eight months later, when we

17     re-interviewed the defendant at her residence, she ultimately

18     admitted after we showed her --

19                MS. NKELE:  Objection, Your Honor.

20                THE COURT:  Overruled.

21                THE WITNESS:  After we showed her some evidence that

22     we got at the search warrant, she ultimately eventually

23     admitted that she did, in fact, pay people money to refer her

24     patients.  And they -- she called them "independent

25     associates."
```

```
 1   Q     BY MS. QUINTERO:  Okay.  And so this was the January 2000
 2   interview?
 3   A     The January 24, 2013, yes.
 4   Q     Okay.  And this was about eight months after this initial
 5   interview on the day of the search warrant?
 6   A     That's correct.
 7   Q     And who besides yourself was involved in that interview?
 8   A     Special Agent Froeschner.
 9   Q     And you indicated at that time she, in fact, admitted to
10   paying people money to refer patients to her?
11   A     Yes, she did.
12   Q     And when she admitted paying people money to refer
13   patients to her, do you remember what she called her payments?
14   A     In the interview, the third interview, she said they were
15   commissions.
16   Q     Okay.  And you previously mentioned the word "independent
17   associate."  Is that the people she said that she would pay the
18   money to refer or recruit patients for her?
19   A     Yes.
20   Q     And was Wilmer one of these independent associates?
21   A     Yes.
22   Q     And did the defendant confirm to you that Wilmer was an
23   independent associate?
24   A     Yes, she did.
25   Q     And at this time during this interview, did she admit
```

1    approximately how much she would pay these patient recruiters?

2    A    Yes.  She said that she would pay them different amounts

3    of money, depending on the type of equipment that their

4    patients got.  For power wheelchairs, she said anywhere between

5    500 and $800 per wheelchair prescription.

6    Q    And other than these statements of the defendant, was

7    there other evidence that you had uncovered even before that,

8    that was inconsistent with her earlier statements that she

9    didn't pay people money to refer patients to her?

10   A    Yes.  She had these contracts with these independent

11   associates, and she also had some schedules and spreadsheets

12   listing the types of equipments with associated amounts that

13   she would pay these patient recruiters or independent

14   associates.

15   Q    And were there also patient recruiter or marketer files?

16   A    Yes.

17   Q    And we'll get to some of this documentation that we're

18   talking about.

19        Now, you mentioned that on this later interview, the

20   January 24th, 2013, interview, that she called her payments a

21   commission; right?

22   A    Yes.

23   Q    Now, the fact that she called it a commission in this

24   later interview, versus a kickback, which she called it in her

25   first interview, did this alleviate your concerns?

1    A     Not at all.

2    Q     And why not?

3          MR. DARDEN:  Objection.  Irrelevant.

4          THE COURT:  Sustained.

5    Q     BY MS. QUINTERO:  Did you still continue to have the same

6    concerns?

7    A     Yes.

8    Q     Now, let's look at some of these documents that -- that

9    you've referred to or referenced.  If you look at the binder in

10   front of you, Government Exhibit 30, can you describe for the

11   jury what Government Exhibit 30 is.

12   A     These are contact information sheets found at Ezcor during

13   the execution of the search warrant.

14   Q     And how far back do some of these contact sheets go?

15   A     They're dated as far back as 2007.

16   Q     And were these contact sheets seized by law enforcement

17   during the execution of the search warrant at Ezcor?

18   A     Yes.

19   Q     And have they been maintained by law enforcement since

20   that date in substantially the same condition as they were

21   found at Ezcor?

22   A     Yes.

23          MS. QUINTERO:  Your Honor, at this time we would

24   like to move in and introduce into evidence Government

25   Exhibit 30.

 1          THE COURT:  It will be received.

 2          MS. QUINTERO:  Thank you, Your Honor.

 3             (Exhibit 30 received into evidence.)

 4  Q    BY MS. QUINTERO:  Now, these contact sheets, why were they

 5  of interest to law enforcement?

 6  A    The contact sheets list individuals who are listed as

 7  independent associates, or IAs, and their contact information.

 8  Q    Let's go ahead and look at page 1 of Government

 9  Exhibit 30.  And just looking at this, what are some of these

10  names that at first glance stand out to you?

11  A    Wilmer, Candi, Wilmer again, Judy, Emilio Lagasca, Jean,

12  Heidi.

13  Q    From your investigation, who does Wilmer refer to?

14  A    Wilmer Guzman.

15  Q    What about Judy?

16  A    Judith Estrella.

17  Q    What about Jean?

18  A    Jean Aves.

19  Q    Based on your investigation, who is Jean Aves?

20  A    Jean Aves was a patient recruiter in Northern California

21  for Ezcor.

22          MR. DARDEN:  Objection.  No foundation.

23          THE COURT:  Sustained.

24  Q    BY MS. QUINTERO:  During your investigation did you learn

25  who Jean Aves was?

```
 1   A     Yes.

 2   Q     And based on your investigation, what did you learn?  Who

 3   was Jean Aves?

 4              MR. DARDEN:  Objection.  Calls for --

 5              THE COURT:  Sustained.

 6   Q     BY MS. QUINTERO:  During the course of your investigation

 7   and in looking through the evidence seized from Ezcor, did you

 8   learn who Jean Aves was?

 9   A     Yes.

10   Q     Who was Jean Aves?

11              MR. DARDEN:  Objection.

12              THE COURT:  Are you talking about her name or what

13   she -- what her position is or what?  When you say who is Jean

14   Aves --

15              MS. QUINTERO:  What was her role with Ezcor?

16              THE COURT:  Sustained.

17   Q     BY MS. QUINTERO:  Did you identify who Jean Aves was --

18   A     Yes.

19   Q     -- as a person?

20   A     Yes.

21   Q     Who was Jean Aves?

22              MR. DARDEN:  Objection.

23              THE COURT:  I'm assuming Jean Aves was Jean Aves.

24              THE WITNESS:  Jean Aves, yes.

25   Q     BY MS. QUINTERO:  Where did Jean Aves reside based on your
```

```
 1   investigation?
 2              THE COURT:  What was what?
 3              MS. QUINTERO:  Reside, live.
 4              THE WITNESS:  In Northern California.
 5   Q    BY MS. QUINTERO:  What about Heidi, who does Heidi refer
 6   to?
 7   A    Heidi is Heidi Morishita.  She also went by Dr. Heidi.
 8   Q    If we can turn to page 2 of Government Exhibit 30, do you
 9   see some of those same names we talked about:  Jean Aves,
10   Candi?  Do you see some of those same names?
11   A    Yes.  And Judy, Emilio Lagasca.
12   Q    Okay.  And if you look at the yellow highlighted name
13   there on the edge there, right-hand edge, do you see that?
14   A    Yes.
15   Q    What does that say?
16   A    Edna Calaustro.
17   Q    What was significant to you during your investigation?
18   A    Yes.  Edna Calaustro was one of the top referring
19   physicians for Ezcor, and she was located in the San Francisco
20   area.
21   Q    And just -- just to remind us, Ezcor was located where?
22   A    Valencia, California.
23   Q    I'm not going to go through the remaining contact sheets
24   here of Government Exhibit 30, but do you see some of those
25   same names throughout the contact sheets that make up
```

1    Government Exhibit 30?

2    A    Yes.

3    Q    If we can go back to page 1, do you see those names that

4    have the initials IA next to them and the heading there,

5    independent associate?

6    A    Yes.

7    Q    You previously mentioned that the defendant admitted to

8    you that she paid money to people to refer patients to her;

9    right?

10   A    Yes.

11   Q    And she called those people independent associates?

12   A    Yes.

13   Q    When -- when did you first talk to the defendant about

14   this contact sheet?

15   A    We asked her -- we asked the defendant about the contact

16   sheet during the search warrant, during the execution of the

17   search warrant, during that interview, the second interview, I

18   guess.

19   Q    Okay.  And with regards to these independent associates,

20   at that time during the execution of the search warrant and

21   when you asked her about it, what did she say that these

22   independent associates did for her?

23   A    The defendant told me that the independent associates were

24   people on her staff that did odd jobs for her.

25   Q    Was that inconsistent with what she told you later on in

1  the January 2013 interview?

2  A    Yes.  In the January 24, 2013, interview, the defendant

3  ultimately admitted that the independent associates were, in

4  fact, individuals that she paid money to in order to refer her

5  patients.

6  Q    And what, if anything, did this confirm to you?

7  A    This confirms that the defendant was, in fact, paying

8  kickbacks to patient recruiters.

9         MR. DARDEN:  Objection.  Conclusion.  Motion to

10  strike.

11         THE COURT:  Sustained.

12  Q    BY MS. QUINTERO:  Now, you mentioned that you showed the

13  defendant some documents during your last interview --

14  A    Yes.

15  Q    -- where -- which is the one she admitted paying people

16  money to refer patients to her.

17       If you turn to Government Exhibit 38, can you explain to

18  the jury what Government Exhibit 38 is.

19  A    Yes.  This is a schedule or a spreadsheet of items and

20  corresponding amounts that was seized from Ezcor during the

21  execution of the search warrant.

22  Q    Okay.  And has this document been maintained by law

23  enforcement since that date of the search warrant in

24  substantially the same condition as it was found at Ezcor?

25  A    Yes, it has.

1       MS. QUINTERO:  Your Honor, at this time I would like

2   to introduce -- move into evidence Government Exhibit 38.

3       THE COURT:  It will be received.

4       (Exhibit 38 received into evidence.)

5   Q   BY MS. QUINTERO:  We can go ahead and publish Government

6   Exhibit 38.  Again, is this one of the documents you showed the

7   defendant during this last interview in January of 2013?

8   A   Yes, it is.

9   Q   As you were going through this document with the

10  defendant, did she tell what you the purpose was in her

11  creating this document?

12  A   Yes.  She told me that she created this document because

13  she was tired of haggling with the patient recruiters over how

14  much money she would pay them for each item.  So she came up

15  with a schedule that she could agree upon.

16  Q   Now, let's look at the various columns here within the

17  spreadsheet.  Starting with the column beginning with item,

18  based on your discussion with the defendant, what does this

19  first column, this column, represent?

20  A   The items listed under that column are the durable medical

21  equipment items that the defendant would pay the patient

22  recruiters for, for each prescription that they brought for

23  those items.  So, for example, if a patient recruiter referred

24  a patient who got a prescription for, let's say, a hospital

25  bed, on line 17, the defendant would pay that patient recruiter

```
 1    $75.

 2    Q    Okay.  If we can look at the next column, what's the --

 3    your understanding that that column represents, HCPCS?

 4    A    The HCPCS code is the code the supplier uses to bill

 5    Medicare for that item.  So, for example, if the supplier was

 6    going to bill a knee brace in line 1 to Medicare, the code

 7    submitted would be L1832.

 8    Q    And the second-to-the-last column, did you have any

 9    discussions with the defendant specifically about the

10    information listed under that column and what it referred to?

11    A    Yes.

12    Q    What were the substance of your conversations with the

13    defendant?

14    A    The defendant stated the amounts listed in this column

15    represent amounts of money, dollar amount that she would pay

16    each patient recruiter for the corresponding item.

17    Q    Now, let's look at the same column but on page 2 of

18    Government Exhibit 38.  Do you see there under lines 29 through

19    31?

20    A    Yes.

21    Q    We can blow that up, please.

22         Do you see where it says PWC, that acronym?

23    A    Yes.

24    Q    What does that acronym stand for?

25    A    Power wheelchair.
```

1    Q     And we see the HCPCS there; right?

2    A     Yes.

3    Q     Are you generally familiar with the HCPCS and those power

4    wheelchairs there?

5    A     Yes.

6    Q     Are those power wheelchairs, based on the HCPCS that you

7    see there, similar to Government Exhibit 2, the power

8    wheelchair that we see here?

9    A     Yes.

10   Q     If you look now right there, still lines 29 and 31 on the

11   very second-to-the-last column, what dollar -- what amounts do

12   we see there?

13   A     500, 800, and 800.

14   Q     Did during your discussion with the defendant about this

15   schedule here, did you discuss with her specifically any of

16   these line items here?

17   A     Yes.  We -- we specifically discussed Line No. 30.

18   Q     Okay.  And what was the substance of your conversation

19   with the defendant about that?

20   A     The defendant confirmed that, if a patient recruiter

21   brought the defendant a prescription for a power wheelchair,

22   code K0823, that she, the defendant, would pay the patient

23   recruiter $800.

24   Q     So it would follow that, if the patient recruiter referred

25   a patient that got a power wheelchair with K0821, they would

1    get 500?

2    A     Yes.

3    Q     So anywhere from 500 to $800 for power wheelchairs?

4    A     Yes.

5    Q     And she, in fact, confirmed that those are the amounts

6    that she would pay for power wheelchairs for the patient

7    recruiters?

8    A     Yes.

9    Q     Now, let me ask you, during your review of the documents

10   seized from Ezcor, did you locate similar schedules such as

11   this one throughout Ezcor?

12   A     Yes.  We found several different lists and schedules.

13   Most of them were found within the -- we call them marketer

14   files or independent associate files.

15   Q     Now, the fact that -- and I'm going to get to some of

16   those marketer files right now, but the fact that the defendant

17   called her patient recruiters independent associates, did this

18   alleviate any concerns that you had?

19   A     No.

20   Q     Let's look at those marketer files now, if you can please

21   turn to Government Exhibit 31, 32, and 33.

22              MR. DARDEN:  May I have one moment, Your Honor.

23              THE COURT:  Yes.

24              MS. QUINTERO:  And also Government Exhibit 76

25   through 79.

1          MR. DARDEN:  No objection to 31 through -- no

2     objection to 31 to 33.

3          THE COURT:  Okay.

4          MR. DARDEN:  Take a few minutes to address the

5     others.  Counsel wants to proceed.

6     Q    BY MS. QUINTERO:  Well, with respect to 31 to 33 just

7     generally, can you explain to the jury what we have there.

8     A    These are files or folders found at Ezcor during the

9     execution of the search warrant that had names of independent

10    associates on them.

11    Q    Okay.  And these are individuals that you believe to be

12    patient recruiters?

13    A    Yes.

14    Q    Now, what are some of the names on these files?

15    A    Jean Aves; Candi; Heidi, Dr. Heidi; and Judy.

16         MS. QUINTERO:  Your Honor, at this time we would

17    like to move into evidence Government Exhibit 31 through 33.

18         THE COURT:  Be received.

19         MS. QUINTERO:  And I'll just wait for the remaining

20    exhibits, 76 through 79.

21         THE COURT:  Okay.

22              (Exhibits 31, 32, 33 received into evidence.)

23         MS. QUINTERO:  Now, I'm going to go ahead and

24    continue, but I'll wait for them to be moved into evidence.

25         THE COURT:  Okay.

```
 1   Q    BY MS. QUINTERO:  We're not going to go through these
 2   files right now.  Jury will have the opportunity to look at
 3   them, but can you explain to the jury what is generally
 4   contained with these marketer patient recruiter files.
 5   A    Yeah.  Lists of Medicare beneficiaries with their Medicare
 6   numbers, dates of birth, addresses, the types of equipment
 7   associated with -- with those beneficiaries.  There's dollar
 8   amounts, payment amounts, copies of prescriptions, copies of
 9   doctor orders, and those Medicare eligibility sheets we saw
10   previously in the patient files with the patient recruiter's
11   name written on top.
12            MS. QUINTERO:  Can we admit Government Exhibit 76
13   through 79 into evidence, Your Honor.
14            MR. DARDEN:  No objection.
15            THE COURT:  It will be received.
16            MS. QUINTERO:  Thank you, Your Honor.
17            (Exhibits 76 through 79 received into evidence.)
18   Q    BY MS. QUINTERO:  Now, these marketer files have been
19   admitted into evidence.  Were these the only ones that were
20   located at Ezcor during the search warrant?
21   A    No.  We found at least ten more.
22   Q    And why were these marketer files significant to you?
23   A    Well, the -- each independent associate or marketer had
24   their own file, and contained in there were the information
25   about the beneficiaries and the items that they received and
```

1    the payment amounts associated for each independent associate.

2         And these were just -- to me, were inconsistent with what

3    the defendant originally told us that these independent

4    associates did.  She originally said they did odd jobs for her,

5    when in fact it looks like she was keeping track of which

6    patients and which items each patient recruiter referred.

7    Q    And we're not going to go through them.  We'll have the

8    jury -- jury -- jury be able to go through them during their

9    deliberation.  So did law enforcement find any W-4s of any of

10   these individuals at Ezcor during the execution of the search

11   warrant?

12   A    Yes.

13   Q    And these W-4s that were found during the execution of the

14   search warrant, have they been maintained by law enforcement

15   since that date in substantially the same condition as they

16   were found?

17   A    Yes.

18            MS. QUINTERO:  Your Honor, at this time I would like

19   to introduce and admit into evidence Government Exhibits 34 and

20   35.

21            MR. DARDEN:  May I have one moment, Your Honor.

22            THE COURT:  Yes.

23            MR. DARDEN:  No objection.

24            THE COURT:  It will be received.

25               (Exhibits 34 and 35 received into evidence.)

**UNITED STATES DISTRICT COURT**

```
 1   Q    BY MS. QUINTERO:  Go ahead and publish Government

 2   Exhibit 34.  What do we have on Government Exhibit 34?

 3   A    This is a form W-4 for Wilmer Guzman.

 4   Q    And what about Government Exhibit 35?

 5   A    This is a form W-4 for Judith Estrella.

 6   Q    And what was significant to you of these two W-4 -- s?

 7             MR. DARDEN:  Objection.  Irrelevant.

 8   Q    BY MS. QUINTERO:  -- during your investigation?

 9             THE COURT:  Sustained.

10   Q    BY MS. QUINTERO:  Were these W-4s significant to you?

11   A    Yes.

12             MR. DARDEN:  Same objection.

13             THE COURT:  Overruled.

14   Q    BY MS. QUINTERO:  Were these W-4s consistent with evidence

15   that you had obtained throughout your -- the course of your

16   investigation?

17             MR. DARDEN:  Objection.  Calls for a conclusion.

18             THE COURT:  Again, the way it's worded, it does call

19   for a conclusion.

20        Did you find anything that you felt was an inconsistency

21   to follow up on?

22             THE WITNESS:  Yes.  I thought it was an

23   inconsistency.

24             THE COURT:  Go ahead.

25   Q    BY MS. QUINTERO:  What did you believe to be inconsistent
```

```
 1   yourself?
 2   A     Well, the defendant even told us that Wilmer Guzman and
 3   Judith Estrella were patient recruiters.  So that means they
 4   were not actually employees of --
 5             MS. NKELE:  Objection.
 6             THE WITNESS:  -- Ezcor.
 7             MS. NKELE:  Move to strike.
 8             THE COURT:  Overruled.
 9             THE WITNESS:  So they were not actually employees of
10   Ezcor as indicated on these W-4s.
11   Q     BY MS. QUINTERO:  Okay.  And just to be clear, the
12   defendant referred to Wilmer as an independent associate; is
13   that right?
14   A     Yes.
15   Q     And your understanding was what with respect to that?
16   A     That independent associates -- that the defendant paid the
17   independent associates money for patient referrals.
18   Q     Just -- just to be fair here, obviously --
19   A     Sure.
20   Q     -- and during -- during your investigation, did you learn
21   whether or not Mr. Guzman was an actual employee of Ezcor?
22   A     No, he was not.
23             MR. DARDEN:  Objection.  Legal conclusion.  Motion
24   to strike.
25             THE COURT:  Sustained.
```

1   Q    BY MS. QUINTERO:  Let's turn to Government Exhibit 36 and

2   37.  Can you describe for the jury what Government Exhibits 36

3   and 37 are.

4   A    These are independent associate letters of contract from

5   Ezcor for Wilmer Guzman and Judith Estrella that were found and

6   seized during the execution of the search warrant at Ezcor.

7   Q    And have they been maintained by law enforcement since

8   that date in substantially the same condition as they were

9   found at Ezcor?

10  A    Yes.

11        MS. QUINTERO:  Your Honor, at this time I would like

12  to introduce and move into evidence Government's Exhibits 36

13  and 37.

14        MR. DARDEN:  No objection.

15        THE COURT:  It will be received.

16        MS. QUINTERO:  If we can go ahead and publish

17  Government Exhibits 36 and 37.

18        THE COURT:  Yes.

19        (Exhibits 36 and 37 received into evidence.)

20  Q    BY MS. QUINTERO:  There's 36, and we'll put up 37.

21        In the meantime, are Government Exhibits 36 and 37

22  basically identical except one is for Wilmer Guzman and one is

23  for Judith Estrella?

24  A    Yes.

25  Q    What was significant to you about Government Exhibits 36

| 1 | and 37? |
| 2 | A    The contracts with these independent associates showed |
| 3 | that the defendant was, in fact, paying these individuals money |
| 4 | for the patient referrals. |
| 5 | Q    And since they're identical, let's just focus on one of |
| 6 | them, Government Exhibit 36.  And this one is for Wilmer |
| 7 | Guzman? |
| 8 | A    That's correct. |
| 9 | Q    Now, if we can look at paragraph 3, we can zoom in on that |
| 10 | one.  Do you see what -- the sentence "Denied claims result in |
| 11 | zero commission," do you see that? |
| 12 | A    Yes. |
| 13 | Q    What was significant to you about this paragraph? |
| 14 | A    It confirms that the defendant was paying these |
| 15 | independent associates money for the patient referrals, and if |
| 16 | the claim was denied by Medicare, then she would not pay the |
| 17 | patient recruiters. |
| 18 | Q    Let's look at paragraph 6 there where it says "Commission |
| 19 | will not be paid, or if already advanced, will be deducted from |
| 20 | earned commission." |
| 21 |      Do you see that? |
| 22 | A    Yes. |
| 23 | Q    What was significant to you during your investigation of |
| 24 | this paragraph? |
| 25 | A    Again, it confirms that the defendant was paying these |

**UNITED STATES DISTRICT COURT**

```
 1    individuals money for their patient referrals.  And this
 2    paragraph says that, if the defendant had already paid one of
 3    these patient recruiters for a patient referral but Medicare
 4    denied that claim, then she would deduct future payments to
 5    that patient recruiter for their future referrals.
 6    Q    Okay.  And do you see where it says "commission" on this
 7    document?
 8    A    Yes.
 9    Q    The fact that defendant used the word "commission" on this
10    document, did this change your view on your investigation?
11    A    No.
12    Q    Why not?
13    A    The commission is still an amount of money paid to each
14    independent associate for patient referrals.  It's the same
15    meaning as a kickback.
16    Q    Let's look at paragraph 8.  Do you see where it says
17    "Don'ts," "Ezcor maintains a zero policy on kickback.  Do not
18    offer kickbacks."
19         Do you see that?
20    A    Yes.
21    Q    What was significant to you about this paragraph?
22    A    Again, based on my investigation, this appeared to be
23    inconsistent with what the defendant's actual practices were,
24    like we saw in that contact memo sheet with patient Vilma Cruz
25    Munar, that the independent associates or patient recruiters
```

```
 1    were paying kickbacks to patients.
 2    Q    And seeing this document, did this at all change your view
 3    of the defendant and her conduct?
 4    A    No.
 5    Q    During your first interview of the defendant, when you
 6    were talking about paying money to people to refer patients to
 7    her, did you ever discuss anything about payments to patients
 8    or payments to doctors or anything along those lines?
 9    A    Not before she called that a kickback.
10    Q    Okay.
11    A    Before she called -- sorry.  Not before she called, um,
12    the payments to individuals to recruit and refer patients to
13    her a kickback, no.
14    Q    So all along your conversation with her up until that
15    point was paying people money to refer patients to her;
16    correct?
17    A    That's correct.
18    Q    And that's what she called a kickback --
19    A    Yes.
20    Q    -- that we heard?
21    A    Yes.
22    Q    Now, overall, seeing this document in its entirety, did
23    that change your view at all of the defendant and her conduct
24    based on your investigation?
25             MR. DARDEN:  Objection.  Irrelevant.
```

**UNITED STATES DISTRICT COURT**

```
 1              THE COURT:  Sustained.

 2   Q    BY MS. QUINTERO:  What was significant to you about this

 3   document here?

 4              MR. DARDEN:  Objection.  Irrelevant.

 5              THE COURT:  I'm not too sure -- sustained.  That's a

 6   vague question.

 7   Q    BY MS. QUINTERO:  As -- as you reviewed this document

 8   during your investigation, was this significant during your

 9   investigation?

10              MR. DARDEN:  Same objection, Your Honor.

11              THE COURT:  Overruled.

12        Was it significant to you?

13              THE WITNESS:  Yes.

14   Q    BY MS. QUINTERO:  And in your view, did it confirm the

15   payment of money to people to refer patients to her?

16              MR. DARDEN:  Objection.

17              THE COURT:  Sustained.  That's a jury determination.

18              MS. QUINTERO:  Now, I just want to make sure,

19   Your Honor, that we did have Government's Exhibits 36 and 37

20   admitted into evidence.

21              THE COURT:  Yes.

22              MS. QUINTERO:  Okay.  Thank you.

23   Q    BY MS. QUINTERO:  Now, let's go back and look at some

24   other patient files.  Can you describe for the jury what we

25   have in Government Exhibits 69, 70, 71, and 75.
```

```
 1              MR. DARDEN:  May I have a moment, Your Honor.
 2              THE COURT:  Again.  Give me those numbers again.
 3              MS. QUINTERO:  69.
 4              THE COURT:  69.
 5              MS. QUINTERO:  70.
 6              THE COURT:  70.
 7              MS. QUINTERO:  71 and 75.
 8              THE COURT:  Okay.
 9   Q    BY MS. QUINTERO:  Can you describe for the jury what we
10   have in those exhibits.
11   A    Yes.  These are more patient files seized from Ezcor
12   during the execution of the search warrant.
13   Q    And are these patient files in substantially the same
14   condition as when they were seized from Ezcor?
15   A    Yes, they are.
16   Q    And have they been maintained by law enforcement in the
17   course of law enforcement business?
18   A    Yes.
19              MS. QUINTERO:  May I continue before getting them
20   admitted, Your Honor.
21              THE COURT:  Yeah.  Go ahead.
22              MR. DARDEN:  No objection, Your Honor.
23              THE COURT:  I'm sorry?
24              MR. DARDEN:  No objection.
25              THE COURT:  Okay.
```

```
 1          MS. QUINTERO:  Admitted, Your Honor?
 2          THE COURT:  Yes.
 3          MS. QUINTERO:  Thank you, Your Honor.
 4              (Exhibits 69, 70, 71, and 75 received into
 5              evidence.)
 6  Q    BY MS. QUINTERO:  Now, I just want to briefly discuss
 7  Government Exhibits 69, 70, and 71.  Those three, what exactly
 8  are these three patient files?
 9  A    These three patient files are patient files for Medicare
10  beneficiaries where Dr. Edna Calaustro was the ordering
11  physician for the power wheelchairs.
12  Q    And, again, these are Ezcor patient files; right?
13  A    That's correct.
14  Q    They're not patient files of Dr. Calaustro; right?
15  A    Correct.
16  Q    Okay.  And they're patient files where Dr. Calaustro, you
17  said, was the referring or the prescribing physician for the
18  durable medical equipment?
19  A    That's correct.
20  Q    And who is Dr. Calaustro?
21  A    Dr. Calaustro was one of the top four referring physicians
22  for Ezcor, and she was located in the San Francisco area.
23  Q    And without going through these patient files in detail
24  right now, do these patient files contain prescriptions and
25  paperwork from Dr. Calaustro for power wheelchairs and other
```

1    DME?

2    A    Yes.

3    Q    Other than these three patient files that we have here

4    where Dr. Calaustro was the prescribing physician, did law

5    enforcement seize other patient files from Ezcor where

6    Dr. Calaustro was also the referring physician?

7    A    Yes.  We seized at least 30 more.

8    Q    And do these other patient files similarly contain

9    prescriptions and paperwork from Dr. Calaustro for power

10   wheelchairs and other DME?

11   A    Yes.

12   Q    What was significant to you about these patient files from

13   Dr. Calaustro?

14            MR. DARDEN:  Relevance objection.

15            THE COURT:  Overruled.

16            THE WITNESS:  Like I mentioned, Dr. Calaustro was

17   located in the San Francisco area, about 300 miles away from

18   Valencia, California.  So for -- for me, based on my experience

19   in the investigation it's a red flag to have -- and it just

20   defies common sense to have a beneficiary who lives in Northern

21   California get their prescription for a power wheelchair filled

22   down in Valencia, California, instead of a company local,

23   closer to their neighborhood.

24   Q    BY MS. QUINTERO:  Now, there's only a couple of pages that

25   I want us to look at right now.  Specifically on Government

1    Exhibit 70, let's look at page 29.

2        What do we have here?

3    A    This is a Medicare eligibility printout for patient

4    Josefina Alcantara.

5    Q    Do you see the yellow highlighted there?  What do we see

6    there?

7    A    Yes.  It says Jean.

8    Q    Okay.  And based on your investigation, who is Jean?

9    A    Jean is Jean Aves.

10   Q    Is that the same Jean Aves that we saw throughout the

11   independent associate contact sheets?

12   A    Yes.

13   Q    And that we saw the -- the marketer file for?

14   A    Yes.

15   Q    And this Medicare eligibility form is similar to the ones

16   that we saw on the substantive count beneficiary patient files;

17   right?

18   A    That's correct.

19   Q    That had the names Wilmer and Judy?

20   A    Yes.

21   Q    And these were -- this is similar to the Medicare

22   eligibility forms that you mentioned were located throughout

23   the marketer files; right?

24   A    Yes.

25   Q    If we can turn to page 18 of Government Exhibit 70, can

1    you please read beginning where it says "Jean."

2    A    "Greg or Sylvia, can you please verify this person for

3    eligibility.  Thanks, Jean."

4    Q    What was significant to you about this?

5    A    Well, it shows that --

6              MR. DARDEN:  Objection.  Irrelevant.

7              THE COURT:  Overruled.

8              THE WITNESS:  The note indicates that Sylvia was

9    dealing with Jean, Jean Aves, and that Jean Aves was a patient

10   recruiter who brought patients to Dr. Calaustro.

11             MR. DARDEN:  I'll object.

12             THE COURT:  Sustain.

13             MR. DARDEN:  Motion to strike, Your Honor.

14             THE COURT:  Sustained.  That's a conclusion that's

15   drawn.

16   Q    BY MS. QUINTERO:  Okay.  Now, we're not going to go

17   through the entire file, but let me ask you, is the Jean -- did

18   the --

19             THE REPORTER:  Counsel, can you start over again.

20   Q    BY MS. QUINTERO:  Is the name Jean Aves located throughout

21   or written throughout other documents on Government Exhibit 70?

22   A    Yes.

23   Q    And is Jean Aves's name written throughout other

24   Dr. Calaustro files, if you will, or patient files from Ezcor

25   where Calaustro was the referring physician that were seized

1    from Ezcor?

2    A     Yes.

3    Q     Now, in your review of the claims data, going back to the

4    claims data for Ezcor, did you determine approximately how much

5    DME was billed to Medicare by Ezcor based on prescriptions from

6    Dr. Calaustro alone?

7    A     Over -- almost half a million dollars was billed to

8    Medicare for prescriptions related to Dr. Calaustro.

9    Q     Prescriptions that she wrote?

10   A     Yes.

11   Q     Now, another document that I want to draw your attention

12   to is Government Exhibit 43.  Can you explain to the jury what

13   Government Exhibit 43 is.

14   A     Yes.  This is a -- the letter from Medicare to Ezcor

15   regarding the notice of audit that was found at Ezcor and

16   seized during the execution of the search warrant.

17   Q     And has this document been maintained by law enforcement

18   since that date --

19   A     Yes.

20   Q     -- in substantially the same condition as it was found at

21   Ezcor?

22   A     Yes.

23          MS. QUINTERO:  Your Honor, at this time I would like

24   to admit, move into evidence, Government Exhibit 43.

25          MR. DARDEN:  I continue to have an objection as to

```
 1  43, Your Honor.
 2           THE COURT:  This is a document that was found at the
 3  location; is that correct?
 4           THE WITNESS:  That's correct.
 5           THE COURT:  Okay.  Overruled.
 6           (Exhibit 43 received into evidence.)
 7  Q    BY MS. QUINTERO:  Now, is this document, Government
 8  Exhibit 43, similar to the letter that we saw earlier on
 9  Government Exhibit 16 when we were talking about Medicare's
10  audit?
11  A    Yes.  It appears to be a copy of the same letter, only
12  this -- this copy has handwritten, like, notes and notations
13  and circles on it.
14           THE COURT:  We're going to interrupt at this time.
15       Ladies and gentlemen, it's time for your recess.  So we're
16  going to break at this time, about 15 minutes.  Remember the
17  admonishment not to discuss the case among yourselves or with
18  anybody else or form or express any opinions about the matter
19  until it's submitted to you and you retire to the jury room.
20       With that admonishment, we'll see you back in about 15
21  minutes.  Leave quietly because I'm going to talk with the
22  attorneys during the break.
23           THE CLERK:  All rise.
24           (Jury out at 10:00 A.M.)
25           (The following proceedings were held out of the
```

UNITED STATES DISTRICT COURT

1            presence of the jury:)

2            THE COURT:  Okay.  The record will reflect that the

3     jurors have left the courtroom.  Just two or three things.  One

4     is there is an objection to 16.  That's been conditionally

5     received, and at this time the Government wants to bring it in,

6     lift the condition.

7        Is that what you're saying?

8            MS. QUINTERO:  I'm sorry?

9            THE COURT:  Would you like to lift the condition on

10    Exhibit 16?

11           MS. QUINTERO:  Yes, Your Honor.

12           THE COURT:  And the defense has continued to object

13    to it.  That will be noted for the record that that's going to

14    be overruled.

15       Two things.  One is -- and I should have covered this

16    beforehand -- logistically, whatever attorney is handling the

17    cross-examination -- when we have multiple attorneys, whatever

18    attorney is handling the cross-examination of that witness

19    should be making the objection.  We shouldn't have objections

20    coming from multiple attorneys on each side, if you could clean

21    that up a little bit.

22       Last thing is counsel asked to address the Court just

23    before we brought the jury -- you can step down if you want --

24    just before we brought the jury in this morning.  And because

25    of time, we had to start the jury trial.

 1          Is there something you wanted to address the Court now?

 2               MS. QUINTERO:  Yes, Your Honor.  I mentioned it to

 3     counsel --

 4               THE COURT:  Okay.

 5               MS. QUINTERO:  -- Nkele.  One of our witnesses that

 6     we expect will be taking the stand is Mr. Guzman, and we just

 7     wanted to make sure that there weren't any issues.  We did have

 8     a motion in limine that the Court already ruled on in regards

 9     to his prior convictions which the Court indicated will not

10     be -- will not come in unless for impeachment purposes if it

11     was --

12               THE COURT:  Honesty.

13               MS. QUINTERO:  -- crimes of dishonesty.  But the

14     crime, obviously -- I mean, you're talking about DUI and so

15     forth --

16               THE COURT:  Okay.

17               MS. QUINTERO:  -- you know, assault.  These were not

18     of --

19               MR. DARDEN:  I have actually not seen a copy of his

20     criminal history.

21               MS. QUINTERO:  That --

22               THE COURT:  Why don't you let counsel see it.

23     Obviously, if it's a crime that involved honesty or integrity,

24     that can come in for impeachment.  Driving under the influence,

25     unless you guys show some relevancy as to why that would come

**UNITED STATES DISTRICT COURT**

```
 1   in, otherwise that would not come in.

 2              MS. QUINTERO:  Right.

 3              THE COURT:  That's what I ruled on in the motions in

 4   limine, but why don't you show him the record.

 5              MS. QUINTERO:  Right.  And there was also a drug

 6   violation or something like that, but like I said --

 7              THE COURT:  It's pretty --

 8              MS. QUINTERO:  Right.

 9              THE COURT:  It's pretty standard whether or not how

10   they come in.

11              MS. QUINTERO:  Right.

12              THE COURT:  It would have to be a crime of -- that

13   involved honesty.  Okay.  Why don't you show each other that.

14   If there's some problem, let me know.  Otherwise, we'll take a

15   recess at this time.

16              THE CLERK:  All rise.

17                   (Recess taken.)

18                   (Jury in at 10:18 A.M.)

19                   (The following proceedings were held in the

20                   presence of the jury:)

21              THE COURT:  The record will reflect that all the

22   members of the jury are in their respective seats in the jury

23   box.  The witness is on the witness stand.

24         And, Counsel, you may continue.

25              MS. QUINTERO:  Thank you, Your Honor.
```

UNITED STATES DISTRICT COURT

1      I just want to make sure that Government Exhibit 43 was

2  admitted into evidence, Your Honor.

3           THE COURT:  Yes, 43 was admitted.

4           MS. QUINTERO:  If we can go ahead and publish

5  Government Exhibit 43.

6  Q    BY MS. QUINTERO:  Before we took the break, you were

7  talking about some markings that were throughout Government

8  Exhibit 43; right?

9  A    Yes.

10  Q    And now just so that I'm clear, this Government Exhibit 43

11  is a copy, if you will, of the notice of audit that we

12  previously saw; right?

13  A    That's correct.

14  Q    But this one was actually seized from Ezcor during the

15  execution of the search warrant on May 25, 2012?

16  A    Yes.

17  Q    And these markings are what we see here throughout the

18  first page here?

19  A    Yes.

20  Q    And if we can look at page 4 of Government Exhibit 43, you

21  see some markings there also?

22  A    Yes.

23  Q    And that's the list -- that's part of the list of the 100

24  beneficiaries that the audit pertains to; right?

25  A    Yes.

```
 1   Q    And -- and if we look at page 5, we also see some similar
 2   markings throughout page 5; right?
 3   A    Yes.
 4   Q    Now, those markings that we see throughout Government
 5   Exhibit 43, were those markings on this document at the time
 6   that this document was seized from Ezcor?
 7   A    Yes.
 8   Q    And why was this document significant to you?
 9            MR. DARDEN:  Objection.  Irrelevant.
10            THE COURT:  Sustained.
11   Q    BY MS. QUINTERO:  In your view, was this document
12   significant?
13   A    Yes.
14   Q    Now, did law enforcement seize some of the patient files
15   from Ezcor that were specifically part of the list of 100
16   beneficiaries that were the subject of this audit?
17   A    Yes.
18   Q    Let's talk about just a few of those files.  If you will
19   turn to Government Exhibits 72, 73, and 74.
20   A    Okay.
21   Q    What do we have on those exhibits, 72, 73, and 74?
22   A    These are patient files seized from Ezcor during the
23   execution of the search warrant that pertained to the 100
24   Medicare beneficiaries listed on that notice of audit.
25   Q    So those patients that these patient files relate to are
```

1    on that list of 100 beneficiaries?

2    A    Yes.

3    Q    Now, were these the only patient files, from the list of

4    the 100 beneficiaries that we saw on that list, that were

5    seized from Ezcor at the time of the search warrant?

6    A    No.  We seized a lot more.

7    Q    So you seized a lot more than just these three that we

8    have admitted into evidence?

9    A    Yes.

10   Q    Now, let's look specifically at Government Exhibit 73.

11   What do we have here?

12   A    This is a patient file found at Ezcor for patient

13   Romulado Canlas.

14          MR. DARDEN:  Sorry.  This is Exhibit 73?

15          MS. QUINTERO:  Yes.

16      And, Your Honor, if I can go ahead and have Government

17   Exhibits 72, 73, and 74 admitted into evidence.

18          THE COURT:  They'll be received.

19          MS. QUINTERO:  Thank you, Your Honor.

20          (Exhibits 72, 73, 74 received into evidence.)

21   Q    BY MS. QUINTERO:  And what stood out to you about

22   Mr. Canlas's patient file?

23   A    In his patient file there's a prescription for a manual

24   wheelchair for Mr. Canlas.  However, the defendant billed

25   Medicare for a power wheelchair, and the delivery ticket in the

```
 1   file shows a delivery of a power wheelchair to the beneficiary.
 2   Q    Okay.  So the patient file, the prescription was actually
 3   for a manual wheelchair?
 4   A    That's correct.
 5   Q    But in reviewing the claims data, a -- an actual power
 6   wheelchair was billed to Medicare?
 7   A    Yes.
 8   Q    And in your review of the claims data, was a power
 9   wheelchair paid by Medicare to Ezcor?
10   A    Yes.
11   Q    And do you know, is there a pretty big price difference
12   between what Medicare would reimburse for a manual wheelchair
13   versus a power wheelchair?
14   A    Yes.
15   Q    Few thousands, at least?
16   A    Oh, yeah.  Yes.
17   Q    Okay, now let's look at that prescription that you're
18   talking about.  If you will turn to page 7 of Government
19   Exhibit 73, is this the prescription you are referring to?
20   A    Yes.
21   Q    And based on that prescription, what is being prescribed
22   here?
23   A    A manual wheelchair.
24   Q    Is there any documentation at all in the patient file from
25   Government Exhibit 73 from a physician supporting the need for
```

```
 1    a power wheelchair such as a face-to-face evaluation,
 2    certificate of medical necessity, anything along those lines?
 3    A     No.
 4    Q     And without going through the entire patient file and
 5    looking through the patient file, was there documentation in
 6    there indicating what type of wheelchair was delivered by
 7    Ezcor?
 8    A     Yes.  A power wheelchair was delivered by Ezcor.
 9    Q     Okay.  But the referring physician prescribed a manual
10    wheelchair?
11    A     That's correct.
12    Q     And what was the significance to you of this?
13    A     Well, the --
14          MR. DARDEN:  Objection.  Irrelevant.
15          THE COURT:  Sustained.
16    Q     BY MS. QUINTERO:  Was this concerning to you?
17    A     Yes.
18    Q     Was this significant to you during your investigation?
19    A     Yes.
20    Q     The fact that the prescription called for a manual
21    wheelchair --
22          MS. NKELE:  Objection.  Assuming facts not in
23    evidence.
24          THE COURT:  Overruled.
25    Q     BY MS. QUINTERO:  The fact that a manual wheelchair was
```

```
 1   prescribed as we see here but a --
 2              MS. NKELE:  Objection, Your Honor.  It says "a
 3   wheelchair."
 4              THE COURT:  I'm sorry.  Which counsel is going to be
 5   making the objections --
 6              MS. NKELE:  I will, Your Honor.
 7              THE COURT:  -- of this witness?
 8              MS. NKELE:  Yes, Your Honor.
 9              THE COURT:  What's your objection?
10              MS. NKELE:  Assuming facts not in evidence.  It
11   says, "wheelchair."  It doesn't say "manual wheelchair."
12              THE COURT:  Overruled.
13   Q    BY MS. QUINTERO:  And the fact that a power wheelchair and
14   not a manual wheelchair was billed to Medicare, was that
15   concerning?
16   A    Yes.
17   Q    And was that problematic in your investigation?
18   A    Yes.  That would be a false claim.
19   Q    Now, the last thing I want to show you from Government
20   Exhibit 73 is page 1, if you will take a look at that, please.
21        Can we blow up that yellow section.
22        And for everyone's sake here, can you try to read that.
23   A    Yes.  It says Redo delivery doc, add manual K5.
24   Q    First of all, what does K5 refer to?
25   A    K5 is -- refers to the HCPCS code for a manual wheelchair.
```

1    Q      Why did this stand out to you?

2    A      Well, this note was located on the front of the patient

3    file, and it says to redo a delivery document that will be sent

4    or is requested by Medicare for the audit.  So the note

5    suggests that the -- someone was going to redo the delivery

6    document inside this patient file to make it appear like a

7    manual wheelchair was delivered to the defendant -- to the

8    beneficiary.

9    Q      And, in fact, the documentation in the patient file showed

10   that what type of wheelchair was delivered to the beneficiary?

11   A      A power wheelchair.

12   Q      And not a manual wheelchair, which was what was

13   prescribed?

14   A      That's correct.

15   Q      Now, in your view, why was this concerning to you?

16   A      Well, the defendant ignored the prescription by the -- by

17   the ordering physician and provided and billed Medicare and got

18   paid from Medicare for a power wheelchair when one wasn't

19   prescribed.

20   Q      Now, let's look at Government Exhibit 72.  What stood out

21   to you about this patient file?

22   A      This is another patient file where a power wheelchair was

23   billed for the beneficiary; yet there's no prescription for a

24   power wheelchair in the patient file.

25   Q      Now, was there any paperwork at all throughout this

```
 1   patient file that medically supported the need for a power
 2   wheelchair such as the face-to-face certificate of medical
 3   necessity, anything along those lines?
 4   A    No.  In fact, the patient history and exam by the
 5   physician actually says that the beneficiary should be able to
 6   use a cane during ambulation.
 7   Q    And that would contradict, in your view, the need for a
 8   power wheelchair?
 9   A    Yes.
10   Q    Now, let's look at page 5, if you can blow up that
11   highlighted portion there.  Is this the notation that you're
12   talking about?
13   A    Yes, it is.
14   Q    Can you read that in the record to the jury, please.
15   A    Sure.  It says, "Should be able to use cane during
16   ambulation."
17   Q    What specifically stood out to you about this?
18   A    Well, if the patient can use a cane to ambulate, then they
19   don't qualify for a power wheelchair.  And, in fact, the
20   physician who wrote this didn't order one, didn't find it
21   necessary.
22   Q    And in reviewing the claims data, was a power wheelchair
23   actually billed and paid to Medicare?
24   A    Yes.
25   Q    Paid by Medicare?
```

1    A    Yes.

2    Q    And would that be considered a false claim?

3    A    Yes, it would.

4    Q    Now, the last of these patient files from the 100 that I

5    want to briefly discuss is Government Exhibit 74.  Can you

6    describe to the jury what we have here in Government

7    Exhibit 74.

8    A    This is a patient file for Cesar Martinez, who was one of

9    the 100 beneficiaries listed on the audit request from Medicare

10   to Ezcor.

11   Q    And what stood out to you about this particular file?

12   A    Well, in the file we see a power wheelchair being ordered

13   for -- and delivered in July -- on July 11th, 2011, for the --

14   for the patient.  But if you look at -- can I have the

15   original?

16   Q    Yeah.  Actually -- thank you very much.  Right behind you,

17   there's the box of exhibits there, if you can look.  That's --

18   locate Government Exhibit 74 there, and it's page 2, I believe.

19   And we'll still go ahead and put it on the screen here, but if

20   you can look at the original as well.

21   A    Okay.  So in the file, like I said, the power wheelchair

22   was supposedly delivered on July 11th, 2011, according to

23   page 2 and 3 in the -- in the patient file, as indicated by the

24   highlighted dates there.

25        This form is the detailed product description for a power

1    mobility device that I think I mentioned earlier.  The supplier

2    fills out and has the physician sign prior to the delivery of

3    the power mobility device.

4         So in the file, the original piece of paper, the detailed

5    product description for power mobility device that's signed by

6    the physician, dated July 11, 2011, when you hold it up to the

7    light, you can see that there's Wite-Out on top of the

8    document.  And when you look at it, you can see that this was a

9    fax, a fax ledger that was whited out, and you can see that

10   this piece of paper was sent, um, and received by somebody on

11   April 19, 2012, and then received by Ezcor on April 19th, 2012.

12   That's almost a year after this piece of paper was supposedly

13   signed.

14   Q    Okay.  And that April 19th, 2012, date, that's during the

15   time of this audit; right?

16   A    That's correct.

17   Q    The audit was sent to -- notice of audit was sent to Ezcor

18   on what date based on the letter?

19   A    March 27th, 2012.

20   Q    And when were -- after the extension, when were those

21   documents due to Medicare?

22   A    May 11, 2012.

23   Q    And right here on the screen -- and obviously on the

24   screen here, we can't tell -- but on the right-hand side we

25   have, I believe, page 2 of that exhibit.  And on the left-hand

1    side, we have page 3 of that exhibit.

2         What's the difference between those two?

3    A    Page 3 is the actual original form.  You can see it's the

4    original handwriting, and it's a color -- it's the original

5    form, and it's not signed or dated.

6    Q    Okay.  And that's not signed nor dated; right?

7    A    That's correct.

8    Q    And the time that this claim approximately submitted to

9    Medicare, when the service was provided, was sometime in July

10   of 2011?

11   A    That's correct.

12   Q    But there's no date or no physician's signature on this

13   at -- document; right?

14   A    On page 3, that's correct.

15   Q    Okay.  Now, continue with regards to page 2.

16   A    Yes.  Yes.

17        THE COURT:  There's no question pending.

18   Q    BY MS. QUINTERO:  With regards to page 2, what are we

19   looking at in page 2 versus page 3?

20   A    This is a exact copy of page 3, except it came through

21   through a fax.  It looks like it came through a fax.  This one

22   is dated.  There's a doctor signature and a date of July 11,

23   2011.  And on this actual hand copy, the received date on the

24   bottom is handwritten, and that's an original, looks to be an

25   original writing.  And, again, the fax ledger up top is whited

1   out.

2   Q    Okay.  So the two dates that we see here on page 2 that

3   are in yellow highlights, those are dates of July 11, 2011;

4   right?

5   A    That's correct.

6   Q    Okay.  We don't see those dates or those signatures on

7   page 3 of this exhibit; right?

8   A    That's correct.

9   Q    And yet on the fax ledger that was whited out on the

10  original, what's the date there?

11  A    April 19, 2012.

12  Q    And why did this stand out for you?

13  A    Well, the -- this piece of paper, the records within the

14  patient file were altered and changed and, in response to the

15  audit, were going to be sent to Medicare.

16  Q    Okay.  Now, this form that we're looking at, that form,

17  when is it typically supposed to be actually completed and

18  bill -- and maintained?

19  A    Prior to the delivery and prior to billing Medicare for

20  the item.

21  Q    Not well after the fact?

22  A    No.

23  Q    Not almost a year after the fact?

24  A    No.

25  Q    Based on your experience, at the time that a Medicare

1   provider submits a claim to Medicare, all the documentation

2   that we've talked about -- face-to-face evaluation, even this

3   document here, at what -- when should the provider have that

4   documentation?

5   A    Prior to the delivery of the power wheelchair and prior to

6   billing Medicare for the power wheelchair.

7   Q    Now, aside from these patient files, were there other

8   patient files from the list of 100 beneficiaries that stood out

9   to you?

10  A    Yes.

11  Q    So these are only a few examples of some of these patient

12  files from that list of 100 that stood out to you?

13  A    That's correct.

14  Q    Okay.  And can you give the jury an idea of why some of

15  these other patient files that were seized from Ezcor which

16  were part of the list of 100, why they stood out to you?

17  A    There were more files that had notes about redoing

18  documents or changing documents.  There were a lot of pencil

19  marks, erasers, dates that were changed or hand -- or

20  pencil-marked in and then erased, added verbiage to some of the

21  history and physicals, and just other forms duplicated with

22  different dates that were changed or altered.

23  Q    From your experience, what is all this indicative of?

24          MR. DARDEN:  Objection.

25          THE COURT:  Sustained.

 1           MS. QUINTERO:  No further questions at this time,

 2    Your Honor.

 3           THE COURT:  Okay.  Cross-examination.

 4           MS. NKELE:  Thank you, Your Honor.  Can I have a

 5    moment, please.

 6           THE COURT:  Yes.

 7       Counsel, you may inquire.

 8           MS. NKELE:  Yes, Your Honor.

 9                      CROSS-EXAMINATION

10    BY MS. NKELE:

11    Q    Good afternoon.

12    A    Good afternoon.

13    Q    I just want to clarify your background a little bit.  You

14    testified already on direct examination that you've been with

15    the OIG, Office of Inspector General, for at least 13 years?

16    A    That's correct.

17    Q    So you are really experience -- you are an experienced

18    investigator; is that correct?

19    A    Yes.

20    Q    And you're familiar with the procedures of Medicare?

21    A    The basic procedures.

22    Q    So usually you know what to look for when you're

23    investigating an alleged fraud or something that is not, in

24    your opinion, very okay; is that correct?

25    A    Generally, yes, yes.

1   Q    Okay.  You testified that you reviewed patient files that

2   had prescriptions for wheelchair; is that correct?

3   A    That's correct.

4   Q    And none of the prescriptions were medically necessary?

5   A    I did not say that, no.

6   Q    Okay.  Anyway, you went out to visit a lot of patients; is

7   that correct?

8   A    I personally visited five or six patients.

9   Q    And all the patients you visited had wheelchairs or

10  prescriptions that were not medically necessary?

11  A    That I believed were not medically necessary, yes.

12  Q    Okay.  Now, you formed that opinion by visiting the

13  patients; is that correct?

14  A    No.  I formed that opinion by visiting -- visiting the

15  patient, talking to the patient, and talking to their primary

16  care physicians.

17  Q    Okay.  And after talking to them, you took pictures of

18  some of them; is that correct?

19  A    Yes.  Some of them, yes.

20  Q    And those are the pictures that we already showed to

21  the -- that the Government showed to us about -- with patients

22  standing next to -- with canes in their houses; is that

23  correct?

24  A    Yes.  The one I took had a patient, a beneficiary standing

25  with a cane in front of their house, yes.

1  Q    And because they could stand with a cane, you reached the

2  conclusion that they did not require wheelchairs; is that

3  correct?

4  A    No, that's not correct.

5  Q    Why did you reach that opinion?

6  A    Like I said, the patients were ambulatory.  They told me

7  they were ambulatory and did not need a power wheelchair, and

8  their primary care physicians never prescribed a power

9  wheelchair for them.

10 Q    Okay.  Did you get an examination to confirm this

11 opinion --

12 A    No.

13 Q    -- by a medical doctor?

14 A    No.

15 Q    Are you trained to examine patients regarding their

16 medical history?

17 A    No.

18 Q    There were prescriptions on -- in their files; right?

19 A    Yes.

20 Q    Did you take any tests or do any investigations regarding

21 the specific diagnosis on the prescriptions?

22 A    No.

23 Q    So you just talked to the patients?

24 A    And their primary care physicians, yes.

25 Q    You also testified that none of the wheelchairs prescribed

1    in the files you reviewed were medically necessary.

2    A    No, I did not.

3    Q    You don't recall testifying to that?

4    A    No.

5    Q    As an -- as an OIG investigator, are you familiar with the

6    Center for Medicare & Medicaid LCD?

7    A    Which LCD?  There's hundreds of LCDs.

8    Q    The basic coverage criteria.

9    A    I'm familiar with it.  Wait.  For power wheelchairs, are

10   you saying?

11   Q    Yes.

12   A    Yes.

13   Q    Okay.  I'd like to show you Exhibit 3, page 3.

14   A    Do you want me to pull the exhibits out here?

15        THE COURT:  No.  It's on the screen.

16        THE WITNESS:  Okay.

17   Q    BY MS. NKELE:  Okay.  Now, it states that the patient has

18   a mobility limitation that signifies -- significantly impairs

19   their ability to participate in one or more mobility related

20   activities.

21        Did you see that?

22   A    I see that, yes.

23   Q    So if they have that, they qualify for a wheelchair; is

24   that correct?

25   A    I think that means that that's one of the things they need

1   to have to qualify for a power wheelchair.

2   Q    Yes.  So they don't have to be unable to stand; is that

3   correct?

4   A    That's my understanding.  That's correct.

5   Q    So the fact that they have a wheelchair doesn't mean they

6   don't qualify -- the fact that they have a cane doesn't mean

7   they don't qualify for a wheelchair, does it?

8   A    The fact that they have a -- can you repeat the question.

9          MS. QUINTERO:  Objection, Your Honor.  Vague.

10  Ambiguous.

11         THE COURT:  Why don't you repeat the question.

12  Q    BY MS. NKELE:  You took pictures of patients with --

13  holding canes; is that correct?

14  A    I took a picture of one patient holding a cane, yes.

15  Q    Okay.  And that was -- there were two pictures.  You

16  didn't take the second one?

17  A    No.

18  Q    Okay.  So you took a picture of a patient with a cane?

19  A    That's correct.

20  Q    That was one of the patients, in your opinion, didn't need

21  a wheelchair?

22  A    That's correct.

23  Q    And that is because they can stand on their own with a

24  cane?

25         MS. QUINTERO:  Objection, Your Honor.  Asked and

```
 1   answered.
 2              THE COURT:  Overruled.
 3              MS. QUINTERO:  Misstates testimony.
 4              THE WITNESS:  No.
 5   Q    BY MS. NKELE:  Why did you form the opinion they didn't
 6   need a wheelchair?
 7   A    First of all, I -- she -- that patient you're referring
 8   to, I believe, was Mrs. Garibay, Maria Garibay.  That's the
 9   picture I took.  She can ambulate.  She can walk with her cane.
10        Throughout the interview, multiple interviews I had with
11   her, she told me she did not need a power wheelchair.  Her
12   primary care physician told me she did not need a power
13   wheelchair.  It wasn't medically necessary, and that's why I
14   came to the opinion that she did not medically need a power
15   wheelchair.
16   Q    Did you find out if this patient had a history of falls?
17   A    No.
18   Q    Did you find out if she could complete her activities of
19   daily living within a reasonable time?
20   A    Yes.
21   Q    What is the time frame with which she can go from her
22   bedroom to the kitchen?
23   A    I actually saw her go from the kitchen to the bedroom in a
24   matter of -- they're one right off of each other -- maybe 15
25   seconds, 10 to 15 seconds.
```

Q    Okay.  And do you know if, in doing that procedure, she
could easily have fallen?

A    I don't know.

Q    Now, you stated that your investigations were triggered
off by four doctors' prescriptions; is that right?

A    No.  Can you repeat the question.  I'm not sure what you
said.

Q    Yesterday you testified that your investigations were
triggered off by four doctors' prescriptions.

A    No.  I did not testify to that, no.  That's not true.

Q    So you were not concerned by any specific doctor's
prescriptions?

A    I was concerned about them, but that's not how the
investigation was triggered.

Q    Now, what triggered your investigation?  Just refresh --

A    I'm sorry?

Q    Can you refresh my memory, what triggered off the
investigation?

A    The HHS OIG received a hotline complaint regarding an
individual by the name of Judith Estrella.  And the complainant
alleged that Judith Estrella was a patient recruiter or
marketer for various Medicare providers, including Ezcor, and
that she received a kickback for each patient referral she made
to those providers, including Ezcor.

Q    In your testimony yesterday and today, did you state what

261

```
 1    you stated now?
 2    A     No.  It was objected to and sustained; so I wasn't able to
 3    say how the investigation started.
 4    Q     Did you testify that investigator -- investigation started
 5    because there was 50 percent prescriptions by four doctors?
 6    A     No.
 7    Q     Did you state in your previous testimony that the
 8    investigation was also triggered by Ezcor withdrawing their
 9    license?
10    A     No.
11    Q     Now, you testified to Exhibit 43, which was a list of 100
12    patients.  That was requested in March of 2007?
13    A     No.
14    Q     You testified to a letter dated April 24; is that correct?
15    A     That's the date the records were due.  Are we talking
16    about exhibit -- I'm sorry -- 44 or 43?
17    Q     Yeah, dated March 27, 2014.
18    A     March 27, 2012.
19    Q     2012?
20    A     Yes.
21               MS. QUINTERO:  I'm sorry, Counsel.  Is that
22    Government Exhibit 43 or 16?
23               MS. NKELE:  I believe it's 43.
24               MS. QUINTERO:  Do you have a notation on it?
25    Because --
```

```
1              MS. NKELE:  43.
2              MS. QUINTERO:  Can you zoom it out.
3              THE REPORTER:  Ms. Quintero, can you get by the mic,
4    please.
5              MS. QUINTERO:  I believe that's Government
6    Exhibit 16.  I believe that's Government Exhibit 16 and not 43.
7              MS. NKELE:  I think you have -- it may be 16 as
8    well.
9              THE COURT:  43 and 16 are the same document, but one
10   of them had different notations on it, though.  So they are
11   different documents.  So which one are you referring to, 16 or
12   43?
13             MS. QUINTERO:  Your Honor, I just -- I just -- so
14   that the record is clear here, is she referring to Government
15   Exhibits here?
16             MS. NKELE:  Yes.
17             MS. QUINTERO:  Okay.  This is Government Exhibit 16,
18   at least a copy of it.
19             THE COURT:  Okay.
20             MS. QUINTERO:  Because Government Exhibit 43 is the
21   one that has all the markings on it that we went through.
22             THE COURT:  Okay.  So referring to Government
23   Exhibit 16.
24   Q    BY MS. NKELE:  Okay.  So referring to exhibit --
25   Government Exhibit 16, there's a list of 100 patients attached
```

```
 1   to it and --

 2   A     Yes.

 3   Q     Just give me a moment.

 4         MS. QUINTERO:  Your Honor, one other thing.  I mean,

 5   I can't see the document myself from here, but it appears that

 6   this document is not a full copy, or it's not the admitted copy

 7   of Government Exhibit 16.  And we would just ask that the

 8   actual copy of the admitted exhibit be the one that be used.

 9         THE COURT:  Why don't the two counsel show each

10   other what the document is so you can make sure it's 16.

11   Q     BY MS. NKELE:  Okay.  You testified that you had a

12   conversation with Ms. Sylvia regarding this letter.

13   A     No.  I did not testify to that.

14   Q     Did you testify that she filed for 45 days' extension on

15   that letter?

16   A     I testified that she requested an extension on the letter

17   and that it was granted by SafeGuard Services.

18   Q     It was granted.  Okay.  And 45 days were granted; right?

19   A     Yeah.  She had 45 days to turn in the records.

20   Q     And 45 days from April 24, 2012, would give her to June?

21   A     No.  When I testified earlier, I think I misspoke.  It was

22   45 days total.  So the extension was probably two weeks, 15

23   days.  So I think they originally got -- had 30 days is my

24   understanding, and she received an extension to make it 45

25   days.
```

**UNITED STATES DISTRICT COURT**

```
 1   Q    But you are not sure about that, are you?
 2   A    I -- I'm not positive of the number of days.  I could
 3   count them.
 4   Q    Okay.
 5   A    But I -- my understanding, she got an extension to
 6   May 11th, 2012.
 7   Q    You're aware she was seeking extension?
 8   A    I was aware that, yeah, she asked for an extension.
 9   Q    But your office got to her office before she could turn
10   over those documents; right?
11   A    What do you mean?
12   Q    You came to her office with your investigation before she
13   turned over those files?
14   A    Yes.  But after the date of May 11th.
15   Q    Did you come to her office and take the files?
16   A    Yes.
17   Q    So the files are in your possession?
18   A    That's correct.
19   Q    And you had a chance to review the files?
20   A    Yes.
21   Q    And you were troubled by the files?
22   A    Yes.
23   Q    Okay.  How many of these files did you actually review?
24   A    Of which files?  I'm sorry.
25   Q    The hundred files that she was requested.
```

1    A    I think we seized almost all of them.  I would say

2    95 percent of them.  So 95, approximately 95.

3    Q    And okay.  And what patients were those that you were

4    troubled by?

5    A    I was troubled by almost all of the patient files I

6    reviewed.  I couldn't tell you exactly which ones on this list.

7    Q    Did you review patient number hundred?  That would be

8    Lucy Bradley.

9    A    Yes.

10   Q    Do you recall the patient Lucy Bradley?

11   A    I do.  I recall that patient chart.

12   Q    Were you troubled by her?

13   A    Yes.

14   Q    What was troubling by her file?

15   A    The patient file indicated that Ms. Bradley was referred

16   to Ezcor by a patient recruiter named Emma Curto.

17   Q    And in the referral, you have said that she did not

18   require medical equipment?

19   A    No.  I'm saying that the -- the claim to Medicare for

20   Lucy Bradley for the power wheelchair was based upon an illegal

21   kickback to Emma Curto for referring that patient to Ezcor.

22   That was my concern.

23   Q    Do you have evidence of illegal kickback, or is that your

24   opinion?

25   A    Of kickback to Emma Curto for this patient?

```
 1   Q     Yes.

 2   A     Yes.

 3   Q     That is your opinion?

 4   A     No.  I have evidence of that.

 5   Q     What is your evidence?

 6   A     In the search warrant evidence back in my office, there's

 7   a spreadsheet and --

 8   Q     Can you refer to any specific evidence right now?

 9   A     That we have here?

10   Q     Yes.

11   A     No.

12   Q     So you -- your opinion is there was a kickback paid?

13   A     And Ms. Curto -- I interviewed her, and she told me there

14   was.

15   Q     The kickback was paid to who?

16   A     Emma Curto.

17   Q     Okay.  What was the condition of Lucy Bradley?

18   A     I -- I don't remember.

19   Q     Would you be surprised if she was paraplegic?

20   A     I never met her.  I only looked at her file.

21   Q     Are you aware of the Medicare supplier standards?

22   A     I know they exist, yes.

23   Q     Is it unlawful for anybody to contact a beneficiary

24   regarding her need for medical equipment?

25   A     Is it unlawful for anyone?
```

```
 1   Q     Yes.  Is it permitted by the standards, provider

 2   standards?

 3   A     I think that it's illegal to solicit the patient to find

 4   out what they need.

 5   Q     Okay.  Do you know for a fact if it is or not?

 6   A     I don't know for a fact.

 7   Q     Okay.

 8   A     The way you're wording it, I don't.

 9   Q     Do you know what the standards were in two thousand and --

10   in 2000?

11   A     No.

12   Q     Do you know what the standards were in 2006?

13   A     No.

14   Q     Okay.  One moment, please.

15         I'll refer you to People's Exhibit 69.

16   A     Whose exhibit?  Government's exhibit?

17              THE COURT:  69.

18              THE WITNESS:  Okay.  I have a hard time reading from

19   that screen.

20              THE COURT:  Can we have the next question, please.

21   Counsel, can we have the next question, please.

22              MS. NKELE:  Okay.

23   Q     BY MS. NKELE:  Is there a limit to how many prescriptions

24   a doctor can send to a DME?

25   A     Not that I'm aware of, no.
```

```
 1   Q    Is there a law against a patient choosing a doctor to go

 2   to?

 3   A    Is there a law -- I'm sorry.

 4   Q    Is there a law that stops a patient from going to any

 5   other doctor except the PCP?

 6   A    No.

 7   Q    So a patient is free to visit any doctor they wish?

 8   A    Yes.

 9   Q    How ill does a patient have to be to receive an electric

10   wheelchair?

11   A    How ill?

12   Q    Yes.

13        MS. QUINTERO:  Objection, Your Honor.  Calls for

14   speculation.

15        THE COURT:  Sustained.

16   Q    BY MS. NKELE:  So you don't know what qualifies a patient

17   for a wheelchair?

18   A    I didn't say that.

19   Q    Do you have to depend on a doctor's prescription?

20   A    For what?  I'm sorry.

21   Q    For a wheelchair.

22   A    Can you repeat the question or clarify your question.

23   Q    Can a doctor prescribe a wheelchair for a patient?

24   A    Yes.

25   Q    And if a doctor prescribes a wheelchair, you can assume
```

```
 1    that the patient needs the wheelchair?
 2    A    I don't necessarily assume that, no.
 3    Q    How many of the doctors prescribed in the -- how many of
 4    the hundred patients received electric wheelchairs?
 5    A    I -- I don't know.
 6    Q    Did all of them receive electric wheelchairs?
 7    A    I don't believe so.
 8    Q    Now, you talked about some the prescriptions were far
 9    away.  How far can a DME provider seek patients?
10    A    How far can they seek patients?
11    Q    Yes.
12              MS. QUINTERO:  Objection, Your Honor.  Calls for
13    speculation.
14              THE COURT:  Overruled.
15              THE WITNESS:  I am not sure.  What do you mean by
16    "seek patients"?  Can you clarify that.
17    Q    BY MS. NKELE:  Do you know about the different regions for
18    DME --
19    A    Yes.
20    Q    -- suppliers?
21    A    Yes.
22    Q    Do you know what coverage Region D -- what areas Region D
23    covers?
24    A    Yes.  It includes California.
25    Q    And?
```

```
1   A      I'm not sure where the separations are.

2   Q      Does it include some other states?

3   A      Yes.

4   Q      So a DME provider in California can supply to patients in

5   other states?

6   A      That's correct.

7   Q      So it's not unusual for a DME supplier in Southern

8   California to supply in Northern California?

9   A      That is unusual.

10  Q      Can a DME supplier in Southern California legally supply

11  to a DME supplier in -- to a patient in Northern California?

12  A      Yes.

13  Q      Is that within the rules?

14  A      Yes.

15  Q      I'd like to draw your attention again to Exhibit 74.  This

16  was a document you were concerned about?

17  A      Yes.

18  Q      Is this document supplied to Medicare?

19  A      Upon request, yes, it would be.

20  Q      Is it supplied to Medicare for billing purposes?

21  A      Just on submitting the claim?

22  Q      Yes.

23  A      No.

24  Q      Is it required to be submitted when billing?

25  A      It's required to have the documentation prior to billing,
```

**UNITED STATES DISTRICT COURT**

1    but I think I explained yesterday that Medicare doesn't require

2    providers to submit documentation with their claim.  But they

3    require them to have that documentation before submitting the

4    claim.

5    Q    Now, this is -- that paper is a delivery document; is that

6    correct?

7    A    No.

8    Q    I'm sorry.  A description of a document [sic] that was

9    delivered?

10   A    It's a description of the products that the supplier

11   intends to deliver to the patient, that it requires the -- the

12   ordering physician to sign off on and agree with.

13   Q    Did you investigate when these were actually delivered?

14   A    Other than looking at the delivery tickets that were in

15   the files, no.

16   Q    Did the delivery tickets indicate they were delivered in

17   2011, or were they delivered in, like you said it, in 2012?

18   A    What was the last half of your question?  I'm sorry.

19   Q    You indicated you were concerned because you saw a date on

20   it, that it's 2012?

21   A    I saw the whited-out date of 2012, yes.

22   Q    When exactly were these delivered?

23   A    According to the delivery ticket in the file, they were

24   delivered -- the power wheelchair was delivered on July 11,

25   2011.

```
1   Q    So July 11, 2011, will be consistent with the delivery?

2   A    The date on the delivery ticket is July 11, 2011.

3   Q    Okay.  And this is just a routine office document?

4        MS. QUINTERO:  Objection, Your Honor.

5        THE COURT:  I don't know what a routine -- why don't

6   you rephrase the question.

7   Q    BY MS. NKELE:  This is not a billing document for

8   Medicare?

9   A    It's a document that the supplier is supposed to have

10  prior to delivery and prior to billing Medicare.

11  Q    But it is not required for billing -- it's no way

12  indicative of a document not being delivered; right?

13  A    I'm sorry.  I don't understand your question.

14  Q    This paper, this sheet of paper you're looking at --

15  A    Yes.

16  Q    -- does not defraud Medicare in any way, does it?

17       MS. QUINTERO:  Objection, Your Honor.

18       THE WITNESS:  The --

19       MS. QUINTERO:  Calls for speculation.

20       THE COURT:  Sustained.  It's calling for a

21  conclusion.

22  Q    BY MS. NKELE:  Okay.  Let me rephrase.  The date on this

23  document is not relevant to the date of delivery of this

24  product?

25  A    It is relevant.  I believe the date on this document is
```

1   relevant to the delivery date of the power wheelchair.

2   Q    Do you have a delivery document in the file?

3   A    Yes.

4   Q    And the delivery document was July 2011?

5   A    Yes.  July 11, 2011.

6   Q    So the delivery document accurately states when it was

7   delivered?

8   A    I don't know if it accurately states when it's delivered,

9   but according to the supplier, that's when it was delivered.

10  Q    Does it have the patient's signature acknowledging

11  receipt?

12  A    Let me make sure.  Let me check.

13       Yes.

14  Q    Thank you.

15       Now, in your years of investigation, are mistakes

16  sometimes made that you have seen in your investigations?

17  A    What kind of mistakes?

18  Q    In documentations with providers.

19  A    I'm not really sure what you're asking.  I'm sorry.

20  Q    If documents are submitted to Medicare and mistakes are on

21  it, does Medicare require providers to go back and correct the

22  mistakes?

23  A    I -- I don't know.

24  Q    Okay.  I'll also refer to your testimony regarding

25  Exhibit 36.

**UNITED STATES DISTRICT COURT**

```
 1   A    36?

 2   Q    Yes.  Okay.  I'll refer you to your testimony on

 3   Exhibit 37.

 4   A    37?

 5   Q    Yes, which will be the independent associate letter of

 6   contract.  Number -- No. 6, now, that states that commission

 7   will not be paid or, if already advanced, will be deducted from

 8   earned commission if the claim denies for any reason including

 9   same or similar equipment.

10   A    Yes.

11   Q    Now, do you know the rules with submitting a claim with

12   Medicare?

13   A    The general rules, yes.

14   Q    And the general rules will be that you can't submit a

15   claim twice; is that correct?

16   A    That's correct.

17   Q    So if, for example, an employee was to submit the same

18   claim twice and is paid, it will be -- you would have to refund

19   that amount to Medicare; right?

20   A    If the same claim was paid twice?

21   Q    Yes.

22   A    Yes.

23   Q    So would it be unusual for an employer to warn employees

24   not to submit claims twice?

25                 MS. QUINTERO:  Objection, Your Honor.  Calls for
```

**UNITED STATES DISTRICT COURT**

```
 1    speculation.
 2              THE COURT:  Sustained.
 3    Q    BY MS. NKELE:  Now, you testified that you talked to
 4    Ms. Sylvia twice; is that correct?
 5    A    No.  I spoke -- I interviewed her three times on two
 6    different dates.
 7    Q    Okay.  The first time you interviewed her, you testified
 8    she said she doesn't pay kickback?
 9    A    That's correct.
10    Q    And the second time she said she pays commission?
11    A    That -- on the third interview eight months later, yes.
12    That's when she said that she paid a commission.
13    Q    The second time did she say she paid kickbacks?
14    A    No.
15    Q    The first time did she say she paid commission?
16    A    No.
17    Q    So she said she paid kickbacks the first time, and the
18    second time she said commission; right?
19    A    The first time she said she did not pay kickbacks or
20    anybody any money to refer patients.  The third time, the
21    interview eight months later, she said that she paid
22    commissions to people to refer her patients.
23    Q    Do you understand what kickbacks is?
24    A    Yes, I do.
25    Q    You understand what commission is?
```

```
 1   A     Yes.
 2   Q     Kickbacks are paid to non-employees.  Is that what your
 3   understanding is?
 4   A     No.  Kickbacks can be paid to anybody.
 5   Q     Commissions are paid to employees.  Is that your
 6   understanding?
 7   A     Are you asking about in the realm of DME suppliers with
 8   Medicare or in other aspects of the real world?
 9   Q     I'm talking in terms of your interview.
10   A     Oh, so in terms of my interview with the defendant?
11   Q     Yes.  Someone, if she said I don't pay kickback, she was
12   talking about not paying anybody for referral; is that correct?
13   A     Yes.  She said she did not pay anybody any money for
14   referring patients to her.
15   Q     And in the second interview, she said she paid commissions
16   to employees?
17   A     In the third interview she said she paid commissions to
18   the independent associates who she actually said were not on
19   her staff --
20   Q     Did --
21   A     -- were not employees.
22         Their only job was to recruit patients and refer them to
23   her for money.
24   Q     She specifically said they were not employees, or is that
25   your conclusion?
```

1    A     The third interview, she said that they were independent

2    contractors.  So she 1099'd them is what she said.  So they

3    were not employees.

4    Q     So she employed them?

5    A     She contracted with them.

6    Q     I'm not talking about the condition of employment.

7              THE COURT:  Counsel, we're getting hung up on

8    semantics here.  It's very common for employees.  There's a

9    difference between employees and subcontractors.

10   Subcontractors aren't technically employees.  They're hired

11   outside.  It's semantics we're talking about; so let's get down

12   to the facts of case here.

13        Go ahead.  Ask your next question.

14        I can understand where you can say no if they're not

15   employees, they're subcontractors.  There's two different

16   distinctions there.

17        Go ahead, Counsel.

18   Q     BY MS. NKELE:  Now, on Exhibit 3 you talked about the

19   processing of a bill for wheelchair.

20   A     I did not talk about Exhibit 3.

21   Q     73.

22   A     Oh, 73?

23   Q     Yes.  You talked of the processing of a payment for a

24   power wheelchair with regards to this prescription; is that

25   correct?

```
 1   A    The defendant billed Medicare for a power wheelchair and

 2   was paid by Medicare for a power wheelchair for this patient,

 3   yes.

 4   Q    Okay.  Did you verify with the doctor's office what this

 5   wheelchair prescription was?

 6   A    No.

 7   Q    So you don't know if it's a power wheelchair?

 8   A    It's a manual wheelchair.

 9   Q    What was delivered?

10   A    A power wheelchair was delivered.

11   Q    Okay.  What -- what is on this prescription?

12   A    It says "wheelchair."

13   Q    How do you know it's not a wheelchair?

14   A    It is a wheelchair.

15   Q    It's not a power wheelchair?

16   A    The power wheelchair prescriptions require additional

17   information, and they say "power mobility device."  And they

18   require the ordering physician or prescribing physician to

19   write the actual prescription the diagnosis, the length of

20   need.  I think that's it, but more information.

21        And the other items in the file, there's no face-to-face

22   sheet as required for a power wheelchair.  There's no detailed

23   product description.  There's no physician's notes that

24   indicate the need for a power wheelchair.

25   Q    So you couldn't make the mistake that it was a power
```

```
 1   wheelchair; right?
 2   A      No.
 3   Q      Someone else who sees a wheelchair could maybe make that
 4   mistake; is that correct?
 5   A      What do you mean by someone else?
 6   Q      If they are not familiar --
 7              MS. QUINTERO:  Objection.  Calls for speculation,
 8   Your Honor.
 9              THE COURT:  It will be speculation as to what others
10   might do.  Sustained.
11   Q    BY MS. NKELE:  Just in conclusion, there is nothing on
12   this prescription that actually states it's manual unless you
13   knew what to look for?
14   A      Correct.  It just says "wheelchair."
15   Q      Do you know if any of these prescriptions, any of the
16   hundred patients that you referred to, if they -- if any of
17   them were referred to Ezcor by CMS, any of the hundred
18   patients?
19          Do you know?
20   A      Referred to Ezcor by CMS?
21   Q      Yes.
22   A      I don't know how they would be referred to Ezcor by CMS.
23   I don't think CMS makes referrals.  So I guess no.
24   Q      So you --
25          Just one moment, Your Honor.
```

1      You also testified to Exhibit 30 regarding contact sheets
2  that you found in Ezcor?
3  A    That's correct.
4  Q    Are those contact -- contact information, to your
5  knowledge, just internal contact information of numbers to be
6  called for any reason?
7  A    Yes.
8  Q    Does it state in that contact sheet that it's for
9  kickbacks?
10 A    It does not say "kickbacks" on the sheet.
11 Q    On the very bottom of that contact sheet, we have "Steve
12 PC Solutions."
13     Do you see that there?
14 A    Yes.
15 Q    In your opinion, do you think that's a contact for
16 patients?
17 A    I have no idea.
18 Q    On the same sheet there's a contact for Walter Eze.  Do
19 you see that?
20 A    Which page are we on?
21 Q    Page 1 -- page 2 of 5, Exhibit 30.  The contact
22 information.
23 A    Yes.
24 Q    And it has Walter Eze on the top line?
25 A    Yes.

**UNITED STATES DISTRICT COURT**

```
 1  Q     And it also has Sylvia Walter-Eze?

 2  A     Yes.

 3  Q     And it has all the field reps on it?

 4  A     The independent associates?

 5  Q     Yes.

 6  A     Yes.

 7  Q     It has Judy, Marvella, Deborah, Emilio.  It has

 8  everybody's contact on it; right?

 9  A     Yes.

10  Q     So it just appears that this is a contact sheet for

11  everybody related to the office; is that correct?

12  A     That's what it looks like, yes.

13        THE COURT:  Ladies and gentlemen, it's 11:30; so

14  we'll break at this time for lunch.  Remember the admonishment

15  not to discuss the case among yourselves or with anybody else

16  or form or express any opinions about the matter until it's

17  submitted to you and you retire to the jury room.

18        We'll see you back in a little bit before -- we'll get

19  started right at 1:30; so come back about 1:20.  Just so you're

20  not confused, when you look at the clock up there, that clock

21  is not accurate.  We have the accurate time here.  So it's

22  11:30 now.  It's not 11:28, or whatever it is.  So for those of

23  you that are clock watchers, I just want to make sure you

24  understand that.

25        See everybody here at one o'clock.  I keep misspeaking.
```

UNITED STATES DISTRICT COURT

```
 1   One o'clock.  You should be back here a few minutes before
 2   1:00, so 12:50.  I keep mixing that up.  I don't know what it
 3   is about this jury, but they just have me off by about an hour.
 4              THE CLERK:  All rise.
 5                  (Noon recess at 11:31 A.M.)
 6                  (Jury in at 1:02 P.M.)
 7                  (The following proceedings were held in the
 8                  presence of the jury:)
 9              THE COURT:  The record will reflect that all the
10   members of the jury are in their respective seats in the jury
11   box.  The witness is on the witness stand.
12        And, Counsel, you may continue your cross.
13              THE CLERK:  Ms. Davis, you are reminded you remain
14   under oath, having been previously sworn.
15              THE WITNESS:  Yes.
16              THE CLERK:  Thank you.
17   BY MS. NKELE:
18   Q    Good afternoon.
19   A    Good afternoon.
20   Q    I'd like to go back to People's Exhibit 16, page 2.
21        Now, that request was received, by your testimony, by
22   Ezcor on March 27, and initially the records were due on
23   March 24th; is that correct?
24   A    I don't know when they actually received the letter, but
25   the letter was dated March 27th, 2012.
```

```
 1   Q    Okay.  And they had to have all the records due by
 2   April 24th, 2012; right?
 3   A    Yes.
 4   Q    And the records to be submitted -- and that would have
 5   been less than 30 days; is that correct?
 6   A    Yeah, yes.
 7   Q    And the records that had to be submitted are listed on --
 8   on page 2?
 9   A    This is the documentation that is required to be in the
10   record, the supplier's record for each beneficiary.
11   Q    And copies of them were requested; right?
12   A    Yes.
13   Q    So they had to make a copy of the -- of all ordering
14   treating physicians' prescriptions?
15   A    Yes.
16   Q    Of clinical documentations?
17   A    Yes.
18   Q    Of the delivery receipts?
19   A    Yes.
20   Q    Of pick-up receipts?
21   A    Yes.
22   Q    Of product informations, including but not limited to
23   manufacturer name?
24   A    Yes.
25   Q    Product name?
```

1    A      Yes.

2    Q      And number?

3    A      Yes.

4    Q      Pictures?

5    A      Yes.

6    Q      Brochures?

7    A      Yes.

8    Q      For each beneficiary?

9    A      Yes.

10   Q      They needed to also send a copy of manufacturers' invoices

11   and payment receipts?

12   A      Yes.

13   Q      Copy of all customer communications and information?

14   A      Pertaining to each beneficiary, yes.

15   Q      They had to make copies of the rental or purchase options

16   furnished to the beneficiary?

17   A      Yes.

18   Q      A copy of waiver of liability?

19   A      Yes.

20   Q      Proof of beneficiary's copayment?

21   A      Yes.

22   Q      Copy of assignment of benefits authorization?

23   A      Yes.

24   Q      Copy of contract agreement between any other health or

25   medical provider, the doctors, nurses -- nursing homes, home

```
 1   health agencies, physical therapists, and all that?
 2   A     Yes.
 3   Q     Billing agency, contract agreements?
 4   A     Yes.
 5   Q     List of current and former sales reps?
 6   A     Yes.
 7   Q     Copy of all state licensure applicable?
 8   A     Yes.
 9   Q     "Current or former sales reps" indicates that it was okay
10   for them to have sales reps; right?
11   A     Sales representatives?
12   Q     Yes.
13   A     Yes.
14   Q     And that was not all they had to provide, because on top
15   of that, the documentation to be provided but not limited to
16   all of this that is listed; right?
17   A     Right.
18   Q     On page 4 of Exhibit 16, you have a list of additional
19   documents to be provided?
20   A     These are the description of the documents that are
21   referenced on page 2, more specific documents requested.
22   Q     Yeah.  Some of them are not just one -- one line, as you
23   have it on page 16; right?
24   A     I'm sorry.  What's the question?
25   Q     These detailed information, that has to be included;
```

1  right?

2  A     Yes.  These are the types of documents that Medicare is

3  requesting.

4  Q     They need dispensing orders, detailed written orders,

5  proof of delivery, certificate of medical necessity.  Those

6  were not required on page 2, were they?

7  A     That would be included in the copy of clinical

8  documentation that justifies medical necessity.

9  Q     All right.  So the list that is on page 16 -- right? -- on

10  this page?

11  A     Page 2?

12  Q     Yeah, page 2.  I'm sorry.

13  A     That's okay.

14  Q     That, if taken one by one, is substantially more than what

15  is listed there; is that correct?

16         MS. QUINTERO:  Objection, Your Honor.  Vague and

17  ambiguous.

18         THE COURT:  I don't understand the question.  Why

19  don't you rephrase the question.

20  Q     BY MS. NKELE:  On this -- on page 2 you have listed -- we

21  have a list of 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14,

22  15 -- 15 documentations that are required; is that correct?

23  A     Yes.

24  Q     These 15 documentation is not 15 pages, is it?

25  A     I don't know.

1   Q    Okay.  Beneficiary information required on page 2 actually

2   comprises of name and address of a beneficiary, health

3   insurance claim number, date of birth, assignment of benefit

4   form, billing statements that's proof that the beneficiary had

5   a copayment or deductible, and beneficiary communication.

6   A    Yes.  I see that.

7   Q    Order information also includes, as listed on this

8   additional documentation request, dispensing order, detailed

9   written order, proof of delivery; is that correct?

10  A    Yes.

11  Q    The medical information includes certificate of medical

12  necessity, advanced determination of Medicare coverage, DME MAC

13  provided forms, physician's notes related to the need for the

14  item, therapist's notes, test results, and other documentations

15  that show medical need for the item; is that correct?

16  A    Yes.

17  Q    Now, all of these, including all the types of

18  documentations which shows patient's condition, test results,

19  overall course, prognosis, diagnosis, duration of condition,

20  physical examination findings, functional abilities and

21  limitations, are all included in this request?

22  A    Yes.

23  Q    And that's for hundred files?

24  A    For a hundred beneficiaries, yes.

25  Q    So all these documents that were requested, were requested

```
 1   for the patient, on line 1, Evans Rowena?
 2   A    Yes.
 3   Q    Was also requested for Murillo Antonio?
 4   A    Yes.
 5   Q    It was also requested for Lubiano, Rosario?
 6   A    Yes.
 7   Q    And it was requested for all the hundred patients listed
 8   here?
 9   A    Yes.
10   Q    And she was to turn them in within 21 days?
11   A    Yeah.  By April 24th, 2012.
12   Q    Was it then unusual to request an extension?
13   A    I don't know.
14   Q    Was it reasonable to request an extension?  In your own
15   opinion, would it be reasonable to request extension for more
16   time?
17   A    I don't deal with Medicare requests for documentation.  I
18   have no idea.
19   Q    Now, after this request, you testified that in April she
20   decided to terminate her provider license; is that correct?
21   A    Her provider number, yes.
22   Q    Yeah.  Provider number.
23        In your opinion, that was suspicious?
24   A    Yes.
25   Q    And in your opinion, that's why you went to her office?
```

```
 1   A     No.  That's why I went to the office when I went to the

 2   office, to do the search warrant, because we were afraid that,

 3   because she was no longer a provider, that she was closing her

 4   store and we wouldn't be able to get the records we needed for

 5   our investigation.

 6   Q     And when you went to her office, was she indeed there?

 7   A     Yes, she was.

 8   Q     And did you see the hundred files as requested all in one

 9   place being worked on?

10   A     I -- I don't know.  I saw a bunch of files.  I don't know

11   if they were on the hundred list or not.

12   Q     Did she change her address?

13   A     What do you mean?

14   Q     Did she move from the location after she gave back her

15   license by the time you got there?

16   A     No.  By the time we got there, no.

17   Q     Did she move from her address, her home address?

18   A     No.

19   Q     Her home address was listed on the profile of her

20   business; right?

21   A     I believe so, yes.

22   Q     Did she change her phone number?

23   A     I don't know.

24   Q     Her phone number was listed on her business profile?

25   A     I never called her phone number; so I don't know the
```

UNITED STATES DISTRICT COURT

1    answer to that.

2    Q    So you -- now, when you took the files -- in fact, she

3    still lives where she was residing at that time?

4    A    I'm sorry.  I don't understand --

5              MS. QUINTERO:  Objection, Your Honor.  Relevance.

6              THE COURT:  Sustained.

7    Q    BY MS. NKELE:  Now, when -- when you seized the file from

8    her office, did you still expect her to respond to the request

9    for information on hundred files?

10   A    The date had already passed where she was supposed to have

11   turned in those files.  But, yes, we did offer to her that, if

12   she wanted us to give them to SafeGuard Services in response to

13   the audit, they would have full access to them.

14   Q    Did she have access to her files after you took them?

15   A    Absolutely.

16   Q    Now, you referred to the Government's Exhibit 73, page 1.

17   You referred to notations on the cover of the file.

18   A    Yes.

19   Q    Now, that patient file was one of the patients that was on

20   the list?

21   A    I believe so, yes.

22   Q    So the notation was consistent to the list of

23   documentations that were required?

24             MS. QUINTERO:  Objection, Your Honor.  Vague and

25   ambiguous.

```
 1            THE COURT:  I'm going to ask you to rephrase the
 2   question.  I'm not sure what it means.
 3   Q    BY MS. NKELE:  On the list that was requested, was there a
 4   request for delivery documents?
 5   A    Yes.
 6   Q    And is there a notation requesting the -- verifying where
 7   the delivery documents were?
 8   A    Yes.  It says, "Where is the delivery document for this
 9   patient?"  Is that the notation you're referring to?
10   Q    Yes.
11   A    Okay.
12   Q    Is there a request for doctor's evaluations on the -- on
13   the request?
14   A    Yes.
15   Q    And on the notation on the front cover of the file, is
16   there a request to verify -- to see doctor's face-to-face
17   evaluation?
18            MS. QUINTERO:  Objection.  Vague as to request,
19   Your Honor.
20            THE COURT:  Overruled.
21            THE WITNESS:  The -- it says, "See doctor physically
22   to collect progress note and face-to-face eval."
23   Q    BY MS. NKELE:  When there's a request from CMS for
24   documentation, it's not unusual for providers to provide those
25   informations.  They have to provide them.  Is that unusual?
```

```
 1              MS. QUINTERO:  Objection, Your Honor.  Calls for
 2    speculation.
 3              THE COURT:  I don't know.  Do you know?
 4              THE WITNESS:  I don't really understand the end of
 5    the question.  I'm not really sure what you're asking.
 6    Q    BY MS. NKELE:  If there is a document that is not on the
 7    list, that is not in the file --
 8    A    Uh-huh.
 9    Q    -- does it have to be provided?
10    A    The -- the supplier is required to provide the
11    documentation that it has on file for that beneficiary.
12    Q    If there's a copy with the doctor, is it provided --
13    expected to make sure that the copy -- they have a copy of it?
14    A    The provider is to make sure they have a copy of the
15    face-to-face, the prescriptions, the evaluations, the detailed
16    product mobility description form, prior to delivering and
17    billing for the wheelchair.  So they should have that in the
18    file already.
19    Q    Is there a note on this request that says, provide the
20    documents in the file prior to that?
21    A    I'm sorry?
22    Q    Does the request call for documents that were in the file
23    before this request was received?
24              MS. QUINTERO:  Objection, Your Honor.  Vague.
25              THE COURT:  Overruled.
```

**UNITED STATES DISTRICT COURT**

```
 1              THE WITNESS:  I still don't understand.

 2              THE COURT:  Sustained.  Sustained.  It is vague.

 3   Q    BY MS. NKELE:  The request calls for documentations,

 4   copies of documentations.

 5   A    Correct.

 6   Q    The request did not exclude documentations from a doctor's

 7   office, does it?

 8   A    I'm sorry.  Did you ask, does it include documentations

 9   from a doctor's office?

10   Q    Yes.

11   A    Yes.

12   Q    If a -- I would like to -- now, I would like to read out

13   the first paragraph after the list of documents to the

14   provider.

15        It says, "We are enclosing a document -- documentation

16   request form that will help you determine what documentation

17   will be necessary.  Please submit any and all information for

18   each claim that you wish to support the billed -- for each

19   claim that you wish to support the billed services.

20        "If these records are not on file in your office, it is

21   your responsibility to obtain copies from the physician,

22   hospital, nursing facility, or other place of service to

23   justify these services."

24        So it's not a violation of the rules, after you receive

25   the request, to get necessary documents from relevant offices,
```

```
 1   is it?
 2   A     It depends on the documentation.  There's certain
 3   documentation that Medicare requires the supplier have in their
 4   possession prior to delivery of the power wheelchair and prior
 5   to billing of the power wheelchair.
 6   Q     Can you show me in the letter of request where it states
 7   that?
 8   A     No.  I don't believe it's in the -- this letter.
 9   Q     Now, you also stated on -- that you saw Exhibit 30, a list
10   of contact information at Ezcor.
11   A     Yes.
12   Q     Do you know who established that list?
13   A     Who established the list?
14   Q     Yes.
15   A     No.
16   Q     Do you know whose writing is on the list?
17   A     Yes.  I believe it's the defendant's, Sylvia Walter-Eze.
18   Q     Are all the writings on the list the same?
19   A     I wouldn't say -- no, not all of them.
20   Q     So which ones are her writing?
21   A     I believe Wilmer -- which one are we looking at?  I'm
22   looking at a different one.  I'm sorry.  Which page did you
23   want?
24   Q     I'm starting from page 2.
25   A     Page 2.
```

1      Okay.  On the very top right it says Lana, home, cell,

2  661-775-, et cetera.  I believe that's the defendant's

3  handwriting.

4      Anthony --

5  Q    Are you an expert, familiar with defendant's handwriting?

6  A    Am I familiar or am I an expert?  Which is the question?

7  Q    Either or.

8  A    I'm familiar with the defendant's handwriting, yes.

9  Q    Can you show me where else on this list that has

10  defendant's writing.

11  A    I believe Anthony and the cell phone number associated

12  with Anthony.

13      And Edna Calaustro, the 933 Province Town Drive, Salinas,

14  California, is her writing.

15      The crossed out Maria Del Rocio Retana, I believe those

16  are all her writings.

17  Q    Are you sure that it's her writing, all those that you

18  listed?

19  A    I believe it's her writing.

20  Q    But you are not sure, are you?

21  A    I cannot be a hundred percent.

22  Q    Now, what are the other writings?  Do you know who wrote

23  them?

24  A    No.

25  Q    Do you know for what purpose they wrote it?

```
1    A    They wrote what?

2    Q    Wrote the list.

3    A    Which name?  Are you talking about the entire list or

4    certain names?

5    Q    Yes.  The entire list.

6    A    It's contact information for certain people, names and

7    telephone numbers, addresses of how to reach people associated

8    with Ezcor.

9    Q    Is there anything unlawful about this list?

10   A    About having a list?

11   Q    Yes.

12   A    No.

13   Q    Page 1 of the list has a name Wilmer on it.

14   A    Yes.  Wilmer is written twice.

15   Q    Do you know which Wilmer that is?

16   A    It's Wilmer Guzman.

17   Q    It doesn't state what his status is, does it?

18   A    What do you mean by "status"?

19   Q    It doesn't say he's a marketer or an independent associate

20   or an employee.  It just says Wilmer; right?

21   A    On this form, yes.

22   Q    Now, do you know the current standard, DME supplier

23   standards, the current standards regarding patient contact?

24   A    No.

25   Q    Did you know the standard regarding patient contact in
```

```
1    2006?

2    A    No.

3    Q    Did you know what it was in 2000?

4    A    No.

5    Q    Do you know if the standards for DME suppliers have always

6    been the same or either have changed over the years?

7    A    I don't know.

8              MS. QUINTERO:  Objection, Your Honor.  Lacks

9    foundation.

10             THE COURT:  Sustained.

11             MS. QUINTERO:  Calls for speculation.

12             THE COURT:  Sustained.

13             MS. NKELE:  Just one moment, Your Honor.

14             MR. DARDEN:  Can I have one moment.

15   Q    BY MS. NKELE:  Let me refer you back to Exhibit 74.

16   Unfortunately, I can't see the Wite-Out that you testify about.

17   Where did this fax come from?  The fax you can see on your own

18   document.

19   A    These lights are so bad . . . looks like -- I don't -- I

20   can't -- there's no phone number on top.  There's no fax number

21   on top.

22   Q    What is the fax number on top?

23   A    There is no fax number on top of where it came from.

24   There's a 661-295-0543.  I believe that's on the receiving line

25   from Ezcor.
```

1    Q    So that was received in Ezcor's office?

2    A    According to the fax ledger, yes.

3    Q    But you don't know where it was coming from?

4    A    No.

5    Q    And this was after the request for documentation?

6    A    That's correct.

7    Q    After the request to contact doctors' offices, nursing

8    homes, wherever, and get any missing documentation?

9    A    That's not what the request says, but it is after the date

10   of the request.

11   Q    Okay.  Let me just refresh your memory again.

12   A    Sure.

13   Q    It says, "Please submit any and all information for each

14   claim that you wish to support the billed services.  If these

15   records are not on file in your office, it is your

16   responsibility to obtain copies from the physician, hospital,

17   nursing facility, or other place of service to justify these

18   services."

19        So it wouldn't be unusual to have a fax from a doctor's

20   office?

21   A    For the detailed product description for power mobility

22   device, yes, it would.  This should be on file in the

23   supplier's office, not the doctor's office.

24   Q    Is it on the letter?

25   A    I don't think so.  What exhibits are the letter again?

```
 1   Q     The letter is Exhibit 16, page 2.

 2   A     Thank you.

 3   Q     Second -- first paragraph after "Documentation to the

 4   provider."

 5   A     May I talk about something on page 4 of that exhibit to

 6   help clarify my answer and where we're misunderstanding each

 7   other, maybe?

 8              MS. NKELE:  Just one moment, Your Honor.

 9   Q     BY MS. NKELE:  I also like to direct you to Exhibit 26 --

10   A     Okay.

11   Q     -- page 16.  You testified about a report that someone

12   from Ezcor offered (inaudible)?

13              THE REPORTER:  I didn't hear the last part.

14              MS. NKELE:  Someone from Ezcor offered a patient

15   $400.

16              THE WITNESS:  No.  I testified that Judy offered the

17   patient $400, or the patient's son $400.  I'm sorry.

18   Q     MY MS. NKELE:  Okay.  Did you see the contact memo sheet?

19   A     Yes.

20   Q     Does it state the matter was investigated?

21   A     Does it state the matter was investigated?  No.

22   Q     Okay.  Can you look at where the date is 10/15/10?

23   A     Yes.

24   Q     "Contacted Judy and told her the patient's son" --

25   A     Yes.
```

1    Q    "The patient's son's accusation against her.  She denied

2    that accusation, stating that the patient and her son had

3    plotted to extort money from her and had used the power

4    wheelchair as a threat if she does not comply."

5    A    Yes.  That's what it says.

6    Q    Okay.  So the matter was investigated?

7    A    You mean by the -- by the -- someone at Ezcor?

8    Q    Yes.

9    A    Is that what you're asking?

10   Q    Now, if --

11   A    It looks like it, yes.

12   Q    And if it's investigated, all she needs to do is document

13   the investigation in the patient's file, in the office file?

14   A    According to who?  Wait.  What's your question?

15   Q    You are familiar with the suppliers' standards; right?

16   A    I said no.  I'm familiar that they exist, but I don't know

17   what all of them are.

18           MS. NKELE:  I have nothing further at this time,

19   Your Honor.

20           THE COURT:  Redirect?

21                        REDIRECT EXAMINATION

22   BY MS. QUINTERO:

23   Q    We can look at that exhibit that we were looking at last.

24   A    The contact memo sheet?

25   Q    The contact memo sheet, yes.

UNITED STATES DISTRICT COURT

1    A      Okay.

2    Q      What page is that, Special Agent Davis?

3           THE COURT:  I'm sorry.  You have to speak from the

4    podium.

5           THE WITNESS:  16.

6    Q      BY MS. QUINTERO:  16 of Government Exhibit --

7    A      26.

8    Q      If we can publish that.  Thank you.

9           The portion that it says that it was investigated, do you

10   know for a fact that it was actually investigated?

11   A      No.

12   Q      Okay.  You're just reading what that notation says there;

13   right?

14   A      That's correct.

15   Q      Your investigation indicate one way or the other whether

16   or not that actually was investigated?

17   A      No.

18   Q      Okay.  So you're just taking what this notation says at

19   face value; right?

20   A      That's correct.

21   Q      The defendant at no time confirmed to you that she in fact

22   investigated this notation or this allegation; correct?

23   A      That's correct.

24   Q      Do you know if any type of police report or anything along

25   those lines was ever filed as a result of that investigation?

1    A    I'm not aware of any.

2    Q    We can go back to Government Exhibit 74, the detailed

3    product description form that we were looking at.

4    A    Yes.

5    Q    Do you have that?  What page do you --

6    A    I think I have that.

7    Q    It's page 2?

8    A    I think it's page 2, though.

9    Q    Page 2 of Government's Exhibit 74?

10   A    Yeah.

11   Q    What's the title of this form?

12   A    Detailed product description for power mobility device.

13   Q    Is this a form -- based on your experience, is this a form

14   that would be kept at a physician's office?

15   A    No.

16   Q    Is this a form that would be kept within patient files at

17   a physician's office?

18   A    No.

19   Q    Is this a form that would be kept, the patient files, for

20   a DME supplier such as Ezcor?

21   A    It's required to be kept by Medicare.

22   Q    It's required to be kept by Medicare before submitting the

23   claim; is that right?

24   A    And before delivery of the power mobility device as well,

25   and the claim.

```
 1    Q    The only interaction, if you will, that a physician has
 2    with this form is signing off on it; is that correct?
 3    A    That's correct.
 4    Q    Now, if there's nothing wrong with backdating a form such
 5    as what we saw here, there's nothing wrong with backdating a
 6    form such as this product description, would there be any
 7    reason for the Wite-Out on the fax ledger that would in- --
 8    that indicates the actual date this form was signed?
 9    A    No.  There would be no reason for it.
10    Q    Is there any reason for whiting out a fax ledger that
11    indicates when this form was actually transmitted between and
12    whoever else was on the other end?
13    A    The only reason would be to hide the fact that the form
14    wasn't received until almost a year after --
15              MS. NKELE:  Objection.
16              THE WITNESS:  -- the supposed date.
17              THE COURT:  Sorry?
18         Next question.
19    Q    BY MS. QUINTERO:  Okay.  Let's go back to Government
20    Exhibit 16, I believe, starting with page 2.
21    A    Okay.
22    Q    We went through that list of documents there; is that
23    right?
24    A    Yes.
25    Q    And as you -- as you're looking through that list of
```

1    documents, do you see often, you know -- and just because --

2    from where I'm seeing it, I can see it a little bit clearer,

3    starting from the bottom, to the top.  "Copy of all state

4    licensures, if applicable."  And then you see "billing, agency

5    contract agreement, if applicable."

6         Do you see that?

7    A    Yes.

8    Q    You see quite a few on this list that indicate "if

9    applicable"; right?

10   A    That's correct.

11   Q    Now, this list of documents that we see here, does that

12   mean that a DME provider such as Ezcor would actually have all

13   of these documents and all of these documents would actually

14   apply to the Medicare claims that they submitted?

15   A    No.

16   Q    This is just a comprehensive list of possible documents

17   that would be in patient files that would be necessary to

18   support the claims submitted to Medicare by the provider; isn't

19   that right?

20   A    That's correct.

21   Q    So it's not 15, 20, how many ever actual types of

22   documents that necessarily has to be provided for every single

23   one of those Medicare beneficiaries that we saw on the list;

24   right?

25   A    That's correct.

1   Q    This is just to give the Medicare provider an idea of the

2   type of documents that might be applicable in support of the

3   claims; isn't that right?

4   A    That's correct.

5   Q    Now, let's go now to page 4 of Government Exhibit 16.  I

6   just want to make sure I'm clear myself.  The list that we just

7   saw right now on page 2 and this list here -- is the list on

8   page 2 in addition to what we see here on page 4, or is that

9   more of an elaborate explanation of the types of documents?

10  A    Page 4 is more of an elaborate -- it's maybe a -- more

11  descriptors of the types of forms that a DME supplier would

12  have and should supply to Medicare.

13  Q    Okay.  And, again, all of these documents that are

14  described here, does that necessarily mean that all of those

15  documents would be applicable for the claims submitted by a

16  provider like Ezcor?

17  A    No.

18  Q    And I think earlier you wanted to explain something that

19  you didn't get to explain about page 4?

20  A    Yes.

21  Q    Do you remember that?

22  A    Yes.

23  Q    Okay.

24  A    Yes.  In the middle of page 4, under the medical

25  information box, on the right-hand side, there's the four

```
 1    bullet points.  The last one, it says "All medical information,
 2    except for the CMN, may be maintained in the patient's medical
 3    record, not necessarily in the supplier's file, but must be
 4    available to the DME MAC or other Medicare contractor upon
 5    request."
 6    Q    What's the significance of that?
 7    A    So it wouldn't be unusual for a supplier to need
 8    additional documentation from a physician.  It says here they
 9    don't necessarily have to have all the information obtained in
10    the patient's medical file with the provider.
11         But if Medicare requested additional documentation to
12    support a claim -- for example, a power wheelchair -- then the
13    DME supplier would have to go ask the physicians for that
14    documentation.  But there's other documentation that the
15    supplier is required to have on -- in their file before they
16    bill Medicare for a power wheelchair and before they deliver a
17    power wheelchair to a Medicare beneficiary.
18    Q    So basically this refers to any documentation above and
19    beyond what the basic documentation is that you need to
20    maintain in your file as a DME provider before you even bill
21    Medicare; is that right?
22    A    That's correct.
23    Q    So the notation that we saw earlier on page 2 is more
24    referencing that, that if there's additional above and beyond
25    the basic mandatory documentation that you need to have before
```

1  you bill Medicare, that you can obtain that documentation; is

2  that right?

3  A    That's correct.

4  Q    And a Medicare provider such as Ezcor, the defendant, we

5  saw how the --

6         THE REPORTER:  Slow down.  Back up.

7  Q    BY MS. QUINTERO:  Now, we saw in the certification

8  sections of the Medicare applications for the defendant where

9  there's a variety -- a litany of promises, if you will, or

10 certifications that defendant made to Medicare; is that right?

11 A    That's correct.

12 Q    On one of those, aside from the fact that she would not

13 submit false claims to Medicare, was that she would be

14 familiar, would know the rules and laws and regulations of

15 Medicare; right?

16 A    That's correct.

17 Q    And we heard from Mr. Person how all the rules and

18 regulations, all that information, is very much available

19 online --

20 A    Yes.

21 Q    -- is that right?

22 A    Yes.

23 Q    As well as through contractors, through, you know,

24 literature handouts, educational-type things; is that right?

25 A    Yes.

```
 1   Q    So as far as -- whose duty is it to be familiar with the
 2   documentation requirements of Medicare for the bills that the
 3   provider is supplying --
 4             MR. DARDEN:  Objection.
 5   Q    BY MS. QUINTERO:  -- and billing Medicare?
 6             MS. NKELE:  Objection.
 7             THE COURT:  Sustained.
 8        We've covered a lot of this area already, Counsel.
 9   Q    BY MS. QUINTERO:  Now, if we can turn to -- let's stay on
10   Government Exhibit 16, actually, page 1.
11             THE COURT:  Of which exhibit?
12             MS. QUINTERO:  Government Exhibit 16, the same one
13   that we're on, Your Honor.
14             THE COURT:  Okay.
15   Q    BY MS. QUINTERO:  Page 1?
16   A    Yes.
17   Q    The date on this is March 27th, 2012; is that right?
18   A    That's correct.
19   Q    Okay.  And based on this letter, when were the records due
20   to Medicare?
21   A    April 24, 2012.
22   Q    And during your investigation, you learned that there was
23   an extension; is that right?
24   A    That's correct.
25   Q    And based on the extension, the new deadline was what?
```

1   A     May 11th, 2012.

2   Q     After that May 11th, 2012, were any further deadlines --

3   extensions given to the defendant to submit all of the

4   paperwork for the audit?

5   A     No.

6   Q     So the final deadline was this May 11, 2012, date; is that

7   right?

8   A     That's correct.

9   Q     And were any documents produced by the defendant in

10  response to the audit by May 11th, 2012?

11  A     No.

12  Q     Now, the search warrant that was executed at Ezcor wasn't

13  until 14 days later on May 25th, 2012; right?

14  A     That's correct.

15  Q     So the fact that law enforcement went in and executed a

16  search warrant and seized the patient files, including some of

17  the 100 patient files, did that preclude -- did that prevent

18  the defendant with complying with the audit?

19  A     No.

20  Q     Why not?

21  A     The due date had already passed.

22  Q     Okay.  14 days?

23  A     Yes.

24  Q     Okay.  And, in fact, I think you mentioned during cross

25  that the defendant had access to the documents even after they

```
 1   were seized by agents; isn't that right?
 2   A    That's correct.
 3   Q    And was this communicated to the defendant?
 4   A    Yes.
 5   Q    And how was this communicated to the defendant?
 6   A    I told her directly.
 7   Q    Okay.  What do you recall about that conversation?
 8   A    I spoke with her over the phone, and I told her that we
 9   had the -- the documents and she could come to our office
10   anytime to review them, to copy them, or she could just tell
11   SGS, or SafeGuard Services, the Medicare contractor, that we
12   had the records and we would be happy to give them to them for
13   review.
14   Q    So at no time was the defendant prevented from complying
15   with the audit; is that right?
16   A    That's correct.
17   Q    Either before or even after the deadline; is that right?
18   A    That's correct.
19   Q    Now, I want to ask you about your testimony during cross,
20   still about this letter, the audit letter.  If we can turn to
21   page 4 or -- I'm sorry -- page 5 of Government Exhibit 16.
22   A    Yes.
23   Q    Page 6, that's highlighted.  Lucy Bradley, remember during
24   cross you talked about that patient?
25   A    Yes.
```

1  Q    And -- and you indicated, in fact, that that was one of

2  the patient files that was seized from Ezcor; is that right?

3  A    Yes.

4  Q    You actually recalled reviewing that file with Ezcor; is

5  that right?

6  A    I do.

7  Q    And you indicated that you had evidence that Emma Curto

8  was paid a kickback specifically for recruiting this

9  beneficiary to the defendant; isn't that right?

10 A    That's correct.

11 Q    Other than the statements from Emma Curto that she was

12 paid kickbacks by the defendant --

13        MS. NKELE:  Objection.  Assuming facts not in

14 evidence.

15        MS. QUINTERO:  Your Honor, this came out during

16 cross.

17        THE COURT:  Why don't you restate the question, just

18 asking the question itself.

19 Q    BY MS. QUINTERO:  Okay.  Other than this evidence we've

20 already heard about, what other evidence do you have that the

21 defendant -- that the defendant paid kickbacks, specifically

22 for Lucy Bradley?

23 A    It -- Emma Curto had one of those marketer files or

24 independent associate files that we -- we went through earlier,

25 and Lucy Bradley is listed in that file along with dollar

1    amounts paid.  There's a lot of correspondence.  I guess she

2    had a lot of specifications for her wheelchair.  That's why I

3    remember it so much.  And how much money it was going to cost

4    and how much money she was going to pay.

5              MS. NKELE:  Objection.  That's hearsay.

6              MS. QUINTERO:  This is evidence obtained during the

7    course of the investigation, Your Honor.  They opened the door.

8              THE COURT:  The door was opened.  As I say, we're

9    getting repetitive, and we're getting -- dragging the case much

10   longer than it should be.  So I'm going to sustain the

11   objection.

12   Q    BY MS. QUINTERO:  Other than the statements that we have

13   already heard, there was more evidence about kickbacks specific

14   to this beneficiary; is that right?

15   A    To the patient recruiter --

16   Q    Yes.

17   A    -- for the beneficiary?

18   Q    Yes.

19   A    Yes.

20   Q    Okay.  I'll move along.

21        Let's look let's look at Government Exhibit 73, please,

22   page 7.  We see this prescription that says "wheelchair";

23   right?

24   A    Yes.

25   Q    Was there any documentation at all, throughout the entire

```
1   patient file that you have in front of you, that indicates that
2   the wheelchair that was prescribed by this referring physician
3   was a power wheelchair?
4   A     No.
5   Q     Okay.  Now, it doesn't say the word "power mobility
6   device"; right?
7   A     That's correct.
8   Q     And you testified as to the difference between when you
9   have a prescription that calls for a power wheelchair versus a
10  manual wheelchair, right?
11  A     Yes.
12  Q     And there's a lot more information --
13  A     Yes.
14  Q     -- isn't that right?
15  A     Yes.
16  Q     Okay.  And if you're a Medicare provider such as Ezcor,
17  where you're providing durable medical equipment and over half
18  of your billings to Medicare are power wheelchairs, are you
19  expected to know what you're billing Medicare for?
20  A     Yes.
21  Q     Right.  You're expected to know the prescriptions that
22  you're basing your claims to Medicare; right?
23  A     Yes.  Along with other documentation that should come with
24  the prescription.
25  Q     And you're expected to know the documentation that is
```

```
 1    necessary that Medicare requires to support a power mobility

 2    device, a power wheelchair prescription; right?

 3    A    Yes.

 4              MS. NKELE:  Objection.  Move to strike.  Calls for a

 5    conclusion.

 6              THE COURT:  Overruled.

 7    Q    BY MS. QUINTERO:  Let's look at Government Exhibit 30,

 8    please, page 1.

 9    A    Okay.

10    Q    I believe you testified that the first time that you asked

11    the defendant about these contact sheets were sometime during

12    your interview of -- during the execution of the search

13    warrant; right?

14    A    That's correct.

15    Q    You or someone during the execution of the search warrant

16    located this document there on-site?

17    A    I did, yes.

18    Q    You did yourself --

19    A    Yes.

20    Q    -- personally?

21    A    Yes.

22    Q    And during your second interview on that same day, during

23    the search warrant, you asked the defendant specifically about

24    the contact sheet; is that right?

25    A    Yes.
```

1  Q      What did the defendant say with respect to who the

2  independent associates were on this contact sheet?

3  A      She said independent associates were individuals on her

4  staff who did odd jobs for her.

5  Q      At that time did she say anything about whether or not

6  these were people that she paid money to, to refer patients to

7  her?

8  A      She denied that.  So we did ask her if these were people

9  who she paid money to, to refer her patients, and she said no.

10 Q      Okay.  And this is after you showed her this independent

11 associate contact sheet; is that right?

12 A      That's correct.

13 Q      Okay.  And she told you that these independent associates

14 were just staff that did odd jobs for her?

15 A      Yes.

16 Q      And she denied that she paid money to these people, these

17 independent associates, to refer patients to her; right?

18 A      That's correct.

19 Q      Now, eight months later, when you're talking about

20 independent associates with the defendant, what did she say at

21 that time?

22         THE COURT:  Counsel, I'm sorry.  I feel sorry for

23 the jury.  How many times do we have to repeat the same

24 questions over and over and over again?  She's already

25 testified to what she said a month later.  She's been

1   cross-examined on what she said a month later.  It's too

2   repetitive.  We've got to -- we've got to ask the questions

3   that are relevant and not just keep repeating, repeating,

4   repeating.  Both sides have been doing it, but it's drawing out

5   the case and making it extremely boring if you ask the question

6   five or six times.

7        Go ahead, but let's not get into repetitive questions.

8             MS. QUINTERO:  My apologies, Your Honor.

9             THE COURT:  That's okay.

10            THE WITNESS:  I'm sorry.  What was the question?

11            THE COURT:  She's going to -- she's going to come up

12   with a brand-new one for you.

13            THE WITNESS:  Thank you.

14   Q   BY MS. QUINTERO:  Just real quick, did she admit that she

15   paid these independent associates money for people to refer

16   patients to her?

17   A    Yes.

18   Q    Okay.  Moving along.

19            THE COURT:  Okay.

20   Q   BY MS. QUINTERO:  Just one last question.  With regards to

21   Mr. Wilmer himself, he's on this independent associate -- did

22   the defendant confirm to you that Mr. Wilmer was, in fact, one

23   of these independent associates?

24   A    Yes.

25   Q    Okay.  Separate from that, you see the phone numbers there

1    for Mr. Wilmer?

2    A    Yes.

3    Q    Did you during the course of your investigation -- based

4    on the phone numbers there, able to identify that those, in

5    fact, were the phone numbers of Mr. Wilmer Guzman?

6    A    Yes.  That's actually how I identified Wilmer, Wilmer

7    Guzman.

8    Q    Based on his phone number?

9    A    Yes.

10   Q    And then the defendant confirmed that he was an

11   independent associate?

12   A    Yes.

13   Q    When you were talking about Government Exhibit 16, the

14   documents requested on the audit --

15   A    Yes.

16   Q    -- during the course of your investigation, did you learn

17   that it was offered to the defendant that SafeGuard Services

18   would, in fact, go and make copies of the documentation for

19   her?

20   A    Yes.

21             MS. NKELE:  Objection.  It's hearsay.

22             THE COURT:  Overruled.

23   Q    BY MS. QUINTERO:  Now, you -- the beginning of your cross,

24   you were asked about your initiation of the investigation and

25   everything.

1    A    Yes.

2    Q    And you talked about, you know, the complaint and the

3    referral and everything.  But that wasn't what -- I'm sorry.

4    Strike that.

5         The -- remember during direct when we talked about the

6    50 percent of claims, at least 50 percent of claims were by

7    four referring physicians?

8    A    Yes.

9    Q    In what context did you use that in your investigation?

10   A    That type of information indicates that -- a fraud trend,

11   that those four physicians were writing prescriptions for

12   potentially medically unnecessary equipment.  So we were able

13   to focus our investigation.

14   Q    Now, based on your experience, is it common for a DME

15   supplier to supply significant durable medical equipment such

16   as power wheelchairs to beneficiaries in other states from

17   where they're located at?

18   A    No.  It's not common.

19           MS. NKELE:  Objection.  Move to strike.

20           THE COURT:  Overruled.  Overruled.

21   Q    BY MS. QUINTERO:  We talked briefly about your reasons for

22   executing the search warrant when you did on May 25th, 2012;

23   right?

24   A    Right.

25   Q    Okay.  And other than deciding to execute on that on

```
1    May 25th, I think the reason you indicated during your cross
2    was because you were concerned that the business would no
3    longer be operating and would not have access to the files.
4         Do you remember that?
5    A    That's correct, yes.
6    Q    Okay.  Were you also concerned that there could have been
7    a possibility, based on your experience investigating these
8    type of cases, that files could be altered?
9    A    Oh, yes.
10            MS. NKELE:  Objection, Your Honor.
11   Q    BY MS. QUINTERO:  Now --
12            THE COURT:  Overruled.
13            MS. QUINTERO:  No further questions, Your Honor.
14   Thank you.
15            THE COURT:  Recross.
16                     RECROSS-EXAMINATION
17   BY MS. NKELE:
18   Q    You did testify that you're not really familiar with all
19   of DME supplier standards?
20   A    Right.  I would not be able to name them all.
21   Q    You stated that she did not call the police after her
22   investigation?
23   A    I stated I was not aware if the defendant made a police
24   report.
25   Q    People's Exhibit -- Government Exhibit 69 is supplier
```

UNITED STATES DISTRICT COURT

```
 1   standards for 2000, and that was in the file.  States in
 2   No. 15, "A supplier must answer questions and respond to
 3   complaints of beneficiaries and maintain documentation of such
 4   contacts."  Is there anywhere on that standard that it requires
 5   calling the police?
 6   A     No.
 7   Q     Exhibit 16, People's Exhibit 16, third paragraph -- fourth
 8   paragraph indicates that the provider is responsible for
 9   retrieval of all pertinent records.
10   A     Yes.
11   Q     So it's expected that you should retrieve the documents
12   when requested?
13   A     Yes.  Like I mentioned on page 4, the supplier is not
14   required to have all of the documentation that could be
15   provided to Medicare in response to the audit, in order to
16   justify the claim to Medicare.
17           MS. NKELE:  One moment, Your Honor.
18       I have nothing further, Your Honor.
19           THE COURT:  You may step down.
20       Next witness.
21           MS. QUINTERO:  Yes, Your Honor.  Government would
22   like to call Mr. Wilmer David Guzman.  And, Your Honor,
23   Mr. Guzman -- Mr. Guzman will be assisted by a Spanish
24   interpreter.
25           THE COURT:  Okay.
```

```
 1              THE CLERK:  Sir, if you could -- I'm going to swear
 2   in the interpreter.
 3         Do you solemnly swear that you will well and truly
 4   interpret from the English language into the Spanish language
 5   and from the Spanish language into the English language in the
 6   cause now before the Court, according to the best of your
 7   knowledge and ability, so help you God?
 8              THE INTERPRETER:  I do.
 9              THE CLERK:  Please state your name for the record.
10              THE INTERPRETER:  Julie Drucker, oath on file.
11              THE COURT:  Swear in the witness.
12              THE CLERK:  Do you solemnly swear that the testimony
13   you shall give in the cause now before the Court shall be the
14   truth, the whole truth, and nothing but the truth so help you
15   God?
16              THE WITNESS:  I do swear.
17              THE CLERK:  Thank you.  Please be seated.
18              THE COURT:  Ladies and gentlemen, as he's taking the
19   stand, let me talk to you a little bit.  When we have an
20   interpreter, when we're interpreting into English, we have to
21   remember that, since we all have to operate off of the same
22   testimony, what is the testimony is what comes from the
23   interpreter, the English that the interpreter is giving to the
24   Court.
25         So if any of you speaks Spanish, it's not what you hear in
```

1   Spanish or what you think in Spanish.  The evidence is what

2   comes from the mouth of the interpreter.  For that reason, we

3   take the microphone normally away from the witness and over to

4   the interpreter because that's the only one you're supposed to

5   be listening to.

6        And you are not to try to second-guess if the interpreter

7   is correct or not.  We have to take what the interpreter says

8   is the interpretation.  She has her oath on file, and she is a

9   certified court interpreter, and you take that interpretation.

10       Okay, Counsel.

11            MS. QUINTERO:  Thank you, Your Honor.

12                        WILMER GUZMAN,

13   called as a witness by the Government, was sworn and testified

14   through the interpreter as follows:

15            THE CLERK:  Sir, please state your name for the

16   record, spell your last name.

17            THE WITNESS:  Guzman is my last name.  My name is

18   Wilmer.

19            THE INTERPRETER:  Interpreter spelling, Wilmer,

20   W-i-l-m-e-r; Guzman, G-u-z-m-a-n.

21            THE COURT:  You may inquire, Counsel.

22            MS. QUINTERO:  Thank you.

23                      DIRECT EXAMINATION

24   BY MS. QUINTERO:

25   Q    Mr. Guzman, I see that you're using an interpreter.

UNITED STATES DISTRICT COURT

```
1    A    Yes.

2    Q    Do you speak and understand English?

3    A    Yes.

4    Q    Is there a reason why you're using an interpreter today?

5    A    I feel more comfortable speaking English.  It's my first

6    language, Spanish.

7    Q    Now, let's just cut to the chase about what you're here to

8    testify about, Mr. Guzman.  Do you know the defendant, Sylvia

9    Walter-Eze?

10   A    Yes.

11   Q    How do you know the defendant?

12   A    I worked with her at Ezcor Medical Supply.

13   Q    And how did you work with her?

14   A    I was a marketer, and I would recruit people that were on

15   Medicare.

16   Q    Okay.  And what do you mean that you were a marketer?

17   A    I was -- I was working with her to try to recruit people

18   that might be older, or 65 or older, so that they could be

19   using wheelchairs.

20   Q    So they could be using?

21   A    To convince them to get a wheelchair.

22   Q    Okay.  And would you be paid by the defendant for

23   recruiting Medicare beneficiaries to her?

24   A    Yes.  She did pay me.

25   Q    Generally how much did the defendant pay you for every
```

```
 1   Medicare beneficiary that you recruited to her for a power
 2   wheelchair?
 3   A    She -- at the beginning, she was paying me $500, but later
 4   on we reached a point where she started paying me $700 per
 5   wheelchair.
 6   Q    And did you arrive to this arrangement directly with the
 7   defendant?
 8   A    Yes.
 9   Q    And at the time that you arrived to this arrangement with
10   the defendant, was it clear to you that it was illegal?
11   A    Yes.
12   Q    Was it clear to you that it was wrong?
13   A    Yes.
14   Q    Why did you do it?
15   A    I was doing it just for the money.
16   Q    Why?
17            MR. DARDEN:  Objection.
18            THE COURT:  Sustained.  Irrelevant.
19   Q    BY MS. QUINTERO:  Now, let me back up a little bit and ask
20   you, how did you first learn of the defendant?
21   A    Dr. Cohen referred her to me.
22            THE INTERPRETER:  Koye, Dr. Koyen.
23   Q    BY MS. QUINTERO:  Okoye?
24   A    Okoye.
25   Q    And who is Dr. Okoye?
```

```
 1   A     I -- I met that doctor when I worked with him with another
 2   medical supplier, and he referred me to her.
 3   Q     So you used to work with another DME supplier recruiting
 4   patients also?
 5   A     Yes.
 6   Q     And did Dr. Okoye write power wheelchair prescriptions for
 7   this other DME supplier that you recruited patients for?
 8   A     Yes.
 9   Q     And Dr. Okoye referred you to the defendant?
10   A     Yes.
11   Q     Did you ultimately meet with the defendant to start
12   referring patients with her -- to her?
13   A     Yes.
14   Q     When you met the defendant, where did you go to meet her?
15   A     I went to meet her at her office.  It's in Valencia.
16   Q     Okay.  Approximately when was this?
17   A     Approximately four to five years ago, around the year
18   2010, more or less.
19   Q     Okay.  And during this first meeting with the defendant,
20   what did you do?
21   A     First, I asked her to start paying me $800 for every
22   wheelchair that I referred to her, but she told me it was too
23   much money and that at first she would pay me 500.
24   Q     Okay.  And the 500 was for what?
25   A     For each wheelchair referred.
```

```
 1   Q     For every Medicare beneficiary that got a power wheelchair
 2   that you recruited for her?
 3   A     Yes.  For every beneficiary who had Medicare.
 4   Q     And did you, in fact, arrive to this arrangement with the
 5   defendant during this first meeting at her office in Valencia
 6   at Ezcor?
 7   A     Yes.
 8   Q     During this meeting with the defendant at Ezcor, did you
 9   discuss with the defendant when you would get paid?
10   A     Yes.  I asked her if she would pay me at the moment that
11   she did the delivery of the wheelchair, or two to three days
12   later; but she told me that she first had to receive the
13   payment from Medicare in order to pay me.
14   Q     How soon after this initial meeting with the defendant,
15   when you arrived to this arrangement, did you start actually
16   recruiting Medicare beneficiaries for her?
17   A     As soon as possible.  As soon as I could.
18   Q     And how long did you actually recruit Medicare
19   beneficiaries for the defendant under this arrangement?
20   A     I recruited for about two years, more or less.
21   Q     So sometime until 2012?
22   A     Yes.
23   Q     Now, Mr. Guzman, I want to talk to you about exactly how
24   you went about recruiting Medicare beneficiaries for the
25   defendant.  Can you explain to the jury how you did it.
```

**UNITED STATES DISTRICT COURT**

```
 1   A     I primarily go to pool houses, doughnut shops, to the
 2   street, to Walmart, and sometimes to swap meets.
 3   Q     So would you go out on the streets?
 4   A     Yes.
 5   Q     Doughnut shops?
 6   A     Yes.
 7   Q     Swap meets?
 8           MR. DARDEN:  Objection.  Asked and answered.
 9           THE COURT:  Sustained.
10   Q     BY MS. QUINTERO:  Now, let's break that down a little bit.
11   Were there a certain type of individual that you were looking
12   for when you would go out on the streets in search of Medicare
13   beneficiaries?
14   A     Yes.  Those that looked that were 65 years and up, those
15   that looked like they might already be receiving Medicare.
16   Q     So you were looking specifically for Medicare
17   beneficiaries?
18   A     Yes.
19   Q     And why were you looking specifically for Medicare
20   beneficiaries?
21   A     Because Medicare paid for the automated wheelchairs.
22   Q     For the power wheelchairs?
23   A     Yes.
24   Q     And when you approach these Medicare beneficiaries or
25   these individuals out on the streets, what was the purpose of
```

**UNITED STATES DISTRICT COURT**

1   you approaching them on the streets?

2   A    My objective was to persuade them to get a power

3   wheelchair.

4   Q    And how would you try to persuade them, the Medicare

5   beneficiaries, to get a power wheelchair?

6   A    I would offer them shoes, back support, knee support,

7   canes, walkers.

8   Q    Okay.  Different types of DME?

9   A    Yes.

10  Q    Other than different types of DME, is there anything else

11  you would offer them to try to persuade them to get a power

12  wheelchair?

13  A    Well, most of them, they didn't want it.  So I would offer

14  them money.

15  Q    Let's talk about you offering the Medicare beneficiaries

16  money.  Why would you offer them money?

17  A    Well, because I was trying to convince them, because they

18  didn't want the other items I was offering them.

19  Q    And around how much money?

20  A    I would offer them, like, 50 or a hundred dollars.

21  Q    And did you at times pay the Medicare beneficiaries money

22  to the -- convince them to get the power wheelchairs?

23  A    Yes.

24  Q    Once you convinced a Medicare beneficiary to get a power

25  wheelchair, what would you do next?

```
 1  A    Well, I would ask them for their Medicare card so I could

 2  give the information to the store, and I would give them the

 3  Medicare number, the name, and the date of birth.

 4  Q    And who at Ezcor would you give this information to, the

 5  Medicare card, name of the beneficiary, and the date of birth?

 6  A    I would primarily give it to either Paloma or Sylvia.

 7  Q    When you say "Sylvia," Sylvia Walter-Eze, the defendant?

 8  A    Yes.

 9  Q    And you mentioned Paloma?

10  A    Yes.

11  Q    Who is Paloma?

12  A    She's an employee that also used to work at the shop.

13  Q    And why would you call the defendant or Paloma with this

14  information?

15  A    They had to check the eligibility to which -- whether they

16  had already -- whether they had never gotten a wheelchair, or

17  if they had gotten one only five years before, in order to be

18  eligible.

19  Q    And they needed to verify that eligibility?

20  A    Yes.

21  Q    Now, once you called the defendant or spoke with Paloma

22  and gave them this information, what would be the next step in

23  the process?

24  A    They would then tell me the next step.  They would tell me

25  which doctor to take them to, either to Dr. Okoye or Dr. Obasi
```

**UNITED STATES DISTRICT COURT**

1    and Dr. Kelly.

2    Q    Okay.  Let me ask you, had -- you mentioned these three

3    doctors that they would then tell you to take them to?

4    A    Yes.

5    Q    Once they verified the eligibility of the Medicare

6    beneficiary; right?

7    A    Yes.

8    Q    Had you previously had discussions with the defendant

9    about you taking the beneficiaries to doctor's offices?

10   A    Yes.  Well, since the thing is -- since Dr. Okoye had

11   introduced her to me, she told me I then needed other doctors.

12   Q    Other than needing doctors, did you have any other

13   conversations with the defendant about doctors and which

14   doctors to take them to?

15   A    Yes.  I had spoken to her because she asked me if I could

16   bring the prescriptions of the -- of the primary doctors.

17   Q    When you say the primary care doctors, the primary care

18   physicians of the Medicare beneficiaries you were recruiting?

19   A    Yes.

20   Q    And what did you tell her?

21   A    I said that I had already tried that, but the primary care

22   doctors did not want to give them that.

23        And then she told me she was going to get other doctors,

24   and that was when she introduced me to Dr. Obasi and Dr. Kelly.

25   Q    And the primary care doctors of the Medicare beneficiaries

```
 1    did not want to prescribe the power wheelchairs?

 2    A    Exactly.

 3    Q    And that's when she told you that she would get different

 4    doctors for you to take them to?

 5              MR. DARDEN:  Objection.  Asked and answered.

 6              THE COURT:  Sustained.

 7    Q    BY MS. QUINTERO:  And what doctors did the defendant refer

 8    you to so that you can take the Medicare beneficiaries to?

 9    A    She referred me to Dr. Obasi and Dr. Kelly and Dr. Okoye,

10    who had already introduced me to her.

11    Q    Okay.  And did you ask the defendant anything about these

12    doctors and their locations or anything along those lines?

13    A    Yes.  I asked her why Dr. Kelly was so far.  He was out

14    there in Pasadena or Altadena or somewhere like that.  I asked

15    her, "Why so far?"

16         And then she said she needed other doctors so it would

17    look okay in front of Medicare.

18    Q    And what was your understanding that she meant by that, it

19    would look okay with Medicare?

20    A    Well, I think it was only since I only worked with

21    Dr. Okoye for a while.  I think she needed more doctors.

22    Q    What was your understanding of the significance of having

23    more doctors?

24              MR. DARDEN:  Objection.  Irrelevant.

25              THE COURT:  Sustained.
```

```
 1   Q     BY MS. QUINTERO:  And did she say that it would look bad
 2   to Medicare?
 3               MR. DARDEN:  Objection.  This is leading.
 4               THE COURT:  Overruled.
 5               THE WITNESS:  Yes.
 6   Q     BY MS. QUINTERO:  What did she say regarding that?
 7   A     She said it was going to look bad if only one doctor was
 8   referring.  That's why she wanted more than one doctor.
 9   Q     Okay.  Now, did the defendant -- when you were recruiting
10   patients for her under your arrangement, did the defendant
11   herself at times instruct you which doctors to take the
12   Medicare beneficiaries to?
13   A     Yes.
14   Q     And when you recruited Medicare beneficiaries for the
15   defendant, did you in fact take them to these doctors,
16   Dr. Okoye, Dr. Obasi, and Dr. Kelly?
17   A     Yes.
18   Q     And when you would take them, how would you take them?
19   A     I would take them in my car.
20   Q     Now, these Medicare beneficiaries that you recruited for
21   the defendant --
22               MR. DARDEN:  I'm going to object to the form of the
23   question, Your Honor.
24   Q     BY MS. QUINTERO:  Did all of --
25               THE COURT:  Overruled.
```

**UNITED STATES DISTRICT COURT**

1    Q    BY MS. QUINTERO:  Did all of them walk?

2    A    Yes.

3    Q    Did they even appear to need a power wheelchair based on

4    your observations?

5    A    No.

6    Q    Why do you say that?

7    A    Because they were walking.

8    Q    And when you found them, they were walking where?

9    A    On the streets, on the streets, or they were walking in

10   their houses.

11   Q    Now, when you were recruiting Medicare beneficiaries for

12   the defendant, did you care if the Medicare beneficiaries

13   actually needed the power wheelchairs that you were recruiting

14   them for?

15   A    No.

16   Q    Ultimately what is it that you cared about?

17   A    Just that she should pay me the money for each wheelchair

18   that I referred.

19   Q    And ultimately when you would take these Medicare

20   beneficiaries to the doctors that the defendant instructed you

21   to, what was the purpose of you taking them to the doctors'

22   offices?

23   A    The objective was for them to get their power wheelchairs.

24   Q    Okay.  So that they could be prescribed a power

25   wheelchair?

1    A    Of course.

2    Q    Now, once you were at the doctor's office, what did you do

3    there?

4    A    I would fill out the applications, and I would wait for

5    them.  They didn't allow me to go in with them.  They would go

6    in.

7    Q    Now, did the doctors or anyone at the doctor's office ever

8    give you the prescriptions for the power wheelchairs?

9    A    No.

10           THE COURT:  We're going to interrupt at this time.

11   Ladies and gentlemen, it's time for the afternoon recess.

12   Remember the admonishment not to discuss the case among

13   yourselves or with anybody else or form or express any opinions

14   about the matter until it's submitted to you and you retire to

15   the jury room.

16       We'll see you back in 15 minutes, and then we'll go until

17   four o'clock this afternoon.

18           THE CLERK:  All rise.

19           (Recess taken.)

20           THE COURT:  Okay.  The record will reflect that all

21   the members of the jury are in their respective seats in the

22   jury box, including the alternates.  And the witness is on the

23   witness stand on direct.

24       Counsel, you may inquire.

25           MS. QUINTERO:  Thank you, Your Honor.

1  Q     BY MS. QUINTERO:  Mr. Guzman, when you tail -- took the

2  Medicare beneficiaries to the doctors, did the doctors or

3  anyone at the doctor's office ever give you the prescriptions

4  for the power wheelchairs?

5  A     No.

6  Q     To your knowledge, did the doctors ever give the

7  prescriptions directly to the Medicare beneficiaries?

8  A     No.

9  Q     Did you ever see the doctors or anyone at the doctor's

10 office give the prescriptions for the power wheelchairs to the

11 Medicare beneficiaries?

12 A     No.

13 Q     Now, once you took the Medicare beneficiaries to the

14 doctor's office, what did you do next?

15 A     I would take them back to their houses, and then I would

16 wait for them to get the delivery, and then I would call after

17 a week to see if the payment was made.

18 Q     When you say that you would call after a week or so, who

19 would you call?

20 A     I'd call Sylvia to inquire if she had been paid.

21 Q     And what was the purpose of you inquiring if she had been

22 paid?

23 A     So she would pay me my money.

24 Q     And who, to your knowledge, would she be waiting to be

25 paid by?

1  A      Medicare.

2  Q      Now, when the defendant would actually pay you under your

3  arrangement with her, how did you actually get paid?

4  A      At the beginning she'd pay me in cash, $500.  And then we

5  reached another agreement that she would pay me up to 700.

6  Q      Okay.  So at the beginning she paid you in cash anywhere

7  from 500 to $700?

8  A      Yes.

9  Q      And ultimately at some point, did she begin to pay you in

10 check?

11 A      Yes.

12 Q      Now, when you were paid in cash by the defendant for

13 recruiting her Medicare beneficiaries, who would actually pay

14 you that cash?

15 A      It was Sylvia personally.

16 Q      Did anyone other than Sylvia ever pay you that cash for

17 recruiting the Medicare beneficiaries?

18 A      No.

19 Q      And the checks, once you were paid by check by the

20 defendant, how would you actually get the checks?

21 A      After some months, she told me that her accountant had

22 advised her that --

23              MR. DARDEN:  Objection.  Nonresponsive.

24              THE COURT:  Sustained.

25 Q      BY MS. QUINTERO:  Okay.  Once you were being paid by

```
 1   check, how would you actually get the checks?

 2   A     Either Sylvia used to give it to me personally, or

 3   sometimes she would leave it for me with Paloma.

 4   Q     Okay.  And at times when the defendant would give it to

 5   you personally, would you see her signing the checks?

 6   A     Yes.

 7   Q     And the checks that you were paid by Ezcor, who were they

 8   all signed by?

 9   A     She was the one that signed them.

10   Q     She, Sylvia Walter-Eze, the defendant?

11   A     Yes.

12   Q     And we'll look at some of these checks in a little bit,

13   but before we do, let me ask you, why did the -- do you know

14   why the defendant started paying you by check versus cash?

15   A     Yes.  Her --

16               MR. DARDEN:  Objection to everything after "yes."

17               THE COURT:  Sustained.

18   Q     BY MS. QUINTERO:  Did you have an understanding that she

19   needed to try to explain the amount of cash that she was paying

20   you?

21               MR. DARDEN:  Objection.  Form of the question,

22   Your Honor.

23               THE COURT:  I don't understand the question.  Why

24   don't you ask it again, Counsel.

25               MS. QUINTERO:  Yes, Your Honor.
```

**UNITED STATES DISTRICT COURT**

```
 1   Q    BY MS. QUINTERO:  As far as the defendant paying you by

 2   check, did you have an understanding as to why she started

 3   paying you by check?

 4               MR. DARDEN:  Objection.  Form and foundation.

 5               THE COURT:  Overruled to the question as just asked.

 6        It should be "yes" or "no."

 7               THE WITNESS:  Yes.

 8   Q    BY MS. QUINTERO:  What did she tell you about why she

 9   needed to start paying you by check?

10   A    She had to explain where that sum of money was going to

11   because it was a large sum of money.

12   Q    And what was your understanding as to what she meant by

13   "explain where that large sum of money was going to"?

14               MR. DARDEN:  Objection.  Irrelevant.

15               THE COURT:  Sustained.

16        You can get into what she said but not what his

17   understanding was.

18               MS. QUINTERO:  Okay.

19   Q    BY MS. QUINTERO:  What specifically did she tell you as

20   far as why she had to explain it?

21   A    Because it was a lot of money that she wasn't able to

22   explain where it was going.

23   Q    Now, during this conversation did the defendant ask you to

24   fill out any papers?

25   A    Yes.  She had me fill a W-4.
```

```
 1   Q    Okay.  And during this conversation did you discuss with
 2   the defendant the money that she was paying you?
 3   A    Yes.  I told her she had to pay me more.
 4   Q    And why is that?
 5   A    Because she was using my Social Security card because she
 6   was already now paying me by check.
 7   Q    Okay.  And what was her response?
 8   A    She told me it was fine.
 9   Q    And how much did she start paying you at that time?
10   A    $700.
11   Q    And that's $700 for what?
12   A    For each power wheelchair referred.
13   Q    For each Medicare beneficiary that got a power wheelchair?
14   A    Yes.
15   Q    And if you look at the binder in front of you, Mr. Guzman,
16   and turn -- the binder, Government Exhibit 34.
17        Government Exhibit 34 has already been admitted into
18   evidence.  We can go ahead and publish that?
19             THE COURT:  Yes.
20   Q    BY MS. QUINTERO:  Do you recognize this document,
21   Mr. Guzman?
22   A    Yes.
23   Q    Can you explain to the jury what this document is on
24   Government Exhibit 34.
25   A    It's the W-4 that she asked me to sign, and I filled it at
```

1    that time.

2    Q     And whose writing is that that we see throughout

3    Government Exhibit 34?

4    A     It's mine.

5    Q     And what about the signature down below?  Whose signature

6    is that?

7    A     It's mine.

8    Q     And what's the date on this W-4?

9    A     April 7, 2010.

10   Q     Now, do you see on the W-4, on the top -- well, there in

11   the middle, where it says employee withholding allowance

12   certificate, the top there of the blown-up section?  It says

13   employee withholding allowance certificate.

14         Do you see that?

15   A     Yes.

16   Q     At any time were you ever an employee of the defendant

17   through Ezcor?

18   A     No.

19   Q     Have you ever been an employee of the defendant or Ezcor?

20   A     No.

21   Q     So is it fair to say that this W-4 is false?

22   A     Yes.

23   Q     In fact, after filling out this form for the defendant,

24   did she ever take any taxes out of the money that she was

25   paying you to recruit the beneficiaries for her?

```
 1   A     No.
 2   Q     Now, let's look at some of those checks now that the
 3   defendant paid you, if you look at the binder in front of you
 4   there and turn to Government Exhibit 20.
 5         Now, just looking at Government Exhibit 20 there in the
 6   binder, do you recognize what you see there throughout
 7   Government Exhibit 20?
 8   A     Yes.
 9   Q     Okay.  And what -- can you explain to the jury what
10   Government Exhibit 20 is.
11   A     It's -- it's the check that Sylvia would pay me for each
12   wheelchair that I recruit.
13   Q     And there's quite a few checks there in Government
14   Exhibit 20; is that right?
15   A     Yes.
16   Q     And are those the checks that the defendant paid you for
17   every Medicare beneficiary that you recruited for her that got
18   a power wheelchair?
19   A     Yes.
20   Q     And obviously this doesn't include the cash payments that
21   she paid you initially; is that right?
22   A     Correct.
23   Q     Now, I'm not going to go through all of these checks.  The
24   jury can look at them during their deliberation.  But if we can
25   look at Government -- page 2 there, and this check is --
```

1    THE COURT:  I may have missed it.  Has this been

2  introduced?

3    MS. QUINTERO:  Yes, Your Honor.

4    THE COURT:  Okay.

5    MS. QUINTERO:  And it's Government Exhibit 20.

6    THE COURT:  Okay.

7    MS. QUINTERO:  This check is listed as Overt Act No.

8  3 in the Indictment.

9  Q    BY MS. QUINTERO:  Now, Mr. Guzman, what is the check

10  number on this check?

11  A    10439.

12  Q    And what's the date on that check?

13  A    May 11, 2010.

14  Q    Now, looking at the check there, in the middle right-hand

15  side, how much is the amount on this check?

16  A    $500.

17  Q    And do you see the signature there in the middle on the

18  check itself?

19  A    Yes.

20  Q    Do you recognize that signature?

21  A    Yes.

22  Q    Whose signature is that?

23  A    It's Sylvia's.

24  Q    And who paid you this check?

25  A    Sylvia.

```
 1   Q    Sylvia Walter-Eze, the defendant?

 2   A    Yes.

 3   Q    And what did the defendant pay you this check for?

 4   A    For a wheelchair that I had recruited for her that was

 5   already delivered.

 6   Q    For a Medicare beneficiary?

 7   A    Yes.

 8   Q    Now, is that your signature -- well, looking there on the

 9   bottom, that other signature on the endorsement portion, do you

10   recognize that signature?

11   A    Yes.

12   Q    And whose signature is that?

13   A    It's mine.

14   Q    And did you, in fact, endorse this check and receive the

15   money from this check?

16   A    Yes.

17   Q    Now, the next check I want to look at is at page 6 of

18   Government Exhibit 20.  What's the check number on that?

19   A    10450.

20   Q    And what's the date of this check?

21   A    6/14/2010.

22   Q    June 14, 2010?

23   A    Yes.

24   Q    And what is the amount of this check?

25   A    1,200.
```

**UNITED STATES DISTRICT COURT**

```
 1  Q     Again, do you see the signature there in the middle of the
 2  check?  Whose signature is that?
 3  A     It is Sylvia's.
 4  Q     And just to -- to make sure, at times when the defendant
 5  would give you the checks, would she sign them there in your
 6  presence at times?
 7  A     Yes.  Sometimes she would sign them, and sometimes she
 8  would leave them for me with Paloma.
 9  Q     And this check, who paid you this check?
10  A     Sylvia did.
11  Q     And what did the defendant pay you this check for?
12  A     For each power wheelchair that was recruited that had
13  already been delivered.
14  Q     For patient referrals?
15  A     For each patient, yes.
16  Q     And looking again at the endorsement portion of this
17  check, is that your signature?
18  A     Yes.
19  Q     And did you, in fact, endorse this check and receive this
20  money from this check?
21  A     Yes.
22  Q     Now, the last check I want to look at is at page 26 of
23  Government Exhibit 20.  What's the check number on that?
24            THE INTERPRETER:  One moment.  26, Counsel?
25            MS. QUINTERO:  Yes, ma'am.
```

**UNITED STATES DISTRICT COURT**

```
 1              THE WITNESS:  1056.
 2   Q    BY MS. QUINTERO:  And what's the date of that check?
 3   A    February 15, 2011.
 4   Q    And how much is this check for?
 5   A    1,650.
 6   Q    And the signature there, whose signature is that on that
 7   check?
 8   A    It is Sylvia's.
 9   Q    And who paid you this check?
10   A    Sylvia did.
11   Q    And the endorsement portion of that check there, is that
12   your signature?
13   A    Yes.
14   Q    And did you, in fact, endorse this check and receive this
15   money?
16   A    Yes.
17   Q    Now, let me ask you, Mr. Guzman, did you ever do any type
18   of work for the defendant or for Ezcor other than recruiting
19   Medicare beneficiaries for her to receive power wheelchairs or
20   other DME?
21   A    No.
22   Q    Did you ever work at Ezcor in the office?
23   A    No.
24   Q    Did you ever deliver any power wheelchairs or other DME
25   for Ezcor?
```

```
 1   A     No.
 2   Q     Did you ever do any language translation or interpretation
 3   for the defendant?
 4   A     No.
 5   Q     Did you ever run any errands for the defendant?
 6   A     No.
 7   Q     Did you ever do any odd jobs?
 8   A     No.
 9   Q     Did you ever do any type of work that the defendant would
10   pay you for other than recruiting patients to her for power
11   wheelchairs or other DME?
12   A     No.
13   Q     So it's fair to say that all of these checks here on
14   Government Exhibit 20 is money that you received from the
15   defendant for recruiting patients for DME, primarily power
16   wheelchairs?
17   A     Yes.
18   Q     So all of these checks, would you say, are kickbacks for
19   recruiting patients?
20         MR. DARDEN:  Objection.  Calls for a legal
21   conclusion.
22         THE COURT:  Sustained.
23   Q   BY MS. QUINTERO:  Now, I want to look at another exhibit.
24   If you will turn to Government Exhibit 36, have you seen this
25   document before, Mr. Guzman?
```

1         THE INTERPRETER:  Just one moment, please.

2         THE WITNESS:  Yes.

3    Q    BY MS. QUINTERO:  And what is -- can you explain to the

4    jury what this document is.

5    A    Yes.  It's a contract document that Sylvia wrote for me

6    because there was a chair that was delivered and the person

7    wasn't there, and they were trying to collect a hundred dollars

8    from me.

9    Q    Who is "they"?

10   A    Sylvia was.

11   Q    That was the purpose of this contract, if you will?

12   A    Yes.

13   Q    Now, let's look at the very top where it says "Independent

14   associate letter of contract."

15        Do you see that?

16   A    Yes.

17   Q    Okay.  And if you can look at the signature down below on

18   the left-hand side, whose signature is that?

19   A    It's mine.

20   Q    And the signature to the right of that, whose signature is

21   that?

22   A    It's Sylvia's.

23   Q    And is that your writing there where it says "Wilmer

24   Guzman" and the date of 10-14-10 next to your signature?

25   A    Yes.

1    Q     When you signed this document, where were you?

2    A     I was at her office.

3    Q     What -- was the -- was the defendant there at the office

4    with you when you signed it?

5    A     Yes.

6    Q     And did you discuss this letter of contract with her at

7    that time?

8    A     Yes.

9    Q     And what was the purpose of this letter?

10   A     The -- the objective was that she would be able to charge

11   me for those hundred dollars for the wheelchairs that weren't

12   delivered; or if they were rejected, she could also charge me.

13   Q     When you say "rejected," who do you mean by?

14   A     Like Medicare, if it denied payment.

15   Q     Okay.  Now, let's look at Government Exhibit 36 where the

16   last sentence there, "Denied claims result in zero commission."

17         Do you see that?

18   A     Yes.

19   Q     What was your understanding about this?

20   A     It's what I just said.  If she had already paid me a

21   commission, then in the next wheelchair, that might be

22   rejected.  She could deduct it.

23   Q     I want to make sure you're looking at paragraph 3.  Okay?

24   Where it says "Denied claim," do you see that?

25   A     Yes.

```
 1   Q     What was your understanding about that, "Denied claims
 2   result in zero commission"?
 3   A     That that would be when Medicare denied a payment.
 4   Q     So you wouldn't get paid if Medicare denied a payment; is
 5   that right?
 6   A     That's right.
 7   Q     And that would be on a DME for a Medicare beneficiary that
 8   you recruited for the defendant?
 9   A     Yes.
10   Q     And the word "commission" that you see there, what did you
11   interpret that to mean?
12   A     The money that she would pay me.
13   Q     For every Medicare beneficiary that got a power
14   wheelchair?
15   A     Yes.
16   Q     Okay.  And now let's look at paragraph 6, where it says,
17   "Commission will not be paid, or if already advanced," do you
18   see that paragraph?
19   A     Yes.
20   Q     What is the significance of that paragraph to you?
21   A     Well, the same thing.  If the wheelchair had been denied
22   payment, then she would charge it at the next one.
23   Q     On the next Medicare beneficiary that you recruited, she
24   would deduct it from you?
25   A     Yes.
```

**UNITED STATES DISTRICT COURT**

1  Q    Now, Mr. Guzman, while the defendant was paying you the

2  money to recruit patients for power wheelchairs, did you know

3  that it was illegal?

4  A    Yes.

5  Q    Did you know that it was wrong?

6  A    Yes.

7  Q    And did you know that it was illegal for you to be paid

8  for patient referrals for Medicare beneficiaries to receive

9  durable medical equipment?

10 A    Yes.

11 Q    And when you signed this document that we're looking at

12 here, did you believe that all of a sudden it was no longer

13 illegal to get paid the money for the patient referrals?

14 A    No.  I knew it was illegal.

15 Q    Did you believe that by signing this document, that it was

16 no longer for you to get paid for -- that it was no longer

17 wrong for you to get paid for the patient referrals?

18 A    No.  I knew that it was illegal.

19 Q    Now, did you know that at the time that you signed this

20 document?

21 A    Yes.

22 Q    Now, the last paragraph that I want you to look at is

23 paragraph 8 of Government Exhibit 36 here.  Do you see where it

24 says, "Don'ts" "Ezcor maintains a zero policy on kickbacks.  Do

25 not offer kickbacks.  Never offer monetary reward, kickback to

```
 1   any patient to encourage the patient to obtain third-payer

 2   covered items"?

 3        Do you see that?

 4   A    Yes.

 5   Q    Now, you previously mentioned that you paid money to

 6   Medicare beneficiaries to convince them or persuade them to get

 7   the power wheelchairs, right?

 8   A    Yes.

 9   Q    At the time that you signed this document with the

10   defendant, did you talk to the defendant about this specific

11   paragraph?

12   A    Yes.  She did mention this --

13             MR. DARDEN:  I object to everything after, "Yes,"

14   Your Honor.

15             THE COURT:  Okay.  Sustained.

16   Q    BY MS. QUINTERO:  And what exactly did you tell the

17   defendant?

18   A    That the people primarily wanted money.

19   Q    Okay.  And what did the defendant respond to you?

20   A    Well, she said, "I don't care.  Just do what you have to

21   do."

22   Q    And what did she say -- what did you understand that to

23   mean as far as doing what you had to do?

24             MR. DARDEN:  Objection.  Irrelevant.

25             THE COURT:  Sustained.
```

```
 1   Q    BY MS. QUINTERO:  What specifically did she say with
 2   regard to you paying money to Medicare beneficiaries?
 3              MR. DARDEN:  Objection.  Asked and answered.
 4              THE COURT:  Overruled.
 5              THE WITNESS:  I told her that most of them primarily
 6   were going for the money, that they all wanted to receive
 7   money.
 8              MR. DARDEN:  I'm going to object.  Nonresponsive.
 9              THE COURT:  The question was, what did she say to
10   you about paying the money?
11              THE WITNESS:  Well she said, "I don't care.  Just do
12   what you have to do."
13   Q    BY MS. QUINTERO:  Do what you have to do to bring her
14   Medicare beneficiaries?
15              MR. DARDEN:  I'm going to object, Your Honor.
16              THE COURT:  Overruled.
17              MR. DARDEN:  Counsel is testifying.
18              THE COURT:  Overruled.
19              THE WITNESS:  Yes.
20   Q    BY MS. QUINTERO:  Now, if you will turn now to Government
21   Exhibit 45, can you tell the jury what --
22              THE INTERPRETER:  Counsel, just a moment.
23              MS. QUINTERO:  Not yet.  Don't publish yet.
24              THE COURT:  What exhibit are you talking about now?
25              MS. QUINTERO:  Government Exhibit 45.
```

**UNITED STATES DISTRICT COURT**

1  Q    BY MS. QUINTERO:  Can you please explain to the jury what

2  Government Exhibit 45 is.

3  A    It's a flyer that Sylvia gave me.

4  Q    Okay.  And what is it a flyer of?

5  A    She gave it to me because she wanted me to bring the

6  prescriptions of the primary care doctors.

7  Q    For a different DME?

8  A    Yes.

9  Q    After the defendant gave you this flyer, did you hold onto

10 it?

11 A    Yes.

12 Q    Where did you keep this flyer?

13 A    In my car.

14 Q    And did you at some point give this flyer to law

15 enforcement agents?

16 A    Yes.

17 Q    And is this flyer here that we're looking at,

18 Government -- or that you're looking at there, Government

19 Exhibit 45, in substantially the same condition as when you

20 gave it to law enforcement agents?

21 A    Yes.

22        MS. QUINTERO:  Your Honor, at this time we would

23 like to introduce and move into evidence Government Exhibit 45.

24        THE COURT:  It will be received.

25            (Exhibit 45 received into evidence.)

UNITED STATES DISTRICT COURT

1  Q    BY MS. QUINTERO:  Now, did you have a conversation with

2  the defendant about this flyer when she gave it to you?

3  A    Yes.

4  Q    What did she tell you about this flyer?

5            MR. DARDEN:  Objection.  Asked and answered.

6            THE COURT:  Overruled.

7            THE WITNESS:  She wanted me to bring her the

8  prescription of all the primary care doctors for all these

9  items.

10  Q    BY MS. QUINTERO:  Okay.  And let's go ahead and publish

11  that.  If we can look at page 1 of Government Exhibit 45, do

12  you see where it says "posture protector"?  Is that one of the

13  pieces of equipment that's --

14  A    Yes.

15  Q    And is this also a -- like a full back brace, if you will?

16  A    Yes.

17  Q    And we're looking on the left-hand side; right?

18  A    Yes.

19  Q    Do you see the notation on there that says "200"?

20  A    Yes.

21  Q    What did that 200 refer to?

22  A    The money that she would give me for every prescription I

23  would bring for that.

24  Q    Okay.  And who wrote the 200 on there?

25  A    She did.

1  Q    And did she write the amounts that she would pay you for

2  other equipment throughout this flyer?

3  A    Yes.

4  Q    And if we turn to page 2, Government Exhibit 45, do you

5  see the numbers written throughout there, the 100 for the

6  LCO [sic] back brace --

7  A    Yes.

8  Q    -- and the 100 for the ACL knee brace?

9       What do those amounts represent?

10 A    It was the money that she was offering me for each

11 prescription from the primary care doctors.

12 Q    Okay.  For this durable medical equipment?

13 A    Yes.

14 Q    Now, Mr. Guzman, did you ever have any discussions with

15 the defendant about complaints by some of the Medicare

16 beneficiaries that you would recruit for Ezcor?

17 A    Yes.

18 Q    What did you tell her?

19 A    I told her that many patients had complained because they

20 only needed wheelchairs, yet they were being received -- they

21 were receiving hospital beds, back support, knee support --

22 Q    Okay.

23 A    -- and other items.

24 Q    Okay.  When you say "needed," you mean they only wanted

25 the power wheelchairs?

1        MR. DARDEN:  Objection.  Counsel is testifying.

2        THE COURT:  Sustained.  Why don't you restate the

3   question.

4   Q    BY MS. QUINTERO:  Did the complaints relate to them

5   getting more durable medical equipment than what you had

6   persuaded them to get, which was a power wheelchair?

7   A    Exactly.

8   Q    And when you told the defendant this, what did she say to

9   you?

10  A    She told me it was not my business and that the doctor had

11  done that.

12  Q    Okay.  And did she appear at all concerned that the

13  beneficiaries were getting equipment that they did not want or

14  need?

15       MR. DARDEN:  Objection.  Speculation.

16       THE COURT:  Sustained.

17  Q    BY MS. QUINTERO:  Was she surprised?

18       MR. DARDEN:  Same objection.

19       THE WITNESS:  No.

20       MR. DARDEN:  Motion to strike.

21       THE COURT:  I'm going to overrule the objection.

22       Did she seem surprised?  Act surprised?

23       THE WITNESS:  No.  She was irritated because I was

24  presenting a complaint to her.

25  Q    BY MS. QUINTERO:  Okay.  Now, Mr. Guzman, you were

1    indicted in this case here in Los Angeles; is that right?

2    A     Yes.

3    Q     What crimes were you charged with?

4    A     I was charged with a crime of fraud and of receiving

5    kickbacks.

6    Q     Okay.  And that was Medicare fraud?

7    A     Yes.

8    Q     And did you enter a guilty plea in this case?

9    A     Yes.

10   Q     Did you do so pursuant to a plea agreement?

11   A     Yes.

12   Q     And as part of your plea agreement, did you agree to

13   cooperate with the Government?

14   A     Yes.

15   Q     What are you hoping, if anything, to get from cooperating

16   with the Government?

17   A     That the judge will go easy on me.

18   Q     Okay.  Who controls your sentence in this case?

19   A     The judge.

20   Q     Does the Government control your sentence?

21   A     No.

22   Q     Have I or anyone from the Government here made any

23   promises to you?

24   A     No.

25   Q     What is your understanding as to your responsibility under

1    the plea agreement?

2    A    To tell the truth.

3    Q    And have you done that today?

4    A    Yes.

5              MS. QUINTERO:  No further questions at this time,

6    Your Honor.

7              THE COURT:  Cross-examination.

8                        CROSS-EXAMINATION

9    BY MR. DARDEN:

10   Q    Good afternoon, Mr. Guzman.

11   A    Good afternoon.

12   Q    I see you have a piece of paper in your shirt pocket.

13   A    Yes.

14   Q    And do you have in your possession any notes or any -- any

15   reports?

16   A    No.  It's -- it's the subpoena to be able to show it.

17   Q    And who subpoenaed you here to court today?

18   A    The court did, United States District Court.

19   Q    At the request of the prosecutor seated at this table;

20   correct?

21   A    Yes.

22   Q    You were brought here to testify as a witness for the

23   Government; right?

24   A    Yes.

25   Q    And you were brought here to testify against Sylvia

```
 1   Walter-Eze; correct?
 2   A     I came to tell the truth.
 3   Q     Came to tell the truth?
 4   A     Yes.
 5   Q     And what do you get in exchange for telling the truth, as
 6   you say?
 7   A     Nothing.
 8   Q     You were charged with seven counts of conspiracy and
 9   health care fraud and taking kickbacks in that Indictment;
10   correct?
11   A     Yes.
12   Q     And then you pled guilty; right?
13   A     Yes.
14   Q     Pled guilty to one count; right?
15   A     I think so.
16   Q     The other six counts, you didn't have to plead guilty to
17   those, did you?
18   A     I think so.  I think yes.
19   Q     And the reason you didn't have to plead guilty to the
20   other six counts is because you are here, testifying for the
21   Government; right?
22              MS. QUINTERO:  Objection, Your Honor.
23              THE COURT:  Sustained.  The way the question is
24   asked, sustained.  It's calling for a conclusion.
25   Q     BY MR. DARDEN:  Well, you're not being prosecuted now on
```

**UNITED STATES DISTRICT COURT**

```
 1   seven counts of fraud, kickbacks, and conspiracy; right?
 2   A    I don't know.  I'm not sure.
 3   Q    Well, you signed this form called a plea agreement; right?
 4   A    Yes.
 5   Q    And it's your understanding that, if you testify against
 6   my client, that you will get a reduced sentence; correct?
 7   A    Well, but I just came to tell the truth.
 8   Q    But it's your understanding that by testifying you will
 9   get a reduced sentence; correct?
10   A    That's what I think.
11   Q    And originally, when you were first approached by the
12   investigators in this case, you didn't want to help them; true?
13   A    At the beginning I was confused.
14   Q    Well, at the beginning you told the agents more than a
15   dozen times that you did not want to help them; true?
16   A    No, I did not tell them that.
17   Q    But did you tell the agents that you did not want to wear
18   a wire and record people?
19   A    No, because I had already begun working in something else.
20   Q    So you never told any federal agent that you did not want
21   to wear a recording device and record people?
22              MS. QUINTERO:  Misstates his testimony, Your Honor.
23   Asked and answered.
24              THE COURT:  Let me just ask one question first.
25        Were you ever asked to wear a wire and record
```

1    conversations?

2              THE WITNESS:  Yes.

3              THE COURT:  And what did you tell them?

4              THE WITNESS:  That I couldn't do that.

5              THE COURT:  I'm sorry.  Counsel, go ahead.

6    Q    BY MR. DARDEN:  And after you tell these federal agents

7    that you couldn't do that, isn't it true that they started

8    talking to you about your wife and your children?

9    A    No.

10   Q    Isn't it true that federal agents told you that you should

11   think about your wife and your children?

12   A    No.  I don't remember that, no.

13   Q    Are you saying that never happened?

14   A    No, I'm not saying that.

15   Q    So you do remember, then?

16   A    I'm saying I don't remember.

17   Q    Did federal agents ask you to make phone calls and to

18   record those phone calls; correct?

19   A    No.

20   Q    No federal agent ever asked you to make phone calls to

21   anyone and record those calls?

22             MS. QUINTERO:  Objection, Your Honor.  Irrelevant.

23             THE COURT:  Overruled.

24             THE WITNESS:  No.

25   Q    BY MR. DARDEN:  Now, you told us a few minutes ago that

1    the Government has no control over the sentence you will

2    receive in this case; correct?

3    A    Yes.

4    Q    But isn't it true that in the plea agreement, the guilty

5    plea agreement that you signed with the Government, isn't it

6    true that the Government promised to recommend a lighter

7    sentence to the Court if you testified in this case?

8    A    I think so.

9    Q    And so as you sit there on the witness stand today, you do

10   understand that the Government does have some control of how

11   your sentence is going to play out; correct?

12          MS. QUINTERO:  Objection, Your Honor.  Calls for a

13   legal --

14          THE COURT:  Sustained.

15   Q    BY MR. DARDEN:  Now, you say that you met my client at

16   some point; correct?

17   A    Yes.

18   Q    On what date did you meet my client, Sylvia Walter-Eze?

19   A    I don't remember exactly, but it was more or less in the

20   year 2010.

21   Q    And when you met my client, you had been referred to her

22   by Dr. Okoye.  Is that what you told us?

23   A    Yes.

24   Q    And you had been bringing patients to Dr. Okoye long

25   before you ever met my client; correct?

1   A    Yes.

2   Q    And that's because you were working with the DME in

3   Long Beach; right?

4   A    I don't remember well, but I do think so.

5   Q    And you were being paid by someone from the DME in

6   Long Beach to take patients to Dr. Okoye?

7   A    Yes.

8   Q    And you were being paid per patient?

9   A    Yes.

10  Q    And you took a few hundred patients to Dr. Okoye long

11  before you met my client; true?

12  A    No, no.

13  Q    How many did you take to Dr. Okoye prior to meeting my

14  client?

15  A    I don't remember exactly.

16  Q    More than 50?

17  A    No.  Too many.

18  Q    More than 48?

19  A    No.  Too many.

20  Q    How much were you being paid by the DME in Long Beach to

21  take patients to Dr. Okoye?

22  A    800.  That's why I asked for the same price from her.

23  Q    So you were committing health care fraud long before you

24  ever met my client; correct?

25  A    No, it wasn't so long.

1   Q      You were committing health care fraud before you met my

2   client; right?

3   A      Well, yes.

4   Q      Were you indicted for the fraudulent prescriptions you

5   caused to be submitted to Medicare as a result of your work

6   with a DME in Long Beach?

7   A      No.

8   Q      So not only do they get rid of six counts in this

9   Indictment, you skate free on all of those other health care

10  fraud crimes you committed in Long Beach; correct?

11  A      About the Long Beach, I only took like five or ten people.

12  Q      Well, when you pled guilty in your guilty plea agreement,

13  you understood that each one of these counts carried five years

14  in the federal prison -- true? -- if not more?

15          THE COURT:  I'm sorry.  The Court's going to, first

16  of all, strike that question.

17      It's improper to ever have punishment or penalty coming in

18  front of the jury in a criminal case.  And speculation that

19  he's indicating he doesn't know what the law is.  It's not

20  necessarily what the law is, and you are not to assume that at

21  all.  You are not to assume anything about punishment or

22  penalty in a criminal case.

23      You can consider it, Counsel, for what his views were, but

24  you cannot consider that that is the punishment.  Okay.

25  Q      BY MR. DARDEN:  Was it your understanding that you could

```
1   go to jail if you were convicted of each and every count that

2   you were charged with in the Indictment?

3   A    Well, I don't know about that.

4   Q    Did you understand that you had been indicted by a federal

5   grand jury?

6   A    Yes.

7   Q    Now, in addition to committing health care fraud with the

8   DME in Long Beach, you were also taking patients to a doctor

9   named Hovick, H-o-v-i-c-k; is that right?

10            MS. QUINTERO:  Objection, Your Honor.  Misstates the

11   testimony.  Misstates the evidence.

12            THE COURT:  Overruled.

13            THE WITNESS:  Yes.

14   Q    BY MR. DARDEN:  And were you committing health care fraud

15   when you were taking patients to Dr. Hovick?

16   A    Yes.

17   Q    And how many fraudulent prescriptions did you obtain in

18   conjunction with Dr. Hovick?

19   A    None.

20   Q    How many patients did you take to Dr. Hovick?

21            MS. QUINTERO:  Your Honor, objection.  Mr. Hovick is

22   not a doctor.  It misstates the evidence.

23            THE COURT:  Why don't you restate the question,

24   Counsel.

25   Q    BY MR. DARDEN:  Did you not agree a few moments ago, when
```

```
 1  I asked you a question, that Mr. Hovick was Dr. Hovick?

 2  A    I know him as "Hovick," but I know he's not a doctor.

 3  Q    But he paid you $180 or so per patient; correct?

 4  A    Correct.

 5  Q    And through your -- your fraudulent activities with

 6  Mr. Hovick, you earned about a -- about $18,000 in 2010; is

 7  that right?

 8  A    I think so.  I haven't counted.

 9  Q    Do you recall having a conversation with federal

10  investigators, August 7, 2013, wherein you agreed that you

11  prospered by $18,000 as a result of your activities with

12  Mr. Hovick?

13  A    He's not a doctor.  Yes, I do remember.

14  Q    And isn't it also true that in that conversation you

15  agreed that you and Hovick took approximately 100 Medicare

16  beneficiaries to doctors?

17  A    I don't remember how many there were.

18  Q    There were a lot; right?

19  A    But I did -- I did work with him.

20  Q    Now, at some point the DME in Long Beach went out of

21  business; is that right?

22  A    Yes.

23  Q    And was that because the feds raided the place?

24         MS. QUINTERO:  Objection, Your Honor.  Calls for

25  speculation.
```

1           THE COURT:  Sustained.

2    Q    BY MR. DARDEN:  Do you know why the DME in Long Beach went

3    out of business?

4    A    No, I don't know.

5    Q    Well, after it went out of business, you spoke to

6    Dr. Okoye; correct?

7    A    Yes.

8    Q    And Dr. Okoye referred you to my client; correct?

9    A    Yes.

10   Q    And did you go to my client's office or business to have a

11   discussion with her?

12   A    Yes.

13   Q    And you told my client you could help get patients there;

14   correct?

15   A    Dr. Okoye told me she was going to accept patients from

16   me.

17   Q    You went to my client, and you introduced yourself to her;

18   right?

19   A    Yes.

20   Q    And you --

21   A    I introduced myself to her.

22   Q    And you had never seen my client prior to that day;

23   correct?

24   A    No.

25   Q    And when you spoke to my client on that first occasion,

```
 1    you told her you could get her patients; right?

 2    A     But she was working with another marketer already.

 3            MR. DARDEN:  Objection.  Motion to strike.

 4            THE COURT:  It will be stricken.

 5    Q     BY MR. DARDEN:  When you -- strike that.

 6          Are you trying to earn extra points with the Government by

 7    making comments like that, Mr. --

 8            MS. QUINTERO:  Objection, Your Honor.

 9            THE COURT:  Sustained.  Argumentative.  Improper.

10    Q     BY MR. DARDEN:  When you spoke to my client about getting

11    her clients or patients referred to her business, you didn't

12    tell her how you were going to get those patients; correct?

13    A     No, but she knew because she already was working with

14    other people.

15            MR. DARDEN:  Objection.  Motion to strike.

16            THE COURT:  Sustained.  It will be stricken.

17          Listen just very carefully to the question.

18          Go ahead, Counsel.

19            MR. DARDEN:  Thank you, Your Honor.

20    Q     BY MR. DARDEN:  When you first met my client and agreed --

21    stated that you would get patients for her, you did not tell

22    her how you were going to get those patients; correct?

23    A     Correct.

24    Q     You did not tell my client that you would walk the streets

25    in search of people who appeared over the age of 65; correct?
```

1    A    Well, yes.  Well, no.  I didn't speak about that.  I just

2    spoke about price.

3    Q    And so you never told my client that you were going to pay

4    these beneficiaries money to get them to go see a doctor or go

5    to a clinic; correct?

6    A    Well, but later that's when I mentioned it to her, and

7    that was when she told me that she didn't care.

8    Q    Well, originally you didn't tell her; right?

9    A    Yes.

10   Q    And you're not in possession of any document or recording

11   or anything like that wherein my client agrees that you should

12   pay beneficiaries to go to the doctor; correct?

13   A    Well, no.

14   Q    So you told us that you would pay beneficiaries sometimes

15   as much as a hundred dollars; right?

16   A    Yes.

17   Q    But that isn't true, is it?

18   A    Oh, yes.

19   Q    Isn't it true that most often you would pay these elderly

20   people no more than $20 and maybe give them a McDonald's lunch?

21   A    Sometimes.

22   Q    And you didn't just walk the streets, looking for

23   potential patients.  You went to nursing homes, didn't you?

24   A    Well, I would also go to those places, but mostly most of

25   those people are HMO.

**UNITED STATES DISTRICT COURT**

```
 1   Q    And you would -- and you would have to meet those people
 2   and have conversations with them to find out that they were
 3   HMO; right?
 4   A    Yes.
 5   Q    And you'd also go to other places that you knew elderly
 6   people would frequent, like adult day cares; right?
 7   A    I think I might have gone once or twice, I think.
 8   Q    Is it fair to say that you'd go just about anywhere to
 9   solicit an elderly person to get them to turn over their
10   Medicare information?
11   A    I did used to do that.
12   Q    You never had a conversation with my client where she said
13   she was paying doctors; true?
14            THE INTERPRETER:  She was paying doctors?
15   Q    BY MR. DARDEN:  You never had a conversation with my
16   client where she said she was paying doctors; true?
17   A    Yes, that's true.
18   Q    And you never had a conversation with my client where she
19   discussed monetary arrangements involving doctors; true?
20   A    I don't understand that question.
21   Q    Well, my client never had a conversation with you of any
22   kind wherein she talked about any financial arrangements she
23   might have had with a doctor; true?
24   A    No.
25   Q    Is it true?
```

```
 1   A     Yes.  I never did.

 2   Q     Now --

 3   A     I don't know what arrangements she had.

 4   Q     If any.

 5   A     I just assumed.

 6   Q     Did you ever see my client give Dr. Okoye money?  Yes or

 7   no.

 8   A     No.

 9   Q     Now, you told us that you would walk the streets and you

10   would see elderly people and you would ask them if they wanted

11   a power wheelchair; is that right?

12   A     That's right.

13   Q     And you told these elderly people that they would have to

14   go to a doctor or to a clinic; correct?

15   A     Yes.

16   Q     And you told these people that they would have to hand

17   over to you their Medicare identification cards and numbers;

18   correct?

19   A     Yes.  So that I could give it to Sylvia.

20   Q     And these people that you, you know, asked for their

21   information, you knew that they did not need power wheelchairs;

22   is that right?

23   A     Yes.

24   Q     And you were able still to talk these people into giving

25   you this information and then receiving wheelchairs they didn't
```

```
 1  need; right?
 2  A     Yes.
 3  Q     Over a period of time, you learned or developed a skill in
 4  convincing these people to do what you knew was wrong; true?
 5             MS. QUINTERO:  Objection, Your Honor.  Vague and
 6  ambiguous.
 7             THE COURT:  Overruled.
 8             THE WITNESS:  I did know.
 9  Q     BY MR. DARDEN:  And in trying to convince these elderly
10  people to part with that personal information and receive these
11  wheelchairs, what was the hook?  What -- what was it that you
12  said or did to get them to do that?
13  A     As I'd said a while ago, I would offer them orthopedic
14  shoes or walkers or canes or back supports.  But the majority
15  really wanted money.
16  Q     And were you concerned at all that by soliciting these
17  people, these elderly people, that you were causing them to
18  violate the federal criminal law?
19             MS. QUINTERO:  Objection, Your Honor.  Calls for a
20  legal conclusion.
21             THE COURT:  Overruled.  He's just asking if he was
22  concerned.
23       You may answer.
24       And, ladies and gentlemen, this is a good example when we
25  said questions are not evidence.  You are not to assume that
```

1    it's a violation of civil -- or of criminal law that people

2    would give false information like that to people he's

3    recruiting.  What the question was, was he concerned about

4    that.

5            THE WITNESS:  At that time I wasn't all that

6    informed.

7    Q    BY MR. DARDEN:  Well, you told us a little while ago that

8    you knew what you were doing was wrong and that it was illegal;

9    right?

10   A    Yes.

11   Q    Now, my client told you that she would not work with you

12   if you paid patients to go to the doctor; isn't that true?

13   A    No, because I did mention to her.  I did mention to her

14   that what most people wanted was money, and she told me what I

15   said before, just to do it.

16   Q    Did you ever --

17   A    "I don't care."

18   Q    You were interviewed by federal agents seven times;

19   correct?

20   A    Yes.

21   Q    And the first time you were interviewed by federal agents,

22   you didn't tell them that my client said, "I don't care.  Just

23   do what you have to do"; true?

24   A    I did not say it at that moment.  I did say it later.

25   Q    And you didn't say it the second time you were interviewed

1    by federal agents; true?

2    A      I don't remember now.  I don't know.

3    Q      It was only after the federal agents told you to start

4    thinking about your wife and kids that you came up with this

5    statement that my client supposedly said, "Do what you have to

6    do"; true?

7             MS. QUINTERO:  Objection, Your Honor.  Lacks

8    foundation.  He said he does --

9             THE COURT:  Sustained.  Assuming a fact not in

10   evidence.

11       Ladies and gentlemen, it's four o'clock.  That means

12   you're going to get a break here.  You have the weekend to

13   enjoy yourself.  Same admonishment, enjoy yourself, do anything

14   you want, think of anything other than this case.

15       I don't know if I mentioned it to you earlier or not -- I

16   thought I had, but maybe I didn't -- on Monday we can't have a

17   full day on Monday.  So we're going to start at one o'clock on

18   Monday.  We can't start -- I can see it tears a lot of you up.

19   You'd have to enjoy yourself, find something to entertain you

20   Monday morning.  We'll start right at one o'clock.  Again, I

21   suggest you come in maybe a quarter of.  You have been golden

22   up to now.  I'm very impressed with your timeliness.

23       Have a nice weekend.  And remember the admonishment not to

24   discuss the case among yourselves or with anybody else or form

25   or express any opinions about the matter until it's submitted

1    to you and you retire to the jury room.

2         We'll see you back here Monday at a quarter of?

3              THE JURY:  1:00.

4              THE COURT:  Perfect.

5              THE CLERK:  All rise.

6                  (Matter adjourned at 4:01 P.M.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5          I, KHOWOONSUN CHONG, FEDERAL OFFICIAL REALTIME

6    COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

7    THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

8    PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

9    FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10   STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11   ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

12   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

13   THE UNITED STATES.

14

15                    DATED THIS 25TH DAY OF MAY, 2015.

16

17

18          /S/ KHOWOONSUN CHONG

19          _____
            KHOWOONSUN CHONG, CSR NO. 12907, CRR
20          FEDERAL OFFICIAL COURT REPORTER

21

22

23

24

25

**UNITED STATES DISTRICT COURT**