1            UNITED STATES DISTRICT COURT

2       CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3        HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

4

5    UNITED STATES OF AMERICA,            )
                                          )
6                   PLAINTIFF,            ) CASE NO.
                                          ) CR 14-259-RGK-1
7         VS.                             )
                                          )
8    SYLVIA OGBENYEANU WALTER-EZE,        )
                                          )
9                   DEFENDANT.            )
     _____)

10

11

12

13

14                REPORTER'S TRANSCRIPT OF
                    JURY TRIAL - DAY 4
15               MONDAY, MARCH 16, 2015
                       1:01 P.M.
16               LOS ANGELES, CALIFORNIA

17

18

19

20

21

22   _____

23        KHOWOONSUN CHONG, CSR 12907, CRR, RMR
             FEDERAL OFFICIAL COURT REPORTER
24         255 EAST TEMPLE STREET, ROOM 181-G
             LOS ANGELES, CALIFORNIA 90012
25                kchong12907@yahoo.com

UNITED STATES DISTRICT COURT

1          **APPEARANCES OF COUNSEL:**

2

3   **FOR THE PLAINTIFF:**

4        UNITED STATES DEPARTMENT OF JUSTICE
         CRIMINAL DIVISION - FRAUD SECTION
5        BY:  BLANCA QUINTERO
              ALEXANDER PORTER
6        Assistants United States Attorney
         4811 Airport Plaza Drive, Fifth Floor
7        Long Beach, California 90815

8

9   **FOR THE DEFENDANT:**

10       LAW OFFICES OF CHRISTOPHER A. DARDEN
         BY:  OMA N. NKELE
11            CHRISTOPHER DARDEN
         Attorneys At Law
12       11500 West Olympic Boulevard
         Suite 400
13       Los Angeles, California 90064

14

15  ALSO PRESENT:

16       JULIE DRUCKER, SPANISH INTERPRETER

17

18

19

20

21

22

23

24

25

1          **I N D E X**

2          **Monday, March 16, 2015**

3          --------------------------------------------------------

4          <u>**CHRONOLOGICAL INDEX OF WITNESSES**</u>

5

6   WITNESSES                                              PAGE

7   WILMER GUZMAN
         CROSS-EXAMINATION (RESUMED) BY MR. DARDEN         381
8        REDIRECT EXAMINATION BY MS. QUINTERO              400
         RECROSS-EXAMINATION BY MR. DARDEN                 402
9
    EDNA CALAUSTRO
10       DIRECT EXAMINATION BY MS. QUINTERO                404
         CROSS-EXAMINATION BY MR. DARDEN                   431
11       REDIRECT EXAMINATION BY MS. QUINTERO              451

12   ELDER (ED) AGUILAR
         DIRECT EXAMINATION BY MS. QUINTERO                452

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**



## INDEX OF EXHIBITS

MARKED FOR IDENTIFICATION

(NONE)

RECEIVED INTO EVIDENCE

(NONE)

**UNITED STATES DISTRICT COURT**

```
 1              LOS ANGELES, CALIFORNIA; MONDAY, MARCH 16, 2015

 2                              1:01 P.M.

 3                               -oOo-

 4

 5              (Jury in at 1:01 P.M.)

 6              (The following proceedings were held in the

 7              presence of the jury:)

 8              THE COURT:  The record will reflect that all the

 9      members of the jury are in their respective seats in the jury

10      box, and the witness is on the witness stand.

11          Ladies and gentlemen, I hope you had a pleasant weekend.

12      I hope you had enough to entertain yourself so you weren't

13      thinking about this case.  Next week is March Madness; so we

14      have all kinds of things to do.

15          Anyway, we're getting back to the evidence at this time.

16      Counsel, you may inquire.

17              MR. DARDEN:  Thank you, Your Honor.

18                          WILMER GUZMAN,

19      called as a witness by the Government, having been previously

20      duly sworn, resumed the stand and testified through the

21      interpreter as follows:

22                      CROSS-EXAMINATION (RESUMED)

23      BY MR. DARDEN:

24      Q    Good afternoon.

25          Mr. Guzman, when we left off last Friday, you were telling
```

**UNITED STATES DISTRICT COURT**

```
 1    us that you made a living by referring patients to DMEs and
 2    doctors; is that right?
 3    A    Yes.  That's correct.
 4    Q    Now, you did enter a guilty plea to this Indictment;
 5    correct?
 6    A    Yes.
 7    Q    And you entered that guilty plea when?  Do you recall?
 8    A    No.
 9    Q    Was it in 2013?
10    A    I don't remember.
11    Q    Was it in 2014?
12    A    Yes.
13    Q    And you had not been sentenced yet; correct?
14    A    I don't know.  I don't remember.
15    Q    Well, has a judge told you you were going to prison or not
16    going to prison?
17    A    No.
18    Q    And it's your understanding that you will not be sentenced
19    until you finish testifying in this case; is that right?
20    A    Correct.  The objective is I am going to tell the truth,
21    and then that the judge will be tolerant of me.
22    Q    And not only will the judge be tolerant of you, but the
23    prosecution will then recommend to the judge what kind of
24    sentence you ought to get; is that correct?
25              MS. QUINTERO:  Objection, Your Honor.  Asked and
```

```
 1    answered.  We've covered this.
 2                THE COURT:  Sustained.
 3          It was asked and answered.  He had indicated yes before.
 4                MR. DARDEN:  Thank you, Your Honor.
 5    Q    BY MR. DARDEN:  Now, Mr. Guzman, you were an employee
 6    of -- of this medical supply company; correct?
 7                MS. QUINTERO:  Objection, Your Honor.  Asked and
 8    answered.  Misstates the testimony.
 9                THE COURT:  I don't know.  Overruled.
10                THE WITNESS:  For Ezcor?
11    Q    BY MR. DARDEN:  Yes.
12    A    I don't know if I was an employee, but I was a marketer.
13    I used to recruit people for Sylvia.
14    Q    You used to recruit people for yourself; right?
15    A    I had reached an agreement with her, with Sylvia.
16    Q    Well, in that agreement, according to you, you got paid
17    5-, 6-, 7-, or $800 per wheelchair; correct?
18    A    From 500 to 700.
19    Q    In addition to receiving from 500 to $700, you signed the
20    W-4 that was shown to you the other day; right?
21    A    Yes.
22    Q    And during your association with my client, you were paid
23    every 15 days; true?
24    A    She would pay me every time she got paid.
25    Q    Didn't you tell Investigator Froeschner from the
```

 1    California Department of Justice that you were paid every 15

 2    days?

 3    A    That is an approximate.

 4    Q    Did you tell the investigator that you were paid every 15

 5    days?  Yes or no.

 6    A    Yes, because it was that period of -- from seven --

 7              MR. DARDEN:  Objection to everything after "yes,"

 8    Your Honor.

 9              THE COURT:  Sustained.

10    Q    BY MR. DARDEN:  And you even told this investigator from

11    the Department of Justice that you felt like an employee

12    because you were treated like an employee; is that correct?

13              MS. QUINTERO:  Objection, Your Honor.  Asked and

14    answered.

15              THE COURT:  Overruled.

16              THE WITNESS:  Well, at the end I didn't feel like an

17    employee because she didn't pay me.

18    Q    BY MR. DARDEN:  Didn't you tell the investigators that you

19    felt like an employee because you were treated like an

20    employee?  Yes or no, sir.

21    A    I don't remember.

22    Q    Did you ever tell anyone interviewing you that you felt

23    like an employee because you were treated like an employee?

24              MS. QUINTERO:  Objection, Your Honor.  Asked and

25    answered.

```
1              THE COURT:  Overruled.

2              THE WITNESS:  I don't remember.

3   Q    BY MR. DARDEN:  You were put on the payroll; correct?

4              MS. QUINTERO:  Objection.  Vague.  Ambiguous.

5              THE COURT:  Sustained.

6        Can you rephrase the question.

7   Q    BY MR. DARDEN:  Did you ever tell any investigator from

8   the FBI, California Department of Justice, or Special

9   Investigator Davis seated here at the table, that Sylvia put

10  you on the payroll?

11  A    I don't remember.

12  Q    Were you on the payroll?

13  A    Well, I did sign the W-4, but I never did any kind of work

14  in her office.

15  Q    Well, you did your work out there, recruiting patients;

16  right?

17  A    Yes.

18  Q    And you did your work taking patients to doctors' offices;

19  correct?

20  A    Yes.

21  Q    And sometimes you would interpret for Dr. Okoye; correct?

22  A    Yes, at times.

23  Q    And sometimes you would even fill out the initial patient

24  paperwork for the beneficiaries; correct?

25  A    Yes.  That's what I used to do, yes.
```

1    Q      And you would tell the patients that, when they went in

2    with the doctor, that they should tell the doctor they wanted

3    power wheelchairs; correct?

4    A      That's what they wanted when I took them there.

5    Q      Did you always pay the patients money?

6    A      Most of the time.

7    Q      Did you ever tell any of the investigators that

8    interviewed you that you did not pay the patients?

9    A      I don't remember.

10   Q      On July 31, 2013, did an FBI agent and an agent from the

11   California Department of Justice come to your home?

12   A      Yes.  More or less on that date.

13   Q      And you were interviewed at your home; correct?

14   A      Yes.

15   Q      And isn't it true that the investigators asked you if you

16   paid the patients, and your response was, "No, I do not pay the

17   patients"?

18   A      I don't remember.

19   Q      In your estimation, how many lies did you tell

20   investigators during the interviews you had with them?

21            MS. QUINTERO:  Objection, Your Honor.

22            THE COURT:  Sustained.

23   Q      BY MR. DARDEN:  And when you tell us that you don't

24   remember whether you were an employee or whether you told the

25   investigators -- or whether you tell -- when you tell us that

UNITED STATES DISTRICT COURT

```
 1    you don't recall if you told the investigators that you never
 2    paid the patients, are you telling the truth now?
 3    A    But you're repeating the same question to me, no?
 4           THE COURT:  The last question was, are you telling
 5    the truth today?
 6           THE WITNESS:  Yes.
 7    Q    BY MR. DARDEN:  When you recruited these people and took
 8    them to a doctor, did you do so because you believed they all
 9    needed a wheelchair?
10    A    At that moment I thought so, but later I learned that it
11    was illegal.
12    Q    So your testimony today is that -- is that, when you
13    recruited these people or took them to the doctor's office, you
14    believed that these people actually needed the power
15    wheelchairs?  Is that what you're telling us?
16    A    Well, as I said, at that moment I did think they needed
17    it, and later, well, you know, I -- I just don't know the
18    rules.
19    Q    When you were recruiting these patients and referring them
20    to Dr. Okoye and some other doctors, you didn't think you were
21    doing anything wrong; is that true?
22    A    You're asking me the same question.
23    Q    When you recruited these patients, did you believe you
24    were doing something wrong?
25           MS. QUINTERO:  Objection, Your Honor.  Asked and
```

**UNITED STATES DISTRICT COURT**

```
 1    answered.
 2                THE COURT:  It hadn't been.  Overruled.
 3                THE WITNESS:  Later I learned that it was wrong.
 4                THE COURT:  At the time you recruited them, not
 5    later, at the time you recruited them, did you know it was
 6    wrong?
 7                THE WITNESS:  Yes.
 8                THE COURT:  Okay.
 9    Q    BY MR. DARDEN:  On Jan- -- strike that.
10         On July 31, 2013, did you tell investigators that, at the
11    time you were recruiting these patients, you did not believe
12    you were doing anything wrong?
13    A    That's right.  I think so.  I don't remember.  I'm not
14    sure.
15    Q    Is it right?  Is it that you don't think so?  Is it that
16    you don't remember?  Is it that you don't know?
17                MS. QUINTERO:  Objection.
18                THE COURT:  Asked and answered.  Next question.
19    Q    BY MR. DARDEN:  And you knew -- you knew that it was wrong
20    to pay the patients because Sylvia had told you that you should
21    not pay the patients and doctors; is that correct?
22    A    At the time that I told her, I told her and she told me
23    that she didn't care.
24    Q    You were interviewed by investigators and the
25    United States attorney in February of this year; correct?
```

1  A     Correct.

2  Q     And at that time isn't it true that you told the U.S. --

3  assistant U.S. attorney and the investigators that, when Sylvia

4  told you not to pay the patients, that you responded by

5  stating, "I will do what I have to do to recruit patients"?

6  A     That's what Sylvia told me.

7  Q     Isn't it true that you told investigators that that is

8  what you told Sylvia?

9  A     No, no.  Sylvia was the one that told me that.

10 Q     When you were interviewed on July 31, 2013, at your home

11 by investigators, did you tell them that the reason you did not

12 pay the patients was because you knew it was against the law?

13 A     I don't remember.

14 Q     On July 31, 2013, did you know it was against the law to

15 pay the patients?

16 A     Yes.

17 Q     And the only person that paid the patients was you;

18 correct?

19 A     All the marketers work that way.

20 Q     The only person that paid the patients at issue in this

21 case was you; right?

22 A     No.  There's another marketer that worked for longer years

23 with Sylvia.

24 Q     Mr. Guzman, the patients you took to Dr. Okoye, did you

25 pay them?  Yes or no.

```
 1   A     Yes.
 2   Q     And you were the only person to pay the patients you took
 3   to Dr. Okoye; true?
 4   A     With Dr. Obasi and Dr. Kelly as well.
 5   Q     Sylvia never paid the patients you took to the doctor's
 6   office; correct?
 7              MS. QUINTERO:  Objection, Your Honor.  Calls for
 8   speculation.
 9              THE COURT:  Sustained.
10   Q     BY MR. DARDEN:  You never saw Sylvia pay the patients you
11   took to the doctors' offices; correct?
12   A     But she knew.
13              MR. DARDEN:  Motion to strike, Your Honor.
14              THE COURT:  It will be stricken.
15         Did you ever see her pay the patients?
16              THE WITNESS:  Oh, no.
17              THE COURT:  Okay.
18   Q     BY MR. DARDEN:  On January 2, 2015, did you tell
19   Special Agent Davis and Assistant United States Attorney
20   Quintero that you told Sylvia that you had to do whatever it
21   takes to convince the patients to accept the power wheelchairs?
22              MS. QUINTERO:  Objection, Your Honor.  Asked and
23   answered.
24              THE COURT:  I think it has, but I'm going to -- I'm
25   going to permit it.
```

**UNITED STATES DISTRICT COURT**

 1          MR. DARDEN:  Not as to this date, Your Honor.

 2          THE WITNESS:  My objective was to persuade them.

 3          THE COURT:  That's not the question.

 4      Why don't you state the question again, Counsel.

 5   Q    BY MR. DARDEN:  On January 2, 2015, did you tell

 6   Assistant United States Attorney Quintero and Special Agent

 7   Alison Davis that you told Sylvia that you had to do whatever

 8   it takes to convince the patients to accept the powered

 9   wheelchairs?

10   A    I did try to convince them.

11   Q    Mr. Guzman, on January 2 this year, did you tell

12   Ms. Quintero and Agent Davis that you told Sylvia that you had

13   to do what you had to do to get these patients to accept

14   powered wheelchairs?

15          THE COURT:  Did you ever make that statement?

16          THE WITNESS:  Not with those words.

17   Q    BY MR. DARDEN:  In addition to signing a W-4, you also

18   signed hey 1099 for Ezcor; is that correct?

19   A    Sylvia never deducted my taxes or anything.

20          MR. DARDEN:  Motion to strike, Your Honor.

21          THE COURT:  Stricken.

22   Q    BY MR. DARDEN:  Mr. Guzman, did you sign a 1099 for Ezcor?

23   Yes or no.

24   A    No.  No.  I don't remember.  I don't remember.

25   Q    Did you ever tell any federal agent or federal prosecutor

1    that you signed a 1099 for Sylvia and Ezcor?

2    A      No.

3    Q      Now, in addition to sign -- in addition to signing a W-4,

4    which you admit that, admit doing that, you also provided Ezcor

5    with a copy of your Social Security card; correct?

6    A      Yes.

7    Q      And you provided Sylvia and Ezcor with a California

8    driver's license; correct?

9    A      Yes.  Correct.

10   Q      And the Social Security number on the Social Security card

11   you provided, is that your Social Security number?

12   A      Yes.

13   Q      And the California driver's license you provided Ezcor and

14   Sylvia, is that a -- was that your true driver's license?

15   A      Yes.

16   Q      You were the person who referred a patient by the name of

17   Winston to the doctor; is that correct?

18   A      Correct, yes.

19   Q      And you are the person who referred --

20   A      She was the one that called me because she was sent a bad

21   back support, knee support, something like that.

22   Q      You're saying Ms. Winston is the one that called you?

23   A      Yes.

24   Q      And then you told her she needed --

25   A      She complained -- she complained about that.

```
 1   Q     About her back?
 2   A     Of all the accessories that had been sent to her, because
 3   she had only asked for the wheelchair.
 4   Q     You referred Ms. Winston to a doctor; right?
 5   A     Yes.
 6   Q     And you referred Ms. Garibay, who's also named in this
 7   Indictment as one of the patients; correct?
 8   A     Yes.
 9   Q     And you also referred Ms. Cruz Munar, M-u-n-a-r, to a
10   doctor; is that correct?
11         MS. QUINTERO:  Objection, Your Honor.  Misstates the
12   testimony.  Evidence not in evidence -- testimony not in
13   evidence.
14         THE COURT:  Well, the question is -- I'm assuming,
15   Counsel, the question is did he ever refer this person?
16         MR. DARDEN:  Yes, Your Honor.
17         THE COURT:  Vilma Cruz Munar, did you ever refer
18   that person to a doctor?
19         THE WITNESS:  I don't remember.  I don't remember
20   them all.
21   Q     BY MR. DARDEN:  Isn't it true that you referred Mariano
22   Mendoza to a doctor?
23         MS. QUINTERO:  Objection, Your Honor.  Facts not --
24   assumes facts not in evidence.
25         THE COURT:  Again, the question is did you ever
```

**UNITED STATES DISTRICT COURT**

```
 1  refer Mariano Mendoza to a doctor?
 2           THE WITNESS:  I don't remember.
 3  Q    BY MR. DARDEN:  Now, after you were visited by federal
 4  agents and agents from state -- the state Department of Justice
 5  in July of 2013, you continued to be a marketer; correct?
 6  A    No.  Once they arrived, no longer.
 7  Q    And so on January 8, 2014, you now know that you were
 8  under surveillance by federal agents; correct?
 9  A    I think so.
10  Q    And isn't it true that on that day that you visited
11  various clinics, including clinics in Pasadena --
12           THE INTERPRETER:  I'm sorry, Counsel.  Interpreter
13  did not hear the question.
14  Q    BY MR. DARDEN:  Isn't it true that on January 8, 2014, you
15  visited various clinics, including clinics located in Van Nuys
16  and Pasadena?
17  A    No.  That's a lie.
18  Q    Do you -- strike that.
19           In January of 2014 did you own a Honda -- Honda Civic?
20  A    I also have my own doctors.  Perhaps you think I work with
21  them, but I also have my own doctors.
22           THE COURT:  Okay.  Listen carefully to the question.
23       Counsel, do you want to restate the question?
24           MR. DARDEN:  Thank you, Your Honor.
25  Q    BY MR. DARDEN:  Well, on January 8, 2014, did you own a
```

**UNITED STATES DISTRICT COURT**

```
 1    gray 2003 Honda Accord, license plate number 6YLK551?
 2    A    Yes.
 3    Q    And did you visit four clinics on that date of January 8,
 4    2014?
 5    A    No, no.
 6    Q    You stopped -- you stopped your involvement with Ezcor in
 7    2011; is that true?
 8    A    No.  I think it was 2012.
 9    Q    What day in 2012?
10    A    I don't remember exactly.
11    Q    Isn't it true that you stopped working with Ezcor in
12    December of 2011?
13    A    I don't remember.
14    Q    Well, after you stopped working with Ezcor, you continued
15    to refer patients to doctors for other medical supply
16    companies; correct?
17    A    No.
18    Q    Did the doctors pay you money?
19    A    No.  I don't know what you're talking about.
20    Q    Well, when you would refer patients -- let's say for
21    wheelchairs or beds or knee braces or back braces or other
22    things they didn't need -- those doctors performed tests on
23    some of the patients; correct?
24    A    What year are you talking about?
25    Q    Pick a year.  How about 2008?
```

**UNITED STATES DISTRICT COURT**

```
1   A     The thing is I don't remember.  I don't remember.  I don't
2   remember.
3   Q     Did any doctor ever pay you for your referrals to that
4   doctor?
5   A     Which doctor are you talking about?  I don't know.
6   Q     How many doctors were you referring patients to between
7   2004 and 2014?
8   A     I didn't work in that -- the truth is I don't know what
9   you're talking about.
10  Q     Well, did you refer patients to Dr. Kelly?
11  A     Yes.
12  Q     Dr. Obasi?
13  A     Yes.
14  Q     Dr. Okoye?
15  A     When I was with working with Sylvia?
16  Q     Dr. Okoye?
17  A     Yes.
18  Q     And you knew Dr. Okoye before you knew Sylvia; right?
19  A     Yes.  Correct.
20  Q     Did you refer patients to Dr. Goff, G-o-f-f?
21  A     Yes.
22  Q     Did any of those five doctors pay you money in exchange
23  for you referring patients to them?
24  A     No.
25  Q     In your opinion, how much fraud are you responsible for,
```

```
 1   Mr. Guzman?
 2            MS. QUINTERO:  Objection, Your Honor.  Calls for a
 3   legal conclusion.
 4            THE COURT:  Sustained.
 5   Q    BY MR. DARDEN:  In your opinion, Mr. Guzman, how much
 6   money did you cause to be billed to Medicare for wheelchairs
 7   and equipment patients did not need?
 8            MS. QUINTERO:  Same objection, Your Honor.
 9            THE COURT:  If you know.
10            MS. QUINTERO:  Objection.  Lacks foundation,
11   Your Honor.
12            THE COURT:  It's just in his opinion.
13        If you know.
14            THE WITNESS:  No.
15   Q    BY MR. DARDEN:  In your opinion, did you cause the billing
16   of an excess of, let's say, $5 million to Medicare for
17   equipment patients did not need?
18            MS. QUINTERO:  Same objection.  Lacks foundation.  I
19   believe he said no.
20            THE COURT:  Sustained.
21   Q    BY MR. DARDEN:  When you were visited on July 31, 2013, by
22   federal agents, isn't it true that you gave them a log listing
23   the patients you referred or had referred to doctors?
24            MS. QUINTERO:  Objection, Your Honor.  Misstates
25   evidence.
```

```
 1              THE COURT:  Overruled.

 2              THE WITNESS:  I don't remember.

 3   Q    BY MR. DARDEN:  Would it refresh your recollection to take

 4   a look at discovery pages 135 to 139?

 5        If I can approach the witness, Your Honor.

 6              THE COURT:  Approach the clerk.

 7        The question is, before you approach the clerk, by seeing

 8   papers like that, would that do anything to refresh your

 9   memory?

10              THE WITNESS:  If you like, you can bring it to me.

11              THE COURT:  Okay.

12              THE WITNESS:  Yes.  I do remember.

13              THE COURT:  Before you go on, if it refreshes your

14   memory, we want to know what you remember.  We don't want to

15   know what's on the paper.  We want to know what you remember.

16   Okay?

17        Okay.  You can give the paper back now.

18              THE WITNESS:  So what is the question?

19   Q    BY MR. DARDEN:  Having looked at the document just handed

20   to you, does that help you remember having given agents a log

21   in July of 2013?

22   A    Yes, yes.

23   Q    And isn't it true that in the log you provided agents --

24   you listed more than approximately 200 patients; correct?

25   A    I didn't count them.
```

```
1   Q    Would you agree that this log or this list contains

2   approximately 200 patients?

3             THE COURT:  Sustained.  It's not in evidence,

4   Counsel.

5   Q    BY MR. DARDEN:  Now, let me just ask you a couple of

6   questions about the plea you entered in this case, Mr. Guzman.

7   Are you a United States citizen?

8   A    No.

9   Q    And when you entered your plea, your guilty plea in

10  federal court, you were advised that you could be deported as a

11  result of your entering a guilty plea; is that correct?

12            MS. QUINTERO:  Objection, Your Honor.  Irrelevant.

13            THE COURT:  Overruled.

14            THE WITNESS:  I don't remember.

15            MR. DARDEN:  May I have one moment, Your Honor.

16            THE COURT:  Yes.

17  Q    BY MR. DARDEN:  Would it help you remember if you saw a

18  copy of the plea --

19            THE COURT:  I'm not going to allow you to refresh

20  the memory on that.  The only importance is if he remembers

21  today while testifying.  The only importance is whether or not

22  it affects his testimony today.  If he remembers after he sees

23  something, it would have no relevance.

24  Q    BY MR. DARDEN:  So today you don't recall whether or not

25  you were told, when you pled guilty, you could be deported; is
```

```
 1    that right?
 2              MS. QUINTERO:  Objection, Your Honor.  Asked and
 3    answered.
 4              THE COURT:  Sustained.  He said he didn't remember.
 5    Q    BY MR. DARDEN:  Is it true you executed your guilty plea
 6    on July 1, 2014?
 7              MS. QUINTERO:  Objection.  Asked and answered.
 8              THE COURT:  Overruled.
 9              THE WITNESS:  I don't remember the exact date, but
10    it was in the year 2014.
11    Q    BY MR. DARDEN:  And you have neither been sentenced nor
12    deported since that day; is that right?
13    A    Correct.  Correct.
14    Q    And whether or not you're sent to jail depends greatly on
15    how well you testify for the Government today; true?
16              MS. QUINTERO:  Objection, Your Honor.
17              THE COURT:  Sustained.
18              MR. DARDEN:  Nothing further, Your Honor.
19              THE COURT:  Redirect.
20              MS. QUINTERO:  One minute, Your Honor.
21                        REDIRECT EXAMINATION
22    BY MS. QUINTERO:
23    Q    Mr. Guzman, that list that you saw of the different
24    patients' names, were those patients that you recruited for
25    Mr. Hovick that we spoke about on Friday?
```

**UNITED STATES DISTRICT COURT**

1          MR. DARDEN:  Object.  This is not in evidence.

2          THE COURT:  I don't know what you're -- why don't

3    you rephrase the question, Counsel.

4          MS. QUINTERO:  Yes, Your Honor.

5    Q    BY MS. QUINTERO:  The list that you saw, who did you refer

6    those patients to?

7          MR. DARDEN:  Objection.  Assumes a fact not in

8    evidence.

9          THE COURT:  Did you refer those patients to anybody?

10         THE WITNESS:  Yes.  Hovick.

11   Q    BY MS. QUINTERO:  Hovick?

12   A    Hovick.

13   Q    Is Hovick a doctor?

14   A    No.

15   Q    Okay.  Mr. Guzman, have I or anyone from the Government --

16   Special Agent Davis, Prosecutor Alex Porter, Special Agent Eric

17   Froeschner -- have we made any promises to you about any other

18   charges for any patient recruiting that you did for Mr. Hovick

19   or any other medical clinics or for any DME suppliers that

20   we've spoken about?

21   A    No.

22   Q    In fact, as you sit here today, do you even know if you

23   will be charged in other cases for recruiting patients to other

24   DME suppliers or medical clinics?

25   A    No, I don't know.

1           MS. QUINTERO:  No further questions, Your Honor.

2           THE COURT:  Recross in that area?

3                    RECROSS-EXAMINATION

4  BY MR. DARDEN:

5  Q    Today is March 16, 2015, Mr. Guzman.  Have you been

6  charged or indicted in any other case for health care fraud,

7  conspiracy, or for taking kickbacks?

8  A    No.

9           MR. DARDEN:  Thank you.  That's all.

10           THE COURT:  Thank you, Counsel.

11      May this witness be excused?

12           MS. QUINTERO:  Thank you, Your Honor.  Yes,

13  Your Honor.

14           THE COURT:  You may be excused.  Thank you very much

15  for coming in.

16      Counsel, your next witness.  I understand it's going to

17  take about five minutes to get that witness here; so we're

18  going to take a very short break.

19      I don't know if you knew about it or not.  There's a

20  witness that's going to be called out of order is my

21  understanding, and it's going to take about five minutes to get

22  that witness in here.

23      So if you want to take a mini break -- that doesn't mean,

24  15 minutes; that means about 5 minutes -- why don't we do that

25  at this time, and we'll get that witness in court.

```
 1                    THE CLERK:  All rise.
 2                       (Recess taken.)
 3                    THE COURT:  Okay.  The record will reflect that all
 4      the members of the jury are in their respective seats in the
 5      jury box.
 6          And do you want to swear in the witness.
 7                            EDNA CALAUSTRO,
 8      called as a witness by the Government, was sworn and testified
 9      as follows:
10                    THE CLERK:  Do you solemnly swear the testimony you
11      are about to give in the matter now before the Court shall be
12      the truth, the whole truth, and nothing but the truth so help
13      you God?
14                    THE WITNESS:  I do.
15                    THE CLERK:  And would you please -- you can be
16      seated.  Would you please state your name for the record and
17      spell your last name.
18                    THE WITNESS:  I'm Edna Calaustro.  Calaustro, letter
19      C- --
20                    THE CLERK:  Can you spell that.
21                    THE WITNESS:  C-a-l-a-u-s-t-r-o.
22                    THE COURT:  Thank you very much.
23          Counsel, you may inquire.
24                    MS. QUINTERO:  Thank you, Your Honor.
25      ///
```

```
 1                    DIRECT EXAMINATION
 2   BY MS. QUINTERO:
 3   Q    Dr. Calaustro, I'm going to get right into what you're
 4   here to testify about.  It's my understanding that you used to
 5   practice medicine in the San Francisco area; is that right?
 6   A    Yes, ma'am.
 7   Q    Now, while you practiced medicine in San Francisco area,
 8   did you ever run into any type of arrangement involving a woman
 9   by the name of Sylvia Walter-Eze?
10   A    Not personally, ma'am.
11   Q    Did you get -- have some type of arrangement involving
12   her?
13   A    Yes.  Yes, ma'am.
14   Q    To your knowledge, who is Sylvia Walter-Eze?
15   A    Sylvia Walter is part of Ezcor.
16   Q    And to your knowledge, what was Ezcor?
17   A    Ezcor is a company dealing with durable medical equipment
18   like power wheelchair, hospital bed, and accessories like
19   back -- back and knee braces.
20   Q    And where was Ezcor located generally?
21   A    In Southern California.
22   Q    Now, this arrangement that you had involving defendant
23   Sylvia Walter-Eze and Ezcor, what was this arrangement?
24   A    This arrangement was made with Jean Aves, a marketer for
25   Ezcor.
```

```
1    Q    And what was the arrangement?

2    A    This was to see -- see the Medicare beneficiaries and

3    write prescriptions for durable medical equipment, specifically

4    power wheelchair.

5    Q    Okay.  And were you paid for writing these power

6    wheelchair prescriptions for Ezcor?

7    A    Yes.  I -- I was.

8    Q    How much were you --

9    A    Each prescription I would get $100.

10   Q    And these power wheelchair prescriptions that you wrote

11   for Ezcor, were they medically necessary?

12   A    No.

13   Q    And what do you mean that they were not medically

14   necessary?

15   A    These -- these medical supplies were only good for people

16   who had motor-related disabilities, and they had to use it in

17   the home.

18   Q    And did any of these Medicare beneficiaries that you saw

19   for Ezcor have these motor-related issues?

20   A    No.

21   Q    Okay.  Now, let's discuss in detail this arrangement that

22   you had with the defendant, involving her.  If I understood you

23   correctly, the arrangement was that you were paid a hundred

24   dollars for every power wheelchair prescription that you wrote

25   for Ezcor; is that right?
```

```
1    A    Yes.

2    Q    And how did you arrive to this arrangement?

3    A    For each -- I would see the beneficiary -- Medicare

4    beneficiaries, and I would write prescriptions, and for each

5    prescription I would get hundred dollars.

6    Q    And how did this arrangement first come about?

7    A    I arranged with Jean Aves, the marketer for the Ezcor.

8    Q    Okay.  And tell me about that.  Did Jean Aves approach

9    you?

10   A    Yes.

11   Q    Okay.

12   A    And she -- she indicated that --

13              MR. DARDEN:  Objection.  Hearsay.

14              THE COURT:  Sustained.

15              MS. QUINTERO:  Your Honor, admissible under

16   801(d)(2)(E), co-conspirator.

17              THE COURT:  Okay.  Okay.  Overruled.

18              THE WITNESS:  The -- this -- this would -- these

19   arrangement would -- I need to see the patients and write the

20   prescriptions, and thereby I would -- afterward I would get the

21   hundred dollars.

22   Q    BY MS. QUINTERO:  Okay.  And what did Jean Aves

23   specifically tell you when she approached you with this

24   arrangement?

25   A    She -- Jean Aves was -- I mean, she indicated that I had
```

1    to see benefit -- I mean Medicare beneficiaries.  And I would

2    see them, and afterwards I would write the prescription and

3    then get hundred dollars.

4    Q    Okay.  And when Jean Aves approached you, did she tell you

5    who you would be writing the power wheelchair prescriptions

6    for?

7    A    Yes.

8              MR. DARDEN:  Objection.  No foundation.

9              THE WITNESS:  It would be for Ezcor --

10             THE COURT:  Overruled.

11             THE WITNESS:  -- company.

12   Q    BY MS. QUINTERO:  Did you say Ezcor?

13   A    Yes.

14   Q    Now, when she approached you about this arrangement to

15   write power wheelchair prescriptions for Ezcor, did she tell

16   you how much you would get paid?

17   A    I would get paid hundred dollars for each prescription I

18   wrote --

19   Q    And did --

20   A    -- for Ezcor.

21   Q    And is that for every prescription you wrote for power

22   wheelchairs?

23   A    Yes.

24   Q    Is there anything else that Jean Aves told you during this

25   meeting with her about Ezcor or gave you anything else about

```
 1   Ezcor?
 2   A     That Ezcor would be paying the money, and she would --
 3   Jean would -- in turn would give me the money.
 4   Q     And when was this that Jean Aves approached you with this
 5   arrangement?
 6   A     Between 2006 and 2007.
 7   Q     Okay.  And you -- you mentioned earlier that he's -- that
 8   Jean Aves was a marketer.  What do you mean by a marketer?
 9   A     Marketer is a recruiter of the Medicare beneficiaries that
10   I would see and write prescriptions for the durable medical
11   equipment, specifically power wheelchair.
12   Q     And to your knowledge, who was Ez- -- who was Jean Aves a
13   patient recruiter marketer for?
14              MR. DARDEN:  Objection.
15              THE WITNESS:  She was recruiting --
16              THE COURT:  Sustained.  It's calling for a
17   conclusion.
18              MS. QUINTERO:  Okay.
19   Q     BY MS. QUINTERO:  To your knowledge, did you have an
20   understanding as who Jean Aves was marketing for or referring
21   patients to you for?
22   A     Jean was recruiting for --
23              MR. DARDEN:  Objection.  Same --
24              THE COURT:  Sustained.
25   Q     BY MS. QUINTERO:  Okay.
```

```
 1    A     Jean was recruiting for --
 2                THE COURT:  You can wait for the next question.
 3                THE WITNESS:  Sorry.
 4                THE COURT:  That's okay.
 5    Q     BY MS. QUINTERO:  Did Jean Aves tell you who she was
 6    recruiting patients for?
 7    A     She was recruiting for Ezcor.
 8                MR. DARDEN:  Objection.
 9                THE COURT:  Overruled.
10          Did she say she was recruiting for Ezcor?
11                THE WITNESS:  Yes.  Yes, Your Honor.  I'm sorry.
12                THE COURT:  It's okay.
13    Q     BY MS. QUINTERO:  Did she tell you she was recruiting for
14    Ezcor?
15    A     Yes.
16    Q     And did she tell you who would be paying you?
17    A     Ezcor would be paying me.
18    Q     Okay.  What about as far as actually getting the money?
19    Who would actually be giving you the money?
20    A     From Medicare.
21    Q     Right.  No.  Who would actually be giving you the money?
22    A     Oh, giving me the money.  I'm sorry.  I didn't understand
23    it.  Jean would be giving me the money.
24    Q     And did she tell you who would be paying her?
25                MR. DARDEN:  Objection.
```

```
 1              THE COURT:  Overruled.
 2         That means you may answer.
 3    Q    BY MS. QUINTERO:  Did Jean Aves tell you who would be
 4    paying her the money to give to you?
 5    A    Ezcor would be paying her the money to give to me.
 6    Q    Okay.  And did you accept this arrangement to write power
 7    wheelchair prescriptions for Ezcor for a hundred dollars?
 8    A    Yes.
 9    Q    Now, prior to this arrangement, had you ever dealt with
10    Ezcor before?
11    A    No.
12    Q    Now, at the time that you accepted this arrangement to
13    write power wheelchair prescriptions for Ezcor, did you know
14    who would be billed for the power wheelchairs or other DME that
15    you would be prescribing?
16    A    Medicare would be billed for these power wheelchairs.
17    Q    Now, Dr. Calaustro, at the time that you accepted this
18    arrangement, did you know that it was illegal?
19    A    Yes.
20    Q    Did you know it was wrong?
21    A    Yes.
22    Q    Why did you do it?
23    A    For the $100 for the -- for each prescription.
24    Q    Now, how soon after you accepted this arrangement did you
25    begin to write power wheelchair prescriptions for Ezcor?
```

```
 1    A      Immediately after I saw her.

 2    Q      And how long would you approximate that you wrote power

 3    wheelchair prescriptions for Ezcor under this arrangement?

 4    A      About a year.

 5    Q      About one year?

 6    A      Yes.

 7    Q      One year?

 8           Now, and to be fair here, do you ever remember discussing

 9    the hundred dollars per power wheelchair prescription directly

10    with the defendant, Sylvia Walter-Eze?

11    A      No.

12    Q      Just to be clear here, had you ever met the defendant in

13    person?

14    A      No.

15    Q      And you're -- you practiced in the San Francisco area; is

16    that right?

17    A      Yes.

18    Q      Okay.  But at some point during this arrangement, did you

19    receive a phone call or actually speak with the defendant about

20    writing power wheelchair prescriptions for Ezcor?

21    A      Yes.

22               MR. DARDEN:  Objection.  No foundation.

23               THE WITNESS:  Yes.

24               THE COURT:  Did you talk to someone who said that

25    she was -- how do you know it was the defendant?
```

```
 1              THE WITNESS:  She -- she introduced herself over the
 2   phone.
 3              THE COURT:  Okay.  Overruled.
 4   Q    BY MS. QUINTERO:  And where were you when she called you,
 5   the defendant?
 6   A    I was in the office at San Francisco.
 7   Q    And what do you remember about this conversation with the
 8   defendant?
 9   A    I re- -- that she was convincing me to write more
10   prescriptions but -- although I told her I cannot be writing
11   more prescriptions, I continued for six months.
12   Q    Okay.  So she was trying to convince you to continue
13   writing more prescriptions for her?
14   A    Yes.
15   Q    And did she, in fact, continue to -- I'm sorry.
16        Did she, in fact, convince you to continue writing more
17   prescriptions for her, for Ezcor?
18   A    Yes.  She was able to convince me.
19   Q    And for how long would you say that you continued writing
20   power wheelchair prescriptions for the defendant, for Ezcor?
21   A    Six more months --
22   Q    Before --
23   A    -- approximately.
24   Q    And for this additional time that you continued writing
25   the power wheelchair prescriptions for the defendant, did you
```

```
 1   continue to receive the hundred dollars for each power
 2   wheelchair prescription?
 3   A     Yes.
 4   Q     And did Jean Aves continue bringing you patients?
 5   A     Yes.
 6   Q     Now, let's talk a little bit about the patients that you
 7   wrote your power wheelchair prescriptions for under this
 8   arrangement with the defendant.
 9         First of all, what type of patients were they?
10   A     These were Medicare patients.
11   Q     And how did you actually get these Medicare beneficiaries?
12   A     Either she -- Jean would bring the patients to my office,
13   or pick me up and we go to the residences of the patients, or I
14   would drive myself.
15   Q     Now, other than recruiting patients to you for Ezcor, did
16   Jean Aves ever bring you any other patients other than the
17   Ezcor patients?
18   A     No.
19   Q     Now, these Medicare beneficiaries that were recruited by
20   Jean Aves for Ezcor, were they all ambulatory?  In other words,
21   could they walk?
22   A     Yes.
23   Q     Even if with a cane or walker, but they were all able to
24   walk?
25   A     Yes.
```

```
 1   Q     Now, let's talk about what you would do when you saw these
 2   Medicare beneficiaries that Ezcor would recruit for -- I'm
 3   sorry -- that Jean Aves would recruit for Ezcor.
 4         What would you do with them?
 5   A     I would interview them, and I bring with me some forms to
 6   fill out.  I do a little simple vital sign.  I take vital signs
 7   and then write prescriptions after that.
 8   Q     Okay.  Now, other than taking their vital signs, did you
 9   run any type of medical tests for them?
10   A     No.
11   Q     Did you perform any type of in-depth physical examination?
12   A     No.
13   Q     Did you do anything to actually determine whether or not
14   these Medicare beneficiaries actually medically needed the
15   power wheelchairs?
16   A     There is a certificate of medical necessity form that I
17   had to fill out, and I would certify it.  And these -- this
18   form is to determine if the patients can -- the patients need
19   the durable medical equipment like a power wheelchair.
20   Q     Other than -- and we'll get to the paperwork right now.
21         Other than filling out the paperwork and doing your
22   prescription, did you do anything to actually determine whether
23   or not the Medicare beneficiaries actually medically needed the
24   power wheelchairs?
25   A     No.
```

**UNITED STATES DISTRICT COURT**

1  Q    And how long would you say that you would spend with each

2  of these Medicare beneficiaries?

3  A    Between 20 to 30 minutes.

4  Q    And these patients that you saw for Ezcor, how many times

5  would you see these patients for?

6  A    Just once.

7  Q    In other words, were there any follow-up visits with these

8  patients?

9  A    No.

10  Q    So just the one time that you --

11  A    I saw them, yes.

12  Q    Is when you wrote the power wheelchair prescription?

13  A    Right.

14  Q    Now, in fact, had you ever seen any of those patients

15  prior to the date that you wrote the power wheelchair

16  prescriptions?

17  A    No.

18  Q    Dr. Calaustro, in all honesty here, did you even care,

19  when you were seeing these Medicare beneficiaries, whether or

20  not the patient actually medically needed the power

21  wheelchairs?

22  A    No.

23  Q    Ultimately, what is it -- what was the purpose of you

24  seeing these Medicare beneficiaries?

25  A    Excuse me.  Getting the hundred dollars for --

```
 1              THE COURT:  It's been asked and answered, Counsel.
 2    Q    BY MS. QUINTERO:  Now, let's talk about the paperwork that
 3    you would fill out for the power wheelchairs.  What type of
 4    paperwork did you have to prepare, other than the
 5    prescriptions, in support of the prescription for Ezcor?
 6    A    Biographical information, face-to-face evaluation, patient
 7    information showing their medical history and prescriptions.
 8    Q    And we'll look through some of those --
 9    A    And --
10    Q    I'm sorry.
11    A    And certificate of medical necessity.
12    Q    Okay.  Was there a physician declaration also?
13    A    Yes.
14    Q    Now, did you have an understanding as to why you had to
15    complete this paperwork?
16    A    It was to support my prescription, writing the
17    prescription.
18    Q    Now, with respect to the prescriptions that you would
19    write, did you ever give any of the beneficiaries those
20    prescriptions?
21    A    No.
22    Q    Who did you give the prescriptions to?
23    A    I faxed them to Ezcor.
24    Q    You would fax them yourself?
25    A    Yes.
```

1   Q      Directly into Ezcor?

2   A      Yes.

3   Q      Now, let's look at some of this paperwork, if we can take

4   a look at Government Exhibit 70, if you can open the binder

5   there in front of you, Dr. Calaustro.

6          Government Exhibit 70 has already been admitted into

7   evidence, Your Honor.  Page 28.

8                    THE COURT:  Okay.

9   Q      BY MS. QUINTERO:  Dr. Calaustro --

10  A      70?

11  Q      You can look at the screen there.

12  A      Yes.  Okay.  This is -- this page is a cover sheet, cover

13  sheet for fax, fax to Ez- -- I mean, indicating the documents

14  that I would send to Ezcor of patients.

15  Q      Okay.  Now, is -- is this a patient that you saw under

16  your arrangement with Ezcor?

17  A      Yes.

18  Q      And now let's look a little bit at the writing here.  This

19  is a fax cover sheet?

20  A      Yeah.

21  Q      Health Haven Medical Clinic, is that the clinic that you

22  practiced?

23  A      Yes.

24  Q      In San Francisco; right?

25  A      Yes.

```
 1   Q    And whose writing is that that we see on this fax cover
 2   sheet?
 3   A    That's mine.
 4   Q    Is that your writing throughout that in the middle there,
 5   with some --
 6   A    Yes.
 7   Q    -- names?
 8   A    Yes.
 9   Q    And what -- what are those names of?  What are those names
10   of?
11   A    The names of the patients I saw.
12   Q    Okay.  And did you fax this cover sheet yourself to Ezcor?
13   A    Yes.
14   Q    And what was the purpose of you faxing this to Ezcor?
15   A    They are supporting documents for the prescription --
16   Q    Okay.
17   A    -- for the power wheelchair.
18   Q    Okay.  And did you -- this is just a fax cover sheet.
19   We'll look at some of the actual documents you refer to.  But
20   did you fax this cover sheet along with prescriptions and
21   supporting documentation for your prescriptions?
22   A    Yes.  I would lay out my prescriptions on the copier and
23   copy it, and that's what I would send with these documents.
24   Q    Let's take a look at that.  It's page 30 of Government
25   Exhibit 70.  Is this what you're referring to here?
```

1  A    Yes.

2  Q    This is, if I'm not -- if I'm reading this right, these

3  are three prescriptions; right?  Two of them laying side by

4  side, if you will, and one at the bottom?

5  A    Yes.

6  Q    And these prescriptions, how did you say you were able to

7  get these prescriptions in one page like this, to be able to

8  fax them --

9  A    I would lay them out --

10 Q    -- to Ezcor?

11 A    I would lay them out -- what you call that? -- glass top

12 of the copier.

13 Q    Okay.  And would you make a copy of it and fax it?

14 A    I would make a copy of them.

15 Q    Okay.  Now, looking at prescription on the very top

16 right-hand corner, what is that prescription there for?  Top

17 right-hand corner.

18 A    Right-hand corner indicates a prescription for the

19 motorized wheelchair.

20 Q    And did you fax these prescriptions to Ezcor?

21 A    Yes.

22 Q    Now -- now, let's look at page 26 and 27 of Government

23 Exhibit 70, right there on the screen in front of you in a

24 minute.  What do we have here?

25 A    This is a face-to-face evaluation form.

UNITED STATES DISTRICT COURT

```
 1   Q     And what is the purpose of a face-to-face evaluation form?
 2   A     To check the physical conditions of the patients.
 3   Q     Is that to support your prescription --
 4   A     Yes.
 5   Q     -- for a power wheelchair?
 6   A     Yes.
 7   Q     And whose writing is that on the face-to-face examination?
 8   A     That's mine.
 9   Q     And the signature down below it, do you see that signature
10   highlighted down below?  Whose signature is that?
11   A     That's mine.
12   Q     Now, if you can look at paragraph 11 of page 20 [sic] --
13   let's see, do you see that right there?
14   A     Yes.
15   Q     Paragraph 11, can you explain to the jury what the purpose
16   of that paragraph is.
17   A     It shows -- it asks for physical -- I mean, the patient's
18   mobility limitation, if he is -- he or she is entitled to the
19   motorized wheelchair, by the ability to -- ability to
20   participate in one or more of the motor-related activities of
21   daily living.
22   Q     So in other words, you're saying here that the patient is
23   unable to complete those tasks --
24   A     Yes.
25   Q     -- of daily living activity?
```

1    A     Yes.

2    Q     Now, when you completed this form and you signed it, was

3    that a truthful statement there?

4    A     No.

5    Q     And what was the purpose of you making that untruthful

6    statement there on this document?

7    A     To support my -- the -- my writing the prescriptions for

8    the motorized wheelchair.

9    Q     Okay.  Now we'll look at page 4 through 7 of Government

10   Exhibit 70.  What do we have there?

11   A     This is the patient information.

12   Q     And is this one of those -- one of those documents that

13   you would complete in support of your power wheelchair

14   prescription?

15   A     Yes.

16   Q     And is that your writing throughout page 4?

17   A     Yes.

18   Q     And let's look at page 8.  And just -- the page we just

19   saw, page 4, is that one of the documents you would fax

20   directly into Ezcor?

21   A     Yes.

22   Q     Okay.  Now, looking at page 8, what do we have here?

23   A     Biographical information sheet, indicating the name of the

24   patient and their addresses.

25   Q     And, again, whose writing is that that we see throughout?

1    A      That's mine.

2    Q      Sorry about that.  Okay.

3           Is that your writing throughout?

4    A      Yes.

5    Q      And, again, is this one of the documents that you faxed

6    directly into Ezcor yourself?

7    A      Yes.

8    Q      Now, let's look at page 14 of Government Exhibit 70.  What

9    do we have here?  What is this document?

10   A      This is the certificate of medical necessity for the

11   durable medical equipment.

12   Q      Okay.  And what exactly is a certificate of medical

13   necessity?

14   A      It -- the certificate medical necessity shows if the

15   patient needed durable medical equipment.  Specifically, the

16   motor wheelchair, motorized wheelchair.

17   Q      And is that your writing that we see throughout the

18   certificate of medical necessity?

19   A      Yes.

20   Q      And down below?

21   A      Yes.

22   Q      Whose signature is that down below?

23   A      That -- that's mine.

24   Q      And by signing this document, what were you indicating

25   with your signature?

```
 1    A    I was certifying the patient, if she needed the power

 2    wheelchair or not.

 3    Q    Your certification that this patient needed a power

 4    wheelchair, was that a truthful statement?

 5    A    No.

 6    Q    And what was the purpose of you signing on that document?

 7    A    It's to support the -- it's also a supporting document

 8    to -- for my writing the prescriptions.

 9    Q    Now, if we can look at page 10, what do we have here?

10    Physician declaration, do you see that?

11    A    Yes.

12    Q    Do you recognize the writing throughout page 10 here?

13    A    Yes.

14    Q    Is this another form that you faxed and would typically

15    fax directly into Ezcor?

16    A    Yes.

17    Q    Under your arrangement with Ezcor to get paid a hundred

18    dollars for every power wheelchair prescription?

19    A    Yes.

20               MR. DARDEN:  Objection.  Leading.

21               THE COURT:  Sustained.

22    Q    BY MS. QUINTERO:  Now, let's cover this a little bit in

23    detail.  Did you have an understanding as to the purpose of

24    completing this form?

25    A    Yes.
```

```
 1   Q      What was --
 2   A      That the patient's medical condition warranted durable
 3   medical equipment, specifically the motorized wheelchair.
 4   Q      Okay.  And the signature down below, do you see that?
 5   Whose signature is that?
 6   A      That's mine.
 7   Q      Okay.  And if we can -- do you see paragraph 1?
 8          Is the patient's medical condition such that the patient
 9   has personal deficits sufficient enough to impair participation
10   in mobility-related activities of daily . . . within the
11   customary areas in the home?
12          Do you see that?
13   A      Yes.
14   Q      And what did you answer there?
15   A      I answered yes.
16   Q      Okay.  And read -- if you can read Question No. 2, can you
17   read that?
18   A      Is the physical -- I mean, is the patient's medical
19   condition such that the patient is unable to self-propel a
20   manual wheelchair?
21          And I said yes.
22   Q      And, lastly, if you can read Question No. 3.
23   A      Is the patient's medical condition such that the patient
24   is nonambulatory and requires the power wheelchair for
25   activities of daily living within the patient's residence?
```

**UNITED STATES DISTRICT COURT**

1       I answered yes.

2  Q    Now, let me ask you, were any of these statements that you

3  made on this declaration truthful?

4  A    No.

5  Q    In fact, looking at Question No. 3 there, did you ever see

6  a patient for Ezcor that was not able to walk and actually

7  needed a power wheelchair to do their daily activities within

8  their home?

9  A    No.

10 Q    And what was the purpose of you making those untruthful

11 statements on this document?

12 A    To support my writing the prescriptions and get the

13 hundred dollars.

14 Q    Now, these documents that we've just briefly looked at

15 here, were these documents the documents that you would

16 customarily complete for Ezcor to support your prescription for

17 a power wheelchair under your arrangement?

18 A    Can you rephrase it again.

19 Q    Yes, ma'am.  Thank you.

20      These documents that we've looked at -- the physician

21 declaration, the certificate of medical necessity, biographical

22 information -- are these the documents that you would

23 customarily fill out and complete for Ezcor under your

24 arrangement?

25 A    Yes.

 1   Q    And I just mentioned the physician declaration right now.

 2   I just want to turn real quickly to another one, page 16 of

 3   Government Exhibit 71.  Is this another patient that you saw

 4   under your arrangement with the defendant?

 5   A    Yes.

 6   Q    And what do we have here on page 16 of the physician

 7   declaration?

 8   A    It shows -- it shows if the Medicare coverage is

 9   compliant.

10   Q    Okay.  The physician declaration --

11   A    Yes.

12   Q    -- was that your signature there?

13        And is this similar to the one we just saw in Government

14   Exhibit 70?

15   A    Yes.

16   Q    And whose writing is that that we see throughout?

17   A    That's mine.

18   Q    And your signature down below?

19   A    It's mine.

20   Q    I'm not going to have you read them into the record since

21   we already looked at paragraphs 1, 2, and 3, if you can

22   highlight them there.  So we're not going to read them into the

23   record, but I ask you, were any of these statements on this

24   declaration that you made truthful?

25   A    No.

1  Q    And did you ever see a patient for Ezcor that was not

2  actually able to walk and actually needed a power wheelchair,

3  Dr. Calaustro, under your arrangement with the defendant?

4  A    What was that question again?  I'm sorry.

5  Q    Any of the patients that you saw for Ezcor under your

6  arrangement, were there any patients at all that actually

7  needed a power wheelchair?

8  A    No.

9  Q    Now, let's look at Government Exhibit 69.  Page 19,

10 Government Exhibit 69.  Is this another patient you saw under

11 your arrangement with Ezcor?

12 A    Yes.

13 Q    What is it we're looking at there?

14 A    The names of the patients I saw for Ezcor.

15 Q    And this is your fax cover sheet --

16 A    Yes.

17 Q    -- for those patients?

18      And who prepared this fax cover sheet?

19 A    I do.

20 Q    That's your writing?

21 A    Yes.

22 Q    Okay.  And what would -- what did you fax this to Ezcor

23 with?

24 A    I faxed the documents that we just discussed previously.

25 Q    Okay.  So the prescriptions and the supporting documents

```
1    for these patients?

2    A    Yes, the copy of the prescriptions.

3    Q    Okay.  Now, let's turn to page 22 of Government

4    Exhibit 69.  What -- what do we see there?  Those are the

5    copies of the prescriptions?

6    A    Yes.

7    Q    And again similar to what we saw in the other patient file

8    where you're faxing them to Ezcor; is that right?

9    A    Yes.

10   Q    And the prescription on the top right-hand corner there,

11   what -- what is that prescription for?

12   A    This is prescription for the motorized wheelchair.

13   Q    Now, after you saw a patient for Ezcor, what did you do

14   with the prescriptions and all of the paperwork that we've

15   seen?  You faxed it all?

16   A    The -- the documents are faxed, and the original

17   prescriptions would be sent by postal mail.

18   Q    And who would you send them to, postal mail?

19   A    Ezcor.

20   Q    And did you ever give any of the prescriptions to a

21   patient?

22   A    No.

23   Q    The power wheelchair prescriptions that you wrote for

24   Ezcor, Dr. Calaustro, were they medically necessary?

25   A    No.
```

```
 1   Q    So the patients that you prescribed power wheelchairs for
 2   at Ezcor did not need the power wheelchairs; is that right?
 3   A    Yes.  They did not need it.
 4   Q    So is it fair to say that they were fraudulent
 5   prescriptions?
 6   A    Yes.
 7   Q    And when you were writing these fraudulent prescriptions
 8   for Ezcor, did you know that it was wrong?
 9   A    Yes.
10   Q    Did you know that it was illegal?
11   A    Illegal?
12   Q    Illegal.  Yes.
13   A    Yes.
14   Q    Okay.  And did you know that it was illegal for you to get
15   paid for writing your fraudulent prescriptions?
16   A    Yes.  It's illegal.
17   Q    Why did you do it, Dr. Calaustro?
18             THE COURT:  That's been asked and answered three or
19   four times now.
20   Q    BY MS. QUINTERO:  Did you care if the Medicare
21   beneficiaries actually needed the power wheelchairs?
22             MR. DARDEN:  Objection.
23             THE WITNESS:  No.
24             THE COURT:  Overruled.
25             THE WITNESS:  No.
```

**UNITED STATES DISTRICT COURT**

```
 1   Q     BY MS. QUINTERO:  Did you care what was in the best
 2   interest of the patients that you were seeing?
 3   A     No.
 4   Q     Now, Dr. Calaustro, I understand that you were indicted
 5   back in 2012 in the Northern District of California; is that
 6   right?
 7   A     Yes.
 8   Q     What crimes were you charged -- indicted for?
 9   A     Fraudulent prescriptions and kickback.
10   Q     Okay.  But were you indicted for Medicare fraud?
11   A     Yes.
12   Q     Health care fraud --
13   A     Yes.
14   Q     -- among others?
15         And did you enter a guilty plea in that case?
16   A     Yes, I pleaded guilty.
17   Q     Did you do so pursuant to a plea agreement?
18   A     Yes.
19   Q     And, in fact, have you already been sentenced in your
20   case?
21   A     Yes.
22   Q     And are you currently already serving your sentence in a
23   federal penitentiary?
24   A     Yes, I am.
25   Q     And what, if anything, are you hoping to get from
```

```
 1   cooperating with the Government in this case?
 2   A     Rephrase that again, please.
 3   Q     Well, have I or anyone from the Government made you any
 4   promises in regards to anything in this -- in -- related to
 5   your sentence?
 6   A     No.
 7   Q     What are you hoping, if anything, to get?
 8   A     Hoping for leniency and mercy.
 9   Q     And, in fact, who controls your current sentence?
10   A     The judge in Northern California.
11   Q     And why then are you testifying in this case?
12   A     I am already in jail, and I have nothing to lose.  So I
13   just want to tell the truth.
14   Q     And have you done that today?
15   A     Yes.
16             MS. QUINTERO:  No further questions, Your Honor.
17             THE COURT:  Cross.
18                       CROSS-EXAMINATION
19   BY MR. DARDEN:
20   Q     Do you still hold a medical license?
21   A     Well, it's in the process of negotiations, sir.
22   Q     So you're trying to negotiate to keep your medical
23   license?
24   A     Pardon me?
25   Q     You're negotiating with the State to keep your --
```

```
 1   A    Well, I'm still -- I received a letter from the medical
 2   board that I'm due for revocation.
 3   Q    And you're trying to negotiate something other than a
 4   revocation?
 5   A    No, not yet.  Nothing.
 6   Q    So you're already in prison; right?
 7   A    Yes.
 8   Q    Okay.  And how long are you in prison for?
 9   A    The total -- the sentence is total 24 months.
10   Q    You mentioned that you were indicted up in the Northern
11   District, and that means the -- the federal judicial district
12   up in San Francisco; right?
13   A    Yes.
14   Q    And you were indicted up there, and you pled guilty to ten
15   counts; right?
16   A    Yes.
17   Q    You fled -- you pled guilty to ten counts of health care
18   fraud, kickbacks, and conspiracy; correct?
19   A    Yes.
20   Q    And up there in San Francisco, during one of your
21   interviews, you admitted writing fraudulent prescriptions for
22   approximately 450 power wheelchairs; is that true?
23   A    I don't know the exact number, sir.
24   Q    But it was hundreds; right?
25   A    Pardon me?
```

```
 1   Q     Hundreds of wheelchairs; right?
 2   A     Yes.
 3   Q     Okay.  And those hundreds of wheelchairs that you wrote
 4   fraudulent prescriptions for and that you pled guilty to up in
 5   San Francisco, had nothing to do with this case; correct?
 6   A     No.  I don't --
 7   Q     When you pled guilty up there in San Francisco, you didn't
 8   plead guilty to anything you did down in Southern California;
 9   right?
10   A     Could you rephrase that, sir.
11   Q     Well, in your Indictment in San Francisco, one of the
12   issues was that you were getting paid by a medical supply
13   company called Deb's; is that true?
14   A     Yes.
15   Q     And for the most part, the charges you pled guilty up
16   there were in association with Deb's and a few other medical
17   supply companies; right?
18   A     Yes.
19   Q     And you didn't plead to anything in San Francisco
20   regarding Ezcor; right?
21   A     No.
22   Q     Did you plead guilty to anything in San Francisco
23   involving Ezcor?
24   A     I don't know if the case --
25             MS. QUINTERO:  Objection.  Asked and answered.
```

**UNITED STATES DISTRICT COURT**

```
1              THE COURT:  Overruled.
2         What?  Do you understand the question?
3              THE WITNESS:  I -- can you rephrase that, sir.
4    Q    BY MR. DARDEN:  When you pled guilty in San Francisco, you
5    didn't plead guilty to anything you did in this case; right?
6    A    Right.
7    Q    And, in fact, you were never indicted in this case; right?
8    A    No.
9    Q    Were you indicted in this case?
10             THE COURT:  Have you been indicted in this case?
11             THE WITNESS:  Did I -- no, no, sir.
12             THE COURT:  Okay.  Try to ask her the question so
13   they're not in the negative.
14             MR. DARDEN:  I appreciate that.  You're absolutely
15   correct.
16   Q    BY MR. DARDEN:  Now, as I understand it, you attended
17   medical school in the Philippines; right?
18   A    Yes.
19   Q    And you got your medical degree -- or rather, your medical
20   license -- in California in December of 2004?
21   A    Yes, sir.
22   Q    And by April 12, 2005, you were being visited by FBI
23   agents, right?
24   A    Yes.
25   Q    And in April of 2005 you were being asked about your
```

```
 1   relationship with a woman named Lolita Ramos; right?

 2   A     Relationship regarding what, sir?

 3   Q     Regarding patient referrals and kickbacks.

 4   A     I don't remember, sir.

 5             MS. QUINTERO:  Objection, Your Honor.  Hearsay.

 6             THE COURT:  Overruled.

 7   Q   BY MR. DARDEN:  In April of 2005 you were being asked

 8   about a woman named Marquita; correct?

 9             MS. QUINTERO:  Objection, Your Honor.  Hearsay and

10   relevance.

11             THE COURT:  Overruled.

12       Do you remember that?

13             THE WITNESS:  What?  What was the name again, sir?

14   Q   BY MR. DARDEN:  Marquita.

15   A     Marquita, yes, sir.

16   Q     In April of 2005 you were being investigated because of

17   kickbacks to Marquita Capras, C-a-p-r-a-s; right?

18   A     I don't remember, sir.

19   Q     Well, in December of 2005 did you activate a Medicare

20   provider number?

21   A     I don't remember the dates, sir.

22   Q     Did you have a Medicare provider number in 2005 at all?

23   A     I don't remember.

24   Q     How about 2006?

25   A     I don't remember too, sir.
```

```
 1   Q    Do you remember that, between January 2005 and December
 2   2006, your prescriptions led to the billing of approximately
 3   $2.7 million in power wheelchairs to Medicare?
 4              THE COURT:  If you know.
 5              THE WITNESS:  I -- I don't know, sir.
 6   Q    BY MR. DARDEN:  Do you recall admitting to federal agents
 7   in March of 2007 that you were receiving kickbacks from Deb's
 8   Medical Supply?
 9   A    Would you rephrase the question, sir.
10   Q    In 2007 did you admit taking kickbacks from Deb's Medical
11   Supply?
12              MS. QUINTERO:  Objection, Your Honor.  Relevance.
13              THE COURT:  Overruled.
14   Q    BY MR. DARDEN:  Were you taking kickbacks from Deb's
15   Medical Supply?
16   A    I don't remember, sir.
17   Q    Do you remember admitting to federal agents in 2008 that
18   you were taking kickbacks from Kingdom Medical Distributors?
19   A    I don't remember, sir.
20   Q    Do you recall taking kickbacks from any medical
21   distributors between two thousand -- well, in 2005?
22   A    Sir, I don't remember.
23   Q    Do you remember what you pled guilty to in 2012?
24   A    Yes.
25   Q    Do you remember that you pled guilty to taking kickbacks
```

```
 1   in 2012?
 2   A     Yes, sir.
 3   Q     Do you remember that you pled guilty to taking kickbacks
 4   from the owners of Kingdom Medical Distributors and Deb's?
 5   A     I -- what name, sir?
 6   Q     Deb's Medical Supply.
 7   A     Deb's Medical Supply, yes, sir.
 8   Q     So even before Jean Aves approached you, you were already
 9   taking kickbacks and writing fake prescriptions; is that right?
10   A     Yes, sir.
11   Q     Now, Jean Aves, have you spoken to her lately?
12   A     No, sir.
13   Q     Is she in the same federal prison where you are, if you
14   know?
15   A     I don't know, sir.
16              MS. QUINTERO:  Objection, Your Honor.
17              THE COURT:  I'm sorry.
18              MS. QUINTERO:  Objection, Your Honor.  Calls for
19   speculation.
20              THE COURT:  Well, she said she doesn't know.
21   Q     BY MR. DARDEN:  Jean Aves was a patient of yours at one
22   time; true?
23   A     Yes, sir.
24   Q     And while she was a patient, she approached you and asked
25   you to write prescriptions for power wheelchairs; correct?
```

**UNITED STATES DISTRICT COURT**

```
1    A     Yes, sir.

2    Q     And when you began writing those prescriptions for Jean,

3    you say that Jean told you that this is for Ezcor; is that

4    right?

5    A     Yes, sir.

6    Q     Now, you told us that you had a conversation with someone

7    you think or thought was Sylvia; is that right?

8    A     I don't remember, sir.

9    Q     You just remember having a conversation with someone --

10   true? -- in Southern California, you think?

11              THE COURT:  He's talking about on the telephone.

12              MS. QUINTERO:  Objection, Your Honor.  Misstates the

13   testimony.

14              THE COURT:  Why don't you ask it again.

15   Q     BY MR. DARDEN:  You recall having a conversation with

16   someone on the telephone, from Southern California?

17   A     I don't remember, sir.

18              THE COURT:  Didn't you just testify that you talked

19   with --

20              THE WITNESS:  Oh, he said "someone."

21              THE COURT:  Well, she's somebody.  So did you ever

22   talk to somebody from Southern California?

23              THE WITNESS:  Yes, sir.

24              THE COURT:  Okay.  Go ahead, Counsel.

25   Q     BY MR. DARDEN:  And when you talked to this person on the
```

**UNITED STATES DISTRICT COURT**

```
 1   phone, you didn't have a discussion about -- about being paid;
 2   true?
 3   A     No, sir.
 4   Q     Is it true -- strike that.
 5         Did you -- did you talk about getting paid when you talked
 6   to this person on the phone?
 7   A     No.
 8   Q     And when you talked to this person on the phone, did you
 9   talk about writing fraudulent prescriptions?
10   A     No.
11   Q     And then you told us that you got a hundred dollars, $100
12   per prescription; right?
13   A     Yes, sir.
14   Q     And this money was delivered to you in cash; right?
15   A     Yes, sir.
16   Q     And my client Sylvia, she didn't put that money in your
17   hand, did she?
18   A     No, sir.
19   Q     It was Jean who put money in your hand; true?
20   A     Yes, sir.
21   Q     My client Sylvia never wrote you a check, did she?
22   A     No, sir.
23   Q     When you were -- when you were first approached by federal
24   agents back in 2005 and asked about your wheelchair
25   prescriptions, isn't it true that you told the agents that all
```

1    of the wheelchair prescriptions you wrote were medically

2    necessary?

3    A    I don't remember that conversation, sir.

4    Q    You recall a conversation at San Francisco International

5    Airport where you were stopped by federal agents?

6              THE COURT:  Can we have a time frame, if you know.

7    Q    BY MR. DARDEN:  November 28, 2011.

8    A    Could you rephrase that again, sir.

9    Q    Were you stopped at Terminal 2 at San Francisco

10   International Airport on November 28, 2011, by federal agents?

11   A    Yes, sir.

12   Q    And did you tell those federal agents at that time that

13   the wheelchair prescriptions you wrote were all necessary for

14   medical reasons?

15             MS. QUINTERO:  Objection, Your Honor.  Asked and

16   answered.

17             THE COURT:  Overruled.

18        Did you say that to them when you first met them?

19             THE WITNESS:  I don't remember what transpired in

20   the meeting, sir.

21             THE COURT:  Okay.

22   Q    BY MR. DARDEN:  Well, do you remember lying to federal

23   agents throughout 2005 and up to the end of 2011?

24   A    Could you rephrase that again, sir.

25   Q    You recall lying repeatedly to federal agents between 2005

```
 1   and November 2011 -- and '11, when they asked you about your
 2   power wheelchair prescriptions?
 3   A    I don't remember, sir.
 4   Q    So you don't recall whether you lied to federal agents or
 5   not during that time period; is that right?
 6   A    I don't remember, sir.
 7   Q    Do you recall being arrested at the Vagabond Inn in
 8   Los Banos in February 9, 2012?
 9   A    Do I remember?
10   Q    Yeah.  Do you remember being arrested at the Vagabond Inn?
11   A    Yes.  They came over.
12   Q    And they arrested you; right?
13   A    Yes.
14   Q    And you were placed in custody; right?  Right?  You
15   were --
16   A    Not -- "placed custody" meaning what, sir?
17   Q    Meaning you were under arrest and you were taken to jail;
18   right?
19   A    I wasn't in jail, sir.  I posted a bond.
20   Q    So you were in custody.  You went to court.  You saw the
21   judge, and you posted a bond?
22   A    Yes, sir.
23   Q    And then you got out back --
24   A    Yes, sir.
25   Q    And when did you go into custody again?
```

```
 1   A     On November 18th last year, when I self-surrendered at
 2   Carswell.
 3   Q     So you surrendered on November 18, 2014; is that right?
 4   A     Yes, sir.
 5   Q     To serve your 34-month sentence; right?
 6   A     Yes, sir.
 7   Q     And to get that 34-month sentence, not only -- strike
 8   that.
 9         To get that 34-month sentence, you also testify for the
10   Government in San Francisco; true?
11   A     What was that question again, sir?
12   Q     You testified for the Government in San Francisco; right?
13   A     Testified for the Government?
14   Q     Yes.  The prosecutors, you testified for them in
15   San Francisco; right?
16   A     Yes, sir.
17   Q     Now, you already told us that the certificates of medical
18   necessity that you signed for power wheelchairs were
19   fraudulent; is that right?
20   A     Yes, sir.
21   Q     Were all of these certificates of medical necessity you
22   signed fraudulent?
23   A     Yes, sir.
24   Q     And each time you signed your name to these certificates
25   of medical necessity, isn't it true that just above your
```

1    signature the form states -- and I quote -- "I certify that the

2    medical necessity information in Section B is true, accurate,

3    and complete to the best of my knowledge.  And I understand

4    that any falsification, omission, or concealment of material

5    fact in that section may subject me to civil or criminal

6    liability"?

7    A    Yes.

8    Q    Isn't that what the form says?

9    A    Yes, sir.

10   Q    So each and every time you signed these fake certificates

11   of medical necessity, you knew that you were committing a

12   violation of a criminal law; right?

13   A    Yes, sir.

14   Q    And you say you did this for a hundred bucks?

15   A    Yes, sir.

16   Q    Why -- why a hundred bucks?  What was so magical about a

17   hundred dollars?

18   A    That -- I don't know the reason why I charged hundred

19   bucks, sir, but that was what I been asking for.

20   Q    You also filled out --

21        THE COURT:  We're going to break at this time.  I

22   didn't give you much of a break the first time.  This time, be

23   back in 15 minutes, and we'll finish up at that time.

24        Remember the admonishment not to discuss the case among

25   yourselves or with anybody else or form or express any opinions

```
 1    about the matter until it's submitted to you and you retire to
 2    the jury room.
 3         We'll be in recess.
 4              THE CLERK:  All rise.
 5                 (Recess taken.)
 6              THE COURT:  The record will reflect that all the
 7    members of the jury are in their respective seats in the jury
 8    box and the witness is on the witness stand in
 9    cross-examination.
10         You may continue, Counsel.
11              MR. DARDEN:  Thank you, Your Honor.
12    Q    BY MR. DARDEN:  When you examined all of these
13    beneficiaries for power wheelchairs, is it fair to say that you
14    did not conduct proper examinations?
15    A    Can you rephrase it again, sir.  I didn't hear it.
16    Q    When you conducted these examinations of these
17    beneficiaries, is it fair to say that you did not conduct
18    proper examinations?
19    A    Yes, sir.
20    Q    Protocol would require you to, you know, have the patients
21    x-rayed before deciding to prescribe a power wheelchair; is
22    that right?
23    A    Protocol requires?
24    Q    Yeah.  Before you -- before you prescribe a power
25    wheelchair, there are a bunch of things you need to do, to look
```

1    at; right?

2    A     Yes, sir.

3    Q     One of the things you ought to look at is an X ray of the

4    beneficiary; correct?

5    A     Yes, sir.

6    Q     You want to look at bone structures and deformities;

7    right?

8    A     Yes, sir.

9    Q     You didn't do that in any of these cases; right?

10   A     No.

11   Q     And one of the other things you want to do is you want to

12   prescribe something less than a power wheelchair whenever

13   possible; true?

14   A     Yes, sir.

15   Q     And the reason for that is because, once people get in

16   power wheelchairs, they don't get out; right?

17   A     I didn't understand the question, sir.

18   Q     One of the reasons you want to prescribe something other

19   than a power wheelchair, if you can, is once people get into

20   power wheelchairs, sometimes they don't get out of them; right?

21   A     I don't have any statistics on that, sir.

22   Q     Well, one of the things you could do is you could

23   prescribe pain medications; right?

24   A     Yes.

25   Q     And you didn't prescribe any pain medications; right?

1    A     They were already on med -- pain meds, sir.

2    Q     And when you conducted your examinations and wrote your

3    progress and patient notes, you would lie in the notes about

4    the type of medication the patients were taking; true?

5    A     I don't remember, sir.

6    Q     You don't remember writing in patient files that the

7    patient was taking hydrocodone when, in fact, they were not?

8    A     I don't remember, sir.

9    Q     Another thing you might do when conducting a proper

10   examination is refer the patient to an orthopedist or some

11   other specialist; correct?

12   A     Yes.

13   Q     Did you ever direct any of these patients to an

14   orthopedist or a specialist?

15   A     No, sir.

16   Q     And isn't it true that you should prescribe a manual

17   wheelchair before prescribing a power wheelchair, if possible?

18   A     I don't understand your question, sir.

19   Q     Well, prescribing a power wheelchair is a prescription of

20   last resort; true?

21   A     Yes.

22   Q     And, if possible and if a wheelchair is required,

23   typically a doctor would order a manual wheelchair first;

24   correct?

25   A     Yes, sir.

1   Q    Did you ever order manual wheelchairs for any of these

2   people?

3   A    No, sir.

4   Q    And when you wrote these prescriptions for power

5   wheelchairs, on most occasions you believed that a lesser

6   mobility device would be better; true?

7   A    Could you rephrase that again, sir.

8   Q    In other words, you wrote these power wheelchair

9   prescriptions even though you believed something other than a

10  power wheelchair would be more appropriate for the patient;

11  right?

12  A    Yes, sir.

13  Q    Some of these patients would have benefitted from walkers

14  and canes as opposed to power wheelchairs; correct?

15  A    Yes, sir.

16  Q    In your patient notes you essentially describe the same

17  symptoms for each patient over and over; is that true?

18  A    Yes, sir.

19  Q    And you would describe easy fatigue, knee pain, shortness

20  of breath, abnormal gait, things like that; right?

21  A    Yes, sir.

22  Q    And you did that repeatedly, prescription after

23  prescription, progress note after progress note; true?

24  A    Yes, sir.

25  Q    And each time that you did this, or most often when you

**UNITED STATES DISTRICT COURT**

1    did this, this was a lie; right?

2    A    Yes, sir.

3    Q    The prescription was a lie; right?

4    A    Yes, sir.

5    Q    Progress notes contained numerous lies; right?

6    A    Yes, sir.

7    Q    The certificate of medical necessity was a lie; right?

8    A    Yes, sir.

9    Q    And those three questions you answered -- I believe it was

10   in People's 69 and People's 70, the ones where you would circle

11   "yes" -- each and every time you did that, it was a lie; right?

12   A    Yes, sir.

13   Q    Did you write prescriptions for patients you never met

14   with?

15   A    No, sir.

16   Q    You had to meet with the patients because you had to get

17   their Medicare cards and senior identification cards; correct?

18   A    Yes, sir.

19   Q    You would copy those items, and you would send those items

20   to Ezcor; right?

21   A    Yes, sir.

22   Q    When you sent or faxed documents to Ezcor, you intended to

23   fax to them everything they would need to bill Medicare for a

24   power wheelchair; correct?

25   A    Yes, sir.

```
 1   Q    And you knew that -- when you faxed these documents to
 2   Ezcor, you knew that Sylvia herself never met those patients;
 3   true?
 4   A    I don't understand the question, sir.
 5           MS. QUINTERO:  Objection, Your Honor.  Call -- calls
 6   for speculation, Your Honor.
 7           THE COURT:  Sustained.
 8   Q    BY MR. DARDEN:  Well, these patients that you were seeing
 9   were in Northern California; correct?
10   A    The patients?
11   Q    Yes.
12   A    Were what, sir?
13   Q    Were they in Northern California when you --
14   A    Yes, sir.
15   Q    -- saw them?
16        And you would go to their homes; true?
17   A    Yes, sir.
18   Q    And you would meet them -- did you meet them at a
19   community center sometimes?
20   A    Community center, sir?
21   Q    Yes.  Did you meet patients at a community center?
22   A    I don't remember, sir.
23   Q    Did you meet patients at places other than your office and
24   the patient's home?
25   A    No, sir.
```

1    Q    One of the proper things or appropriate things for a

2    doctor to do after prescribing a power wheelchair is to do

3    follow-ups; right?

4    A    Yes, sir.

5    Q    But regarding the hundreds of power wheelchair

6    prescriptions you wrote, did you ever do any follow-ups with

7    the patients?

8    A    Not all of them, sir.

9    Q    On March 28, 2014, did you tell federal agents that, out

10   of 400 or more power wheelchair prescriptions, that you only

11   did follow-ups with about ten patients?

12   A    I don't remember, sir.

13   Q    The prescriptions you wrote, or the ones you say you wrote

14   for Ezcor, you wrote those primarily in 2006; is that right?

15   A    Yes, sir.

16   Q    And you've been ill since June of 2014; is that true?

17   A    I've been what, sir?

18   Q    Ill.  Sick, ill.

19            THE COURT:  Have you been ill?

20            THE WITNESS:  Yes.  I had a stroke, sir.

21   Q    BY MR. DARDEN:  Okay.  And -- and you've had some issues

22   with your memory; is that true?  Or do you know?

23   A    Yes, sir.

24            MR. DARDEN:  Thank you.

25            That's all, Your Honor.

```
 1              THE COURT:  Thank you, counsel.
 2         Redirect.
 3                    REDIRECT EXAMINATION
 4    BY MS. QUINTERO:
 5    Q    Dr. Calaustro, have I or the Government, anyone from the
 6    Government, made any promises to you about any charges for your
 7    conduct here in Los Angeles?
 8    A    No ma'am.
 9    Q    In fact, do you know if you'll even be charged here in
10    Los Angeles for your conduct involving Ezcor and the defendant?
11    A    No.
12              MS. QUINTERO:  That's all I have, Your Honor.
13              THE COURT:  Anything else?
14              MR. DARDEN:  No, Your Honor.
15              THE COURT:  You may step down.
16              THE WITNESS:  Thank you.
17              THE COURT:  Next witness.
18              MS. QUINTERO:  Yes, Your Honor.  The Government
19    would like to call Mr. Elder Ed Aguilar.
20                        ELDER AGUILAR,
21    called as a witness by the Government, was sworn and testified
22    as follows:
23              THE CLERK:  Mr. Aguilar, right here to be sworn,
24    please.  Please raise your right hand.  Do you solemnly swear
25    that the testimony you are about to give in the matter now
```

UNITED STATES DISTRICT COURT

```
 1  before the Court shall be the truth, the whole truth, and

 2  nothing but the truth so help you God?

 3              THE WITNESS:  Yes.

 4              THE CLERK:  Thank you.  You may be seated.  May I

 5  please ask that you state your full name for the record and

 6  spell your last name.

 7              THE WITNESS:  My name is Elder.  Last name is

 8  Aguilar, A-g-u-i-l-a-r.

 9              THE COURT:  You may inquire, Counsel.

10              MS. QUINTERO:  Thank you, Your Honor.

11                      DIRECT EXAMINATION

12  BY MS. QUINTERO:

13  Q    Mr. Aguilar, it's my understanding that you used to work

14  for a company called Ezcor 9000, or Ezcor Medical Supply; is

15  that right?

16  A    That's correct.

17  Q    What type of company was Ezcor?

18  A    Medical supply company.

19  Q    And where was Ezcor located when you worked for Ezcor?

20  A    Valencia, California.

21  Q    And approximately when did you work for Ezcor?

22  A    From late 2007 to late 2011.

23  Q    So you worked for Ezcor for about four years?

24  A    About four years, yes.

25  Q    Do you remember the owner of Ezcor?
```

UNITED STATES DISTRICT COURT

```
 1   A     Yes, I do.

 2   Q     And what's the owner's name?

 3   A     Sylvia Walter-Eze.

 4   Q     Do you see Sylvia Walter-Eze in this courtroom?

 5   A     Yes, I do.

 6   Q     Can you please point to where Sylvia Walter-Eze is

 7   sitting.

 8   A     Second lady down there with the glasses.

 9              THE COURT:  Indicating the defendant.

10              MS. QUINTERO:  I'm sorry, Your Honor?

11              THE COURT:  Record should indicate he's indicating

12   the defendant.

13              MS. QUINTERO:  Okay.  Thank you.

14   Q     BY MS. QUINTERO:  Were there any other owners for Ezcor

15   that you knew of?

16   A     Not that I knew of.

17   Q     Who was your boss at Ezcor?

18   A     Sylvia Walter-Eze.

19   Q     Who actually hired you while you worked at Ezcor?

20   A     Sylvia Walter-Eze.

21   Q     And who ran the day-to-day operations at Ezcor?

22   A     Sylvia Walter-Eze.

23   Q     When you worked at Ezcor for those four years, what was

24   your position?

25   A     I was the delivery technician.
```

```
 1   Q    And generally what hours did you work at Ezcor as a
 2   delivery technician?
 3   A    Just Monday through Friday 9:00 to 5:00, generally.
 4   Q    And what were your duties as the delivery technician at
 5   Ezcor?
 6   A    I would do most of the deliveries or all of the deliveries
 7   while I was there.
 8              THE REPORTER:  Slow down.
 9              THE COURT:  It's tough to be a witness sometimes.
10   Just relax.
11              THE WITNESS:  I've never did it before.
12        So, yes, I would do deliveries on a day-to-day basis, and
13   I would schedule the appointments for the beneficiaries.
14   Q    BY MS. QUINTERO:  And generally, when you would schedule
15   the beneficiaries and do the deliveries, what kind of customers
16   did you deliver the durable medical equipment for?
17   A    It was Medicare patients, usually older people.
18   Q    Okay.  Other than yourself, did anyone else deliver
19   durable medical equipment for Ezcor when you worked there?
20   A    No.  It was just me.  It was just me, mostly.
21   Q    Now, I want to talk to you about your delivery of
22   specifically power wheelchairs --
23   A    Uh-huh.
24   Q    -- when you worked at Ezcor.
25        First, who trained you in doing the deliveries of the
```

1  power wheelchairs?

2  A     That would be Sylvia Walter-Eze.

3  Q     Sylvia Walter-Eze, the defendant?

4  A     Yes.  Yes, that's right.  Sorry.

5  Q     Can you briefly explain what you would do when you would

6  deliver a power wheelchair to a Medicare beneficiary?

7  A     I would -- it started off the day by scheduling the

8  appointment for the beneficiaries; loading up my van usually

9  with the power wheelchair and then arriving to their homes and

10  actually delivering the power wheelchair; and then just

11  training them on the basics, basic operations of the power

12  wheelchair, like how to, you know, drive them about, go

13  forwards, go backwards, how to turn and how to maintain them by

14  charging them, and just day-to-day usage of the power

15  wheelchair.

16  Q     And after you were done delivering the power wheelchairs,

17  what would you typically do?

18  A     I -- towards the end of me working there, I had to take

19  pictures of the beneficiaries with the power wheelchairs and

20  then get delivery documents signed and -- and bring the

21  envelope back to the office with all the paperwork signed.

22  Q     And with all the paperwork signed, who would you give that

23  paperwork too?

24  A     Sylvia Walter-Eze or whoever was at the front desk at the

25  time.

UNITED STATES DISTRICT COURT

```
 1   Q    Okay.  Let's discuss a little bit more in detail your
 2   deliveries of power wheelchairs.  While you worked at Ezcor
 3   delivering the power wheelchairs, were there any concerns that
 4   you brought to the defendant's attention about your delivery of
 5   the power wheelchairs?
 6   A    On several occasions I brought up the fact that some of
 7   these people were walking around or sometimes they acted like
 8   they didn't need the power wheelchair or say they didn't want
 9   them.
10           MS. NKELE:  Objection.
11           THE COURT:  Overruled.
12       This is what you told her?
13           THE WITNESS:  Yeah.  I brought this up.
14           THE COURT:  Okay.  Go ahead.
15   Q    BY MS. QUINTERO:  Okay.  Sorry.  Go ahead and continue.
16   What specifically did you bring to the defendant's attention?
17   A    Yeah.  That would -- some people didn't want them and some
18   people refused the delivery sometimes.  And then some people
19   lived in a, like, second story apartment building with no
20   elevator in some cases.
21   Q    Is there anything else you remember telling the defendant
22   specifically about the power wheelchairs when you were trying
23   to deliver them?
24   A    Just that some people looked like they were walking around
25   just fine and didn't, at least in my opinion, look like they
```

1   needed to be on a power wheelchair.

2   Q    Okay.  And let's talk a little bit about some of those

3   things that you mentioned.  Now, you mentioned that you

4   served -- you observed a lot of these Medicare beneficiaries

5   could walk.  How did these beneficiaries walk?

6   A    You know, some would, you know, be leaning on things

7   sometimes.  But some would, you know, be gardening outside,

8   walking around, or meet me downstairs and walk up and down the

9   stairs when there was no elevator.

10  Q    And the fact that these beneficiaries could walk, did

11  that -- why did that trouble you?

12  A    I just thought it was kind of strange that they were

13  getting these power wheelchairs and they were walking around

14  fine, especially the people that lived, like, in a second story

15  home and stuff.

16  Q    Okay.  And you said you remember mentioning this at least

17  a few times to the defendant; is that right?

18  A    Correct.

19  Q    What exactly do you remember telling the defendant about

20  this?

21          MS. NKELE:  Objection.  Hearsay.

22          THE COURT:  Overruled on the hearsay objection, but

23  I think it's been asked and answered.  I think he's already

24  told.

25  Q    BY MS. QUINTERO:  Okay.  What did the defendant respond to

```
 1   you when you told her this?
 2   A    It was just kind of --
 3           MS. NKELE:  Objection.
 4           THE COURT:  Overruled.
 5           THE WITNESS:  It was just kind of dismissed as, you
 6   know, "They're fine.  They're going to need it soon," or, you
 7   know, "They will use it eventually."
 8   Q    BY MS. QUINTERO:  Anything else that you remember her
 9   telling you?
10   A    Just -- I mean, just that in general, that they were going
11   to use it and they wanted it and they were probably going to
12   use it later.
13   Q    Okay.  When you say that it was kind of dismissive or
14   something along those lines, what do you mean?
15   A    It was just kind of like, well, it's okay.  Kind of
16   brushed off, kind of like it's none of my business kind of
17   thing.
18   Q    Now, when you told the defendant that these beneficiaries
19   were walking and didn't appear to need the power wheelchairs,
20   did she appear to you to be surprised that the beneficiaries
21   you were delivering the power wheelchairs could walk and --
22           MS. NKELE:  Objection.
23   Q    BY MS. QUINTERO:  -- didn't appear to need it?
24           MS. NKELE:  Calls for speculation.
25           THE COURT:  Overruled.
```

```
 1        Did she appear to be surprised?
 2             THE WITNESS:  I -- no.
 3             THE COURT:  Okay.
 4   Q    BY MS. QUINTERO:  Now, did she ever instruct you to go
 5   back and pick up the power wheelchairs back from the
 6   beneficiaries when you would tell her this?
 7   A    No.
 8   Q    Did she ever instruct you that, whenever you were out
 9   delivering a power wheelchair and you saw that the beneficiary
10   could walk, not to deliver the power wheelchair?
11   A    No.
12   Q    Can you speak up a little bit?
13   A    No.
14   Q    Sorry.
15   A    Sorry.
16   Q    Okay.  And you said that you told her this a few times or
17   so about the beneficiaries walking and not appearing to need
18   the power wheelchair.  Why did you only tell her a few times?
19   A    Oh, after the first couple of times just of, you know, not
20   getting anything or felt like it just wasn't important.  What I
21   was saying was not going to make a difference anyway to bring
22   it up.
23   Q    Going back to some of the other things that you mentioned
24   that you observed when you would deliver these power
25   wheelchairs to the beneficiaries, you said that these
```

```
1   beneficiaries would live on the second floor of an apartment
2   complex, second floor?
3   A     There was a couple times, yes.
4   Q     Okay.  And what do you remember specifically about that?
5   A     First of all, that I had to carry this big power
6   wheelchair up some stairs when there was no elevator, and I had
7   to take it apart and carry it up in pieces.  And I thought that
8   was strange because how were they going to get down with the
9   power wheelchair?  It just kind of troubled me, I guess.
10  Q     Okay.  And did you tell the defendant specifically about
11  these instances?
12  A     Yeah.
13  Q     And what -- what did the defendant say?
14  A     Kind of the same reaction because I kind of complained
15  about having to carry it upstairs because it was really heavy
16  and I had to do it by myself.  And then just brought up the
17  fact that they were upstairs and it probably wouldn't get too
18  much use --
19  Q     Uh-huh.
20  A     -- of the power wheelchair.
21  Q     Okay.  And you said that these were in second-floor --
22  A     Yes.
23  Q     -- homes, second-floor apartment complexes?
24  A     Yes.
25  Q     No elevator access?
```

461

```
 1   A     Correct.
 2   Q     And how would -- how would you have to access from -- go
 3   from the first floor to the second floor?
 4   A     By stairs.  Just sometimes it would have to be by stairs,
 5   and I would have to take it apart and carry it up in pieces.
 6   Q     Now, when you were delivering some of these power
 7   wheelchairs to these Medicare beneficiaries, at times were the
 8   homes too small --
 9   A     Yes.
10   Q     -- for the power wheelchairs?
11   A     Yeah.  In my opinion, yes.
12   Q     Okay.  And is -- is this something -- did you mention this
13   to the defendant?
14   A     Yes.  I brought up the fact that sometimes there was no
15   room to put the power wheelchair, or there was no space to even
16   set it down --
17   Q     Okay.
18   A     -- or bring it upstairs.
19   Q     And how many -- and did you mention this to her more than
20   once?
21   A     Yeah.  It was probably more than once, probably couple
22   times, several times.
23   Q     What did she tell you when you would say this to her?
24   A     That I would have to make it fit.  I would have to move
25   furniture around just to set it in the house.
```

**UNITED STATES DISTRICT COURT**

```
 1   Q    Okay.  And in those instances, would you in fact make it
 2   fit?
 3   A    Yes.
 4   Q    And how would you make the power wheelchair fit in those
 5   homes that were too small?
 6   A    I would have to move furniture, move couches, or move beds
 7   if they had it in their bedrooms.  Or, you know, whatever I had
 8   to do, leave it inside the house or around the house, garage
 9   sometimes.
10   Q    Were there times when you delivered the power wheelchair
11   and left it outside the house or the garage?
12   A    Yes.
13   Q    And when you told the defendant about this, that the house
14   was too small for the power wheelchair, did she appear to you
15   to be concerned at all?
16   A    No.  Not at all, no.
17   Q    At any time did she instruct you not to deliver the power
18   wheelchair when the home was too small?
19   A    No.
20   Q    At any time did she instruct you to go back and get the
21   power wheelchair when you told her that the beneficiary's home
22   was too small?
23   A    No.
24   Q    At any time did you -- did she ever instruct you not to
25   deliver a power wheelchair when you saw that the house was too
```

```
 1   small to operate a power wheelchair inside the home?
 2   A     No.
 3   Q     And you said that you mentioned this at least a couple of
 4   times to her; is that right?
 5   A     Correct.
 6   Q     Were there other times that you delivered a power
 7   wheelchair to a beneficiary where you believed the house was
 8   too small to her, but you just didn't mention it to her?
 9   A     Yes.
10   Q     And why didn't you mention it all the times that you saw
11   the house was too small for the power wheelchair?
12   A     Because I always got the same reaction, that I just had to
13   make it fit and, you know, that they were later on going to
14   make room for it, or they were going to use it, or that it was
15   fine.  They'll -- you know, they'll make it work.  Just make it
16   fit.
17   Q     Were there times when you were still at the beneficiary's
18   home when you told the defendant that the house was too small
19   for the power wheelchair?
20   A     Yes.
21   Q     And in those instances did you communicate with the
22   defendant?
23   A     Yes.
24   Q     How did you communicate with her?
25   A     By calling the office or calling her cell phone directly.
```

```
1   Q     And in those instances what -- what would she tell you?
2               MS. NKELE:  Objection.  Hearsay.
3               THE COURT:  Overruled.
4               THE WITNESS:  That -- you know, to make it work,
5   make it fit, or just -- just leave it with them sometimes in
6   the front yard or the garage or just anywhere with them, just
7   to get it delivered.
8   Q     BY MS. QUINTERO:  Okay.  And would you, in fact, do that?
9   A     Yes.
10  Q     And did -- in those instances did she ever instruct you
11  not to deliver the power wheelchair?  In other words, to bring
12  it back to Ezcor?
13  A     No.
14  Q     Now, were there ever any instances where you observed
15  that, after delivering the power wheelchairs, that the Medicare
16  beneficiaries were not using the power wheelchairs?
17  A     Yes.  Yes, I did notice that.
18  Q     And how did you notice that the Medicare beneficiaries
19  were not using the power wheelchairs after you delivered it to
20  them?
21  A     Sometimes we would have to go back to the beneficiaries
22  because they would call that their power wheelchair was not
23  working anymore.  And my training from the manufacturers on
24  these power wheelchairs is that, if they don't get used or get
25  charged, the batteries are going to go flat.  Even if you do
```

```
 1    try to charge it for weeks on end, they're not going to work
 2    anymore because the batteries are flat and they need to be
 3    replaced.
 4         So I would have to go back and replace the batteries on
 5    some of these, and I would find them in the same condition as
 6    that power wheelchair back there, just the plastic wrap and
 7    sitting in the same place as I delivered it.
 8              MS. QUINTERO:  Your Honor, let the record reflect
 9    that the witness pointed to Exhibit 2, the power wheelchair
10    demonstrative.
11              THE COURT:  Yes.  It is wrapped in plastic.
12              MS. QUINTERO:  Thank you, Your Honor.
13    Q    BY MS. QUINTERO:  And did you have any discussions with
14    the defendant about this?
15    A    Yeah.  I brought up the fact that the power wheelchairs
16    more were not working because they just hadn't been used.  The
17    batteries had gone flat.
18    Q    Okay.  And what did she tell you?
19    A    That maybe, now that we replaced batteries, they're going
20    to start using it now.
21    Q    Okay.  And did she -- you mentioned to her anything about
22    observing that the power wheelchairs would have the plastic --
23    A    Yes.
24    Q    -- and appeared not to be used?
25    A    Yeah.
```

1  Q    And what did she tell you in those instances?

2  A    Um, basically the same answer, that maybe they're going to

3  start using it now.  You know, maybe now they need it or now

4  they're going to -- sorry -- you know, start using it now that

5  they got new batteries.

6  Q    How often did this happen where you would have to go out

7  and replace the batteries because they had gone flat for lack

8  of use?

9  A    I would do this fairly often.  At least every couple

10 months or several months, we would have to go -- we would have

11 at least a couple or a few power wheelchairs that needed

12 batteries.

13 Q    So quite a few times?

14 A    Yeah.

15 Q    And how often was it that you would actually observe that

16 the power wheelchairs were in the exact same condition as you

17 delivered them?  In other words, in their original plastic

18 packaging and all that.

19 A    It was at least several times.  Couple or two or three

20 times, maybe more.

21 Q    Now, these concerns that you had and you talked to the

22 defendant about that we've talked about here -- the fact that

23 the beneficiaries were walking around just fine, living on the

24 second floor of an apartment complex, houses too small for the

25 power wheelchairs and everything, did -- did you have any --

```
1   did you think there was anything wrong with any of this?
2   A    Um, yeah.  I thought, at least in my opinion, that it was
3   kind of strange that we were -- you know, some of these people
4   didn't want the chairs, and I was told to, you know, just
5   deliver it.  And, you know, and then we're billing Medicare for
6   it and, you know, I just -- it was just strange to me, I
7   thought was.
8   Q    Okay.  And if you felt there was something wrong with it,
9   why did you continue working at Ezcor for the four years that
10  you worked there?
11  A    Well, at the time I was -- I was in school.  I was putting
12  myself through college, and I needed a job.  And, to me, I was
13  just doing a job.  I was just a 9:00 to 5:00 worker, putting
14  myself through school.
15  Q    Now, let me ask you, while you worked at Ezcor, where --
16  you mentioned a minute ago sometimes the beneficiaries tried to
17  reject the power wheelchairs; is that right?
18  A    That's correct.
19  Q    And when the beneficiary tried to reject the delivery,
20  what did you do in those instances?
21  A    I would just call the office or Sylvia directly and tell
22  her that these people don't want the chair sometimes.
23  Q    And that's Sylvia Walter-Eze, the defendant?
24  A    Correct.
25  Q    And what did the defendant tell you to do in those
```

```
 1   instances?
 2   A     I was just asked to hang on and just wait around, and I
 3   would get a call back sometime later, you know, maybe half an
 4   hour later, an hour later.  And then all of a sudden the
 5   beneficiaries would say, "Okay, fine.  I'll accept the -- the
 6   power wheelchair," or the delivery.
 7   Q     So the defendant asked you to hang -- hang out there at
 8   the -- by the beneficiary's house?
 9   A     Yes.
10   Q     Did she tell you --
11             MS. NKELE:  Objection.
12             THE COURT:  Sorry?
13             MS. NKELE:  Objection.
14             THE COURT:  Sustained.
15   Q     BY MS. QUINTERO:  Did she tell you what she was going to
16   do?
17   A     Talk to them or have a field representative talk to the
18   beneficiaries, the people receiving the power wheelchair.
19   Q     And did she tell you what the purpose was of why she was
20   going to talk to the beneficiaries or to the field
21   representative?
22             MS. NKELE:  Objection.  Asks for speculation.
23             THE COURT:  Overruled.
24        Did she say anything about that?
25             THE WITNESS:  Yeah.  Yeah.  The fact that, oh, here,
```

UNITED STATES DISTRICT COURT

1    let me talk to them.  Maybe the field rep will talk to them to

2    accept the delivery.

3    Q    BY MS. QUINTERO:  Okay.  And after that would the

4    defendant communicate with you?

5    A    Yes.

6    Q    And would you, in fact, deliver the power wheelchair --

7    A    Yes.

8    Q    -- or other DME?

9    A    Yes.

10   Q    In those instances did the defendant ever instruct you not

11   to deliver the power wheelchair because the beneficiary was

12   trying to reject it?

13   A    Maybe there was one or two times that -- where the

14   beneficiary just did not accept it, but most of the time, they

15   ended up accepting the delivery.

16   Q    Okay.  But did the defendant ever instruct you not to

17   deliver it?

18   A    No.

19   Q    Okay.  And you mentioned field representatives.  Okay.

20   We'll get to -- to that right now.  Other than delivering power

21   wheelchairs and other DME, did you have other responsibilities

22   in the office?

23   A    Yeah.  Sometimes I would have to check eligibility,

24   Medicare eligibility for patients or for beneficiaries,

25   potential beneficiaries.

```
 1   Q     And when you say that you would check Medicare eligibility

 2   for the patients, what do you mean by that?

 3   A     We would have to call the Medicare offices or check

 4   online.  You know, we would have the patient's information, the

 5   Medicare number, date of birth, their name.  And we would call

 6   to see if they're eligible for Medicare.

 7   Q     Okay.  And can you explain to the jury, field

 8   representatives, who are the field representatives?  What do

 9   you mean by that?

10   A     They would go and gather potential patients, people that

11   are eligible for Medicare for the aid.  And then we would check

12   or I would check sometimes if they do have Medicare, in fact,

13   and if they are eligible for power wheelchairs or knee braces

14   or whatever, other medical equipment that they might need or

15   want.

16   Q     So they were patient recruiters?

17   A     Patient recruiters, yes.

18   Q     And --

19              MS. NKELE:  Objection.

20              THE COURT:  Sorry?

21              MS. NKELE:  Objection.  Asks for speculation.

22              THE COURT:  Overruled.

23   Q     BY MS. QUINTERO:  And what type of patients would they

24   recruit?

25   A     Usually older people.  I don't know if there's a better
```

1    term for that, but older people that are, you know, Medicare --

2    or they said they had Medicare.

3    Q    These patient recruiters, who were they working for?

4    A    They were working as representatives for Ezcor, is my

5    understanding.

6    Q    So for the defendant?

7    A    Yes.

8    Q    Do you recall the names of some of these patient

9    recruiters?

10   A    I remember there was a Wilmer, there was a Candi, there

11   was a Judy, there was a Dr. Heidi.  There was a -- those are

12   just some of the ones I remember.

13   Q    Okay.

14   A    I'm sure there was more.

15   Q    Let's -- I want to show you an exhibit.  It's Government

16   Exhibit 24 here.  I'm sorry.  23.  Do you recognize the person

17   that's depicted there in Government Exhibit 23?

18   A    Yes.

19   Q    And who is that?

20   A    Wilmer.

21   Q    And who is Wilmer?

22   A    He was one of the field representatives.

23   Q    Okay.  And the next exhibit I want to show you is

24   Government Exhibit 24.  Do you recognize the person that's

25   depicted there?

```
1    A     Yeah.  That's Judy.

2    Q     That's Judy?

3    A     Yes.

4    Q     And is she one of the patient recruiters that you

5    mentioned?

6    A     Yes.

7    Q     And Wilmer, is he one of the patient recruiters you

8    mentioned?

9    A     Yes.

10   Q     Now, to your knowledge, did Judy or Wilmer ever work in

11   the office at Ezcor?

12   A     No.  They were just mostly out, recruiting patients.  I

13   never saw them in the office, like, working, actually doing

14   work in the office.

15   Q     Did they ever --

16   A     No.

17   Q     -- do any work in the office or anything else that you

18   know of for Ezcor other than recruit patients?

19   A     No, not that I know of.

20   Q     Now, did you have an understanding as to whether the field

21   representatives or patient recruiters were paid for recruiting

22   Medicare beneficiaries to Ezcor?

23   A     Yeah.  It was my understanding that they did.

24   Q     How do you know that the patient recruiters were paid?

25   A     They would come in the office sometimes, and sometimes
```

1    when I was alone in the office, they would say, "Oh, did Sylvia

2    leave you any money," for such and such patient?  They would

3    come asking for money, I guess if they hadn't gotten paid, I

4    would say, for certain -- or ask me if we had already billed

5    for a certain patient or certain beneficiary to get their cut,

6    or pay.

7    Q    Who would pay the Ez- -- who would pay the patient

8    recruiters for Ezcor?

9    A    Sylvia Walter-Eze.

10   Q    And when Sylvia wasn't there, were there other times that

11   they were paid?

12   A    Yeah.  Sometimes a check would be left behind, and then I

13   was just told, just hand them that check that was left behind

14   in the front desk or in her desk.

15   Q    Okay.  Let's talk a little bit about -- I think you

16   mentioned about verifying Medicare eligibility, checking or

17   verifying Medicare eligibility of some of these patients.  What

18   exactly did you mean by that?

19   A    That we just call basically like a Medicare office, or,

20   you know, it's a phone line or online.  And you check if they

21   have Medicare and if they have what's called "same or similar,"

22   if they've had a power wheelchair within the last five years or

23   so.  And if they have, then obviously they couldn't get another

24   one.  So that's what we check:  If they're eligible and then if

25   they have a same or similar item billed within the last five

1    years.

2    Q    And once you verify if a Medicare beneficiary was eligible

3    to receive a power wheelchair, what would you do next?

4    A    I would turn in the paperwork to Sylvia or, if not, start

5    doing delivery documents for the -- for the patients.

6    Q    Now, during the four years that you worked at Ezcor, how

7    did Ezcor get the majority of its customers?

8    A    Through field representatives.

9    Q    Were there many walk-in sales at all that you observed

10   during the time that you worked at the store?

11   A    Not very many, no.

12   Q    Now, during the times that you worked inside the store,

13   did you ever see any of the patient recruiters come into Ezcor

14   with any of the Medicare beneficiaries?

15   A    Yes.

16   Q    And what did you observe in those instances?

17   A    They would come walk in with them, and basically we had

18   like a showroom.  So they would show them, you know, the power

19   wheelchair or the knee braces or back braces or canes -- you

20   know, any of the medical equipment we had.

21   Q    And who were these Medicare beneficiaries brought in with,

22   or by?

23   A    By the field representatives.

24   Q    How did they get around?  These Medicare beneficiaries,

25   when you saw them come into the store, how did -- were they

```
1   getting around?
2   A    Some would, you know, walk in.  Or some would, you know,
3   walk with the assistance of a cane or a walker.  But most of
4   the time they would walk in, walk around.
5   Q    Okay.  So they were walking sometimes with a cane or a
6   walker?
7   A    Uh-huh.
8   Q    Now, on some of the times when you would see the patient
9   recruiter bring in a Medicare beneficiary into Ezcor, show them
10  a power wheelchair and so forth, was the defendant present
11  there at Ezcor?
12  A    Yes.
13  Q    Did you observe whether or not the defendant had any
14  interactions with the patient recruiter and the Medicare
15  beneficiary?
16  A    Yes.
17  Q    And, now, during these times what would you observe?
18  A    That they were showing them and basically tell them, oh,
19  look, you can have this, you can also have this, showing them
20  different products that we have that they can -- they can get
21  that Medicare would pay for, you know, that they can have all
22  these items.
23  Q    And was the defendant sometimes involved in these
24  interactions?
25  A    Yes.
```

**UNITED STATES DISTRICT COURT**

1   Q    And what, if anything, do you recall happening once the

2   Medicare beneficiary left with the patient recruiter?

3   A    Some time later, maybe the same day or the next day, we

4   would get a prescription for those patients that had been in

5   previously for a power wheelchair or knee braces or other

6   equipment.

7   Q    And how would you get those prescriptions coming in to

8   Ezcor?

9   A    They would be faxed in sometimes or brought in by the

10  field representatives.

11  Q    And when they would be faxed in to Ezcor, do you know who

12  they would be generally faxed in from?

13  A    Just different doctors' offices.

14  Q    And do you remember the names of some of these doctors

15  that would fax their prescriptions in to Ezcor?

16  A    I know there was a Dr. Kelly, Dr. Okoye, Obasi -- there

17  was a Dr. Obasi in there somewhere -- may have been a couple

18  other ones that I don't necessarily remember off the top of my

19  head.

20  Q    Just generally, to your knowledge, at Ezcor as far as the

21  prescriptions for the power wheelchairs or other DME, just

22  generally how did Ezcor get the prescriptions?

23  A    Like I said, sometimes they were brought in by the -- by

24  the sales rep or the field reps, and sometimes they were faxed

25  in.  Or a couple of times they were picked up from doctors'

```
 1   offices or clinics or whatever they were.
 2   Q    And who would pick up -- when they would be picked up, who
 3   would pick up those prescriptions from the doctors?
 4   A    There was probably once or twice that I -- that I drove
 5   Sylvia to a clinic or a doctor's office.  And, you know, we'd
 6   come back with prescriptions or paperwork.
 7   Q    And were -- what were some of these doctors that you
 8   recall driving the defendant to go pick up the prescriptions?
 9   A    I didn't -- I didn't see them because I usually didn't get
10   out of the car.  I would stay in the car or in the waiting
11   room.  I don't know if it was a Dr. Obasi or something, or
12   somewhere in L.A.
13               MS. NKELE:  Objection.
14               THE COURT:  Sustained.  Speculation.
15   Q    BY MS. QUINTERO:  Okay.  When you say that, the defendant
16   would pick up prescriptions when you would drive her?
17   A    Yes.
18   Q    And when she would pick up the prescriptions, did you get
19   out of the car?
20   A    No.  Usually did not.
21   Q    Okay.  And then, when she returned to the car, what
22   paperwork did she have with her?
23   A    You know, just be an envelope with the -- with some
24   paperwork.  And when we got back to the office, I was told,
25   "Hey, look, we got all these new prescriptions.  Start doing
```

**UNITED STATES DISTRICT COURT**

```
 1    paperwork or checking same or similar for these items."
 2    Q    So among the paperwork was prescriptions?
 3    A    Yeah.  Prescriptions and --
 4    Q    Okay.  Let's talk about paperwork.  When you would deliver
 5    the power wheelchairs, you would have some paperwork with
 6    you --
 7    A    Yes.
 8    Q    -- is that right?
 9    A    That's correct.
10    Q    What type of paperwork generally are we talking about?
11    A    I had a delivery sheet with a -- with a list of all the
12    items being delivered, you know, warranty information, and the
13    company information, Medicare information, home assessment and
14    evaluation sheets.  It was several sheets like that that I had
15    to get signed and give copies to the beneficiaries.
16    Q    Let's look at some of that paperwork.  If we can look at
17    Government Exhibit 29 that's been admitted into evidence
18    already, if you look at page 14.
19              THE COURT:  Should be on the screen.
20              THE WITNESS:  Oh, okay.
21    Q    BY MS. QUINTERO:  Is this some of the paperwork that you
22    would have with you when you would deliver power wheelchairs --
23    A    Yes.
24    Q    -- to beneficiaries for Ezcor?
25    A    Yeah.
```

1    Q    Okay.  Let's look at -- what exactly is it that we're

2    looking at on page 14?

3    A    That was a cover letter.  That was just the first page

4    of -- of the delivery documents that I would take.

5    Q    Okay.  And what about page 15, Government Exhibit 29?

6    A    That was the list I'm talking about.  That's the list of

7    items they would receive, and in this case it looks like it was

8    just one item for a power wheelchair.  Yeah.

9    Q    Okay.  And let's look at page -- Government Exhibit 29.

10   What do we have here?

11   A    That was a -- a sheet called the -- the home assessment,

12   home evaluation.

13   Q    Okay.  Just looking at page 19 here of Government

14   Exhibit 29, do you recognize the writing on that home

15   assessment form?

16   A    Yes.

17   Q    Whose writing is that?

18   A    That's mine.

19   Q    Okay.  And do you see down below where it says "assessed

20   by"?  Whose writing is that?

21   A    That's mine.

22   Q    Is that also your signature down below?

23   A    Yes.

24   Q    Now, I want to go through this home assessment in a little

25   detail, but first let me ask you, were you ever given any

```
 1   instructions by anyone on how to fill out this home assessment
 2   form?
 3   A    Yeah.  I was instructed on how to fill it out by the
 4   defendant, Sylvia.
 5   Q    Okay.  The defendant?
 6   A    Uh-huh, yes.
 7   Q    Okay.  And let's go through it.
 8   A    Okay.
 9   Q    At the very top, what do we have at the very, very top?
10   A    That -- oh, the very top up there, the patient's
11   information.
12   Q    Okay.  And let's go to paragraph 4 and 5.
13   A    Okay.
14   Q    What information are we seeing there?
15   A    4 and 5 is just the item that they -- that they were
16   receiving, the HCPCS code which was the code for, in this case,
17   the power wheelchair, which was K0823, which is the Medicare
18   code for the power wheelchair, and just information about the
19   chair itself.
20   Q    And, now, paragraph 6, do you see that?
21   A    Yes.
22   Q    Can you read that?
23   A    Yeah.  "Does the patient's home provide adequate access
24   between rooms, maneuvering space, and surface for the placement
25   of a POV"?
```

```
 1   Q     Okay.  What's a POV?

 2   A     Power operated vehicle, which was in most cases a scooter.

 3   Q     And those scooters, those are intended primarily for

 4   outdoor use; is that right?

 5   A     Yeah.

 6   Q     So it's different than a power wheelchair?

 7   A     Yes.

 8   Q     Now, what, if any, instructions did you receive from the

 9   defendant about completing this section of this home assessment

10   form?

11   A     That I had to just check in -- check off "no" on No. 6 and

12   "yes" on No. 7.

13   Q     Okay.  So you were told always check off "no" on No. 6 and

14   "yes" on No. 7?

15   A     Yes.

16   Q     And who gave you these instructions?

17   A     Sylvia.

18   Q     When the gate -- the defendant instructed you on how to

19   complete this form, did she ever instruct you or tell you

20   anything to actually assess whether the home provided adequate

21   access between rooms, maneuvering space, and surface for the

22   placement of a POV?

23   A     Oh, no.

24   Q     Okay.  Let's look at No. 7.

25   A     Okay.
```

1   Q    Were you given any instructions by the defendant as to

2   what to indicate there on No. 7?

3   A    Yeah.  I was to check "yes" for delivery of power

4   wheelchair.

5   Q    Were you ever given any instructions by the defendant to

6   actually assess whether the home provided adequate access

7   between rooms, maneuvering space, and surface for the placement

8   of a power wheelchair?

9   A    No.

10  Q    Now, over the years that you delivered power wheelchairs

11  for Ezcor, did you ever go inside the Medicare beneficiary's

12  home and do a walk-through of the house to determine whether or

13  not there was adequate access between rooms, maneuvering space,

14  and surface for the placement of a power wheelchair?

15  A    No.

16  Q    Did the defendant ever give you any instructions one way

17  or the other about that?

18  A    No.

19  Q    What did she tell you about that, if anything?

20  A    Just to check off this list and deliver the power

21  wheelchair.

22  Q    Okay.  Now, let's look at paragraph 8.  Home measurements,

23  do you see that?

24  A    Yes.

25  Q    What about there?  Did you receive any instructions from

1   the defendant about what to indicate on paragraph 8?

2   A     Yeah.  I was just to put an "OK" or checkmarks, as in to

3   just acknowledge that it was okay.

4   Q     Did she ever instruct you to put any measurements on

5   there?

6   A     No.

7   Q     In all the years that you worked at Ezcor, did you ever

8   take any measurements of the homes that you were delivering

9   power wheelchairs to?

10  A     No.

11  Q     Now, if we can go up and highlight and zoom in on it,

12  paragraph 2, do you see that?

13  A     Yes.

14  Q     Can you read that paragraph?

15  A     Prior or at the time of delivery of a PMD, Ezcor performs

16  an on-site -- as on-site evaluation of the patient's home to

17  verify that the patient can adequately maneuver the device that

18  is provided, considering physical layout, doorway width,

19  doorway thresholds, et cetera.

20  Q     Okay.  Now in the four years that you delivered power

21  wheelchairs for Ezcor, did you ever do an on-site evaluation of

22  the Medicare beneficiary's home prior to the delivery of a

23  power wheelchair?

24  A     No.

25  Q     To your knowledge, did the defendant or anyone at Ezcor

```
 1    ever do an on-site evaluation of a Medicare beneficiary's home
 2    prior to you delivering a power wheelchair to that beneficiary?
 3    A    No.
 4    Q    Did you ever do an on-site evaluation of a Medicare
 5    beneficiary's home even at the time of delivering the power
 6    wheelchair?
 7    A    No.
 8    Q    So to your knowledge, is this statement on paragraph 2 a
 9    truthful statement?
10    A    No.
11    Q    Okay.  Now, let's look down below where you have your
12    signature.  Do you see that on paragraph 9, where it says
13    "supplier" --
14    A    Yes.
15    Q    -- "attestation"?
16    A    Yes.
17    Q    Can you read where it says, "I have completed."
18    A    I have completed an assessments of the patient's home, and
19    based upon this information, the patient's home will
20    accommodate the following equipment: PWC.
21    Q    And you have your name there and your signature down
22    below; right?
23    A    That's mine, yes.
24    Q    Is that an accurate statement, Mr. Aguilar?
25    A    No.
```

```
 1   Q     Okay.  Now, in fact, did you ever complete an assessment
 2   of a patient's home when delivering a power wheelchair?
 3   A     No.
 4   Q     If it's not an adequate statement, why did you sign off on
 5   this document?
 6   A     It needed to be signed to turn it in.
 7   Q     And who instructed you that it needed to be signed in
 8   order to turn it in?
 9   A     My boss, Sylvia Walter-Eze.
10   Q     Okay.  Now, let's look at another document.  These
11   documents -- this document we're looking at is Ms. Maria
12   Garibay's patient file, page 10.  Can you explain to the jury
13   what page 10 is.
14   A     This is the paperwork we would print from Medicare
15   eligibility for a patient.
16   Q     That's -- this is what you were talking about when you
17   would verify the patient's Medicare eligibility?
18   A     Yes.
19   Q     Now, if you look at the very top right-hand corner, do you
20   see that, the handwritten name on there?
21   A     Yes.
22   Q     And whose writing is that?
23   A     That's mine.  Yeah.  Looks like it's mine.
24   Q     Okay.  And what does that say there?
25   A     Wilmer.
```

```
1   Q     And what does that refer to?
2   A     As in Wilmer is the -- the recruiter or the field
3   representative that brought this particular patient.
4   Q     Okay.  And what was the purpose of you writing Wilmer's
5   name on this Medicare eligibility form of Maria Garibay?
6   A     We would do this to -- just so we have a record of who
7   brought this patient in, who brought this beneficiary.
8   Q     Okay.  And is that something that was typically done
9   during the time that you worked at Ezcor, in other words,
10  writing the name of the patient recruiter on these Medicare
11  eligibility forms?
12  A     Yes.
13  Q     And did anyone give you any instructions to write the
14  patient recruiter's name on that eligibility verification form?
15  A     Yeah.  I was asked to -- to put their name of -- of the
16  people that -- I would do it, or if not, it would already be on
17  there, and somebody else did the check.
18  Q     Who gave you that instruction to do that?
19  A     Sylvia.
20  Q     Sylvia Walter-Eze, the defendant?
21  A     Yes.
22  Q     Based on your four years working at Ezcor, would you
23  expect to see notations of the names of the patient recruiters
24  throughout patient files at Ezcor on the Medicare eligibility
25  sheet just like we saw?
```

**UNITED STATES DISTRICT COURT**

1    A    Yes.

2    Q    Here?

3    A    Yes, yeah.

4    Q    And let's look at a couple more.  Government Exhibit 26,

5    from patient file Vilma Cruz Munar, page 15.  Pretty much the

6    same thing here?

7    A    Yeah, same thing.

8    Q    Medicare eligibility form?

9    A    Yeah.

10   Q    Whose name do you see there?

11   A    Judy.

12   Q    Is that Judy, the patient recruiter you mentioned earlier?

13   A    Yeah.

14   Q    Let's look at another one.  Government Exhibit 27 for

15   Nazario Gutierrez, substantive count bene, page 10.

16   A    That's -- this is another form.  This is --

17             THE REPORTER:  Your Honor, I need him to start over.

18   Q    BY MS. QUINTERO:  If you can slow down a little bit, I

19   know I have a bad habit as well, talking a little bit fast,

20   Mr. Aguilar.

21   A    This is the paperwork we would print from the Medicare

22   Web site for same and similar and Medicare information on the

23   beneficiaries.

24   Q    And on the top right-hand corner we see the name Wilmer?

25   A    Yes.

```
 1   Q    Same thing, the patient recruiter that recruited this
 2   beneficiary?
 3   A    Yes.
 4   Q    And the last patient file, Government Exhibit 28 for
 5   substantive count Mary Winston, page 18, another Medicare --
 6   A    Yeah, yeah.  Another -- this is the other paperwork for
 7   Medicare eligibility.
 8   Q    And we see the name Wilmer on the top right-hand corner?
 9   A    Yes.
10   Q    And do you see the name underneath Wilmer?  What is that?
11   A    Azinge.
12   Q    Who is Azinge?
13   A    It was one of the doctors.
14   Q    Okay.  One of the doctors that would fax in the
15   prescriptions?
16   A    Yes.
17   Q    Okay.  Now, if you can take a look at Government
18   Exhibit 28, page 26.
19        THE COURT:  Ladies and gentlemen, we will take a look at
20   that tomorrow morning.  It's four o'clock.  Remember the
21   admonishment not to discuss the case among yourselves or with
22   anybody else or form or express any opinions about the matter
23   until it's submitted to you and you retire to the jury room.
24        Tomorrow morning you'll come in at -- let's see if anybody
25   can figure it out.
```

```
 1                    THE JURY:  8:15.
 2               THE COURT:  We'll see you at 8:15.  Have a pleasant
 3     evening.  When you leave, leave quietly because I'm going to be
 4     talking to the attorneys a little bit.
 5               THE CLERK:  All rise.
 6                    (Jury out at 4:00 P.M.)
 7                    (The following proceedings were held out of the
 8                    presence of the jury:)
 9               THE COURT:  Okay.  You can have seats.  The jury
10     is -- the record will reflect the jury is not in the courtroom
11     anymore.  I was asked if I can talk to you.
12          Was there some question somebody had?
13               MR. DARDEN:  I think the issue was they wanted to
14     know if we were going to call any additional witnesses.
15               THE COURT:  Okay.
16               MR. PORTER:  Depending on the timing tomorrow,
17     Your Honor, we may be able to finish our case in chief
18     tomorrow.  And we wanted to make sure we got a complete witness
19     list from the defense.  So far we have received the name of one
20     potential witness.  If there are others, we would like to know
21     about that.
22               THE COURT:  I forgot to mention to the jury when
23     they left, tomorrow we're going to have to complete at
24     three o'clock rather than four o'clock.  So I just want to put
25     everybody on notice on that.
```

**UNITED STATES DISTRICT COURT**

1       You didn't happen to talk to the jury about tomorrow, did

2  you?

3            THE CLERK:  No.

4            THE COURT:  They're breaking at 3:00.  Okay.

5       Anything else?  If not, we'll see you back here tomorrow

6  morning at 8:15.

7       Do keep in mind that observations -- we're starting to

8  lose the jury now.  They're starting to look up at the -- you

9  can just tell when you're losing the jury because it is very,

10 very repetitive.

11      And the questions that are asked are things like, did you

12 do something in the morning?  Did you do it in the afternoon?

13 Did you do it in the evening?  Did you do it the next day?  Did

14 anybody else do it in the morning, the afternoon?  You can just

15 ask one question, did anybody ever do something?  And it's

16 really dragging out the trial, having them re-read where a

17 document speaks for itself.

18      As of now, if we finish this tomorrow, I'm not going to

19 get into it.  But if it starts dragging so it looks like it's

20 going to go out for a long period of time, for the Jury's sake,

21 I'm going to say let's speed it up, et cetera.

22      Sometimes when you try the case, you don't have time to

23 look at the jury over there.  I can tell you we're starting to

24 lose the jury a little bit.

25      Have a pleasant evening.

```
 1              MR. PORTER:  Your Honor, can we just get a deadline
 2   for the defense witness list, or is there -- is there any
 3   deadline for the defendants to provide us --
 4              THE COURT:  It should be the day before they start
 5   their case.
 6              MR. PORTER:  Okay.
 7              THE COURT:  If they're going to be -- if you're
 8   going to be finishing tomorrow, it should be by tomorrow
 9   morning.
10              MR. PORTER:  Great.  Thank you, Your Honor.
11              THE COURT:  I'm assuming you may or may not finish
12   tomorrow.  You don't know.
13              MR. PORTER:  Hopefully.  If we stop by three --
14              THE COURT:  Let me ask, how many more witnesses do
15   you have?  Because you have a lot in your -- on your list here.
16              MR. PORTER:  I believe there are nine witnesses
17   after the current witness, but a lot of them are very short
18   testimony, maybe 10, 15 minutes.
19              THE COURT:  Based on what I've seen so far, that's
20   an oxymoron.  Maybe you can do it.  We'll see.  Okay.  Okay.
21   Then, if you could -- as of tomorrow, if it goes more than
22   tomorrow, they may have to bring in other witnesses depending
23   on what your witnesses testify tomorrow.
24         As of tomorrow, you've indicated one witness so far?
25              MR. DARDEN:  Yeah.  We've indicated one witness so
```

**UNITED STATES DISTRICT COURT**

```
1   far.
2            THE COURT:  Okay.
3            MR. DARDEN:  And I don't know if the defendant is
4   going to testify, but so far we only gave one witness.
5            THE COURT:  Anybody that wants to wear green
6   tomorrow can do it.
7            THE CLERK:  All rise.
8               (Matter adjourned at 4:04 P.M.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1          CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5          I, KHOWOONSUN CHONG, FEDERAL OFFICIAL REALTIME

6   COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

7   THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

8   PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

9   FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10  STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11  ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

12  CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

13  THE UNITED STATES.

14

15          DATED THIS 26TH DAY OF MAY, 2015.

16

17

18          /S/ KHOWOONSUN CHONG
                _____
19          KHOWOONSUN CHONG, CSR NO. 12907, CRR
            FEDERAL OFFICIAL COURT REPORTER
20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**