1          UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3       HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

4

5   UNITED STATES OF AMERICA,            )
                                         )
6                   PLAINTIFF,           ) CASE NO.
                                         ) CR 14-259-RGK-1
7          VS.                           )
                                         )
8   SYLVIA OGBENYEANU WALTER-EZE,        )
                                         )
9                   DEFENDANT.           )
   _____)

10

11

12

13

14              REPORTER'S TRANSCRIPT OF
                 JURY TRIAL - DAY 5
15            TUESDAY, MARCH 17, 2015
                     8:31 A.M.
16            LOS ANGELES, CALIFORNIA

17

18

19

20

21

22   _____

23        KHOWOONSUN CHONG, CSR 12907, CRR, RMR
              FEDERAL OFFICIAL COURT REPORTER
24          255 EAST TEMPLE STREET, ROOM 181-G
              LOS ANGELES, CALIFORNIA 90012
25               kchong12907@yahoo.com


              UNITED STATES DISTRICT COURT

 1                    **APPEARANCES OF COUNSEL:**

 2

 3   **FOR THE PLAINTIFF:**

 4       UNITED STATES DEPARTMENT OF JUSTICE
         CRIMINAL DIVISION - FRAUD SECTION
 5       BY:  BLANCA QUINTERO
              ALEXANDER PORTER
 6       Assistants United States Attorney
         4811 Airport Plaza Drive, Fifth Floor
 7       Long Beach, California 90815

 8

 9   **FOR THE DEFENDANT:**

10       LAW OFFICES OF CHRISTOPHER A. DARDEN
         BY:  OMA N. NKELE
11            CHRISTOPHER DARDEN
         ATTORNEYS AT LAW
12       11500 West Olympic Boulevard
         Suite 400
13       Los Angeles, California 90064

14

15   ALSO PRESENT:

16       JULIE DRUCKER, SPANISH INTERPRETER

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1          **I N D E X**

2          **Tuesday, March 17, 2015**

3          ---------------------------------------------------------

4          <u>**CHRONOLOGICAL INDEX OF WITNESSES**</u>

5    WITNESSES                                               PAGE

6    MARIANO MENDOZA
          DIRECT EXAMINATION BY MR. PORTER              501
7         CROSS-EXAMINATION BY MR. DARDEN               507
          REDIRECT EXAMINATION BY MR. PORTER            513
8
     ELDER AGUILAR
9         DIRECT EXAMINATION (RESUMED) BY MS. QUINTERO  514
          CROSS-EXAMINATION BY MS. NKELE                517
10
     JAVIER EDGAR CALDERON
11        DIRECT EXAMINATION BY MS. QUINTERO            542
          CROSS-EXAMINATION BY MR. DARDEN               549
12
     MARY WINSTON
13        DIRECT EXAMINATION BY MR. PORTER              553
          CROSS-EXAMINATION BY MR. DARDEN               557
14        REDIRECT EXAMINATION BY MR. PORTER            563

15   KIET TRAN
          DIRECT EXAMINATION BY MR. PORTER              565
16        CROSS-EXAMINATION BY MR. DARDEN               569

17   VILMA CRUZ MUNAR
          DIRECT EXAMINATION BY MR. PORTER              574
18
     SUSAN LIM
19        DIRECT EXAMINATION BY MR. PORTER              579
          CROSS-EXAMINATION BY MR. DARDEN               584
20
     MARIA GARIBAY
21        DIRECT EXAMINATION BY MS. QUINTERO            587
          CROSS-EXAMINATION BY MR. DARDEN               593
22
     LELYS CAMPOS
23        DIRECT EXAMINATION BY MS. QUINTERO            596
          CROSS-EXAMINATION BY MR. DARDEN               602
24        REDIRECT EXAMINATION BY MS. QUINTERO          603

25

1    **WITNESSES (CONT'D)**

2

3    ERIC FROESCHNER
         DIRECT EXAMINATION BY MR. PORTER              604
4        CROSS-EXAMINATION BY MR. DARDEN               653
         REDIRECT EXAMINATION BY MR. PORTER            672
5        RECROSS-EXAMINATION BY MR. DARDEN             679

6

7    SYLVIA OGBENYEANU WALTER-EZE
         DIRECT EXAMINATION BY MS. NKELE               688

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **<u>INDEX OF EXHIBITS</u>**

2               <u>MARKED FOR IDENTIFICATION</u>

3                        (NONE)

4

5

6               <u>RECEIVED INTO EVIDENCE</u>

7    14                                          645

8    46 through 51                              607

9    52 and 53                                  633

10   54                                          638

11   57                                          642

12   58 through 67                              646

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

```
 1              LOS ANGELES, CALIFORNIA; TUESDAY, MARCH 17, 2015

 2                            8:31 A.M.

 3                             -oOo-

 4

 5              (Jury in at 8:31 A.M.)

 6              (The following proceedings were held in the

 7              presence of the jury:)

 8              (Call to order.)

 9         THE COURT:  The record will reflect that all the

10   members of the jury are in their respective seats in the jury

11   box, including the alternates.

12         Happy Saint Patrick's day, I guess.  I'm glad you're all

13   sober, starting out the day, anyway.

14         We did have some questions.  The clerk was asked about

15   what the status of the case is as far as what is going to --

16   you know, when it's going to terminate.  It was reported to me

17   yesterday that the Government is going to try to finish today,

18   maybe early tomorrow, but going to try today.

19         And then the defense puts their case on; so I would say no

20   sooner than tomorrow, maybe Thursday.

21         Is that right?  What's tomorrow?  Tomorrow is Wednesday.

22   Yeah, maybe Thursday.  We'll let you know as we go through the

23   case.  As we get closer and get more information, we'll keep

24   you informed.  Okay?

25         Counsel.
```

1        MR. PORTER:  Yes, Your Honor.  The witness from

2   yesterday afternoon is stuck in traffic.  So we're going to be

3   calling Mr. Mariano Mendoza at this time.

4        THE COURT:  Okay.  Out of order?

5        MR. PORTER:  Yes, Your Honor.

6        THE COURT:  Why don't you go ahead and call that

7   witness.

8        And by the way, ladies and gentlemen, I told you at the

9   beginning of the case -- and I didn't tell you yesterday, I

10  probably should have.  Tuesday, which is today, we're probably

11  going to have to terminate the case -- excuse me.  We're

12  probably going to have to stop the case at three o'clock this

13  afternoon because we're going to have to be dark from 3:00 to

14  4:00.  So we will be ending today at three o'clock.  Okay?  Not

15  the case will be ending, we'll be ending at three o'clock.

16                          MARIANO MENDOZA,

17  called as a witness by the Government, was sworn and testified

18  as follows:

19        THE CLERK:  Mr. Mendoza, I need to go ahead and

20  place you under oath.  Would you please raise your right hand.

21  Do you solemnly swear that the testimony you are about to give

22  in the matter now before the Court shall be the truth, the

23  whole truth, and nothing but the truth so help you God?

24        Speak into the microphone, please.

25        THE WITNESS:  Thank you, ma'am.  I swear.

1          THE COURT:  If you can speak into the microphone so
2    we can hear you, sir.
3          THE WITNESS:  Is this close enough?
4          THE COURT:  Can you state your name and spell your
5    last name, sir.
6          THE WITNESS:  Mendoza, M-e-n-d-o-z-a.
7          THE COURT:  Thank you very much.
8       Counsel, you may inquire.
9                    DIRECT EXAMINATION
10   BY MR. PORTER:
11   Q    Mr. Mendoza, where do you currently live?
12   A    Say again, please.
13   Q    I don't need the address.  What city do you currently live
14   in?
15   A    I live in Anaheim, sir.
16   Q    How long have you lived in Anaheim?
17   A    Two years and three months.
18   Q    And before Anaheim where did you live?
19   A    I live in Santa Clara, California.
20   Q    Santa Clara, up in Northern California?
21   A    Yes, sir.
22   Q    How long did you live up in Santa Clara?
23   A    Two and a half.
24   Q    Okay.  And before Santa Clara, where did you live?  Did
25   you live here in the L.A. area?

```
 1   A      Yes, sir.
 2   Q      Okay.  So, Mr. Mendoza, I want to ask you a few questions
 3   about a power wheelchair that you received in April of 2010,
 4   but before I do that, I notice today coming in that you had
 5   some assistance getting up to the witness stand.
 6          Do you have some impaired vision?
 7   A      Yes, sir.  Very well.
 8   Q      Okay.  In fact, are you -- are you legally blind?
 9   A      Yes, sir.
10   Q      And how long have you had trouble with your eyesight?
11   A      Since 2009 or -8.  I can't really recall exactly the year.
12   But -9, I think.
13   Q      But with your vision problems, can you see me standing
14   here at the lectern?
15   A      No.
16   Q      It's okay.
17               THE COURT:  That's okay.
18               THE WITNESS:  I can hear your voice, but I cannot
19   see.  All blurry.
20   Q      BY MR. PORTER:  That's fine.  Just do your best answering
21   the questions that I have here today.
22          Now, getting back to the power wheelchair, with that power
23   wheelchair, do you remember dealing with a woman named Judy?
24               MR. DARDEN:  Objection.  Leading.
25               THE COURT:  Overruled.
```

**UNITED STATES DISTRICT COURT**

```
1              Do you remember dealing with a lady named Judy?
2                   THE WITNESS:  Yes.
3                   THE COURT:  Okay.
4    Q    BY MR. PORTER:  And how did you meet Judy?
5    A    Oh, God.  I cannot really recollect.  From -- from my --
6    from a relative of mine.
7    Q    Okay.  And did you contact Judy to ask her for a
8    wheelchair?
9    A    No.
10   Q    Okay.  Did you talk to Judy ever about a wheelchair?
11   A    She talked to me about it, not -- I did not talk to her.
12   Q    Okay.  And when you spoke to her, did you talk to her
13   about a manual wheelchair or a power wheelchair with an
14   electric motor?
15   A    I -- I did not tell her exactly.  Just wheelchair.  I'm
16   assuming it's only a hand wheelchair.
17   Q    Okay.  So you talked to her about a wheelchair.  In your
18   assumption, it was a regular wheelchair?
19   A    Yes.  I'm assuming only regular.  I did not expecting
20   motorize.
21   Q    Okay.  So after you talked to Judy about a wheelchair, did
22   you then see a doctor?
23   A    Yes, I see a doctor.
24   Q    Did you go to the doctor's office, or did the doctor come
25   to your house?
```

1    A      She came to my house, sir.

2    Q      Do you remember the name of that doctor?

3    A      No, I cannot recollect her name.

4    Q      Was the doctor male or female?

5    A      Female doctor.

6    Q      And when you spoke to that doctor, did you talk to the

7    doctor about receiving a regular wheelchair or a power

8    wheelchair?

9    A      I did not exactly emphasize a "handful," but I'm assuming

10   just wheelchair.

11   Q      Okay.  After you saw that doctor, was a power wheelchair

12   then delivered to your house?

13   A      Yes, sir.

14   Q      And were you living in the L.A. area at that time?

15   A      Yes, sir.

16   Q      And after that power wheelchair was delivered, did you

17   ever use that power wheelchair?

18   A      Oh, no, sir.  I didn't know how to operate.

19   Q      Okay.  Why didn't you ever use the power wheelchair?

20   A      Because I am not really intending to use a motorized.  I

21   might kill somebody or kill myself.  I don't even know how to

22   drive now at that time.

23   Q      Okay.  And again were you expecting to receive a regular

24   wheelchair or a power wheelchair?

25   A      A regular only.

```
 1   Q     Did you even want a power wheelchair?
 2   A     No.
 3   Q     And did you tell Judy at the time about your vision
 4   problems?
 5   A     Yes.  She knows I have a real visual problem.
 6   Q     And did you tell the doctor at the time about your vision
 7   problems?
 8   A     Yes.
 9   Q     So is it fair to say that you were surprised when the
10   power wheelchair showed up at your house?
11   A     Yes, sir.
12   Q     And did you feel that it would be safe for you to use the
13   power wheelchair?
14   A     No.  It's not safe for me because I don't even know how to
15   drive.  I cannot even -- my -- I cannot see very well.  That's
16   why I did not even know how to use it.
17   Q     So after you received the power wheelchair, where did you
18   put it?  What did you do with it?
19   A     I put it in the garage.
20   Q     And then sometime later, did you move up to Northern
21   California, up to Santa Clara?
22   A     Yes, sir.  But I did not -- because the -- before we move,
23   the wheelchair was gone.
24   Q     It was gone.  Do you know what happened to it?
25   A     Probably somebody took it or -- yeah, from my garage
```

```
 1    because my garage is open.
 2    Q    Now, at the time you received the power wheelchair in
 3    2010, were you able to walk?
 4    A    Yes.  I'm able to walk.  I can walk.
 5    Q    And back in 2010 could you walk around inside of your
 6    house?
 7    A    Oh, yes, sir, I do.
 8    Q    And could you also walk outside of the house?
 9    A    Yes, sir.
10    Q    And currently to this day, are you still able to walk?
11    A    Yes, sir.
12    Q    And even though you have vision problems -- you're legally
13    blind -- are you able to walk outside of your house?
14    A    Yes, sir.
15    Q    Now, where you live in Anaheim, are there any restaurants
16    near your house that you go to?
17    A    Yes.  Just a block away from my residence, one street
18    across the street.
19    Q    What restaurant is that?
20    A    Del Taco and McDonald.
21    Q    And you walk to those restaurants?
22    A    Yes, sir.
23    Q    How often do you go to those restaurants?
24    A    Maybe once a week or twice a week.
25    Q    And, Mr. Mendoza, do you also receive dialysis treatments?
```

```
 1   A      Oh, I'm receiving Monday, Wednesday, Friday.  Yes, sir.

 2   Q      And so for dialysis, do you have to go somewhere to

 3   receive those dialysis treatments?

 4   A      My insurance covers my transportation.

 5   Q      Okay.  How do you typically get to the dialysis center?

 6   A      I took the regular bus because it's close by the stop

 7   there, and then in -- in going.  And then in coming home, my

 8   insurance coverage take me home.

 9   Q      You take the public bus to the dialysis center?

10   A      Yes, sir.  Because it's only one way.

11              MR. PORTER:  No further questions, Your Honor.

12              THE COURT:  Cross-examination.

13                        CROSS-EXAMINATION

14   BY MR. DARDEN:

15   Q      Good morning, Mr. Mendoza.

16   A      Good morning, sir.

17   Q      Now, Mr. Mendoza, you are a registered nurse; is that

18   correct?

19   A      Yes, sir.

20   Q      You're a licensed RN?

21   A      Yes, sir.

22   Q      And you were working at Cedars-Sinai Hospital up until

23   2009 when your vision became impaired; is that right?

24   A      Yes, sir.

25   Q      And the cause of your visual impairment, is that diabetes?
```

```
 1   A     Yes, sir.
 2   Q     Now, you told us that your relative referred you to Judy;
 3   is that right?
 4   A     Yes, sir.
 5   Q     And this relative, was it your aunt?
 6   A     Yes, my aunt.
 7   Q     Is your aunt also an RN or a nurse?
 8   A     No.
 9   Q     Is it true your aunt said to you one day that you needed a
10   wheelchair and she would introduce you to Judy?
11   A     Uh-huh.
12   Q     Is that what happened?
13   A     Yes, sir.
14   Q     And your aunt told you you needed a wheelchair.  You
15   agreed that you needed one; true?
16   A     Uh-huh.
17   Q     You have to answer "yes" or "no."
18   A     Yes, sir.  Yes, sir.  I'm sorry, sir.
19   Q     But what you wanted was you wanted a -- a manual
20   wheelchair; is that right?
21   A     She did not specify.  Just "wheelchair," so I'm assuming
22   it's only hand wheelchair.
23   Q     So when you talked to your aunt, there was no discussion
24   about a power wheelchair versus a manual wheelchair, but in
25   your mind, you wanted a manual wheelchair; is that true?
```

**UNITED STATES DISTRICT COURT**

```
 1   A    That's true, sir.

 2   Q    And given your experience and -- and having been an RN,

 3   you felt that you needed it medically; is that true?

 4   A    Yes.

 5   Q    Now, at some point you saw a doctor -- you had a doctor's

 6   visit; is that right?

 7   A    Say again, please.

 8   Q    This doctor, you saw the doctor?

 9   A    Yes, sir.

10   Q    Did you go to the doctor's office, or did the doctor come

11   to you?

12   A    She came to me.

13   Q    Was the doctor a male or a female?

14   A    Female, sir.

15   Q    Now, do you recall that the doctor came to see you on

16   March 8, 2010?  Was that about the date, March 8, 2010?

17   A    I cannot recall the date, exact date, sir.

18   Q    Do you recall that it was sometime in 2010?

19   A    Yeah.  Yes, sir.

20   Q    And one of the first things the doctor did was to ask you

21   about your medical history; is that true?

22   A    Yes, sir.

23   Q    And did you tell the doctor at that time that you were a

24   diabetic?

25   A    Yes, sir.
```

1  Q    And did you tell the doctor at that time that you had

2  blisters on both feet?

3  A    I did not say bli- -- or, yeah, at that time I had some

4  problem with my feet because I'm diabetic.

5  Q    Okay.  And was there some discoloration on your feet that

6  had -- that had the appearance of gangrene, let's say?

7  A    No.  I didn't have any gangrene.

8  Q    I mean, because gangrene is a very specific medical term;

9  right?

10  A    Yes.

11  Q    But did you have some type of -- some type of

12  discoloration on your feet at the time, on the skin?

13  A    No.  No, not discoloration.  I just have some blisters,

14  and then it became worse, and then I've been seen by a

15  podiatrist.

16  Q    Okay.  And did you tell the doctor that you had had

17  surgery on both your eyes?

18  A    Yes, I do.  Because I have cataract.

19  Q    Did you tell the doctor you had cataracts in both eyes?

20  A    Yes.

21  Q    And have you suffered from hypertension at all?

22  A    Yes, sir.  I have hypertension also.

23  Q    Did you tell the doctor that you suffered from

24  hypertension?

25  A    I cannot recollect if I mention it to her or not, but she

```
 1   knows I have diabetic and hypertension.
 2   Q    Do you have a stent in your coronary artery?
 3   A    Yes, sir.
 4   Q    And did you have that procedure on or about January 20,
 5   2009?
 6   A    Yes, sir.
 7   Q    And did you tell the doctor about the stent that you had
 8   in your coronary artery?
 9   A    I cannot recall if I mention it to her --
10   Q    Right.
11   A    -- exactly about my stent.
12   Q    And what was the diagnosis of your heart condition, that
13   is, prior to getting the stent?
14   A    Because they said I was having heart failure at that time
15   when I was admitted, and then they did an angiogram.  And then
16   the doctor said, "Oh, I put a stent," but I did not go there
17   for any chest pain at all.
18   Q    And did you -- did you tell the doctor that you saw
19   regarding the wheelchair that you had had an angiogram?
20   A    I did not exactly -- I cannot recollect I mentioned to her
21   I have an angiogram.
22   Q    And did you tell the doctor that, when you went to the
23   hospital and received the angiogram, that you went there with
24   no chest pain?
25   A    As I said, I did not exactly tell her or I mention about
```

**UNITED STATES DISTRICT COURT**

512

```
 1    my angiogram.
 2    Q    If it is contained in a medical record in this case that
 3    you had a stent in your coronary artery placed there in
 4    January 2009 and you were diagnosed with an angiogram prior to
 5    receiving a stent --
 6              MR. PORTER:  Objection.
 7    Q    BY MR. DARDEN:  Do you know, is there any other way of the
 8    doctor knowing this other than you telling him?
 9              THE COURT:  That's an improper question and assuming
10    facts not in evidence.
11         That's not before you, ladies and gentlemen.
12    Q    BY MR. DARDEN:  Now, when the doctor came to see you --
13    or, rather, when you saw the doctor, did you tell the doctor
14    you wanted a wheelchair?
15    A    Yes.
16    Q    Now, as you came into the courtroom, I -- I believe one of
17    the agents here helped escort you into the courtroom; is that
18    correct?
19    A    That's very true, sir.
20    Q    Prior to seeing the doctor in this case, you had a cane;
21    is that true?
22    A    Yes, sir.
23    Q    And prior to seeing the doctor relative to this case, you
24    also had a walker; right?
25    A    Uh-huh.
```

```
 1   Q    Is that "yes"?  Is that "yes"?
 2   A    Yes.
 3   Q    And having used a cane and having used a walker, was it
 4   your belief that you required the assistance -- or that you
 5   needed the assistance of a wheelchair?
 6   A    Yeah, for my balance and steadiness in walking.  So I need
 7   the cane and walker, but I used mostly the cane.
 8             MR. DARDEN:  Thank you very much.
 9             THE COURT:  Anything further of this witness?
10             THE WITNESS:  Thank you, sir.
11             THE COURT:  Wait just a second.
12             MR. PORTER:  One question.
13                      REDIRECT EXAMINATION
14   BY MR. PORTER:
15   Q    When you asked for the regular wheelchair, the manual
16   wheelchair --
17             MR. DARDEN:  Objection.  Assumes a fact not in
18   evidence.
19             THE COURT:  Why don't you restate the question.
20   Q    BY MR. PORTER:  When you asked for the wheelchair, did you
21   want it for inside your house or to go outside, like to the
22   store or something like that?
23   A    Just outside.
24             MR. PORTER:  Thank you, Your Honor.  No questions.
25             THE COURT:  Anything further of this witness?
```

```
 1          MR. DARDEN:  No, Your Honor.  Thank you.
 2          THE COURT:  You may step down.  Do you want some --
 3   is there somebody to help him?  Yeah, please.
 4          THE WITNESS:  Are we done, sir?
 5          THE COURT:  You are done, and he'll be there to help
 6   you down.
 7          THE WITNESS:  Thank you very much, sir.
 8          THE COURT:  Next witness, Counsel.
 9          MS. QUINTERO:  Yes, Your Honor.  We'll go ahead and
10   get started with Mr. Aguilar, or finish Mr. Aguilar.
11                      ELDER AGUILAR,
12   called as a witness by the Government, having been previously
13   duly sworn, resumed the stand and testified as follows:
14          THE CLERK:  You can go ahead and be seated, and I'll
15   just remind you that you are still under oath.
16          THE WITNESS:  Okay.
17          THE CLERK:  Thank you.
18                  DIRECT EXAMINATION (RESUMED)
19   BY MS. QUINTERO:
20   Q    Good morning, Mr. Aguilar.
21   A    Good morning.
22   Q    Yesterday you mentioned that one of the things that you
23   eventually started doing as a delivery technician was taking
24   pictures of the beneficiaries --
25   A    Correct.
```

1   Q     -- when you would deliver the power wheelchairs --

2   A     Uh-huh.

3   Q     -- and so forth.

4         Do you remember that?

5   A     Yes.

6   Q     Okay.  I'm going to go ahead and just have you look at

7   Government Exhibit 28.  Actually, let -- before we look at

8   that, let me ask you, how soon after you started working at

9   Ezcor did you have to start taking the pictures of the

10  beneficiaries with the power wheelchairs and so forth?

11  A     Must have been about two years into me working it, so

12  about two years.  Yeah, I guess two years after I started

13  working there, making the deliveries.

14  Q     Okay.  And who gave you the instruction to start taking

15  the pictures of the beneficiaries?

16  A     Sylvia.

17  Q     Sylvia Walter-Eze, the defendant?

18  A     Yes.

19  Q     And what did she tell you was the purpose of taking the

20  pictures of the beneficiaries, of the power wheelchairs, and

21  other DME?

22  A     It was to verify that we actually delivered it and it was

23  with the patient.  That's why some of the pictures have their

24  name on it.  It was like a proof of delivery.

25  Q     Let's look at page 19 of Government Exhibit 28.  This is

1    Mary Winston there?

2    A    Yes.

3    Q    Is that a picture you would have taken?

4    A    Yeah.

5    Q    Now, after you started taking these pictures, as we see

6    here of Mary Winston, did you have any discussions with the

7    defendant about the photographs that you were taking of the

8    beneficiaries?

9    A    Yeah.  There was -- in the beginning I would just take a

10   picture of, you know, somebody standing by their chair or with

11   the equipment, whatever we delivered.  And then I was told I

12   had to get them sitting on the chair, like this example here.

13   Q    And who told you that you needed to have them actually

14   sitting on the chair?

15   A    Sylvia Walter-Eze.

16   Q    The defendant?

17   A    Yes.

18   Q    And did she tell you why you had to have them sitting on

19   the chair and not standing next to the chair?

20   A    I was just told it looks better.  It looks like they're

21   using it or like they're going to use it or that they need it.

22   Q    Okay.  And let me just show you really quickly

23   Government Exhibit 75, page 10.

24   A    Yeah.  I took that one as well.

25   Q    You took that one as well.  And is that a beneficiary that

```
1    you delivered a power wheelchair to?

2    A     Yes.

3    Q     And the -- just for the record, the -- the beneficiary

4    standing right next to the -- the power wheelchair; right?

5    A     Correct.

6    Q     Is this one of the first pictures you think that you may

7    have taken --

8    A     Yeah, I believe so.  This is one of the earlier ones.

9    Q     And this is one of the ones possibly where she told you to

10   start taking them of the beneficiary sitting down?

11   A     Yes.

12          MS. QUINTERO:  No further questions, Your Honor.

13          THE COURT:  Okay.

14       Cross-examination.

15                      CROSS-EXAMINATION

16   BY MS. NKELE:

17   Q     Good morning, Mr. Aguilar.

18   A     Good morning.

19   Q     Just one moment.

20       Mr. Aguilar, you testified that you worked as a delivery

21   technician for Ezcor for about four years?

22   A     That's correct.

23   Q     That will be from about 2007 to 2011; right?

24   A     Yes.

25   Q     I would like to show you what is marked as Exhibit 29.
```

1    That is -- you reviewed it yesterday, and that's the Government

2    Exhibit 29.  This, you reviewed yesterday.

3    A    Yes.

4    Q    And you said that was your signature?

5    A    Yes.  Correct.

6    Q    You also stated that you were told to just put "OK"?

7    A    Correct.

8    Q    And even if it's not true, you still had to put it?

9    A    Yes.  I was instructed to do so, yes.

10   Q    So even though it was a lie, you put it?

11   A    Yes.  That's what I was asked to do.

12   Q    The exhibit I just showed you is dated in 2011.  So most

13   of the deliveries you did in 2011, you marked it the same way?

14   A    Yes.  It was either "OK" or a checkmark.

15   Q    I have another one for 2010.  You marked it the same way

16   too?

17   A    That's correct.

18   Q    You attested that it was true and signed it?

19   A    That's correct.

20   Q    Did you do that in 2009 as well?

21   A    I'm -- probably, yes.

22   Q    And 2008?

23   A    If I was working there, yeah, most likely.

24   Q    So you signed a lot of these in 2009, 2008, and 2007 the

25   same way; right?

```
 1   A     Most likely, yes.
 2   Q     Even though it had false information on it, you put your
 3   signature on it?
 4   A     Yes.  That's what I was asked to do.
 5   Q     So for four years, you kept lying and lying on your
 6   delivery documents?
 7   A     That's what I was asked to do, yes.  That's correct.
 8   Q     And that was because you were asked to lie?
 9   A     Yes, because that's what I was asked to do.
10   Q     Okay.  Do you recall being interviewed by Agent
11   Michael Scott and Alison Davis in October 2013?  Special Agent
12   Davis is here.  Do you recall her interviewing you in 2013,
13   October?
14   A     I remember one of the agents, yes.  There was another one.
15   I don't remember the name, though.
16   Q     You recall in the interview stating that Ezcor had field
17   reps?
18   A     Yes.
19   Q     Did you ever see them?
20         MS. QUINTERO:  Objection, Your Honor.  Hearsay.
21   Improper use.
22         THE COURT:  Sustained.
23         THE WITNESS:  Well, I --
24         THE COURT:  Let's wait for the next question.
25   Q     BY MS. NKELE:  At any time before yesterday did you ever
```

```
 1   tell the investigators that E- -- Ezcor had patient recruiters?
 2   A     Yes.
 3   Q     You used the word "patient recruiters"?
 4   A     Patient recruiters, sales reps, anything like that, yes.
 5   Q     Did you in any interview prior to yesterday say that Ezcor
 6   used field reps, or did you say "recruiters"?
 7   A     Field reps, recruiters, either/or.
 8   Q     So if the investigators did not --
 9              MS. QUINTERO:  Objection, Your Honor.  Hearsay.
10   Improper use.
11              THE COURT:  I haven't heard the whole question.
12        Go ahead.
13   Q   BY MS. NKELE:  If the investigators never stated that you
14   said "patient recruiters," that would be incorrect?
15              THE COURT:  Again, that's speculative.  That's
16   presuming facts not in evidence.  You can't assume any fact in
17   a question is true.  Only if you got it by the answers, not by
18   the question.
19        Remember when we first started out I told you that you
20   can't assume the facts in a question is true, like "Did you
21   stop beating your wife?"  You can't assume something like that
22   is true.  You have to be guided just by the answers here.
23        So this will be -- that question will be stricken.
24        Next question, Counsel.
25   Q   BY MS. NKELE:  Did you tell Agent Scott and Special Agent
```

1  Davis that field reps came to the office with prescriptions?

2  A     Yes.

3  Q     Do you also recall saying that the field reps sometimes

4  did deliveries?

5            MS. QUINTERO:  Same objection, Your Honor.  Hearsay.

6            THE COURT:  Overruled.

7            THE WITNESS:  Sometimes they would take knee braces

8  sometimes or smaller items.

9  Q     BY MS. NKELE:  So they sometimes did deliveries?

10  A     Yes.

11  Q     You also recall saying that field reps came to patients'

12  homes sometimes when you did deliveries?

13  A     There was -- might have happened where they were maybe at

14  their home already.  Never took anybody with me.

15  Q     Did the field service reps come to the patient's house

16  independent of you sometimes when you were there making

17  deliveries?

18            MS. QUINTERO:  Objection, Your Honor.  Calls for

19  speculation.

20            THE COURT:  Overruled.

21        Did you ever see the field reps come when you were there?

22            THE WITNESS:  There was times that I went to the

23  house and they were there for whatever other reason.

24  Q     BY MS. NKELE:  Did you ever recall doing training apart

25  from the trainings that you did with Walter-Eze?

1    A     At the manufacturers, where I would pick up the chairs,

2    they gave me training on the maintenance of the chair and how

3    to dismantle them and things of that nature -- basic training

4    for the chairs only.

5    Q     And when you did all these trainings, you always talked

6    about home assessment?

7    A     No.  These trainings at the manufacturers was about the

8    chair itself.

9    Q     Did you ever -- did you ever discuss with them about how

10   to deliver the chairs?

11   A     Aside --

12          MS. QUINTERO:  Objection, Your Honor.  Ambiguous.

13          THE COURT:  Overruled.

14       Go ahead.

15          THE WITNESS:  Aside from dismantling the chair,

16   uh-uh, no.

17   Q     BY MS. NKELE:  Did you ever talk with them about the

18   dimensions of where these chairs can be used?

19   A     That information was on their Web site most of the time.

20   Just, you know, the size of the chair information, general

21   information of the power wheelchair.

22   Q     So when you went to deliver these chairs, was it your

23   responsibility to make sure that there is no risk of fall?

24   A     No.  I -- I was never asked to make that my

25   responsibility.  I was just told to deliver the power

```
 1   wheelchair.
 2   Q    Were you ever told to make sure that patients knew how to
 3   use the wheelchair?
 4   A    Like I stated before, I -- I was told to have them -- or
 5   teach them how to drive forward, backwards, and turn the power
 6   wheelchair.
 7   Q    So you did show them how to use it?
 8   A    How to operate the joystick on the power wheelchair,
 9   correct, yes.
10   Q    Did you ever have to tell them to take away carpets or
11   anything that might result in a patient falling or affect the
12   use of a power wheelchair?
13   A    I was never asked to tell them that, no.
14   Q    When you delivered a chair and there was a box in the way,
15   where the patient can maneuver the wheelchair, did you ever
16   think of taking it off or just --
17   A    Like I said before, sometimes I was asked to move
18   furniture or boxes or whatever was in the way just to get the
19   chair inside the house.
20   Q    Did you get training on other -- on other equipment?
21   A    Other general equipment like walkers and canes and things
22   like that from the manufacturer or the warehouses where we
23   would pick them up from.
24   Q    I'd like to show you a document that is from discovery.
25             MS. QUINTERO:  Has it been admitted into evidence?
```

```
 1              MS. NKELE:  No.

 2              MS. QUINTERO:  Then --

 3       Your Honor, this hasn't been admitted into evidence.

 4              THE COURT:  She can show him the document.

 5       You can't post it.  You can't publish it until it's been

 6  admitted into evidence.

 7              MS. NKELE:  Okay.  Can I approach the witness,

 8  Your Honor.

 9              THE COURT:  Yes.  Through the clerk.

10  Q    BY MS. NKELE:  Do you know whose writing -- do you

11  recognize the writing?

12  A    I think it's mine.

13  Q    Was it notes you made during a training?

14  A    I don't remember when I took them, no.  I don't remember

15  when exactly.

16  Q    And what is the -- but it is your writing; right?

17  A    Like I said, I think so.  I'm not a hundred percent sure.

18  Q    Do you see what is on the third line?

19  A    Yes.

20  Q    And what does it say?

21              MS. QUINTERO:  Your Honor, objection.

22              THE COURT:  Sustained.

23              MS. QUINTERO:  Lack of foundation.

24              THE COURT:  Sustained.  It's not evidence.

25  Q    BY MS. NKELE:  Based on what is on that line, did you know
```

```
 1    if you would -- do you -- did you know anything about --
 2             THE COURT:  I'm sorry, Counsel.  Not based on what's
 3    on that line.  You can ask him, did he know.
 4    Q    BY MS. NKELE:  Did you know that you could report patient
 5    abuse?
 6    A    Did I know?
 7    Q    Yes.
 8    A    No.
 9    Q    Did you know the patient had a right to refuse an
10    equipment?
11    A    Yes.  I did know that.
12    Q    Did you know you had to report it and document every
13    report?
14    A    I guess I brought it up -- I brought up the issues before
15    to --
16    Q    Did you --
17    A    -- my boss.
18    Q    Did you ever file a complaint with the office?
19    A    No.
20    Q    So apart from what you're saying today, there is no record
21    that you ever reported this?
22             THE COURT:  Did you ever report anything other than
23    to your boss?
24             THE WITNESS:  Not -- not other than to my boss.
25             THE COURT:  Okay.  Was there any records that you
```

**UNITED STATES DISTRICT COURT**

```
 1    reported it to your boss that you know of?
 2              THE WITNESS:  No, not that I know of.
 3              THE COURT:  Okay.  Next question.
 4    Q    BY MS. NKELE:  Now, for the prescriptions that you
 5    delivered for the equipment that you delivered, you always had
 6    prescriptions; right?
 7    A    I don't know that.
 8    Q    Did you understand the routine for the office?
 9    A    Sure.
10              MS. QUINTERO:  Objection, Your Honor.  Ambiguous as
11    to "routine."
12              THE COURT:  Overruled as to that question.
13    Q    BY MS. NKELE:  Did you understand the process that was
14    used in the office?
15              THE COURT:  Which process are we talking about?
16    Q    BY MS. NKELE:  The process before you can deliver an
17    equipment.
18    A    As far as what?  As far as making the paperwork or
19    delivery or what?  I didn't understand.
20    Q    If there's a prescription that comes into the office, did
21    you know what to do with it?
22    A    The prescription had the HCPCS code written on it; then I
23    knew that's what the patient was getting delivered.
24    Q    You came into the office most mornings just to pick up
25    your schedule and leave; right?
```

**UNITED STATES DISTRICT COURT**

```
 1   A    Most mornings, I don't -- sure.
 2   Q    So if you had deliveries to do, you just came, picked up
 3   your schedule, and you left the office?
 4   A    Sometimes, yeah.
 5   Q    So most of your work was done outside the office; right?
 6   A    I don't think that's accurate, no.
 7   Q    You came to the office when you didn't have delivery and
 8   helped out; right?
 9   A    With stocking stuff and regular warehousing stuff and
10   cleaning equipment, yes.
11   Q    When you didn't have delivery?
12   A    Yes.
13   Q    When you had delivery, you worked outside the office?
14   A    When I was delivering something, I was not inside the
15   office, yes.
16   Q    So how many days a week do you think you were out in the
17   field?
18   A    It all depends.  I mean, several days of the week.  I
19   don't know.  Depends.
20   Q    So sometimes you have deliveries every day?
21   A    Sometimes.
22   Q    And every day you'll be out in the field?
23   A    Sometimes.
24   Q    And you -- sometimes you have to deliver samples to
25   doctors' offices?
```

```
 1   A     Yes.  I remember doing that.

 2   Q     So delivery was not just to patients' homes?

 3   A     Correct.

 4   Q     You did consider yourself an employee; right?

 5   A     Yeah.

 6   Q     Yesterday you testified that the field reps never came to

 7   the office, but you also said --

 8               MS. QUINTERO:  Objection, Your Honor.  Misstates the

 9   testimony.

10               THE COURT:  Sustained.

11         Just ask the question.  The jury remembers what was said.

12               MS. NKELE:  Okay.

13   Q    BY MS. NKELE:  You testified that -- you also testified

14   that you came in sometimes --

15               THE COURT:  Counsel, that's the problem.  In asking

16   the question, you can't say what the witness testified to.  The

17   jury has already heard it.  You can't testify as to what he

18   testified to.  You can just ask the question.

19   Q    BY MS. NKELE:  The reps did come to the office sometimes;

20   right?

21   A     The reps did come to the office, yes.

22   Q     And they came sometimes with patients and reviewed

23   products; right?

24   A     Yes.

25   Q     They also came to pick up their checks; right?
```

**UNITED STATES DISTRICT COURT**

```
 1   A     Yes.

 2   Q     And they also came to talk to Walter-Eze, your boss?

 3   A     Yes.

 4   Q     If you are out in the field doing deliveries, would you

 5   know if they came to the office?

 6   A     Like I said, I wasn't -- I wasn't out of the office a

 7   hundred percent of the times.  So sometimes I was there; I did

 8   see them in there.

 9   Q     But if they showed up in the office and you weren't there,

10   would you know they came?

11   A     If they had dropped off deliveries with -- and I would

12   find this paperwork on my desk with their name on the top

13   corner of it, and that's how I know they -- they were there.

14   Q     So there were times they came to the office and you just

15   didn't see them?

16   A     Sure.

17   Q     How many deliveries did you do for Ezcor in the four years

18   you were there?

19   A     There's no way I -- I -- I don't know.  I didn't memorize

20   them.

21   Q     A lot of times you had to take -- sometimes you had to

22   take equipments upstairs; right?  Wheelchairs upstairs?

23   A     Upstairs, yes.

24   Q     How many times you think that happened?

25   A     I don't know.  More than a couple times, yes.
```

**UNITED STATES DISTRICT COURT**

```
 1   Q     So in four years about a couple of times?
 2   A     I said more than a couple.  It could be two; it could be a
 3   hundred.  I don't know.
 4   Q     Okay.  Was it more than two times?
 5   A     Pretty sure.
 6   Q     Was it more than five times?
 7   A     I don't know.
 8   Q     So it's between two and five then?
 9   A     No.  That's -- that's not it.  I don't know what you mean
10   by that.
11   Q     And on those occasions you had to take this wheelchair,
12   this kind of wheelchair upstairs --
13   A     Similar power wheelchairs.  Not that one but similar,
14   things of that nature.  Power wheelchairs.
15   Q     And you had to break it down and take them off?
16   A     Yes.
17   Q     Can you break down this wheelchair for us.
18              THE COURT:  You're not going to do it now.
19              MS. QUINTERO:  Objection, Your Honor.
20              THE COURT:  She's not asking.  Could you do it if
21   you had to?
22              THE WITNESS:  Yeah.
23   Q     BY MS. NKELE:  Is this wheelchair the kind that can be
24   dismantled?
25   A     Even that one that is not meant to be dismantled had to be
```

**UNITED STATES DISTRICT COURT**

 1   dismantled at times because I had to make it fit inside the

 2   house.  We had ones that were dismantle-able, but they didn't

 3   bill as much.  But these were -- these were common ones that I

 4   would have to dismantle just to get inside the house even

 5   though they aren't meant to be dismantled.

 6   Q    When you take them up to the house, does the patient have

 7   to bring them down?

 8   A    I don't know what they do with it after I leave.

 9   Q    Are the power wheelchairs meant to be used outside the

10   house?

11   A    It was my understanding they were meant to be used inside

12   the house.  And most people, if they had them, said, "Oh, leave

13   them in front.  I'll use it outside."

14   Q    That's a conversation between you and the patient?

15   A    That's not a conversation that we always had.  It was my

16   understanding sometimes, like one of the pictures, somebody

17   just left it out.  "Oh, I'll just use it outside" or use it

18   whatever.  What they did with it, I don't know.

19   Q    But your instruction was to deliver it inside the home?

20   A    My instruction was to deliver it.  It didn't matter where.

21   Just get it delivered.

22   Q    So you could deliver it under a tree outside?

23   A    Sure.

24   Q    And then you would write a lie that it was delivered to

25   the patient?

```
 1   A     I don't like the word "lie," but that's what I was

 2   instructed to do.  So I was doing my job.

 3   Q     I'd like to show you Defense Exhibit B.

 4              THE CLERK:  There's a white binder behind you.

 5              THE WITNESS:  Oh.

 6              THE CLERK:  Counsel, I'm sorry.  That's Exhibit B as

 7   in "boy"?

 8              MS. NKELE:  Yeah.

 9              THE CLERK:  Thank you.

10   Q     BY MS. NKELE:  Are you familiar with that order flow

11   sequence?

12   A     What are you talking about?  Just the front page or --

13              MS. QUINTERO:  Ahh, I'm sorry.  Objection,

14   Your Honor.  Pardon me.  Excuse me.  This document has not been

15   admitted into evidence.  Sorry, Your Honor.

16              THE COURT:  "Objection" will do next time, Counsel.

17              MS. QUINTERO:  Objection, Your Honor.

18              THE COURT:  Go ahead, Counsel.

19              MS. QUINTERO:  My apologies.

20   Q     BY MS. NKELE:  Now, on number -- on the paper -- right? --

21   it instructs you to confirm delivery with the patient; right?

22              MS. QUINTERO:  Objection, Your Honor.  It has not

23   been admitted into evidence.

24              THE COURT:  Sustained.  It would be hearsay.

25   Q     BY MS. NKELE:  Were you supposed to confirm delivery with
```

1    patients a day before delivery?

2    A     With -- I'm sorry.  Can you repeat that.

3    Q     Were you supposed to confirm delivery with patients before

4    you delivered?

5    A     I would call to see if they were home.  Sometimes it would

6    be the same day.

7    Q     Okay.  And were you supposed to test the -- and check the

8    equipment to make sure that it was in proper working order?

9    A     I made sure it powered on, yeah.

10   Q     And you were supposed to deliver it to them and train them

11   on how to use the item?

12   A     Like I had said before, I trained them on how to operate

13   the joystick and how to move the power wheelchair around, yes.

14   Q     And then later you had to take photographs; right?

15   A     Yes.

16   Q     And that's because sometimes after delivery patients would

17   say they didn't deliver -- they didn't receive it; right?

18   A     Yeah, sometimes.  We had that happen maybe once.

19   Q     So the reason for taking the picture is to make sure that

20   the equipment is next to the patient; right?

21   A     It was as a proof of delivery, as in they're holding their

22   name and they have the chair; so it's them.

23   Q     So either sitting in it or standing by it, it was proof of

24   delivery?

25   A     I guess it could all be proof of delivery, but I was asked

1    that it was preferred for them to be sitting on the chair or in

2    the chair.

3    Q    If they sat on the chair, you can actually see that they

4    can fit in the chair; right?

5    A    Yeah.  I assume that makes sense.

6    Q    So the patient calls later to say they couldn't fit into

7    the chair or use the chair, then you would have proof that they

8    did fit in the chair and the -- right?

9         MS. QUINTERO:  Objection, Your Honor.  Calls for

10   speculation.

11        THE COURT:  Sustained.

12   Q    BY MS. NKELE:  If the patient is sitting in the chair,

13   does it mean it fits the patient?

14        MS. QUINTERO:  Same objection, Your Honor.  Calls

15   for speculation.

16        THE COURT:  Sustained.

17   Q    BY MS. NKELE:  Could you see the patient either sit in the

18   chair --

19   A    Could I see?

20   Q    Yes.

21   A    Could I see them sitting on the chair?

22   Q    Yes.

23   A    If they're sitting on the chair and I happen to look at --

24   in their direction and I see them sitting in the chair, yeah, I

25   can see they're sitting in the chair.

1  Q     And when you see them, could you tell if the chair is too

2  small for them?

3  A     You can stuff anybody in one of those chairs.  I don't

4  know how well they're supposed to fit in them.

5  Q     So you could never tell if the patients fitted in the

6  chair or not?

7  A     I can never tell?  I don't understand your question.

8  Q     Did you ever tell Ezcor that there was a wheelchair that

9  the patient could not use because they couldn't fit inside?

10 A     Well, for people that were larger, we had the bigger

11 chairs.

12        THE COURT:  Did you ever tell Ezcor that you

13 delivered one that the patient could not fit in?  Do you

14 remember a time that --

15        THE WITNESS:  There was probably a couple times

16 where maybe somebody looked like they're pretty big, but they

17 were within -- these chairs can handle up to 300 pounds.  So

18 even somebody up to 250 pounds but really short --

19        THE COURT:  The question was, did you ever tell

20 Ezcor that you delivered a wheelchair to someone who couldn't

21 fit in it?  If you remember.

22        THE WITNESS:  I don't remember.

23        THE COURT:  Okay.

24 Q     BY MS. NKELE:  So once you delivered the wheelchair, it

25 was supposed to stay upstairs in -- or in the patient's house?

```
 1   A    I don't know where it was supposed to stay.  That --
 2   Q    What were you told?
 3   A    I was told to deliver the power wheelchair.
 4   Q    And you were not told where it should be?
 5   A    No.
 6   Q    But you remember being told to write something on the
 7   paper?
 8   A    What paper?
 9   Q    The delivery paper.
10   A    They were supposed to write the signature on it that they
11   received it.
12   Q    But you didn't know you were to leave it inside the home?
13   A    I was told to deliver the power wheelchair to the patient.
14   Q    You test- -- did every patient have a right to the
15   wheelchair regardless of the size of their home?
16             MS. QUINTERO:  Objection, Your Honor.
17             THE COURT:  Sustained.  Calls for speculation.
18   Q    BY MS. NKELE:  Were you supposed to discriminate against a
19   patient because they have a small house?
20             MS. QUINTERO:  Objection, Your Honor.
21             THE COURT:  Overruled.
22             THE WITNESS:  Was I supposed to discriminate?
23   Q    BY MS. NKELE:  Yes.
24   A    No.  I don't think so.  I was never told to.
25   Q    So you were supposed to deliver a wheelchair even if the
```

```
 1    house is small or if it's a mansion?

 2    A    Sure.

 3    Q    Now, you said you were told to lie on the assessment

 4    paper; right?

 5    A    I never said that.

 6    Q    You weren't told to lie?

 7              MS. QUINTERO:  Objection, Your Honor.

 8              THE COURT:  Sustained.  He said he was told to fill

 9    out the blanks.  He never described it as being "lied."

10    Q    BY MS. NKELE:  Did you say that what you filled out was

11    not true?

12    A    I said it was not accurate.

13    Q    So it was true but not accurate?

14    A    I don't understand that.

15    Q    Was it inaccurate?

16              MS. QUINTERO:  Objection, Your Honor.  Asked and

17    answered.

18              THE COURT:  You said that it was inaccurate what you

19    put down there, and you knew it was inaccurate when you signed

20    it; is that correct?

21              THE WITNESS:  I was instructed what to put on there.

22    Did I know what was supposed to be on there?  I don't know.

23    But I was asked to put that on the paper; so that's what I did

24    on the delivery.

25              THE COURT:  Sometimes what you put on the paper
```

**UNITED STATES DISTRICT COURT**

```
 1   wasn't accurate; is that correct?
 2           THE WITNESS:  That's correct.
 3           THE COURT:  Okay.  Next question.
 4   Q    BY MS. NKELE:  So everything you are saying today is
 5   accurate; right?
 6   A    I'm telling the truth.
 7   Q    What you're testifying to --
 8   A    I'm saying the truth to the best of my knowledge.
 9   Q    If you were told to say something other than the truth,
10   would you say that?
11   A    Not here.
12   Q    On December 30th, 2014, you had another interview with
13   Special Agent Alison Davis and the Government's trial attorney;
14   is that correct?
15   A    I don't remember the exact date.
16   Q    Okay.  But after you had the interview in 2013, about 14
17   months later, few months ago you had another interview with the
18   Government attorney and the special agent?
19   A    Sure.  Yes.
20   Q    And in that interview do you remember a little bit more
21   than you did in the first interviews?
22   A    Do I remember about it?
23           MS. QUINTERO:  Objection, Your Honor.  Calls for
24   hearsay.
25           THE COURT:  I don't know.
```

**UNITED STATES DISTRICT COURT**

1        Do you remember more about the second one than the first

2   one?

3              THE WITNESS:  In regards to what?  In regards to the

4   questions?

5              THE COURT:  I don't know.  I didn't ask the

6   question.

7              THE WITNESS:  Yeah.  Then --

8              THE COURT:  Why don't you ask the question again.

9   Q    BY MS. NKELE:  In that interview you told them more than

10  you did in the first interview?

11  A    If the questions were different.

12  Q    Okay.  So now you had more details about the field reps?

13  A    I -- I don't think that's an accurate statement.

14  Q    Well, in the first interview, at first you remembered they

15  came to the office.  Later, they didn't come to the office.

16             MS. QUINTERO:  Objection, Your Honor.  Calls for

17  hearsay.  Improper use.

18             THE COURT:  Overruled.

19       But I don't understand the question.  There was a

20  statement, not a question.

21  Q    BY MS. NKELE:  Did they come to the office or didn't they

22  come to the office?

23  A    Who, the field representatives?

24  Q    Yes.

25  A    They did sometimes, yes.

1  Q    Now, you talked about verifying patient eligibility.  What
2  exactly did you do when you did that?
3  A    You call a phone number for Medicare and check if they are
4  Medicare eligible, if they have Medicare.
5  Q    What else did you check with the eligibility?
6  A    First you check eligibility, and then you check what's
7  called same and similar.
8  Q    What is that?
9  A    Like I said before, it's basically you check the record if
10 they received something like a power wheelchair in the past.
11 Q    And if they have, what would happen?
12 A    If they have, if they have received it within the past
13 five years, from what I remember, they cannot get another one.
14 Q    So it wouldn't matter if they had a prescription.  They --
15 the -- they couldn't get another one; right?
16 A    I don't know what the law is about it, but I knew we
17 couldn't deliver another one.
18 Q    Okay.  So that was the purpose of doing the check on
19 eligibility?
20 A    Correct.  We wouldn't get paid for another chair if they
21 had received one in the past five years.
22         MS. NKELE:  Okay.  All right.  I have nothing
23 further of this --
24         THE COURT:  Anything further?
25         MS. QUINTERO:  No further questions, Your Honor.

```
 1              THE COURT:  You may step down, sir.  Thank you for
 2   coming in.
 3              THE WITNESS:  Thank you.
 4              THE COURT:  Next witness.
 5              MS. QUINTERO:  Yes, Your Honor.  The Government
 6   would like to call Mr. Javier Calderon.
 7          Again, my apologies for my spontaneous outburst earlier.
 8                        JAVIER EDGAR CALDERON,
 9   called as a witness by the Government, was sworn and testified
10   through the interpreter as follows:
11              THE CLERK:  Mr. Calderon, right here to be sworn,
12   please.  Do you solemnly swear that the testimony you are about
13   to give in the matter now before the Court shall be the truth,
14   the whole truth, and nothing but the truth so help you God?
15              THE WITNESS:  I swear.
16              THE CLERK:  Thank you.  You may be seated.  May I
17   please ask that you state your full name for the record and
18   spell your last name.
19              THE WITNESS:  Javier Edgar Calderon.
20              THE INTERPRETER:  Interpreter spelling, Your Honor?
21              THE COURT:  Please.
22              THE INTERPRETER:  J-a-v-i-e-r; Edgar, E-d-g-a-r;
23   C-a-l-d-e-r-o-n.
24              THE COURT:  Ladies and gentlemen, again let me
25   remind you, we have a translation going on here.  So what you
```

**UNITED STATES DISTRICT COURT**

```
 1    take as evidence is what comes from the mouth of the
 2    translator, not from the witness.  If you speak Spanish, don't
 3    try to listen to what he's saying.  Listen to the witness --
 4    excuse me -- listen to the translator.
 5         Go ahead.
 6              MS. QUINTERO:  Thank you, Your Honor.
 7                        DIRECT EXAMINATION
 8    BY MS. QUINTERO:
 9    Q    Good morning, Mr. Calderon.
10    A    Good morning.
11    Q    Where are you originally from?
12    A    From Mexico City.
13    Q    And when did you come to the United States?
14    A    In the year 1997.
15    Q    And have you remained in the United States since you came
16    here in 1997?
17    A    Yes.
18    Q    And what area do you currently live in?
19    A    In the area of the San Fernando Valley.
20    Q    Now, I understand that you're the nephew by marriage of
21    Mr. Nazario Gutierrez; is that correct?
22    A    Yes.
23    Q    So your wife is Mr. Gutierrez's niece?
24    A    Yes.  That's right.
25    Q    And how long have you been married to Mr. Gutierrez's
```

1    niece?

2    A     Sixteen years.

3    Q     So is it fair to say that you've known Mr. Gutierrez for

4    the past 16 years?

5    A     Yes.  That's correct.

6    Q     Now, I want to show you Government Exhibit 27 there on

7    your screen.  It's page 11.  Do you recognize the person that's

8    depicted here on this photograph?

9    A     Yes.

10   Q     And can you tell the jury who this gentleman is on the

11   photograph.

12   A     The man is Nazario Gutierrez.

13   Q     Let's talk a little bit about your uncle Mr. Gutierrez.

14   Approximately how old is Mr. Gutierrez?

15            MR. DARDEN:  Objection.  No foundation.  Hearsay.

16            THE COURT:  I'm not too sure.  Let me correct

17   something first, and then I'll see if you have an objection.

18       Is the gentleman in the photograph your uncle?

19            THE WITNESS:  No.  My wife's.

20            THE COURT:  Okay.  So he's the one you're talking

21   about.  That is your wife's uncle?

22            THE WITNESS:  Yes.

23            THE COURT:  Okay.  And now --

24   Q     BY MS. QUINTERO:  I'm sorry.  I -- is he your uncle by

25   marriage?

**UNITED STATES DISTRICT COURT**

```
1    A    Uh-huh, yes.  My uncle by marriage.

2              THE COURT:  Okay.  What's your next question?

3    Q    BY MS. QUINTERO:  Okay.  Approximately how old is

4    Mr. Gutierrez?

5              MR. DARDEN:  No foundation.

6              THE COURT:  Sustained.

7    Q    BY MS. QUINTERO:  Mr. Calderon, do you know how old

8    Mr. Gutierrez is?

9              MR. DARDEN:  Same objection.

10             THE COURT:  Overruled.

11             THE WITNESS:  Yes.

12             THE COURT:  He's answered the question.

13   Q    BY MS. QUINTERO:  To your knowledge, is Mr. Gutierrez a

14   Medicare beneficiary?

15             MR. DARDEN:  Objection.  No foundation.  Hearsay.

16             THE COURT:  Sustained.

17   Q    BY MS. QUINTERO:  Are you aware if Mr. Gutierrez is a

18   Medicare beneficiary or not?

19             MR. DARDEN:  Same objection.

20             THE COURT:  Sustained.

21   Q    BY MS. QUINTERO:  Have you ever been aware of

22   Mr. Gutierrez receiving Medicare benefits?

23             MR. DARDEN:  Same objection.

24             THE COURT:  Overruled.

25             THE WITNESS:  Yes.
```

**UNITED STATES DISTRICT COURT**

```
1    Q    BY MS. QUINTERO:  Okay.  So it's fair to assume

2    Mr. Gutierrez is a Medicare-eligible beneficiary?

3            MR. DARDEN:  I'm going to object.

4            THE COURT:  Sustained.

5    Q    BY MS. QUINTERO:  And --

6            THE COURT:  It's calling for speculation.

7        Go ahead, Counsel.

8    Q    BY MS. QUINTERO:  To your knowledge, did Mr. Gutierrez

9    receive Medicare beneficiaries [sic] back in 2010?

10           MR. DARDEN:  Objection.  Foundation.  Hearsay.

11           THE COURT:  Overruled.

12       Do you know if he received benefits?

13           THE WITNESS:  Yes.

14           THE COURT:  And what do you base that knowledge on?

15   How do you know it?

16           THE WITNESS:  Because of the days when he was living

17   at the house, he would go to the doctor.

18           THE COURT:  And did you go with him?

19           THE WITNESS:  No.  My wife would accompany him.  She

20   would give him rides to his medical appointments.

21           THE COURT:  Sustained.

22   Q    BY MS. QUINTERO:  And how long did Mr. Gutierrez live with

23   you at your house?

24   A    You could say it was around ten years.

25   Q    Okay.  And when was the last time that Mr. Gutierrez lived
```

```
 1   with you?
 2   A     Approximately it will have been a year that he will no
 3   longer have been living with us.
 4   Q     Okay.  But in 2010 did Mr. Gutierrez live with you?
 5   A     Yes.
 6   Q     Over the years that you've known Mr. Gutierrez, and
 7   especially the time that he lived with you, what type of
 8   employment has he had?
 9              MR. DARDEN:  Objection.  Irrelevant.  No foundation.
10              THE COURT:  Overruled.
11              THE WITNESS:  He would mention that he'd work in the
12   fields with pears, melons, and watermelons.
13              MR. DARDEN:  Motion to strike as hearsay,
14   Your Honor.
15              THE COURT:  Sustained.  It will be stricken.
16   Q     BY MS. QUINTERO:  Was -- was Mr. Gutierrez a field worker?
17              MR. DARDEN:  Objection.  Leading.
18              THE COURT:  Overruled.
19              THE WITNESS:  Yes.
20   Q     BY MS. QUINTERO:  And where --
21              MR. DARDEN:  Objection.  No foundation.  Motion to
22   strike.
23              THE COURT:  Overruled.
24   Q     BY MS. QUINTERO:  To your knowledge --
25              THE COURT:  Overruled.
```

```
1   Q    BY MS. QUINTERO:  To your knowledge, where he would go and
2   pick pears and --
3              MR. DARDEN:  Objection.  No foundation.  Hearsay.
4              THE COURT:  Sustained.  That will be calling for
5   hearsay.
6        Counsel, if you want to get into it, that's fine if you
7   can show he went out there with him.  But if you're asking for
8   hearsay, it's objectionable.
9   Q    BY MS. QUINTERO:  Did you ever see Mr. Gutierrez going out
10  to the field?
11  A    He would say he was going off to the fields, and sometimes
12  we'd give him rides to the bus terminals.
13             THE COURT:  Be stricken.
14             MS. QUINTERO:  Okay.
15             THE WITNESS:  And sometimes he would bring us boxes
16  of fruit.
17             THE COURT:  Next question.
18  Q    BY MS. QUINTERO:  Now, let's talk about your uncle's
19  ability to walk.  How would you describe Mr. Gutierrez's
20  ability to walk?
21             MR. DARDEN:  Objection.  No foundation.
22             THE COURT:  Overruled.
23             THE WITNESS:  Excellent.  Excellent.  He walks quite
24  a bit.
25  Q    BY MS. QUINTERO:  And from knowing Mr. Gutierrez for the
```

1    last 16 years, have you ever known him to be unable to walk?

2    A    No.  He has always walked well.

3    Q    And when your -- Mr. Gutierrez lived with you for those

4    ten years or so, did you ever see him going out for walks?

5    A    Every day.

6    Q    And what places would you see him go walking to?

7    A    He used to -- he used to like playing pool quite a bit.

8    So he would walk a distance of four to six miles every day to

9    go to play pool.

10   Q    Okay.  During the time that Mr. Gutierrez lived with you,

11   did you ever see Mr. Gutierrez use a walker to get around the

12   house?

13   A    No, never.

14   Q    Did you ever see him using a cane or a wheelchair to get

15   around the house?

16   A    No.

17   Q    Now, were you aware that Mr. Gutierrez ultimately received

18   a power wheelchair?

19   A    Yes.

20   Q    And did you ever see that power wheelchair yourself?

21   A    Yes.  I did see it.

22   Q    Did you ever see Mr. Gutierrez use that power wheelchair

23   to get around either inside or outside of the house?

24   A    No.  He never used it.

25   Q    So based on what you're telling us, Mr. Gutierrez has

```
 1  never needed a, or used a power wheelchair to get around his
 2  home; is that right?
 3              MR. DARDEN:  Objection.  Compound.
 4              THE COURT:  Sustained.  He said to his knowledge
 5  he's never seen it.  He never said he never did it.  He can
 6  only testify to what he saw or participated in.
 7              MS. QUINTERO:  Okay.  Okay.  Thank you, Your Honor.
 8         No further questions.
 9              THE COURT:  Okay.  Cross.
10                        CROSS-EXAMINATION
11  BY MR. DARDEN:
12  Q    Now, I think you told us that Mr. Gutierrez will walk,
13  what, four to six miles to play pool every day.  Is that -- was
14  that your testimony?
15              MS. QUINTERO:  Objection, Your Honor.
16              THE COURT:  Overruled.
17              THE WITNESS:  Yes.  That's right.
18  Q    BY MR. DARDEN:  But, of course, he wasn't with you --
19              THE COURT:  I'm sorry, Counsel.  I don't think he
20  said every day.  But he said he walked four to six miles.
21         Go ahead.
22              MR. DARDEN:  I'm sorry.  He just said "of course."
23              THE COURT:  I don't remember if he said every day or
24  not.
25  Q    BY MR. DARDEN:  And, of course, he wasn't with you every
```

1    day; right?

2    A     Not every day, no.

3    Q     There were extended periods of time when he was not with

4    you; correct?

5          Can you answer "yes" or "no," please.

6                THE COURT:  Let the Court control whether or not

7    it's just a "yes" or "no" answer.

8          Next question.

9    Q     BY MR. DARDEN:  Now, let me ask you to take a look at

10   Exhibit 27, if I can have one moment, page 15.

11         Now, have you ever seen Mr. Gutierrez's signature?

12   A     No.

13   Q     So you can't tell us whether or not that's his signature

14   on page 15 of Exhibit 27?

15   A     No.  I could not say if it's that.

16   Q     If you look at the next page, page 16, and do you see

17   there a signature that purports to be the name Nazario

18   Gutierrez, handwritten?

19   A     Yes.

20   Q     Can you tell me whether or not that's Mr. Gutierrez's

21   signature?

22                MS. QUINTERO:  Objection, Your Honor.  Lacks

23   foundation.

24                THE COURT:  Overruled.

25                THE WITNESS:  No.

UNITED STATES DISTRICT COURT

```
 1   Q     BY MR. DARDEN:  Now, you told us that a wheelchair -- or

 2   that Mr. Gutierrez came into possession of a wheelchair;

 3   correct?

 4   A     Yes.

 5   Q     And were you present when the wheelchair was delivered?

 6   A     No.

 7   Q     But you did see the wheelchair inside the house for a long

 8   time; is that right?

 9   A     Yes.  Yes, I did see it.

10   Q     And was there any doubt but that the wheelchair belonged

11   to Mr. Gutierrez?

12   A     No.

13   Q     Now, you told us that Mr. Gutierrez also went to the

14   doctor; right?

15   A     Yes.

16   Q     And on those occasions when he went to the doctor, did --

17   did you -- did your wife take him?

18   A     Sometimes my wife would take him.  Other times a person

19   would go to pick him up in a car.

20   Q     Now, the person that would go to pick him up in a car, was

21   that a male or a female?

22   A     Male.

23   Q     Did you meet that person?

24   A     No.  I never saw him.

25   Q     On those occasions when Mr. Gutierrez went to the doctor,
```

```
 1   you were not present when he spoke to the doctor or was
 2   examined by the doctor; correct?
 3   A     No.  I was never there.
 4   Q     And so as far as whether or not any diagnosis was made by
 5   any doctor, you weren't present when that doctor made that
 6   diagnosis; correct?
 7   A     Yes.  I wasn't there.
 8              MR. DARDEN:  Thank you.  That's all.
 9              THE COURT:  Redirect?
10              MS. QUINTERO:  I have no questions, Your Honor.
11              THE COURT:  You may step down.  Thank you very much
12   for coming in.
13       Next witness.
14              MR. PORTER:  Government calls Mary Winston,
15   Your Honor.
16                        MARY WINSTON,
17   called as a witness by the Government, was sworn and testified
18   as follows:
19              THE COURT:  Good morning.
20              THE CLERK:  May I have you please raise your right
21   hand.  Do you solemnly swear that the testimony you are about
22   to give in the matter now before the Court shall be the truth,
23   the whole truth, and nothing but the truth so help you God?
24              THE WITNESS:  Yes.
25              THE CLERK:  Thank you.  May I please ask that you
```

**UNITED STATES DISTRICT COURT**

```
 1    state your full name and spell your last name.
 2              THE WITNESS:  Mary Louise Winston, W-i-n-s-t-o-n.
 3              THE CLERK:  Thank you.  I'll move this microphone
 4    for you.
 5              THE COURT:  Okay.  Counsel, you may inquire.
 6                        DIRECT EXAMINATION
 7    BY MR. PORTER:
 8    Q    Good morning, Ms. Winston.
 9    A    Good morning.
10    Q    Ms. Winston, where do you currently live?  What city?  I
11    don't need your address.
12    A    Los Angeles.
13    Q    And how long have you lived in Los Angeles?
14    A    At that address?
15    Q    Well, your -- any address.  How long have you lived in
16    L.A.?
17    A    Off and on for 59, going on 60 years.
18    Q    Okay.  And, Ms. Winston, are you a -- do you receive
19    Medicare benefits?
20    A    Yes.
21    Q    Okay.  I want to ask you about a power wheelchair that you
22    received back in 2011.  Do you remember meeting a man that went
23    by the name Wilmer?
24    A    Yes.
25    Q    And how did you meet this -- this individual named Wilmer?
```

```
 1   A     He was at my neighbor's.

 2   Q     Okay.  I want to show you a picture.  It's going to come

 3   up on the screen there.  Let me see if I can figure this out.

 4   Okay.  So this picture, Government's Exhibit 23, do you

 5   recognize this individual?

 6   A     Yeah.

 7   Q     And who does that individual appear to be?

 8   A     Wilmer.

 9   Q     Okay.  And so when you met this gentleman Wilmer, what did

10   he tell you about a power wheelchair?

11   A     Oh, he was saying that I might qualify to get it --

12   Q     Okay.

13   A     -- because I did need one.

14   Q     And was he at your apartment complex where you live?

15   A     Yes.

16   Q     And was he speaking to another individual there at the

17   apartment complex?

18   A     Yes.

19   Q     And that individual, could they get a power wheelchair?

20   A     No.

21   Q     Why not?

22   A     They had Kaiser.

23   Q     Okay.  But he told you that you could potentially get one

24   because you had Medicare?

25   A     Yes.
```

```
 1   Q    So after you met Wilmer, did you then go to a doctor to
 2   get a power wheelchair?
 3   A    Yes.
 4   Q    And do you remember the name of that doctor?
 5   A    No.
 6   Q    And how did you get from your house to the doctor's
 7   office?
 8   A    I believe "Wilbur" took me, I believe.
 9   Q    Did he take you in a car or a truck or something like
10   that?
11   A    Car.
12   Q    And after you went to the doctor, some time later then
13   did you receive a power wheelchair?
14   A    Yeah.
15   Q    And was it --
16   A    Yes.
17   Q    And was it delivered to your home?
18   A    Yes.
19   Q    And do you remember how long ago, from today, how many
20   years ago that was that you received that power wheelchair?
21   A    I think probably about four years ago, I guess.
22   Q    And do you still have that power wheelchair to this day?
23   A    Yes.
24   Q    And over the past several years, since you received the
25   power wheelchair, have you used that power wheelchair?
```

```
 1    A     Yes.
 2    Q     And do you use that power wheelchair inside your home or
 3    outside your home?
 4    A     Outside.
 5    Q     So inside of your apartment, how do you get around, or are
 6    you able to walk around inside your apartment?
 7    A     Yes.
 8    Q     And have you ever used the power wheelchair to get around
 9    the inside of your home, like to the kitchen or to the
10    bathroom?
11    A     No.  Not really, no.
12    Q     Okay.  And when you use the power wheelchair outside,
13    where do you go with it?
14    A     I've gone to church.  I've gone to the store.  I've walked
15    my dog on it, you know.  Ride it.  I've gone to the health
16    center.
17    Q     But -- so it helps you to get around outside?
18    A     Oh, yes.
19    Q     And inside your apartment, is your apartment large enough
20    to get into the bedroom with the power wheelchair?
21    A     I don't think so.  It may be, but I've never tried.
22    Q     Okay.  Let me just ask you a couple questions about your
23    ability to walk.  I noticed you walked in here today.  Are you
24    able to walk outside, go on a walk at all?
25    A     Yes.
```

1    Q    And how far do you go if you walk outside?

2    A    Block or more.

3    Q    Okay.  Your primary care physician, who is your primary

4    care physician?

5    A    Tara Spears [phonetic].

6    Q    Are you familiar with a doctor named Dr. Keit Tran?

7    A    Yes.

8    Q    And how long have you been seeing Dr. Tran?

9    A    Oh, God.  For over 20 years.

10   Q    Okay.  And has Dr. Tran ever prescribed a power wheelchair

11   for you?

12   A    To be honest, I don't remember.

13   Q    Okay.

14            MR. PORTER:  No further questions, Your Honor.

15            THE COURT:  Cross.

16                    CROSS-EXAMINATION

17   BY MR. DARDEN:

18   Q    Ms. Winston, good morning.

19   A    Good morning.

20   Q    Ms. Winston, you were interviewed by federal agents on

21   January 5, 2015; is that right?

22   A    I guess.

23            MR. PORTER:  Objection.

24            THE WITNESS:  I don't remember the exact date, but I

25   was interviewed.

```
 1              MR. PORTER:  Objection.  Relevance.

 2              THE COURT:  Overruled.

 3   Q    BY MR. DARDEN:  And these agents came to your residence;

 4   is that right?

 5   A    Yes.

 6   Q    And were you living in the same place -- that is, in

 7   January 2015 -- as you were back in March of 2011?

 8   A    Yes.

 9   Q    And when the agents came to see you, did they tell you why

10   they were there?

11   A    Yes.

12   Q    Now, just inside the front door of your apartment, is

13   there a power wheelchair located there?

14   A    Yes.

15   Q    And when the agents came, was the power wheelchair in the

16   living room area?

17   A    Yes.

18   Q    And so you still have that power wheelchair; is that

19   correct?

20   A    Yes.

21   Q    When you received the power wheelchair, did the delivery

22   person show you how to operate it?

23   A    I don't remember if they showed me or not.  I'm pretty

24   sure they did, but I don't really remember.

25   Q    But you do know how to operate the wheelchair?
```

1   A     Yes.

2   Q     And is it difficult for you to operate the wheelchair?

3   A     No.

4   Q     Is it essentially turning it on and then using a joystick

5   of some sort to direct it?

6   A     Yes.

7   Q     Now, you told us that you met this person named Wilmer

8   whose photograph you looked at a moment ago; is that right?

9   A     Yes.

10  Q     And you had a conversation with Wilmer about a power

11  wheelchair; is that true?

12  A     Yes.

13  Q     And you told Wilmer you'd like to have one -- is that

14  right? -- during the conversation?

15  A     Yes.

16  Q     And nobody forced you to agree to accept the power

17  wheelchair; right?

18  A     No.

19  Q     Did someone force you to accept the power wheelchair?

20  A     No.

21  Q     Now, I bet the power wheelchair is too heavy for you to

22  carry; is that true?

23  A     Yes.

24  Q     And your apartment or your house is too small for the

25  wheelchair, that is, to move around the bedroom and the

1    bathroom; is that right?

2    A    Yes.  You could say that.

3    Q    So you think it might fit, but it wouldn't -- it would not

4    be a convenient fit?

5    A    Correct.

6    Q    But back in -- from 2000 to 2011, you had a variety of

7    health issues; is that right?

8    A    Yes.

9    Q    Now, you told us that you went to see a doctor; is that

10   true?  Wilmer took you -- I'm sorry.  Wilmer took you to see a

11   doctor?

12   A    Yes.

13   Q    And you sat down with this doctor and you told the doctor

14   about your health history; is that right?

15   A    Yes.

16   Q    And did you tell the doctor that you are a diabetic?

17   A    Yes.  Yeah, I --

18   Q    And did you tell the doctor you had arthritis?

19   A    Yes.

20   Q    Did you tell the doctor that you had throat surgery in

21   January of 2000?

22   A    Probably, yeah.

23   Q    And did you also tell the doctor that you had major

24   surgery in March of 2000 to remove a tumor on your adrenal

25   gland?

```
 1   A     Yeah, I did.
 2   Q     Okay.  And when you talked to Wilmer about getting a power
 3   wheelchair, is it true that you felt that you needed the
 4   wheelchair because back in 2011 your health was poor?
 5   A     Yes.
 6   Q     I mean, you really honestly felt that you needed a power
 7   wheelchair; true?
 8   A     Yes.
 9   Q     And when you told us today that you walk about a block,
10   that's because Dr. Tran has told you that you should walk a
11   block or so; is that right?
12   A     Several doctors have said, yes.
13   Q     Now, you have a foot doctor; right?
14   A     Yeah.
15   Q     And you have a doctor for -- you have a rheumatologist;
16   right?
17   A     Yes.
18   Q     And when you walked in today, I think you walked in with a
19   cane; is that right?
20   A     Yes.
21   Q     Did you have a cane back in 2011?
22   A     More than likely that, yes.  Might even had the walker, I
23   don't know.
24   Q     Because you had had -- strike that.
25         You did have a cane and also a walker before you got the
```

1   power wheelchair; right?

2   A     Yes.

3   Q     And is it fair to say that, even though you had a cane and

4   a walker, that those two items weren't doing the job as well as

5   you would have liked; so therefore you felt you needed the

6   power wheelchair?

7   A     Yes.

8   Q     Now, did you also have -- did you have cataracts in your

9   left eye?

10  A     Yes.

11  Q     And did you tell that to the doctor?

12  A     Probably, yeah.  I don't remember.

13  Q     Were you also suffering from heart disease back in 2011?

14  A     Yes.

15  Q     Did you tell that to the doctor?

16  A     Probably.

17  Q     You were also a smoker.  Did you smoke back in 2011?

18  A     Yes.

19  Q     Okay.

20  A     Yes.

21  Q     Did you have arthritis in your elbow and shoulder in 2011?

22  A     All -- all over, yes.

23  Q     You had arthritis all over?

24  A     Yeah.

25  Q     And that arthritis that you had all over, including your

```
 1   elbow and your shoulder, did it make it hard for you to use
 2   your cane and walker, at least back in 2011?
 3   A     Yeah.
 4   Q     Now, is your health better today than it was back when you
 5   got the power wheelchair?
 6   A     Yes, somewhat.
 7   Q     I'm sorry?
 8   A     Somewhat better.
 9   Q     Do you still have the power wheelchair today?
10   A     Yes.
11            MR. DARDEN:  Thank you.  That's all.
12            THE COURT:  We're going to be breaking unless you
13   have -- I don't know if you have any more redirect.  If you do,
14   I'll have to break first.
15            MR. PORTER:  Okay.  One question.
16            THE COURT:  One question?
17            MR. PORTER:  Yeah.
18            THE COURT:  You only have one question?
19            MR. PORTER:  Maybe two.
20            THE COURT:  Give you two questions, and then we
21   break if you have any more.
22            MR. DARDEN:  I may have 20 after.
23                        REDIRECT EXAMINATION
24   BY MR. PORTER:
25   Q     Ms. Winston, you keep the power wheelchair there in your
```

1    living room; is that right?

2    A     Yes.

3    Q     Okay.  But when you want to use it outside, how do you get

4    it outside?

5    A     I have my son or neighbor take the chair outside, because

6    you take the battery off and stuff, and you have to -- because

7    I don't have a ramp.  You can't put a ramp there.

8                    THE COURT:  Okay.

9                    MR. PORTER:  My two questions.  Thanks.

10                   THE COURT:  Anything less than 20?

11                   MR. DARDEN:  I'll waive the 20 questions,

12   Your Honor.  Thank you.

13                   THE COURT:  Thank you very much.  We appreciate you

14   coming in.

15        We'll take a break at this time.

16        Ladies and gentlemen, remember the admonishment not to

17   discuss the case among yourselves or with anybody else or form

18   or express any opinions about the matter until it's submitted

19   to you and you retire to the jury room.  We'll see you back in

20   15 minutes.

21                   THE CLERK:  All rise.

22                   (Recess taken.)

23                   THE COURT:  The record will reflect the jurors are

24   all present in their respective seats in the jury box.  We have

25   a witness on the witness stand.

```
1        Do you want to swear the witness in.

2                          KIET TRAN,

3  called as a witness by the Government, was sworn and testified

4  as follows:

5              THE CLERK:  Do you solemnly swear that the testimony

6  you are about to give in the matter now before the Court shall

7  be the truth, the whole truth, and nothing but the truth so

8  help you God?

9              THE WITNESS:  Yes, I do.

10             THE CLERK:  Thank you.  You may be seated.  May I

11 please ask that you state your full name for the record and

12 spell your last name.

13             THE WITNESS:  My last name is T-r-a-n.  And first

14 name Kiet, K-i-e-t.

15             THE COURT:  Counsel, you may inquire.

16                       DIRECT EXAMINATION

17 BY MR. PORTER:

18 Q    Good morning, Dr. Tran.  You're a medical doctor; is that

19 right?

20 A    Yes, I am.

21 Q    How long have you worked as a medical doctor here in the

22 United States?

23 A    About 33 years.

24 Q    And are you originally from the United States?

25 A    No.  I originally from Vietnam.
```

```
 1   Q     Okay.  And did you receive any medical training in Vietnam
 2   before you came to the United States?
 3   A     Well, I graduated in Vietnam, and when I came here, I get
 4   into the training.
 5   Q     Okay.  And so when did you come to the United States?
 6   A     In 1982.
 7   Q     And so the training that you received in the
 8   United States, what type of training did you receive here in
 9   the United States?
10   A     Oh, I got three year training in internal medicine, one
11   year in infectious disease, and a year in geriatric medicine.
12   Q     And when did you come out here to Southern California to
13   start practicing medicine?
14   A     In 1988.
15   Q     Are you currently practicing medicine here in the L.A.
16   area?
17   A     Yes, sir.
18   Q     What is your area of -- of specialization?
19   A     Well, internal medicine and general practice.
20   Q     So, Dr. Tran, I want to ask you a few questions about one
21   of your patients, Mary Winston.  How long has Mary Winston been
22   one of your patients?
23   A     Well, I -- I first saw her in 1994.  It's about 20 years
24   ago.
25   Q     Based on your experience seeing Ms. Winston, would you
```

```
 1   consider yourself her primary care physician?
 2   A     For the -- from the beginning, at the time I first saw
 3   her, yeah, I see her more often.  But recently in the last few
 4   year, I see her less.
 5   Q     In the past few years, how often have you seen
 6   Ms. Winston?
 7   A     About three time a year.
 8   Q     When is the most recent time, the last time you saw
 9   Ms. Winston?
10   A     In December last year.
11   Q     Dr. Tran, over these, I believe you said 20 years treating
12   Ms. Winston, have you ever prescribed for Ms. Winston a power
13   wheelchair?
14   A     No, sir.
15   Q     And have you ever prescribed for Ms. Winston a manual
16   wheelchair, a regular wheelchair?
17   A     No, sir.
18   Q     What about a cane or a walker?  Have you ever prescribed
19   one of those for Ms. Winston?
20   A     Well, I -- I think she need it but -- you know, I think
21   she need one, yeah.
22   Q     And has Ms. Winston ever requested from you a power
23   wheelchair?
24   A     No.  No, sir.
25   Q     Your current medical office, where is it located?
```

```
1    A      It's in the L.A. area, about ten blocks from here.
2    Q      Ten blocks from here, really close over in Chinatown; is
3    that right?
4    A      That's right.
5    Q      And is it in an office building?
6    A      Yes, sir.
7    Q      And is your office on the first floor of the office
8    building or the second floor?
9    A      Second floor.
10   Q      And is there an elevator in your building?
11   A      No, sir.
12   Q      So does Ms. Winston come see you at your office?
13   A      Yes.
14   Q      Okay.  And when she comes, have you ever seen her come in
15   a power wheelchair?
16   A      Well, she -- when she come in to my office, I didn't see
17   the power wheelchair with her.  Yeah.
18   Q      Okay.  When she comes into your office, is she walking?
19   A      Yes.
20   Q      And there's a flight of stairs there to get up to the
21   second story; is that right?
22   A      Yes, sir.
23   Q      Okay.  And, Dr. Tran, in your -- all your years as a
24   practicing physician here in L.A., how many prescriptions for
25   power wheelchairs total have you written?
```

```
 1              MR. DARDEN:  Objection.  Irrelevant.
 2              THE COURT:  Sustained.
 3              THE WITNESS:  It's about --
 4              MR. DARDEN:  Objection.
 5              THE COURT:  Next question.
 6  Q    BY MR. PORTER:  Okay.  Well, would you say that it's a
 7  common practice for you to prescribe power wheelchairs?
 8              MR. DARDEN:  Objection.  Irrelevant.
 9              THE COURT:  Overruled.
10              THE WITNESS:  No, sir.
11  Q    BY MR. PORTER:  And in the last year, for example, how
12  many power wheelchairs have you prescribed?
13              MR. DARDEN:  Objection.  Irrelevant.
14              THE COURT:  Sustained.
15              MR. PORTER:  No further questions.
16              THE COURT:  Okay.  Cross.
17                   CROSS-EXAMINATION
18  BY MR. DARDEN:
19  Q    Doctor, do you keep records of your contacts and visits,
20  office visits?
21  A    Yes, I do.
22  Q    And in the case of Mary Winston, you've been seeing her
23  off and on for almost 20 years; is that right?
24  A    Yes, sir.
25  Q    And she suffers from a variety of ailments; is that right?
```

1    A    Yes, sir.

2    Q    Now, did you -- have you ever had a discussion with Mary

3    Winston about the power wheelchair we now know to be in her

4    possession?

5    A    No, sir.

6    Q    Were you aware that she had asked for a power wheelchair

7    or wanted one?

8    A    She never asked me.  She never initiated talk to me about

9    a power wheelchair.

10   Q    Now, you were asked a moment ago about a cane and a

11   walker -- and a walker for Ms. Winston.  Didn't you, in fact,

12   prescribe a cane and a walker for her on some prior occasions?

13   A    Well, I know that she need the cane.  She walk with cane,

14   yeah, but just a walking cane, the regular one.

15   Q    Well, you were interviewed by agents on January 5, 2015,

16   at your clinic on Cesar Chavez; correct?

17   A    Yes, sir.

18   Q    And at that time didn't they ask you whether or not you

19   had ever written a prescription to Ms. Winston for a cane or

20   walker, and didn't you reply you may have written her a

21   prescription for a cane or walker?

22   A    Well, I -- I have reviewed the chart, but -- well, I --

23   it's -- well, okay.  I myself, I don't see it, any prescription

24   for the walking cane in my chart.

25   Q    And so if Ms. Winston told us that she has had a cane and

```
 1   a walker, then would it be true that she did not get those
 2   items from you?
 3   A    I know that she see the other physician too.  So then she
 4   may have the walker cane from the other physician.
 5   Q    Now, in terms of the ailments Ms. Winston suffers from, it
 6   includes obesity and being overweight; right?
 7   A    Yes, sir.
 8   Q    And that has interfered with her ability to walk, has it
 9   not?
10   A    Yes, sir.
11   Q    And does she also have an enlarged heart?
12   A    She -- she is suffering from a lot of medical illness.
13   She have high blood pressure.  She have arthritis.  She have
14   some other medical condition that affected her heart, yes.  She
15   have some degree of the heart problem, yes.
16   Q    And some of these medical conditions you just described
17   might interfere with her ability to walk properly; correct?
18   A    Yes, sir.
19   Q    Now, in 2011 was there -- was her health poor in
20   comparison to today?
21   A    Well, I -- I see her about the same.
22   Q    What types of surgeries has Ms. Winston had that you know
23   of?
24   A    I'm not aware of any.  She -- she may have some surgery
25   for the kidney.
```

1    Q    And that's the only surgery you're aware of, is perhaps a

2    surgery on her kidney?

3    A    Yes, sir.

4    Q    Are you aware of a surgery she had for a -- on her adrenal

5    gland?

6    A    That's what I'm talking about, kidney, adrenal.

7    Q    How about -- can you describe, by the way -- I mean, this

8    ailment involving her adrenal gland, what exactly is wrong with

9    her?

10   A    Well, she have a condition they called -- the potassium in

11   the blood is low because --

12            THE COURT:  Let me interrupt you because I want to

13   limit it only to how it affected walking.  I don't want to get

14   into a lot of things that aren't relevant here.

15            MR. DARDEN:  That would have been my follow-up

16   question.

17            THE COURT:  Let's kind of incorporate this question

18   too.  Otherwise, we may go into a long medical history here.

19   Q    BY MR. DARDEN:  Can you describe the ailment she suffers

20   from, as far as her adrenal gland is concerned, and how it

21   might affect her walking.

22            THE COURT:  Thank you.

23            THE WITNESS:  Oh, not much.  She have low potassium,

24   but affecting the walking, I don't see any significance.

25   Q    BY MR. DARDEN:  Well, isn't a symptom of low potassium,

**UNITED STATES DISTRICT COURT**

1   weakness, muscle weakness?

2   A    Yes, sir.

3   Q    Now, you told us that your office is on the second floor

4   of a building; right?

5   A    Yes, sir.

6   Q    You didn't watch Ms. Winston enter and exit the building,

7   did you?

8   A    No.  No, sir.

9   Q    And when you saw Ms. Winston, you would see her once she

10  made it into the examination room; true?

11  A    That's right.

12  Q    And you don't know how she arrived at the clinic and how

13  she departed; correct?

14  A    Yes.

15          MR. DARDEN:  Thank you.

16       That's all, Your Honor.

17          THE COURT:  Redirect.

18          MR. PORTER:  Nothing further, Your Honor.

19          THE COURT:  Doctor, thank you very much for coming

20  in.  You are excused at this time.

21          THE WITNESS:  Thank you.

22          THE COURT:  Next.

23          MR. PORTER:  Government calls Ms. Vilma Cruz Munar.

24  ///

25  ///

```
 1                        VILMA CRUZ MUNAR,
 2   called as a witness by the Government, was sworn and testified
 3   as follows:
 4             THE CLERK:  May I please ask that you raise your
 5   right hand.  Do you solemnly swear that the testimony you are
 6   about to give in the matter now before the Court shall be the
 7   truth, the whole truth, and nothing but the truth so help you
 8   God?
 9             THE WITNESS:  Yes.
10             THE CLERK:  Thank you.  And may I please ask that
11   you state your full name for the record and spell your last
12   name.
13             THE WITNESS:  My name is Vilma Cruz Munar,
14   M-u-n-a-r.
15             THE CLERK:  Thank you.
16             THE COURT:  You may inquire, Counsel.
17                      DIRECT EXAMINATION
18   BY MR. PORTER:
19   Q    Good morning, Ms. Munar.  Can you see me here --
20   A    Good morning.
21   Q    Can you see me over the monitor there?
22   A    Yeah.  I can see you, up --
23             MR. PORTER:  Your Honor, may I step to the side here
24   so that I can --
25             THE COURT:  We need you on the mic, at the podium.
```

1   Q     BY MR. PORTER:  Ms. Munar, if you can, try to look at me

2   around the monitor there, right here.  Ms. Munar, do you

3   currently live in West Covina?

4   A     Yes.

5   Q     Are you currently living in a nursing home?

6   A     Yes.

7   Q     Are you originally from the United States, Ms. Munar?

8   A     Which one?

9   Q     Are you originally from the United States or --

10  A     Yes.

11  Q     Okay.  Did you grow up in Burma?

12  A     No.  I grew up in Guam.

13  Q     Oh, Guam.  Excuse me.

14        And, Ms. Munar, do you receive Medicare benefits?

15  A     Yes.

16  Q     Ms. Munar, I want to ask you a few questions about a power

17  wheelchair that you received in June of 2010.  With respect to

18  that power wheelchair, do you remember meeting a woman named

19  Judy?

20  A     Yes.

21  Q     Okay.  I want to show you a picture on the screen in front

22  of you.  This has been introduced into evidence as Government's

23  Exhibit 24.

24  A     Oh.  She become ugly.

25  Q     Ms. Munar, looking at that picture, do you recognize that

**UNITED STATES DISTRICT COURT**

```
 1    individual?

 2    A     She's already old.

 3    Q     Is that the woman you recognize as Judy?

 4    A     Maybe if I saw her in person, but here in the thing,

 5    it's --

 6    Q     Okay.  So just so I'm clear, looking at that picture, do

 7    you recognize that as Judy or not?

 8    A     Maybe.

 9    Q     Okay.  So do you remember Judy talking to you about a

10    power wheelchair?

11    A     Yes.

12    Q     And can you please explain how that happened, your

13    conversation with Judy about the power wheelchair.

14    A     She told me that I can use it, but I said I don't know how

15    to drive a car; so how can I drive that thing?

16    Q     Okay.  And so you don't know how to drive that thing.

17    Were you referring to the power wheelchair?

18    A     Yes.

19    Q     So after you met Judy, did she take you to see a doctor?

20    A     Yes.

21    Q     And do you remember that -- the name of the doctor?

22    A     The name of the doctor?

23    Q     Yes.  Do you remember the name of the doctor?

24    A     No.

25    Q     When you went to see that doctor, though, did you ask for
```

1    a power wheelchair?

2    A    No.

3    Q    Okay.  Knowing that, though, was a power wheelchair

4    eventually delivered to your apartment?

5    A    Yes.

6    Q    And when it was delivered to you, were you surprised that

7    it showed up?

8    A    Yeah, because I don't know how to drive that wheelchair.

9    Q    And did you ever tell Judy that you didn't want the power

10   wheelchair?

11   A    Yes.  I tell her I don't like it.  Bring it back.

12   Q    Okay.  Bring it back.  Did you tell her to take it back?

13   A    Yes.

14   Q    Did you ever use the power wheelchair yourself?

15   A    No.

16   Q    And why didn't you ever use it yourself?

17   A    I don't know how to -- to drive that stupid thing.

18   Q    Did you think that it would be safe for you to use the

19   power wheelchair?

20   A    No.

21   Q    Okay.  Let me just ask you a couple more questions.  So

22   going back to 2010, July of 2010, at that time were you able to

23   walk?

24   A    Yes, I can walk.

25   Q    Okay.  And at the time were you able to walk around the

```
 1   apartment that you lived in?

 2   A     I can walk.  I can walk 15, you know, 15 to 20.

 3   Q     Okay.  When you received the power wheelchair, did you

 4   live in an apartment at the time?

 5   A     Yes.

 6   Q     And was that apartment on the second story of the

 7   apartment complex?

 8   A     Yeah.  We live in the second floor.

 9   Q     And were you able at that time to walk up the stairs to

10   the second story?

11   A     I can go down, and I can go up.  But I don't know how to

12   drive that.

13   Q     Okay.  Ms. Munar, who is your primary care physician?

14   A     Dr. Lim.

15   Q     And how long has Dr. Lim been your doctor?

16   A     I don't remember, but it's a long time ago.

17   Q     And has Dr. Lim ever prescribed a power wheelchair for

18   you?

19   A     No.

20             MR. PORTER:  Nothing further, Your Honor.

21             THE COURT:  Cross.

22             MR. DARDEN:  No cross-examination, Your Honor.

23             THE COURT:  Thank you very much for coming in today.

24   You are excused at this time.

25             MR. PORTER:  Thank you.
```

**UNITED STATES DISTRICT COURT**

1          Your Honor, the Government's next witness is Dr. Susan

2     Lim.

3               THE CLERK:  Dr. Lim, right here to be sworn, please.

4                         SUSAN LIM,

5     called as a witness by the Government, was sworn and testified

6     as follows:

7               THE CLERK:  Can you please raise your right hand.

8     Do you solemnly swear that the testimony you are about to give

9     in the matter now before the Court shall be the truth, the

10    whole truth, and nothing but the truth so help you God?

11              THE WITNESS:  Yes.

12              THE CLERK:  Thank you.  You may be seated.  May I

13    please ask you to state your full name for the record and spell

14    your last name.

15              THE WITNESS:  Lim, L-i-m.

16              THE CLERK:  Your full name is?

17              THE WITNESS:  Full name, Susan Lim.

18              THE COURT:  You may inquire, Counsel.

19                       DIRECT EXAMINATION

20    BY MR. PORTER:

21    Q    Dr. Lim, you're a medical doctor; is that right?

22    A    Yes.

23    Q    And what's -- where is your current medical practice?

24    Where is it located?

25    A    It's in West Covina, 1250 South Sunset Avenue, Suite 203.

1  Q    Okay.  And what is your area of specialization in

2  medicine?

3  A    Internal medicine.

4  Q    And, Dr. Lim, did you receive any medical training here in

5  the United States?

6  A    Yes, I did.

7  Q    And did you also receive medical training abroad before

8  you came to the United States?

9  A    Yes, I did.

10 Q    And where did you receive your medical training from?  Was

11 that in Burma?

12 A    Yes.

13 Q    And where did you receive that training from?

14 A    I received from Rangoon Institute of Medicine Number 1 in

15 Rangoon, Burma.

16 Q    And then, when you came to the United States, did you

17 receive additional medical training?

18 A    Yes, I did.

19 Q    And where did you receive that training?

20 A    My internship was in Philadelphia, Pennsylvania.

21      And then my residency was in New York City, Jamaica in

22 New York.

23 Q    And when did you come out here to Southern California to

24 start practicing medicine?

25 A    1991 I came back.

**UNITED STATES DISTRICT COURT**

1    Q    And specifically with your practice, your current practice

2    in West Covina, how long have you been there at that practice?

3    A    Eighteen years.  This year is my 18th.

4    Q    Okay.  Now, during your time at your practice in

5    West Covina, have you had a patient named Vilma Cruz Munar?

6    A    Yes, I did.  And I still have her.

7    Q    And how long --

8                THE COURT:  That was the lady that just walked out

9    of here?

10                THE WITNESS:  Yes.

11                THE COURT:  Go ahead, Counsel.

12   Q    BY MR. PORTER:  And how long have you treated Ms. Munar?

13   A    Since January 2004.

14   Q    And you mentioned just a second ago she's currently your

15   patient?

16   A    Yes.

17   Q    When was the last time that you saw Ms. Munar?

18   A    Saturday, March the 14th, 2015.

19   Q    Just this past weekend?

20   A    Yes.

21   Q    And in general how frequently do you see Ms. Munar?

22   A    Once a month, because she lives in a nursing home.

23   Q    So based on that history, is it fair to say you're

24   familiar with Ms. Munar's physical condition?

25   A    Yes, very much.

UNITED STATES DISTRICT COURT

```
 1   Q    And would you consider yourself to be her primary care
 2   physician?
 3   A    Yes, I am.
 4   Q    As Ms. Munar's primary care physician, have you ever
 5   prescribed for her a power wheelchair?
 6   A    No, I never.
 7   Q    Has Ms. Munar ever asked you for a power wheelchair?
 8   A    No.  She never asked me.
 9   Q    Now, Dr. Lim, am I correct that Ms. Munar had a stroke in
10   September of 2010?
11   A    2010, yes.  She suffer a stroke.
12   Q    Okay.  And after that stroke in September of 2010, did you
13   prescribe anything for Ms. Munar to help her walk?
14   A    Just a walker with cane -- a walker with seat.  That's
15   all.
16   Q    And that was after the --
17   A    After.
18   Q    -- stroke?
19   A    After.
20   Q    Did you prescribe a power wheelchair for Ms. Munar --
21   A    No.
22   Q    -- after the stroke?
23   A    I did not, I did not.
24   Q    Okay.  But before the stroke in September of 2010, was
25   Ms. Munar able to walk without assistance?
```

**UNITED STATES DISTRICT COURT**

1    A    Correct.  She was able to walk without assistance before

2    the stroke.

3    Q    And before the stroke in September of 2010, had you ever

4    prescribed a regular wheelchair for Ms. Munar?

5    A    No.  Before the stroke, no.

6    Q    And before her stroke in September 2010, had you ever

7    prescribed a walker for Ms. Munar?

8    A    No, not a walker also.

9    Q    Were you aware that in June of 2010, before the stroke,

10   Ms. Munar actually received a power wheelchair?

11   A    No, I didn't know.  I didn't know she receive or not.

12   Q    And have you ever seen Ms. Munar in a power wheelchair?

13   A    No.  I never saw her came to my office with that.

14   Q    And would you have prescribed a power wheelchair for

15   Ms. Munar before her stroke in September of 2010?

16   A    Not me.

17   Q    Based on your knowledge of Ms. Munar, would it have been

18   safe for her to have a power wheelchair?

19             MR. DARDEN:  Objection.  Irrelevant.

20             THE COURT:  Sustained as to whether it's safe.

21   Q    BY MR. PORTER:  Dr. Lim, in your more than 15 years of

22   your practice in West Covina, have you written many

23   prescriptions for power wheelchairs?

24             MR. DARDEN:  Objection.  Irrelevant.

25             THE COURT:  Overruled.

1         Have you written many?

2              THE WITNESS:  I wrote a few for eligible patients.

3              THE COURT:  Okay.

4    Q    BY MR. PORTER:  And that's in your entire time practicing

5    in --

6    A    Yes.

7    Q    -- West Covina?

8    A    In 18 years.

9    Q    And on those occasions, when you have written the power

10   wheelchair prescriptions, have you ever written a prescription

11   on the very first time you ever saw a patient?

12   A    No, I never.

13             MR. DARDEN:  Objection.

14             THE COURT:  Sustained.

15             MR. DARDEN:  Motion to strike.

16             THE COURT:  It will be stricken.

17        Did you find this patient to be eligible for a wheelchair?

18             THE WITNESS:  No.

19             THE COURT:  Next question.

20             MR. PORTER:  Nothing further, Your Honor.

21             THE COURT:  Cross.

22                        CROSS-EXAMINATION

23   BY MR. DARDEN:

24   Q    Doctor, you say Ms. Munar suffered a stroke in September

25   of 2010 --

```
 1   A     Correct.
 2   Q     -- is that right?
 3         And what were the -- what were the results of that stroke?
 4   How did it affect her?
 5   A     Oh, yeah.  Initially, she was suffering a lot, and she was
 6   admitted to intensive care unit.
 7         But later she became much better in the -- even in the
 8   hospital, she recover fast.  I transfer her to the
 9   rehabilitation inpatient center in the hospital, and she
10   received physical therapy, intense -- intensive physical
11   therapy.
12   Q     How long did she remain in intensive physical therapy?
13   A     Oh, I don't remember, though.  Could be one month.
14   Q     Memory loss, is memory loss often -- does it often occur
15   after a stoke?
16   A     Did she have memory loss?  No, she did not.
17   Q     My question is does memory loss occur sometimes after a
18   stroke?
19   A     Sometimes after stroke, she even have disfigure -- could
20   not swallow and could not talk too well.  So there is some
21   impact in the memory too, yes.
22              MR. DARDEN:  Thank you.
23              MR. PORTER:  Nothing further, Your Honor.
24              THE COURT:  Doctor, thank you very much for coming
25   in.  You may be excused at this time.  Thank you very much for
```

586

```
 1   coming in.
 2       Next witness.
 3           MS. QUINTERO:  Yes, Your Honor.  Government would
 4   like to call Ms. Maria Garibay.
 5                       MARIA GARIBAY,
 6   called as a witness by the Government, was sworn and testified
 7   through the interpreter as follows:
 8           THE CLERK:  Good morning.  May I please ask that you
 9   raise your right hand.  Do you solemnly swear the testimony you
10   are about to give in the matter now before the Court shall be
11   the truth, the whole truth, and nothing but the truth so help
12   you God?
13           THE WITNESS:  Yes.
14           THE CLERK:  Thank you.  And may I please ask that
15   you state your full name for the record and spell your last
16   name.
17           THE WITNESS:  Maria Elena Garibay.
18           THE INTERPRETER:  Interpreter spelling?
19           THE COURT:  Please.
20           THE INTERPRETER:  M-a-r-i-a, E-l-e-n-a,
21   G-a-r-i-b-a-y.
22           THE COURT:  Thank you.
23       You may inquire.
24           MS. QUINTERO:  Thank you, Your Honor.
25   ///
```

UNITED STATES DISTRICT COURT

```
 1                    DIRECT EXAMINATION
 2   BY MS. QUINTERO:
 3   Q    Good morning, Ms. Garibay.
 4   A    Good morning.
 5   Q    Where are you originally from?
 6   A    From Mexico.
 7   Q    And when did you move to the United States?
 8   A    Like in '73.
 9   Q    And have you remained in the United States since you first
10   came here around 1973?
11   A    Yes.
12   Q    What city do you currently live in?
13   A    Lakeview Terrace.
14   Q    Is that in the Sylmar area?
15   A    Yes.
16   Q    Are you a Medicare eligible beneficiary?
17   A    Yes.
18   Q    Approximately when did you begin to receive Medicare
19   benefits?
20   A    Around 2008, two thousand -- yes.
21   Q    Okay.  Now, I want to ask some questions about your
22   ability to walk.  I noticed that, when you walked into the
23   courtroom, you walked up there with the assistance of a walker;
24   is that right?
25   A    Yes.
```

```
 1   Q     Now, do you use a cane or a walker to get around?
 2   A     Yes.
 3   Q     Do you use any type of wheelchair at all to get around
 4   your house?
 5   A     No.
 6   Q     So is it fair to say that walking around your house, you
 7   get around with a cane or a walker?
 8   A     Yes.
 9   Q     Now, I want to talk about your doctor.  Do you have a
10   primary doctor that you regularly see in the Sun Valley area?
11               THE INTERPRETER:  Sun Valley, Counsel?
12               MS. QUINTERO:  Yes.
13               THE WITNESS:  Yes.
14   Q     BY MS. QUINTERO:  And who is your -- your doctor that you
15   see in the Sun Valley area?
16   A     Dr. Campos, female.
17   Q     And approximately how long has Dr. Campos been your
18   doctor?
19   A     From around 2007.
20   Q     Okay.  And how often do you see Dr. Campos in her office
21   in Sun Valley?
22   A     Every three months or six months.
23   Q     Okay.  And what do you see Dr. Campos for?
24   A     For my prescriptions and for my physical checkups.
25   Q     Now, has Dr. Campos ever prescribed a power wheelchair for
```

**UNITED STATES DISTRICT COURT**

```
 1  you?
 2  A      No.
 3  Q      Have you ever asked Dr. Campos to prescribe a power
 4  wheelchair for you?
 5  A      No.
 6  Q      Now, despite the fact that over the years Dr. Campos has
 7  never prescribed a power wheelchair for you, did you get a
 8  power wheelchair?
 9  A      Yes.
10  Q      Do you remember the details on how you got the power
11  wheelchair?
12  A      Well, I was taken to Los Angeles, and then later it was
13  brought to me to my house.
14  Q      Do you remember the person that took you to Los Angeles?
15  A      Yes.
16  Q      What's the person's name?
17  A      I forgot.  Wilmer, Wilmer.
18  Q      Okay.  Prior to this person Wilmer taking you -- did you
19  say to Los Angeles?  Was it to a doctor's office?
20  A      Yes.
21  Q      Prior to this had -- had you known Wilmer before?
22  A      No.
23  Q      So this is the first time you met Wilmer?
24  A      Yes.
25  Q      Okay.  I want to show you this photograph.
```

**UNITED STATES DISTRICT COURT**

```
 1        You can go ahead and publish it.
 2        Ms. Garibay, do you recognize the person that's depicted
 3   in this photograph, Government Exhibit 23?
 4   A    Yes, yes.
 5   Q    And who is that person?
 6   A    Mr. Wilmer.
 7   Q    Okay.  And he's the one that took you to the doctor's in
 8   Los Angeles?
 9   A    Yes.
10   Q    Now, when Wilmer took you to the clinic, did you see a
11   doctor at the clinic?
12   A    Yes.
13   Q    Did the doctor or anyone at the doctor's office give you a
14   prescription at all for the power wheelchair for you to fill?
15   A    No.
16   Q    Okay.  When Wilmer took you to the doctor to get a power
17   wheelchair, did you think you needed a power wheelchair?
18   A    Well, I don't remember.
19   Q    Okay.  Did you think you needed a power wheelchair to get
20   around your house?
21   A    Well, yes.
22   Q    To -- to get around your house, not outside your house?
23   A    Yes, for -- yes.
24   Q    For what, for outside?  I'm sorry.  I'm not understanding.
25   A    I wanted to go shopping, but then I got scared.
```

**UNITED STATES DISTRICT COURT**

1   Q     You wanted to go shopping with a power wheelchair,

2   outside?

3   A     Yes.

4   Q     Okay.  And did you in fact -- was a power wheelchair

5   delivered to you?

6   A     Yes.

7   Q     And were you at home when the power wheelchair was

8   delivered to you?

9   A     Yes.

10  Q     And when the power wheelchair was delivered to you at

11  home, were you walking around at that time?

12  A     With my walker, yes.

13  Q     Okay.  And is that how you would get around your house,

14  with a cane or a walker?

15  A     Yes.

16  Q     Now, when the man delivered -- when the power wheelchair

17  was delivered to you, did you remain inside of your home, or

18  did you go outside of the house?

19  A     I went outside.

20  Q     And when the power wheelchair was delivered to you, where

21  did the person leave it?

22  A     There outside of the front door -- of the door of the

23  house.

24  Q     When the person delivered the power wheelchair, did the

25  person come inside your house at all and take any measurements?

1    A      No.

2    Q      Did he even come inside your home at all to look around?

3    A      No.

4    Q      Okay.  Ms. Garibay, do you still currently have the power

5    wheelchair that we're talking about?

6    A      Yes.

7    Q      Do you currently use that power wheelchair?

8    A      No.

9    Q      At some point would you use it to go outside?

10   A      No.

11   Q      When you would use it to go shopping, you mentioned --

12   A      Just outside, just to train myself because I didn't know

13   how to use it.

14   Q      Okay.  And did you eventually stop using it even outside?

15   A      Yes.

16   Q      Why did you stop using it?

17   A      Because it doesn't work.  It doesn't function.

18   Q      Were you afraid to use the power wheelchair?

19          MR. DARDEN:  Objection.  Leading.

20          THE COURT:  Sustained.

21   Next question.

22   Q      BY MS. QUINTERO:  Did you ever use the power wheelchair to

23   just go to -- down the block?

24   A      Yes.

25          MS. QUINTERO:  No further questions, Your Honor.

```
1              THE COURT:  Cross.
2                         CROSS-EXAMINATION
3   BY MR. DARDEN:
4   Q    Ms. Garibay, how old were you when you received the power
5   wheelchair?
6   A    I don't remember.
7   Q    Do you remember what year you received the power
8   wheelchair?
9   A    It was over five years ago, approximately.
10  Q    And after you got the wheelchair, the battery
11  malfunctioned; is that right?
12  A    Yes.
13  Q    And did you call Wilmer at that point?
14  A    Yes.  And he got another one for me.  I was given another
15  new one.
16  Q    Now, when you got the wheelchair or just before getting a
17  wheelchair, Wilmer took you to a doctor; right?
18  A    Yes.
19  Q    And did the doctor examine you?
20  A    Yes.
21  Q    And did the doctor talk to you about your medical history?
22  A    I don't remember.
23  Q    Well, in 2011 did you suffer from emphysema?
24  A    What is emphysema?
25  Q    Well, did you suffer from shortness of breath in 2011?
```

**UNITED STATES DISTRICT COURT**

```
 1    A      Yes.
 2    Q      And did you suffer from muscle weakness in 2011?
 3    A      Yes.
 4    Q      And in 2011 did you suffer from a disc degenerative
 5    disease?
 6    A      Yes.
 7    Q      And you had a weight problem; is that right?
 8    A      Yes.
 9    Q      And do you have COPD?
10    A      What is that, the machine to breathe?
11    Q      Okay.  Let me ask you that.  Do you have a machine to
12    breathe?
13    A      At night, yes.
14    Q      In 2011 did you also have some issues, medical issues
15    involving your knees?
16    A      Yes.
17    Q      What was the problem with your knees in 2011?
18    A      I have arthritis, and it's as if my knees get dislocated.
19    Q      Okay.  Now, today -- today you are not yet 60 years old;
20    is that true?
21    A      No.  It is true.
22    Q      How old are you?
23    A      57.
24    Q      Now, all of the medical issues you described -- the
25    arthritis, the degenerative disc issue, the shortness of
```

1    breath, the air machine -- do all of these conditions and

2    issues contribute to your inability to walk effectively?

3              MS. QUINTERO:  Objection, Your Honor.  Calls for

4    speculation.

5              THE COURT:  Overruled.

6              THE WITNESS:  Yes.

7    Q    BY MR. DARDEN:  And if you can tell us, what is the

8    specific or -- specific conditions that cause you to use a

9    walker today?

10   A    Well, the thing is, if I sit, I can't get up.  And if I

11   walk, then my knees bend and then I fall.

12   Q    And is that why you needed a wheelchair back in 2011?

13             MS. QUINTERO:  Objection, Your Honor.  Calls for

14   speculation.

15             THE COURT:  Overruled.

16             THE WITNESS:  Yes.  I -- yes.

17             MR. DARDEN:  Thank you.

18        Nothing further.

19             THE COURT:  Redirect?

20             MS. QUINTERO:  No questions, Your Honor.

21             THE COURT:  You may step down.  Thank you very much

22   for coming in.

23             THE CLERK:  Counsel, can I have the name of your

24   witness, please.

25             MS. QUINTERO:  Yes.  Dr. Lelys Campos.

**UNITED STATES DISTRICT COURT**

```
 1                          LELYS CAMPOS,
 2  called as a witness by the Government, was sworn and testified
 3  as follows:
 4              THE CLERK:  Do you solemnly swear the testimony you
 5  are about to give in the matter before the Court shall be the
 6  truth, the whole truth, and nothing but the truth so help you
 7  God?
 8              THE WITNESS:  I swear.
 9              THE CLERK:  Thank you.  You may be seated.  May I
10  please ask that you state your full name for the record and
11  spell your last name.
12              THE WITNESS:  My last name is Campos, C-a-m-p-o-s.
13              THE CLERK:  Your first name?
14              THE WITNESS:  Lelys, L-e-l-y-s.
15              THE CLERK:  Thank you.
16              THE COURT:  Okay.  You may inquire, Counsel.
17              MS. QUINTERO:  Thank you, Your Honor.
18                       DIRECT EXAMINATION
19  BY MS. QUINTERO:
20  Q    Good morning, Dr. Campos.
21  A    Good morning.
22  Q    It's my understanding you currently practice medicine; is
23  that correct?
24  A    Correct.
25  Q    What city are your medical offices located?
```

```
1    A      Sun Valley.

2    Q      And what is your area of practice?

3    A      General practice.

4    Q      Now, I want to just briefly discuss your educational

5    background.  Where did you attend college?

6    A      In El Salvador.

7    Q      And how about medical school?  Where did you attend

8    medical school?

9    A      In Guadalajara, Mexico.

10   Q      And approximately when did you graduate from medical

11   school?

12   A      '72.

13   Q      After medical school did you come to the United States and

14   do an internship?

15   A      Yes, I did.

16   Q      And where did you do your internship?

17   A      I did one internship in Dallas, Texas, and the externship

18   here in the V.A. Hospital in West Los Angeles.

19   Q      And did you ultimately take and pass your medical

20   boards --

21   A      Yes, I did.

22   Q      -- in 1981?

23          Once you passed your medical boards, did you start

24   practicing in the Los Angeles county area?

25   A      Right away.
```

**UNITED STATES DISTRICT COURT**

```
 1   Q    And when did you start your practice in Sun Valley?
 2   A    In '96.
 3   Q    So if my math is right, you've been practicing in
 4   Los Angeles county about 34 years or so?
 5   A    That's right.
 6   Q    Now, as part of your practice in the Sun Valley area, have
 7   you had the opportunity to see a patient by the name of Maria
 8   Garibay as her primary care physician?
 9   A    Yes, I have.
10        THE COURT:  Was that the lady that just walked out
11   of the courtroom?
12        THE WITNESS:  Right.
13        THE COURT:  Thank you.
14   Q    BY MS. QUINTERO:  Roughly how long has Ms. Garibay been a
15   patient of yours?
16   A    Oh, around five years.
17   Q    When did you first start seeing Ms. Garibay as a patient
18   of yours?
19   A    Like in '09.
20   Q    Generally, on a yearly basis, how often would you say that
21   you've seen Ms. Garibay in your office?
22   A    Like three or four times a year.
23   Q    Over the years that Ms. Garibay has been a patient of
24   yours, have you personally examined Ms. Garibay?
25   A    Yes.
```

```
 1   Q     And over the years that Ms. Garibay has been a patient of
 2   yours, how would she generally come into your office?
 3   A     She comes walking with the assistance of a cane or maybe a
 4   walker sometimes.
 5   Q     Have you ever seen Ms. Garibay come to your office in a
 6   power wheelchair?
 7   A     No, not at all.
 8   Q     Have you ever seen Ms. Garibay come into your office in a
 9   manual wheelchair?
10   A     No.
11   Q     When was the last time that you personally examined
12   Ms. Garibay?
13   A     That was in February of this year.
14   Q     Just last month?
15   A     Last month.
16   Q     Now, during the last visit that you saw Ms. Garibay, how
17   did she come into your office?
18   A     She came walking.
19   Q     With an assistive device or something?
20   A     With a cane.
21   Q     Now, during the five years or so that you've been treating
22   Ms. Garibay as a patient, have you ever prescribed a power
23   wheelchair for her?
24   A     No.
25   Q     Has she ever even asked you to prescribe a power
```

1    wheelchair?

2    A     No, she hasn't.

3    Q     In your 30 years of practicing medicine, how many power

4    wheelchairs do you think you've prescribed in those 34 years?

5              MR. DARDEN:  Objection.  Irrelevant.

6              THE COURT:  Sustained.

7              THE WITNESS:  Maybe one or two.  One.

8              THE COURT:  Sustained.

9              MR. DARDEN:  Motion to strike.

10             THE COURT:  Stricken.

11        Next question, Counsel.

12   Q     BY MS. QUINTERO:  Would you say that it's a common

13   practice for you to prescribe a power wheelchair?

14             MR. DARDEN:  Objection.  Irrelevant.

15             THE WITNESS:  Oh, no, not at all.

16             THE COURT:  Overruled.

17   Q     BY MS. QUINTERO:  If it's not at all, why do you so rarely

18   prescribe power wheelchairs in your practice?

19             THE COURT:  Counsel, there's no testimony that --

20   excuse me.

21             THE WITNESS:  I give it only to --

22             THE COURT:  There's no testimony that she rarely

23   prescribes power wheelchairs.

24        Let me just ask the question.

25             MS. QUINTERO:  Yes.

**UNITED STATES DISTRICT COURT**

```
 1              THE COURT:  Did you feel that the patient
 2   Ms. Garibay was eligible for a wheelchair?
 3              THE WITNESS:  No.
 4              THE COURT:  Go ahead, Counsel.
 5              MS. QUINTERO:  Thank you, Your Honor.
 6   Q    BY MS. QUINTERO:  Dr. Campos, just because the patient
 7   wants a power wheelchair, do you -- do you prescribe a power
 8   wheelchair?
 9   A    No.
10   Q    Why is that?
11   A    Because you make them --
12              MR. DARDEN:  Objection.
13              THE COURT:  Overruled.
14              THE WITNESS:  Because, if they walk a little bit, I
15   usually advise them to exercise to improve their ability to
16   walk, not -- not a wheelchair or --
17   Q    BY MS. QUINTERO:  And what are the potential adverse
18   consequences for your patients using a power wheelchair if they
19   can actually walk, even if a little?
20   A    Well, they are going to get worse by not using their legs
21   and walking.  They may become really handicapped.
22              MS. QUINTERO:  No further questions at this time,
23   Your Honor.
24              THE COURT:  Cross.
25   ///
```

```
 1                    CROSS-EXAMINATION
 2   BY MR. DARDEN:
 3   Q    Doctor, you saw Ms. Garibay at your office on February 16,
 4   2015; is that correct?
 5   A    Correct.
 6   Q    And at the time Ms. Garibay was using a walker; correct?
 7   A    Correct.
 8   Q    Did you prescribe that walker?
 9   A    No.  She already has it.
10   Q    You testified that, on some prior occasions, Ms. Garibay
11   also had a cane; is that right?
12   A    Yes.
13   Q    Did you prescribe that cane?
14   A    No.
15   Q    Were you aware that Ms. Garibay, once seated, could not
16   get up?
17   A    Sometimes.
18   Q    Were you aware that, when Ms. Garibay would walk, her
19   knees would give out; she would fall down?
20   A    I have seen walking well, never saw her falling down.
21   Q    Well, did she ever tell you that -- that, when she walks,
22   she falls down?  Her knees give out, and she falls down?
23              MS. QUINTERO:  Objection, Your Honor.  Misstates the
24   testimony.
25              THE COURT:  Overruled.
```

**UNITED STATES DISTRICT COURT**

```
 1          Did she ever make that statement to you?
 2              THE WITNESS:  No.
 3   Q    BY MR. DARDEN:  If you were made aware that Ms. Garibay
 4   could not walk without her knees giving out and her falling
 5   down, would you have considered a wheelchair?
 6   A    Yes, I would.
 7              MR. DARDEN:  Thank you.  That's all.
 8              THE COURT:  Anything further of this witness?
 9                     REDIRECT EXAMINATION
10   BY MS. QUINTERO:
11   Q    In the years that you've been treating Ms. Garibay, has
12   there been any reason for you to prescribe a power wheelchair?
13   A    No.
14              MS. QUINTERO:  Thank you, Your Honor.
15              THE COURT:  Anything else of this witness?
16              MR. DARDEN:  No, Your Honor.  Thank you.
17              THE COURT:  You may step down, Doctor.  Thank you
18   very much for coming in.
19          Next witness.
20              MR. PORTER:  At this time Government calls Special
21   Agent Eric Froeschner.
22              THE COURT:  Okay.
23                     ERIC FROESCHNER,
24   called as a witness by the Government, was sworn and testified
25   as follows:
```

```
 1              THE CLERK:  Do you solemnly swear the testimony you
 2    are about to give in the matter now before the Court shall be
 3    the truth, the whole truth, and nothing but the truth so help
 4    you God?
 5              THE WITNESS:  Yes, ma'am, I do.
 6              THE CLERK:  Thank you.  You may be seated.  May I
 7    please ask that you state your full name for the record and
 8    spell your last name.
 9              THE WITNESS:  My name is Eric Froeschner,
10    F-r-o-e-s-c-h-n-e-r.
11              THE CLERK:  Thank you.
12                         DIRECT EXAMINATION
13    BY MR. PORTER:
14    Q    Agent Froeschner, where do you currently work?
15    A    At the California Department of Justice.  I'm currently
16    assigned to the Bureau of Medi-Cal Fraud and Elder Abuse.
17    Q    And the bureau of -- Bureau of Medi-Cal Fraud and Elder
18    Abuse, is that also known as BMFEA?
19    A    Yes.
20    Q    And what is the function of Cal DOJ and BMFEA?
21    A    Well, the California Department of Justice is divided up
22    into several bureaus throughout the state, and we investigate
23    all different types of crimes throughout the State of
24    California.
25    Q    And specifically what does the BMFEA department
```

1   investigate?

2   A    The Bureau Of Medi-Cal Fraud and Elder Abuse, just as the

3   title suggests, we investigate Medi-Cal fraud and elder abuse

4   throughout the State of California.

5   Q    What's your title with Cal DOJ?

6   A    I'm a special agent.

7   Q    And how long have you held the position, the position of

8   special agent with Cal DOJ?

9   A    I've been a special agent with Cal DOJ for -- since 1997,

10  and so --

11  Q    Specifically with the BMFEA department, how long have you

12  been with them?

13  A    Since November of 2004.

14  Q    So approximately 11 years?

15  A    Yes, sir.

16  Q    And during your 11 years with Cal DOJ BMFEA, roughly how

17  many health care fraud investigations have you worked on or

18  personally led?

19  A    In excess of a hundred.

20  Q    Okay.  So during your time working for Cal DOJ, did you

21  have the occasion to investigate the defendant and her company,

22  Ezcor 9000?

23  A    Yes, sir, I did.

24  Q    And approximately when did Cal DOJ become involved in the

25  investigation into the defendant and Ezcor?

```
 1    A      January of 2011.
 2    Q      And did you personally become involved in the
 3    investigation at that time?
 4    A      Yes, sir.
 5    Q      And have you worked on this investigation jointly with any
 6    other agencies?
 7    A      Yes, sir.  With the United States Department of Health and
 8    Human Services, Office of Inspector General, and the FBI.
 9    Q      Now, as part of your investigation in this case, did you
10    obtain and review Ezcor's Medicare and Medi-Cal claims data?
11    A      Yes, I did.
12    Q      And is that the claims data that has already been
13    introduced into evidence as Government Exhibits 11 and 12?
14    A      Yes, sir.
15    Q      And can you just explain briefly, not too much detail,
16    about what type of information is contained in the claims data.
17    A      Sure.
18           The claims data actually contains a massive amount of
19    data.  It contains beneficiaries' information, all their
20    personal information -- first name, last name, middle name,
21    dates of birth, Social Security number -- all types of
22    identifying information for the beneficiaries.
23           It also contains the type of service or product that they
24    received.  It contains the referring physician's information,
25    contains dates, dates that the claims were submitted to
```

1  Medicare, dates that the patient was originally seen.

2       And then it also contains the financial information, so

3  the amount that the Medicare providers bill to Medicare as well

4  as the amount that was reimbursed.

5  Q    Okay.  So is it fair to say a voluminous amount of data?

6  A    Yes, sir.

7  Q    Were you able to summarize that data into certain summary

8  charts?

9  A    Yes, sir.

10 Q    Okay.  Let's look first at Government Exhibits 46 through

11 51.

12      And, Your Honor, at this time I would move Government's

13 Exhibits 46 through 51 into evidence.  I believe we've already

14 discussed this with defense counsel, and they don't have any

15 objection.

16           THE COURT:  Okay.

17           MR. DARDEN:  May I have a moment.  46 through 51?

18           THE COURT:  Sure.  46 through 51.

19           MR. DARDEN:  Sorry.  That's going to take a moment.

20           THE COURT:  Okay.

21           MR. DARDEN:  No objection, Your Honor.

22           THE COURT:  Okay.  It will be received.

23           (Exhibits 46 through 51 received into evidence.)

24 Q    BY MR. PORTER:  Okay.  So if we can publish Government

25 Exhibit 46 on the screen there, okay.  So looking at this chart

1    here, Government Exhibit 46, can you explain to the jury what's

2    reflected here.

3    A    Yes.  This chart represents the total combined billed and

4    paid amounts to and from Medicare and Medi-Cal.

5    Q    Okay.  And what's the time period on this -- on this

6    chart?

7    A    January of 2007 through March of 2012.

8    Q    And you personally have reviewed the Medicare and Medi-Cal

9    claims data for Ezcor; is that right?

10   A    Yes, sir.

11   Q    Based on your review of that claims data, can you explain

12   to the jury why there is a discrepancy between the billed

13   amount of 3.5 million and the paid amount of 1.9 million.

14   A    Sure.  There's a couple reasons for that.

15        So a Medicare provider can actually bill any amount they

16   want to Medicare, but Medicare only reimburses what they call

17   an allowable amount.  And of that allowable amount, Medicare

18   only reimburses 80 percent.  So that's part of the -- the

19   disparity in the amounts.

20        And the second part is that it's not uncommon -- or claims

21   that somebody submits to Medicare can be denied.

22   Q    And those denials, can they happen on the front end or the

23   back end, or both?

24   A    Both.

25   Q    Okay.  Let's look at next Government Exhibit 47.  Okay.

1  Can you explain what's reflected here and how this chart

2  relates to the one that we were just looking on the previous

3  slide.

4  A    Sure.  So this slide represents the total billed and paid

5  to Medicare and Medi-Cal.  So it's the same total amount, but

6  it's -- it's separated in between Medicare and Medi-Cal.  So

7  all -- Medicare was billed 3.4 million.  Medi-Cal was billed

8  89,000.

9  Q    Okay.  So the two bars on the left side of the chart, the

10 larger bars, those are the Medicare billings?

11 A    Yes.

12 Q    And the two bars on the right side of the chart are the

13 Medi-Cal billings?

14 A    Yes, sir.

15 Q    And can you explain to the jury why the Medi-Cal billings

16 are so much smaller than the Medicare bills.

17 A    Sure.  Like I talked about on the last slide, Medicare can

18 reimburse an allowable amount, but they only -- but the total

19 that they'll only reimburse is 80 percent.

20      And then if a beneficiary has a secondary insurance such

21 as Medi-Cal, then Medi-Cal can reimburse up to 20 percent.

22      However, not all beneficiaries have Medi-Cal.  So while

23 they may have Medicare, they may not have Medi-Cal.  And also,

24 even if a beneficiary does have Medi-Cal, it doesn't

25 necessarily mean that the provider will submit a claim to

```
 1   Medi-Cal, because they only reimburse 20 percent.
 2   Q    Okay.  Let's go next to Government's Exhibit 48.  Can you
 3   explain to the jury what's reflected here on Exhibit 48.
 4   A    Sure.  So this is -- this is a breakdown of the total
 5   billed and paid to Medicare and Medi-Cal, but it's broken down
 6   by year.
 7        So you can see, from 2007 through 2010, the amounts billed
 8   and paid increased each year during that time period.
 9   Q    And these are obviously the billings for Ezcor-9000, the
10   defendant's business; right?
11   A    Yes, sir.
12   Q    Look at the first four years, 2007 to 2010.  What do you
13   notice in those four years?
14   A    The amount increases each year during that time period.
15   Q    Okay.  And then after 2010, from 2010 to 2011, is it fair
16   to say that there's a pretty significant drop in the billings?
17   A    Yes, sir.
18   Q    And can you explain to the jury some of the reasons why --
19   why that drop occurred in 2011.
20            MR. DARDEN:  Objection.  Speculation.
21            THE COURT:  Sustained.
22   Q    BY MR. PORTER:  Okay.  Well, Special Agent Froeschner, are
23   you aware of any changes to Medicare rules that happened in
24   early 2011?
25   A    Yes, sir.
```

**UNITED STATES DISTRICT COURT**

```
 1   Q     What are the changes that happened in early 2011?
 2   A     So the Affordable Care Act was enacted, and it eliminated
 3   what we call lump sum payment purchases.  So essentially
 4   effective January 1 -- not essentially.  Effective January 1 of
 5   2011, Medicare stopped reimbursing lump sum payments.
 6         Instead, a Medicare provider could furnish -- I misspoke.
 7   Sorry.  Lump sum payments for standard power wheelchairs.
 8         So instead, a Medicare provider starting in January of
 9   2011 could furnish a standard power wheelchair, but they had to
10   do so on a monthly payment purchase.  So essentially what
11   happened was, as of that date, January 1st, 2011, Medicare
12   stopped reimbursing the full amount for the wheelchair, and
13   instead they would reimburse -- that amount would be split up
14   among 13 monthly payments.
15   Q     So the program went from a -- a complete reimbursement to
16   essentially a rental program?
17   A     That's correct.
18   Q     So the payments were then spread over how many months?
19   A     Thirteen months.
20   Q     Okay.  And then from 2011 to 2012, there's another pretty
21   significant drop on this chart.  Is that fair to say?
22   A     Yes, sir.
23   Q     Can you explain some of the reasons for that drop.
24   A     Sure.  The first reason was the defendant actually stopped
25   submitting claims to Medicare in March, early March of 2012.
```

**UNITED STATES DISTRICT COURT**

1       And then also Medicare sent their notice of audit to the

2   defendant in March of 2012 when they requested the hundred

3   patient files to be reviewed.

4   Q     Okay.  So the 2012 numbers there, that's only for

5   approximately two months of 2012?

6   A     That's correct, yes.

7   Q     When was the late -- the date of the last billing

8   defendant submitted to Medicare?

9   A     The last claim was submitted on March 2nd of 2012.

10          THE COURT:  We're going to break at this time,

11   ladies and gentlemen, for lunch.  I'll have you come back in at

12   one o'clock, a few minutes earlier than that so we can get

13   started right at one o'clock.

14       Remember the admonishment not to discuss the case among

15   yourselves or with anybody else or form or express any opinions

16   about the matter until it's submitted to you and you retire to

17   the jury room.

18       Also, keep in mind we'll be breaking at 3:00.  In case you

19   have to make plans to get picked up or anything, we'll be

20   breaking at 3:00 this afternoon.

21       We'll be in recess.

22          THE CLERK:  All rise.

23              (Noon recess at 11:30 A.M.)

24              (The following proceedings were held out of the

25              presence of the jury:)

1          THE COURT:  Okay.  Counsel, one of the parties

2   wanted to speak with the Court before the -- before the jury

3   came back?

4          MR. PORTER:  Yes, Your Honor.

5          THE COURT:  The record will reflect the jury is not

6   present.

7      Yes, Counsel.

8          MR. PORTER:  Your Honor, yesterday we asked the

9   Court for a complete witness list from the defense attorneys.

10  And this afternoon, just after we broke, we received for the

11  first time a list of 14 different witnesses who the defense may

12  call.  There are two experts included on this list.  I don't

13  even have the complete names of the experts and have never

14  received any Rule 16 disclosure on any experts.

15     And the remaining people, there's only one individual

16  who's been previously mentioned to us, and that was John

17  Adefowere.  And every day essentially for the last week we've

18  been asking, and that's the only name that's come up.

19     And so we've now received a list of 14 witnesses,

20  Your Honor.

21         THE COURT:  And you're asking what?

22         MR. PORTER:  We're asking -- I think a lot of these

23  are irrelevant.  I think that the experts, there's been no

24  Rule 16 disclosure; so they should be excluded.  I think a lot

25  of the witnesses are irrelevant.  At the very least, we should

1    know who they are from the defendant, and with no disclosure at

2    this point, they should be excluded as well.

3            THE COURT:  Under what section?  Under what

4    authority?

5            MR. PORTER:  Well, Rule 16 provides for reciprocal

6    discovery obligations.  We've received no reciprocal discovery

7    for these individuals, and we've never heard of these people

8    before.

9            THE COURT:  Okay.  Counsel, do you wish to be heard?

10           MS. NKELE:  Yes, Your Honor.  Your Honor, I

11   apologize to counsel.  We are just trying to get in touch with

12   these people.  The only one I spoke with before, which we put

13   on the list, was the accountant.  These were all possibilities

14   that she, the defendant, thought she might call but wasn't able

15   to find them because a lot of the information was in all the

16   files.  So she was looking for them.

17       We only just got a -- an investigator.  She was just able

18   to retain --

19           THE COURT:  Counsel, let me ask you a couple

20   questions.  I don't want to get into things that are not

21   relevant.  One is two of these are experts; is that correct?

22           MS. NKELE:  No.  Just one is a possible expert.  We

23   haven't talked to him.

24           THE COURT:  The expert witness was not disclosed

25   under the criminal procedure rules, the federal rules of

**UNITED STATES DISTRICT COURT**

```
 1   criminal procedure.
 2              MS. NKELE:  Well, I'm -- I'm not sure he's --
 3              THE COURT:  Did you comply with Rule 16?
 4              MS. NKELE:  No.  He was just someone she consulted
 5   before.
 6              THE COURT:  Okay.  Any expert that was not divulged
 7   under Rule 16 would be excluded.
 8         You have at least -- you mention at least 12 other
 9   witnesses that you wish to call, and those were never disclosed
10   although you knew their names.  Is that what you're telling me?
11   But you still didn't disclose them?
12              MS. NKELE:  No, we didn't.  I just made her write
13   all the people that she's saying she wants to call.  And just
14   yesterday --
15              THE COURT:  And that just came up today?
16              MS. NKELE:  Two days ago.
17              THE COURT:  Why wasn't that disclosed beforehand?
18   That's part of the preparation for the trial.
19              MS. NKELE:  Your Honor, we hadn't made contact with
20   any one of them.  I just told her because the Court wanted --
21   they wanted the list; so I told her, let's just write it.
22              THE COURT:  So you really don't know if they're
23   going to testify or not.  They're just potential.  Is that what
24   you're saying?
25              MS. NKELE:  That's what I told them, and they don't
```

```
 1   accept it.  One we have talked to yesterday, and we turned over
 2   the -- the --
 3           THE COURT:  There's no question that you -- I think
 4   it's co-counsel -- already mentioned one possible witness, and
 5   the defendant may or may not testify.  That's all I know, was
 6   those two.  Now counsel says there -- and you tell me.  Are
 7   there 14 additional witnesses other than those two or does 14
 8   include those two?
 9           MS. NKELE:  Other than Adefowere, Sally Ellis we
10   just talked to.  I have turned over her statement to the
11   Government.
12           THE COURT:  Okay.
13           MS. NKELE:  That's the only witness that I'm aware
14   that's been talked to.  I just turned that over.  Then the
15   possibility of the defendant.
16           THE COURT:  Okay.  So those two witnesses:  That
17   witness and the defendant.
18           MS. NKELE:  Uh-huh.
19           THE COURT:  How many other witnesses did you say you
20   intend to call?
21           MS. NKELE:  There are about ten others, but if I --
22   about seven.
23           THE COURT:  Okay.  And --
24           MS. NKELE:  Most of them are character witnesses,
25   and two are doctors that had prescribed -- but we just decided
```

```
 1    to call them.
 2              THE COURT:  But they weren't divulged as expert
 3    witnesses under Rule 16.  The doctors weren't.  The character
 4    witnesses are a different question, but the two doctors were
 5    not -- were not divulged under Rule 16; is that correct?
 6              MS. NKELE:  The doctors that prescribed -- one
 7    moment.
 8              MR. PORTER:  I'm afraid it's a bit of a moving
 9    target, Your Honor.  I have a list of 14 individuals that she
10    gave me, not including the defendant.
11              THE COURT:  Let me find out now.  I'm not going to
12    take a whole lot of time because the jury is supposed to be
13    back.  Why don't you give me the names of the witnesses you
14    know you're going to call.
15         And let me help you out.  Defense already indicated that
16    an Adefowere would be called.  That's one.
17              MS. NKELE:  Yes, Your Honor.
18              THE COURT:  Let me put that down.  And the defendant
19    may or may not be called.
20              MS. NKELE:  Yes, Your Honor.
21              THE COURT:  And what are the other witnesses?  Can
22    you give me their names.
23              MS. NKELE:  Sally Ellis will be called.
24              THE COURT:  Can you spell it for me.
25              MS. NKELE:  S-a-l-l-y.
```

```
1               THE COURT:  S-a-l-l-y.

2               MS. NKELE:  E-l-l-i-s.

3               THE COURT:  E-l-l-i-s.  I just need the last names.

4       Any other witnesses?

5               MS. NKELE:  That we know for sure?

6               THE COURT:  That you're either going to call or that

7    you want to potentially call.

8               MS. NKELE:  Okay.  Kesselman, K-e-s-s-e-l-m-a-n.

9               THE COURT:  Both are character witnesses?

10              MS. NKELE:  No, no, no.  Sally is an ex-employee.

11              THE COURT:  Go ahead.

12              MS. NKELE:  And Kesselman is a character -- oh, I'm

13   sorry.  Kesselman was a business contact.

14              THE COURT:  Go ahead.

15              MS. NKELE:  And McBride, M-c-B-r-i-d-e, that's a

16   character.

17              THE COURT:  Okay.

18              MS. NKELE:  And M-a-d-u, that's a character witness.

19              THE COURT:  Okay.

20              MS. NKELE:  And then Morrow, M-o-r-r-o-w, that's a

21   character witness.

22              THE COURT:  Okay.

23              MS. NKELE:  And B-o-s-a-h, Bosah, that's a character

24   witness.

25              THE COURT:  That's a character.  Okay.
```

**UNITED STATES DISTRICT COURT**

```
 1              MS. NKELE:  And then the last character witness is
 2   Ramattan, R-a-m-a-t-t-a-n.
 3              THE COURT:  Okay.  Any other witnesses that you
 4   either intend to call or may call?
 5              MS. NKELE:  There is -- well, Dr. Tan, T-a-n, was
 6   one of her prescribing --
 7              THE COURT:  T-a-n?
 8              MS. NKELE:  Yes.  T-a-n.
 9              THE COURT:  Okay.
10              MS. NKELE:  And then Dr. -- I'm sorry.  Then mark
11   Baldwin.
12              THE COURT:  I'm sorry.  Baldwin?
13              MS. NKELE:  Baldwin.
14              THE COURT:  Is that a doctor?
15              MS. NKELE:  No.  It's from Medicare.
16              THE COURT:  I'm sorry?
17              MS. NKELE:  Medicare investigator.
18              THE COURT:  He's an investigator?
19              MS. NKELE:  Yeah.  Baldwin.
20              THE COURT:  Okay.  Anybody else?
21              MS. NKELE:  And Vanzant, V-a-n-z-a-n-t, Medicare
22   investigator.
23              THE COURT:  Spell it again.
24              MS. NKELE:  V-a-n-z-a-n-t.
25              THE COURT:  Is that it?
```

1          MS. NKELE:  Yes, Your Honor.

2          THE COURT:  So you have an employee, someone who

3   does business with them, five character witnesses, one doctor,

4   and two investigators.

5          MS. NKELE:  Yes, Your Honor.

6          THE COURT:  And at this time you don't know if

7   you're going to call them or not, but they're potential

8   witnesses?

9          MS. NKELE:  Just potential, Your Honor.

10          THE COURT:  And the expert -- obviously, the doctor

11   you're calling as an expert.

12          MS. NKELE:  He's just one of the doctors that

13   prescribed wheelchairs for her.

14          THE COURT:  Okay.  But you'd be calling them as an

15   expert to testify, I'm assuming.

16      Counsel, do you wish to be heard?

17          MR. PORTER:  Yes, Your Honor.

18      Dr. Tan, I don't believe would be testifying in an expert

19   capacity, at least that's not what she said.

20          THE COURT:  Okay.

21          MR. PORTER:  But I believe that would fall within

22   our motion in limine on legitimate services.

23          THE COURT:  Okay.

24          MR. PORTER:  We filed a motion in limine before to

25   exclude potentially legitimate services.

UNITED STATES DISTRICT COURT

1          THE COURT:  Okay.  What else?  Let's go ahead,

2    because I've got to bring the jury back in.  Any --

3          MR. PORTER:  Yes, two other witnesses.

4      Sally Ellis, she worked there from 2004 to 2006, outside

5    the scope of the conspiracy.  I'm not sure how that's relevant.

6        Alex Kesselman, business contact, again I have no idea

7    what the relevance is of that.

8          THE COURT:  Okay.

9          MR. PORTER:  And then five character witnesses, six

10   character witnesses, that seems like an excessive number.

11         THE COURT:  Five.

12         MR. PORTER:  Five.

13         THE COURT:  And the two investigators?

14         MR. PORTER:  The two investigators, again the

15   relevance would be the issue.  I think that there are some

16   documents that I think already have been admitted that they're

17   on, but I don't know why we would need to call the

18   investigators.

19         THE COURT:  Okay.

20         MS. NKELE:  Your Honor, Sally Ellis worked up to

21   2006.  And Calaustro had -- was called to the stand, and she

22   worked in the office around the time that Dr. Calaustro was --

23         THE COURT:  Okay.

24         MS. NKELE:  Sally had contact with a --

25         THE COURT:  Thank you, Counsel.

**UNITED STATES DISTRICT COURT**

```
1          We're going to bring the jury back in now.  Is there a
2    chance you're going to finish today?
3                  MR. PORTER:  Hopefully, Your Honor.  I believe so.
4                  THE COURT:  If you finish today, then the two
5    witnesses, the defendant and the first witness that was
6    mentioned earlier, if we get to the defense today, they can
7    testify.
8          I will give you a ruling on all the other witnesses
9    tomorrow morning.  If you have any objection to those
10   witnesses, you can put those in writing, serve it on the
11   defendant in the morning, and I can look at it in the morning.
12                 MR. PORTER:  Thank you.
13                 MS. NKELE:  Your Honor, those two witnesses are not
14   available to testify today.
15                 THE COURT:  You don't think I'm going to put this
16   case over again.
17                 MS. NKELE:  To tomorrow morning.
18                 THE COURT:  If we go, have your witnesses available.
19   Have your witnesses ready to call because, as soon as we finish
20   with these witnesses, we're going to go to the defense, and
21   you're going to have to call your witnesses at that time.
22   We're not going to be continuing and trying the case during the
23   middle of the trial, particularly on witnesses that may or may
24   not show up.
25         Anyway, so the Court's warning to you, make sure you have
```

UNITED STATES DISTRICT COURT

```
 1   witnesses available so there's no break in the trial.
 2              MS. NKELE:  Your Honor, we're trying to call them at
 3   the -- at least call Sally.  That's the only one we're sure of
 4   and -- over the lunch break, and we're not -- she's not able to
 5   come --
 6              THE COURT:  Counsel, you heard what I said, and that
 7   is to make sure your witnesses -- I'm giving you this much.
 8   You don't have to call her tonight.  So if you want her as a
 9   witness, and as a potential witness, get her in by tomorrow
10   morning.
11        Tonight, if we finish with the Government's case and we
12   finish with your first witness, that's enough.  I'll call it
13   tonight, and we'll make a ruling on the other witnesses
14   tomorrow morning.
15        Okay.  Let's bring the jury back in.
16        And, Counsel, if you have any objections that should be in
17   writing, that should be by -- if you can get it in to the Court
18   by 8:00 in the morning, both of you should be in by 8:00 so I
19   can rule on it.
20              MR. PORTER:  Yes, Your Honor.
21                  (Jury in at 1:07 P.M.)
22                  (The following proceedings were held in the
23                   presence of the jury:)
24              THE COURT:  The record will reflect that all the
25   members of the jury are in their respective seats in the jury
```

```
 1    box.  Witness is on the witness stand.
 2        I apologize.  We had a few things to take care of before
 3    we got back.  So we're ready to proceed at this time.
 4        Counsel, you may inquire.
 5    Q    BY MR. PORTER:  Let's take a look at Government's
 6    Exhibit 49.  Government's Exhibit 49, Special Agent Froeschner,
 7    can you explain to the jury what's set out here in Exhibit 49.
 8    A    Sure.  This slide represents the types of claims that were
 9    submitted to Medicare, basically broken down by type of durable
10    medical equipment.
11    Q    Got it.  And looking at this chart, what is the largest
12    category of claims that Ezcor billed to Medicare?
13    A    The largest category is for power wheelchairs, and that's
14    42 percent of the claims submitted.
15    Q    And what was the dollar amount associated with those
16    billings?
17    A    $1,431,443.
18    Q    Okay.  And now on this chart, next to the power wheelchair
19    slice, there's a red slice of 5 percent.  What is that portion
20    for?
21    A    That portion is for power wheelchair accessories.
22    Q    What would that include?
23    A    That would include accessories that are used specifically
24    with a power wheelchair.  So it could be something like an
25    armrest, a footrest, a backrest, or like a seat cushion,
```

**UNITED STATES DISTRICT COURT**

```
 1   something like that.
 2   Q    And then the next category there, the green portion,
 3   8 percent, what is that category for?
 4   A    So that's for wheelchair accessories.  So as I said, for a
 5   power wheelchair accessory, that has to be used for a power
 6   wheelchair.  But wheelchair accessories could be used for
 7   either a power wheelchair or for a manual wheelchair.
 8   Q    So knowing that the wheelchair accessories could be used
 9   for either manual or power wheelchair, did you go back to the
10   claims data and see the amount of manual wheelchairs that Ezcor
11   billed to Medicare?
12   A    Yes, sir, I did.
13   Q    How did that amount, the number of manual wheelchairs,
14   compare to the number of power wheelchairs they billed?
15   A    It was a small percentage.  So the defendant billed for a
16   total of 343 wheelchairs, but only 46 of those wheelchairs were
17   manual wheelchairs.  The rest were power wheelchairs.
18   Q    Knowing that, what did that lead you to conclude about
19   that 8 percent portion here, whether that was provided for
20   wheelchairs or power wheelchairs?
21   A    Primarily for power wheelchairs.
22   Q    Okay.  So if you add those three categories to the -- the
23   blue, red, and green category, what's the total percentage for
24   power wheelchairs, power wheelchair accessories, and wheelchair
25   accessories?
```

```
 1   A     Total of 55 percent.
 2   Q     Okay.  And seeing that number 55 percent for power
 3   wheelchairs and accessories, what significance does that have
 4   to you as an investigator during the course of your
 5   investigation?
 6   A     It's just a very large number to be -- a very large
 7   percentage to be billing for one item, for power wheelchairs.
 8   And it suggests that the defendant was doing something to
 9   maximize the number of power wheelchairs that she was billing
10   Medicare for.
11   Q     Okay.  And if we look at the next categories here, there
12   are two other large categories, 19 and 14 percent.  What are
13   those two categories for?
14   A     The 19 percent is the percentage of her claim that she
15   billed Medicare for hospital beds and accessories.  And the 14
16   percent is the amount of the percentage of the total amount of
17   claims she billed, and that was for knee and back braces.
18   Q     Okay.  Now, previously in this trial we introduced into
19   evidence Government Exhibit 38.  Let's take a look at that real
20   quick, if we can put that up on the screen.
21   A     I'm sorry, sir.  I missed the number.
22   Q     38.  It will come up on the screen in front of you.  You
23   don't need to open the binder.
24         Again, Exhibit 38, can you tell the jury what this exhibit
25   reflects.
```

```
 1   A     Sure.  This -- this reflects the amount of kickback that
 2   the defendant paid for each type of DME that was -- that was
 3   provided.
 4   Q     And does this list include hospital beds, knee and back
 5   braces?
 6   A     Yes, sir, it does.
 7   Q     And on this list what is the range of the amount of
 8   kickback that the defendant would pay for a hospital bed?
 9   A     So --
10              MR. DARDEN:  Objection.  Legal conclusion.
11              THE COURT:  Overruled.
12              THE WITNESS:  So the amount, the kickback that she
13   paid for hospital beds, it ranged from a low of -- thank you --
14   a low of $75 to a high of 375.
15   Q     What about knee and back braces?
16              MR. DARDEN:  Same objection.
17              THE COURT:  Same objection?
18              MR. DARDEN:  Yes.
19              THE COURT:  Overruled.
20              MR. DARDEN:  No foundation.
21              THE COURT:  Overruled.
22              THE WITNESS:  The kickback ranged from a low of $59
23   to a high of $200.
24   Q     BY MR. PORTER:  Okay.  Now let's switch back to
25   Government's Exhibit 49 that we were just looking at.  So being
```

1    aware of that list that we just looked at, listing out the

2    amounts paid for each type of DME, what significance did it

3    have to you, then seeing these large portions of billings for

4    hospital beds, knee and back braces?

5    A    It was significant particularly in that -- so the -- the

6    amount, the type of DME of power wheelchair that she billed the

7    most for, power wheelchairs was over 50 percent.  That

8    corresponds to the highest amount of kickback that was paid for

9    power wheelchairs.

10        The second highest amount that she billed for was for

11   hospital beds and accessories.  Again, if you look at the -- at

12   the schedule, that corresponds to the second highest kickback

13   that was paid.

14        And then the third highest percentage of DME that she

15   billed was for knee and back braces.  And, again, if you look

16   at the schedule, that was the third highest amount of kickback

17   that she paid.

18   Q    Okay.  Let's go to Government's Exhibit 50.  Can you

19   explain to the jury what's reflected here.

20   A    Yes, sir.  This -- this slide represents the top referring

21   physicians for Ezcor.  It breaks down the -- the percent, the

22   amounts that -- that were billed, and the percentages.

23   Q    Now, this chart is referred -- it says "top referring

24   physicians," but just to be clear, is this the top ten

25   referring physicians for Ezcor?

1    A    That's correct.

2    Q    Looking at the right side of the chart, the blue portion,

3    what's reflected there in the blue portion of the chart?

4    A    The blue portion represents $707,775, and that's the

5    amount -- or 30 percent -- that's the amount of billing that

6    the defendant did to Medicare based on referrals from

7    Dr. Mezia Azinge-Obasi.

8    Q    And that means that Dr. Obasi had written the prescription

9    for those -- that DME?

10   A    That's correct.

11   Q    Okay.  And just below Dr. Obasi, who's the second largest

12   referring physician?

13   A    That would be Dr. Edna Calaustro.

14   Q    Okay.  And combined, Dr. Obasi and Dr. Calaustro, how much

15   in billings on this chart do those doctors account for?

16   A    51 percent.

17   Q    Then looking over here to the other side, the left side of

18   the chart, what other doctors are listed on the left side of

19   the chart?

20   A    Dr. Charles Okoye, Dr. Iduama Kelly-Dokubo, Dr. Emanuel

21   Ayodele.  And the "others" column would represent -- again this

22   is the top ten referring physicians; so the others would be the

23   remaining five physicians.

24   Q    So the five listed here by name, what percentage on this

25   chart do those five physicians account for?

```
 1   A     84 percent.
 2   Q     And during the course of your investigation, what
 3   significance did it have to you, seeing this large
 4   concentration of billings in just a few physicians?
 5               MR. DARDEN:  Objection.  Irrelevant.
 6               THE COURT:  Overruled.
 7               THE WITNESS:  Again, it's a large percentage of
 8   billing by just five physicians, and it -- and it -- it
 9   indicates an improper relationship between those doctors.
10               MR. DARDEN:  Objection.  Calls for a conclusion.
11               THE COURT:  Sustained.  The second part will be
12   stricken.
13   Q     BY MR. PORTER:  Let's focus on Dr. Calaustro here, the red
14   portion, 21 percent.  Did the jury hear from Dr. Calaustro
15   earlier in this trial?
16   A     Yes, sir.
17   Q     What did she say about her relationship with Ezcor?
18               MR. DARDEN:  Objection.
19               THE COURT:  Sustained.
20   Q     BY MR. PORTER:  Let's go to Government's Exhibit 51.  Can
21   you explain to the jury what's reflected in 51.
22   A     Yes.  This exhibit breaks down the number of power
23   wheelchairs that were prescribed by the top prescribing
24   physicians.  So, for instance, Dr. Mezia Azinge-Obasi
25   prescribed 73 power wheelchairs.  Dr. Charles Okoye prescribed
```

1    65 power wheelchairs, and so on.

2    Q    What time period does this chart cover?

3    A    This would be from January of 2007 through March 2012.

4    Q    Okay.  So the blue bar here for Dr. Azinge-Obasi, during

5    that five-year time period, wrote 73 power wheelchair

6    prescriptions?

7    A    Yes, sir.

8    Q    And how many is that per year?

9    A    That's approximately 15 wheelchairs, power wheelchairs,

10   per year.

11   Q    Okay.  And during the course of your investigation, what

12   significance did it have to you seeing this large number of

13   prescriptions from some of these doctors?

14   A    It's --

15            MR. DARDEN:  Objection.  Irrelevant.

16            THE COURT:  Overruled.

17            THE WITNESS:  It's just a very large number of power

18   wheelchairs to be prescribed by individual -- individual

19   doctors.

20            THE COURT:  Next question.

21   Q    BY MR. PORTER:  Okay.  All right.  Let's talk about some

22   of the bank records.  So in addition to the claims data that we

23   just looked at, during the course of this investigation, did

24   you and other agents obtain bank records for Ezcor?

25   A    Yes, sir, we did.

1    Q    And those bank records, have they already been admitted

2    into evidence as Government's Exhibit 19?

3    A    Yes, sir.

4    Q    And those bank records, were they voluminous?

5    A    Yes, sir.

6    Q    Were you able to summarize those bank records into a few

7    charts for us?

8    A    Yes, sir.

9    Q    Let's look at Government's Exhibit 52 and 53.

10        And, Your Honor, at this time I would move 52 and 53 into

11   evidence.

12            MR. DARDEN:  Objection.

13            THE COURT:  Is this a summary?  Is that what you're

14   saying?

15            MR. PORTER:  Yes, Your Honor.

16            THE COURT:  Is yours on foundation, the objection on

17   foundation?

18            MR. DARDEN:  Yes, Your Honor.

19            THE COURT:  Okay.  You're going to have to lay the

20   foundation.

21            MR. PORTER:  Okay.

22   Q    BY MR. PORTER:  So we talked about bank records.

23   Exhibit 19 -- Exhibit 19 contains the bank records that have

24   been introduced in this case?

25   A    Yes, sir.

1    Q      And did you review all those bank records?

2    A      Yes, sir.

3    Q      And were those bank records voluminous?

4    A      Yes, sir.

5    Q      Did you summarize the information from those bank records

6    and put them into Exhibits 52 and 53?

7    A      Yes, sir.

8    Q      Do Exhibits 52 and 53 accurately reflect the information

9    that you obtained from the bank records?

10              THE COURT:  Give him a second to look at the two

11   exhibits.

12              THE WITNESS:  Yes, they do.

13              THE COURT:  Those are your summaries?

14              THE WITNESS:  Yes, sir.

15              THE COURT:  And you prepared that?

16              THE WITNESS:  Yes, sir.

17              MR. PORTER:  Your Honor, at this time the Government

18   would move into evidence Exhibits 52 and 53.

19              MR. DARDEN:  Renew our objection, Your Honor.

20              THE COURT:  Overruled.  They will be received.

21              (Exhibits 52 and 53 received into evidence.)

22   Q    BY MR. PORTER:  Looking -- so let's publish Exhibit 52.

23   Can you explain to the jury what's reflected here.

24   A    Yes.  This is -- this is a bar graph, and you'll see three

25   bars there.  The red bar in the amount of $18,870 represents

1    the amount that Ezcor paid to Wilmer Guzman in checks only.

2    Q    Okay.  So that's the first bar.  What's the second bar for

3    Judith Estrella?

4    A    The second bar is just over $15,000.  That represents the

5    amount that the defendant paid for Judith Estrella in checks

6    only.

7    Q    And then the third bar there, the green one for cash, how

8    much is that?

9    A    It's 91,000.

10   Q    And those -- that 91,000, how was that taken out of the

11   accounts?

12   A    Through ATM withdrawals, branch teller withdrawals, or

13   checks written to "cash."

14   Q    And the accounts you looked at to make these exhibits, was

15   the defendant a signatory on those bank accounts?

16   A    Yes, she was.

17   Q    Okay.  So let's talk first about Wilmer Guzman, the bar

18   there.  Now, did Mr. Guzman testify earlier in this trial?

19   A    Yes, sir.

20   Q    What did he say about what these checks, the $18,000, was

21   for?

22              MR. DARDEN:  Objection.

23              THE COURT:  Sustained.

24   Q    BY MR. PORTER:  Next column for Judith Estrella of

25   $15,000, is that the amount of checks written to Judith

1  Estrella?

2  A    Yes, sir.

3  Q    And what significance did it have to your investigation,

4  finding these checks written to Wilmer Guzman and Judith

5  Estrella?

6            MR. DARDEN:  Objection.  Irrelevant, Your Honor.

7            THE COURT:  Overruled.

8            THE WITNESS:  It corroborated our findings that the

9  defendant was paying patient recruiters kickbacks to bring

10 patients to the -- to the business.

11 Q    BY MR. PORTER:  And then let's talk about the last column

12 there for cash.  And as an investigator, what significance did

13 it have to you, if any, seeing this $91,000 in cash being taken

14 out of the accounts?

15 A    As an investigator, anytime we see cash, it is concerning

16 to us because, unlike with a check or a wire transfer, you --

17 you can't tell where the money is going.  You don't know who

18 the cash is going to.  You're not going to -- when it's going,

19 whereas with a check or money transfer you have that

20 information available to you.

21 Q    Let's go next to Government Exhibit 53.  Can you explain

22 to the jury what's reflected here in Exhibit 53.

23 A    Yes, sir.

24      This slide represents money from Ezcor bank accounts to

25 the defendant, Sylvia Walter-Eze.  So you'll see two accounts

1    there.  The Wells Fargo account, that's 8707, the last four

2    digits; and the Bank of America account, last of 3951.

3         Now, there were two other bank accounts that the Medicare

4    checks were deposited into, and then from those two accounts

5    the money went into these two accounts that you see on the

6    chart.  These two accounts were used for expenses.

7         And I searched both of the -- I searched all of the bank

8    records, but specifically searched these bank records for these

9    accounts and found checks written to Sylvia Walter-Eze totaling

10   the amount of $166,787.

11   Q    So that $166,000 number, that just represents the checks

12   with the defendant's actual name on them; is that right?

13   A    Yes, sir.

14   Q    Okay.  And in addition to those payments that you saw

15   directly to the defendant, were there any other payments in the

16   accounts or expenses in the accounts that you saw that were for

17   the defendant's personal use?

18   A    Yes, sir.

19   Q    And what -- what types of things did you see?

20   A    A variety of retail stores:  A lot of Costco, Walmart,

21   T.J.Maxx, a couple car dealerships, a health club, like a gym,

22   tennis lessons, various restaurants, that type of thing.

23   Q    Okay.  So this $166,000 number there, does that represent

24   the full amount of the money the defendant received from Ezcor?

25   A    No, it does not.

**UNITED STATES DISTRICT COURT**

```
1   Q    Okay.  Now, let's talk about a couple more charts that are
2   based on the Medicare claims data, and these are going to be
3   Government Exhibits 54 through 56, if you can turn to those
4   real quick.
5        I'll lay a foundation if the defense has an objection to
6   these exhibits.
7                 MR. DARDEN:  I do.
8                 THE WITNESS:  Okay.  I've viewed them both.
9   Q    BY MR. PORTER:  Okay.  So 54, 55, 56, these summary
10  charts, are they based on the Medicare claims data?
11  A    Yes, sir.
12  Q    And the Medicare claims data has already been admitted as
13  Government Exhibit 11; is that right?
14  A    That's correct.
15  Q    Did you personally review the Medicare claims data?
16  A    Yes, I did.
17  Q    Was the Medicare claims data voluminous?
18  A    Yes, sir.
19  Q    Do these charts fairly and accurately reflect the
20  information you pulled from the Medicare claims data?
21  A    Yes, sir.
22                MR. PORTER:  Your Honor, at this time the Government
23  would move into evidence Government's Exhibits 54 through 56.
24                THE COURT:  Is that a summary of -- of the Medicare
25  data?
```

1          THE WITNESS:  Yes, sir.

2          MR. DARDEN:  Over our objection.

3          THE COURT:  Objection will be overruled.

4          (Exhibit 54 received into evidence.)

5  Q    BY MR. PORTER:  Okay.  Let's publish Exhibit 54.  What is

6  reflected here in Exhibit 54?

7  A    Exhibit 54 is a map that I created using Google maps.

8  You'll see a bunch of -- of dots, and each of those dots

9  represents an Ezcor patient, a Medicare beneficiary who was

10  billed to Medicare by Ezcor.

11  Q    And Ezcor was located in the Los Angeles area; is that

12  right?

13  A    That's correct.

14  Q    We see some beneficiaries up here in Northern California,

15  Central California, down to San Diego.  What significance did

16  it have to you, seeing these beneficiaries in locations all

17  over the state?

18          MR. DARDEN:  Objection.  Irrelevant.  Calls for a

19  conclusion.

20          THE COURT:  I don't know what -- I don't know what

21  the relevance would be, Counsel.

22          MR. PORTER:  As an investigator, background of the

23  investigation, steps they took during the investigation,

24  Your Honor.

25          THE COURT:  Sustained.

```
1    Q    BY MR. PORTER:  Okay.  So looking at this chart --
2              MR. DARDEN:  I'm sorry.  That's -- fifty -- 54 has
3    not been admitted.
4              THE COURT:  They have been.  Over your objection
5    they were admitted.
6    Q    BY MR. PORTER:  Okay.  So Exhibit 54, where did we see the
7    beneficiaries located on this chart?
8    A    Throughout the State of California.
9              MR. DARDEN:  Objection.  It's irrelevant.
10             THE COURT:  Overruled.
11   Q    BY MR. PORTER:  Okay.  Let's go next to Exhibit 55, and
12   what's reflected here in Government's Exhibit 55?
13   A    This exhibit reflects the distance from -- from the Ezcor
14   store to the residences of the Medicare beneficiaries.  It
15   shows that approximately 689 beneficiaries lived more than 25
16   miles from Ezcor, and 167 beneficiaries lived 25 miles or less
17   from Ezcor.  And the average distance of a beneficiary was 138
18   miles from the store.
19   Q    Okay.  Let's go next to Government's Exhibit 56.
20   Exhibit 56, what is reflected here?
21   A    Exhibit 56 reflects two of the referring physicians for
22   beneficiaries who were located in Northern California.
23   Q    Okay.  So Dr. Calaustro here, we see 57 beneficiaries; is
24   that right?
25   A    Yes, sir.
```

1    Q    And these are the beneficiaries in Northern California.

2    Where was Dr. Calaustro's office located?

3    A    In San Francisco.

4    Q    But then we also see 19 beneficiaries for

5    Dr. Azinge-Obasi.  Where was Dr. Obasi's office located?

6    A    In Los Angeles.

7    Q    But these are for beneficiaries who lived in Northern

8    California?

9    A    That's correct.

10   Q    So knowing that, how -- do you have any explanation for

11   how Dr. Obasi could be referring physician for patients up in

12   San Francisco?

13            MR. DARDEN:  Objection.  Conclusion.

14            THE COURT:  Sustained.

15   Q    BY MR. PORTER:  Let's look next at Government's

16   Exhibit 57.

17        Let's not publish that yet.  I need to ask a couple

18   questions.

19        So if you could take a look at Government's Exhibit 57,

20   did you personally prepare this exhibit?

21   A    Yes, sir.

22   Q    And is this exhibit based on some of the documents that

23   have already been introduced into evidence?

24   A    Yes, sir.

25   Q    For example, Ezcor's Medicare enrollment?

```
 1   A    That's correct.

 2   Q    And the notice of audit that we saw earlier?

 3   A    Yes, sir.

 4   Q    What's reflected here in this -- in this exhibit in

 5   general, without going into specifics?

 6            MR. DARDEN:  I'm going to object.  This is all

 7   redundant testimony already given, Your Honor.

 8            THE COURT:  Overruled at this time.  Overruled.

 9            THE WITNESS:  It -- it's -- it's a Medicare

10   timeline.

11   Q    BY MR. PORTER:  Okay.  Did you prepare this timeline?

12   A    Yes.

13   Q    Does it accurately reflect the information that it --

14   that's already been introduced into evidence?

15   A    Yes.

16   Q    And is this a summary of that evidence?

17   A    Yes, sir.

18            MR. DARDEN:  May I object again, Your Honor --

19            THE COURT:  Yes.

20            MR. DARDEN:  -- to the exhibit.  It's already in.

21            THE COURT:  Is this new material that we have not

22   covered yet?

23            MR. PORTER:  This is simply a summary chart,

24   Your Honor.

25            THE COURT:  To show something we have not covered
```

```
 1   yet?
 2            MR. PORTER:  Yes.  I believe this puts it into
 3   overall context, things that have come out --
 4            THE COURT:  I'm going to overrule it.
 5            MR. PORTER:  Okay.  So at this time the Government
 6   moves into evidence Exhibit 57.
 7            THE COURT:  Over the objection of counsel, it will
 8   be received.
 9            MR. PORTER:  Publish Exhibit 57?
10            THE COURT:  Yes.
11            (Exhibit 57 received into evidence.)
12   Q   BY MR. PORTER:  Okay.  Now, it's a little more detailed.
13   Can you explain to the jury what's reflected here in
14   Exhibit 57.
15   A    Yes, sir.
16        So, again, this is -- this is a Medicare audit timeline,
17   beginning on March 21, 2012, with the revalidation of the
18   defendant's Medicare enrollment.
19        Then the next thing you'll see on the timeline, just six
20   days later, after she indicated through her revalidation that
21   she wanted to continue billing Medicare, a notice of audit was
22   sent out by Medicare.
23        And then just two weeks later --
24            MR. DARDEN:  I would object to this testimony,
25   Your Honor.  Others have testified to all of this already.
```

```
 1                  THE COURT:  I think they have, Counsel.  All this
 2     has come in.
 3                  MR. PORTER:  Just a couple questions.
 4     Q    BY MR. PORTER:  May 11, 2012, is that the new deadline?
 5                  MR. DARDEN:  I'm sorry.  I would continue to object,
 6     Your Honor.
 7                  THE COURT:  Overruled as to two questions.
 8          You have two questions, Counsel.  That's the first one.
 9     It hasn't been answered yet.  You can ask it again.
10                  THE WITNESS:  Please.
11     Q    BY MR. PORTER:  May 11, 2012, was that the new deadline
12     for the defendant to provide documents to Medicare?
13     A    Yes, sir.
14     Q    And did the defendant get an extension after that date?
15     A    She did not.
16     Q    Okay.  Some -- some -- some more slides here based on the
17     combination of the Medicare claims data and some of the
18     documents that have already been introduced into evidence.  So
19     Government's Exhibits 68 and 67, if you can take a look at
20     those, please, before we publish them.
21          Okay.  Have you had a chance to look at those?
22     A    Yes, sir.
23                  MR. DARDEN:  Can I just have one moment.
24                  THE COURT:  Yes, sir.
25                  MR. PORTER:  Yes.
```

```
 1                    MR. DARDEN:  Thank you.

 2                    THE COURT:  Okay.

 3   Q    BY MR. PORTER:  So let me lay some foundation.  First of

 4   all, did you prepare all these exhibits?

 5   A    Yes, sir.

 6   Q    And the information that you used to prepare these

 7   exhibits, did it come from documents that have already been

 8   introduced into evidence?

 9   A    Yes, sir.

10   Q    Did it also come from the Medicare claims data we've been

11   talking about?

12   A    Yes, sir.

13   Q    Again, is that data voluminous?

14   A    Yes, sir.

15   Q    And the pictures on here -- in fact, I believe,

16   Exhibit 14 -- if you can turn to Exhibit 14 in the binder in

17   front of you --

18        I believe that's been conditionally admitted, Your Honor?

19              THE COURT:  Yes.

20   Q    BY MR. PORTER:  And I'm going to -- I believe those were

21   pictures taken by you, Special Agent Froeschner.  Please take a

22   look at those pictures.

23   A    Okay.  I've looked at the pictures.

24              MR. DARDEN:  Can I have one moment, Your Honor.

25              THE COURT:  Uh-huh.
```

1          MR. DARDEN:  Thank you.

2     Q     BY MR. PORTER:  Exhibit 14, did you take those pictures?

3     A     Yes, sir, I did.

4     Q     Do those pictures fairly and accurately reflect what you

5     saw with your own eyes on -- when you took those pictures?

6     A     Yes, sir.

7          MR. PORTER:  At this time, Your Honor, I would move

8     into evidence Government's Exhibit 14.

9          THE COURT:  Be received.

10         (Exhibit 14 received into evidence.)

11    Q     BY MR. PORTER:  Now, going back to the summary slides, 58

12    through 67, now that Exhibit 14 has been admitted, are all

13    these summary slides based on evidence that has already been

14    introduced into evidence in this case?

15    A     Yes, sir.

16    Q     And you personally prepared these summary exhibits?

17    A     Yes, sir, I did.

18         MR. PORTER:  Your Honor, at this time the Government

19    would move into evidence Exhibits 58 through 67.

20         THE COURT:  These are summaries of what exhibits?

21         THE WITNESS:  The numbers?

22         THE COURT:  You're talking about whatever it is, 58

23    through 67, I believe it is.

24         THE WITNESS:  The majority is a -- of it is from the

25    claims data.  I don't know the -- I can look at the numbers.

UNITED STATES DISTRICT COURT

1            THE COURT:  That's a summary of all the claims data?

2            THE WITNESS:  Primarily, yes.

3            THE COURT:  And you did the summary yourself?

4            THE WITNESS:  Yes, sir.

5            THE COURT:  Okay.

6            MR. DARDEN:  I'll object.

7            THE WITNESS:  But --

8            THE COURT:  Go ahead.  You were saying, no

9    foundation?

10            MR. DARDEN:  No foundation.  And the fact that what

11    is primarily contained here, 99.99 percent of it has already

12    been admitted through other exhibits and described and

13    discussed by other witnesses.  It is redundant, Your Honor.

14            THE COURT:  It may have.  We'll have to get into it

15    and find out.  Overruled on the foundation issue, and I'll just

16    cut him off if it goes too repetitive.

17        Counsel.

18            (Exhibits 58 through 67 received into evidence.)

19    Q    BY MR. PORTER:  Okay.  So let's publish Exhibit 58.  And

20    can you explain to the jury what's reflected here in

21    Government's Exhibit 58.

22    A    Yes.  This is a summary slide for Medicare beneficiary

23    Mariano Mendoza, who was the basis for Count 2 regarding the

24    submission of a claim to Medicare for a medically unnecessary

25    power wheelchair submitted on April 8, 2010.

```
 1            MR. DARDEN:  Objection.  Motion to strike.
 2  Conclusion, "medically unnecessary."
 3            THE COURT:  That part will be stricken.
 4  Q    BY MR. PORTER:  Okay.  Let's go next to Government's
 5  Exhibit 59.  And Government's Exhibit 59, what's reflected here
 6  on -- on Exhibit 59?
 7  A    This is a summary slide for the claim represented in
 8  Count 2 of the Indictment.
 9  Q    So the information here, did that come from the Medicare
10  claims data?
11  A    Yes, sir.
12  Q    And under the claim number column, it's all the same
13  number; is that right?
14  A    Yes, sir.
15  Q    But then there are four different lines here?
16  A    Yes, sir.
17  Q    And it lists the name Mariano Mendoza, and what are the
18  four different items that were included in this one claim?
19  A    So if you look under the HCPCS code, the H-C-P-C-S, that's
20  the Medicare code for those types of equipment.  So the HCPCS
21  for a K0823 would be for a power wheelchair.  And the next one
22  is a HCPCS code for an armrest.  Next one is a battery for a
23  power wheelchair.  And the last one is a chair back.
24  Q    Okay.  And what was the total amount billed and the total
25  amount paid for this one claim to Medicare?
```

1    A       Approximately $5,700.

2    Q       And how much was paid on that amount?

3    A       Approximately $3,700.

4    Q       Okay.  Let's go next to Government's Exhibit 60.  Can you

5    please explain what's reflected here in Government's

6    Exhibit 60.

7    A       This is a summary slide regarding -- or for Medicare

8    beneficiary Vilma Cruz Munar, who was the basis for Count 3 of

9    the Indictment.

10   Q       And what date was the claim submitted to Medicare for

11   Count 3?

12   A       The claim was submitted on June 24th, 2010.

13   Q       And looking at the pictures here on the left, Ms. Munar --

14   on the right, what is reflected there in that picture?

15   A       On the right?

16   Q       Yes.

17   A       That's a picture of Ms. Munar's power wheelchair that she

18   got from Ezcor.  And it's -- I took that picture in Ms. Munar's

19   son's -- it's an apartment, but the front room of his

20   apartment.  And it's difficult to see there, but it was

21   actually separate into --

22           MR. DARDEN:  I'm going to object as asked and

23   answered already.

24           THE COURT:  It's been answered.  Next question.

25   Q       BY MR. PORTER:  How did you know this was the same power

1  wheelchair Ezcor delivered to Ms. Munar?

2  A     I compared the serial number on the wheelchair in the

3  picture with the serial number listed on the delivery ticket in

4  the Ezcor patient file for Vilma Cruz Munar.

5  Q     Can you explain the physical condition of this power

6  wheelchair when you saw it.

7             MR. DARDEN:  Objection.  Irrelevant.

8             THE COURT:  Sustained.

9  Q     BY MR. PORTER:  Okay.  Let's go next to Government's

10 Exhibit 61.  What is reflected here in Exhibit 61?

11 A     This is a summary slide for the claim represented in

12 counts -- I believe it was Count 3.

13 Q     Again, claim number is all the same in all four rows; is

14 that right?

15 A     That's correct.

16 Q     And then the same items:  Power wheelchair, arm rest,

17 battery, and chair back.  And what was the total dollars billed

18 to Medicare for those items on this one claim?

19 A     It was approximately -- I'm sorry -- $4,800.

20 Q     Okay.  And then in the far right-hand column, it says

21 dollars paid to supplier, and the number is zero.  Can you

22 explain what happened with the billing for this power

23 wheelchair.

24 A     Yes.  What happened was the --

25             MR. DARDEN:  I'm going to object, Your Honor.

```
 1    Irrelevant.  Ask the Court to look at the bottom of the page of
 2    that exhibit.  It's not relevant.
 3              THE COURT:  Sustained.
 4    Q    BY MR. PORTER:  Based on your review of the claims data,
 5    this claim was actually submitted to Medicare; is that right?
 6    A    That's correct.
 7    Q    Okay.  And based on your review of the claims data, was at
 8    one point the claim actually paid to the defendant?
 9              MR. DARDEN:  I'm going to object as irrelevant.
10              THE COURT:  Overruled.
11              THE WITNESS:  It was paid.
12    Q    BY MR. PORTER:  But at a later point, what happened with
13    that claim?
14              MR. DARDEN:  Objection.  Irrelevant.
15              THE COURT:  Overruled.
16              THE WITNESS:  An overpayment was assessed, and the
17    money was recouped.
18              THE COURT:  Okay.
19    Q    BY MR. PORTER:  Let's go to Government's Exhibit 62.  Can
20    you please explain what's reflected here on Exhibit 62.
21    A    Yes.  This is a summary slide for Medicare beneficiary
22    Nazario Gutierrez, who was the basis for Count 4 of the
23    Indictment, regarding the submission of a claim for a power
24    wheelchair to Medicare on August 16, 2010.
25    Q    The picture on the left, where did that picture come from?
```

**UNITED STATES DISTRICT COURT**

```
 1   A    This picture was actually located inside Mr. Gutierrez's
 2   Ezcor patient file.
 3   Q    Let's go back to Government's Exhibit 63.  And Exhibit 63,
 4   what's reflected here?
 5   A    This is a summary of the claim that was submitted
 6   regarding Count 4 of the Indictment.
 7   Q    And what was the total amount that Ezcor billed to
 8   Medicare for this one claim, and how much did Medicare pay on
 9   that one claim?
10   A    Dollars billed was approximately $5,800.  And the amount
11   paid was approximately $3,500.
12   Q    Next, Government's Exhibit 64.  What is reflected here in
13   Government Exhibit 64?
14   A    This is a summary slide for Medicare beneficiary Mary
15   Winston, who was the basis for Count 5 in the Indictment,
16   regarding the submission of a claim to Medicare for a power
17   wheelchair submitted on April 18, 2011.
18   Q    And those pictures there on the slide, did you take those
19   pictures?
20   A    Yes, sir, I did.
21   Q    Have you been in Ms. Winston's home yourself?
22   A    Yes, sir.
23   Q    Okay.  And is there room inside of her home to use this
24   power wheelchair inside of her home?
25              MR. DARDEN:  Objection.  Calls for a conclusion.
```

**UNITED STATES DISTRICT COURT**

1          THE COURT:  Sustained.

2   Q    BY MR. PORTER:  Okay.  Next, Government's Exhibit 65.  Is

3   this another summary of the Medicare claims data for this one

4   claim?

5   A    For Count 5, yes, sir.

6   Q    Okay.  Now, let's look at the far right-hand -- two

7   right-hand columns:  Dollars billed and dollars paid to

8   supplier.  Now, those numbers are smaller than the previous

9   slides we were looking at; is that right?

10  A    Yes, sir.

11  Q    Can you explain why those numbers are smaller?

12  A    Again, because of the Affordable Care Act, on January 1st

13  of 2011, Medicare providers could only furnish standard power

14  wheelchairs on a monthly rental basis.

15  Q    Okay.  So the charge here of $600 for a power wheelchair,

16  that's for a one-month -- that's a one-month charge?

17  A    Yes, sir.

18  Q    And over how many months can a supplier bill Medicare for

19  a power wheelchair?

20  A    13 months.

21  Q    So a supplier could submit this claim every month for 13

22  months?

23  A    Yes, sir.

24  Q    All right.  Let's look now at Government's Exhibit 66.

25  What is reflected here?

**UNITED STATES DISTRICT COURT**

1   A     This is a summary slide for Medicare beneficiary

2   Maria Garibay, who was the basis for Count 6 of the Indictment,

3   regarding a submission of a claim for a power wheelchair on

4   May 16, 2011.

5   Q     And then if we go to Government's Exhibit 67, what is

6   reflected here?

7   A     This is a summary of the claim regarding that count.

8   Q     Okay.  And again dollars billed, is this for the full

9   power wheelchair or a monthly rental?

10  A     This would be the monthly rental.

11  Q     Again, these claims could be submitted 13 different times;

12  is that right?

13  A     That's correct.

14              MR. PORTER:  No further questions, Your Honor.

15              THE COURT:  Okay.  Cross-examination.

16                          CROSS-EXAMINATION

17  BY MR. DARDEN:

18  Q     When did you begin working on this case?

19  A     Approximately January of 2011.

20  Q     And when did -- let's start with Mr. Guzman.  When did you

21  first go see Mr. Guzman?

22  A     Sometime, I think, in 2013.

23  Q     July 31 sound about right?

24  A     It could be.  Yeah, I don't remember the specific date.

25  Q     And what was the next time you saw Mr. Guzman?

**UNITED STATES DISTRICT COURT**

```
 1              MR. PORTER:  Objection, Your Honor.  Relevance.
 2   Outside the scope of direct.
 3              THE COURT:  Overruled.
 4              THE WITNESS:  It was -- it was fairly shortly
 5   thereafter.  I would say within -- within a month.
 6   Q    BY MR. DARDEN:  On January 8, 2014, did you participate in
 7   a surveillance of Mr. Guzman?
 8   A    I don't know if it was on that date, but I have surveilled
 9   Mr. Guzman before.
10   Q    In 2014?
11   A    I don't know.
12   Q    Did you surveil him after you visited him for the first
13   time in 2013?
14              MR. PORTER:  Objection.  Again beyond the scope.
15              THE COURT:  It is beyond the scope of direct.
16   Sustained.
17              MR. DARDEN:  We can call him as our witness --
18              THE COURT:  Certainly.
19              MR. DARDEN:  -- Your Honor, in the defense case.
20   Q    BY MR. DARDEN:  So you looked at all this data, and you
21   summarized all of this data, Medi-Cal data; correct?
22   A    I summarized best I could, yes.
23   Q    And what you saw consistently, in each of my client's
24   files, were prescriptions for wheelchairs; correct?  I mean, in
25   almost every case?
```

1   A     There were not prescriptions in every case.  I guess it

2   would depend on what -- are you referring to a legitimate

3   prescription or any prescription --

4   Q     I'm referring to prescriptions, sir.  In almost every file

5   you saw in my client's office, regarding wheelchairs, you saw a

6   related prescription in just about every file; is that true?

7              MR. PORTER:  Objection.  If he can specify what

8   files he's referring to.

9              THE COURT:  Overruled.

10             THE WITNESS:  Almost every patient file.

11  Q     BY MR. DARDEN:  Okay.  And how many patients complained to

12  you that they did not receive wheelchairs even though

13  wheelchairs had been prescribed?

14  A     I don't recall any of them saying that they never received

15  a power wheelchair.

16  Q     And did any of the beneficiaries or patients complain to

17  you that their signatures were forged on delivery tickets or

18  receipts?

19  A     No.  I don't recall anyone making that claim.

20  Q     Now, one of the things you've done in your voluminous

21  summaries of information was -- well, a moment ago you -- you

22  put up exhibits and charts that described, like Exhibit 61 that

23  showed Vilma Cruz Munar having, in her name, Medicare being

24  billed for a power wheelchair for $3,800; correct?  In

25  Exhibit 61?

```
1   A      Yes, sir.

2   Q      And then in Exhibit 63, with respect to Nazario Gutierrez,

3   you showed Ezcor billing Medicare $4,733.82; is that correct?

4   A      Yes, sir.

5   Q      And then Medicare paid on that request $2,913.12; correct?

6   A      Yes, sir.

7   Q      That is less than 20 percent of the claim; true?

8   A      I believe that's more than 20 percent.

9   Q      Well, let me -- thank you.  Let me rephrase the question,

10  because you told us earlier that Medicare only pays up to

11  80 percent; right?

12  A      80 percent of the allowable amount, yes, sir.

13  Q      And is this $2,900, is that 80 percent of the allowable

14  amount?

15  A      Without a calculator, I'm not sure, sir.

16  Q      Well, the difference between what's billed and what's paid

17  in that situation is about $1,900?

18  A      I think like 1,800.  Is that closer?

19  Q      Okay.  We'll take your number.

20         So there's a difference between what was billed and what

21  was paid of $1,800.  Was Medi-Cal or the State of California

22  billed for 20 percent of that $4,733.82?

23  A      No, sir.

24  Q      So this $1,800, I take it then that Ezcor had to eat that

25  $1,800; is that right?
```

1    A    Well, again, I don't -- the amount that she bills is --

2    she can bill whatever amount she wants, and then the allowable

3    amount that Medicare allows to pay, they pay 80 percent of

4    that.  So I don't know what you mean by she had to "eat" it.

5    Q    If Ezcor paid $4,733 for a wheelchair and they only paid

6    2,913, then that $1,800 is -- would be a loss to Ezcor;

7    correct?

8    A    No, because they don't pay that amount.  They only pay,

9    like, a thousand dollars for that wheelchair.

10   Q    Okay.  Now, show me what data did you examine to determine

11   that the wheelchair in Exhibit 63 only cost Ezcor $1,000.

12   A    It's based on my experience.

13   Q    So you didn't examine any specific data to see how much

14   Ezcor paid for the wheelchair in Exhibit 63; correct?

15   A    I don't know exactly what she paid for that, but I know

16   that the power wheelchairs run for approximately 900 to a

17   thousand dollars.

18   Q    What did she say in this case on Exhibit 63, the exact

19   amount?

20   A    I don't know.

21   Q    Now, my client is running a business.  Whether you like it

22   or not, she's still running a business; right?

23   A    Yes, sir.

24   Q    And she has overhead, doesn't she?

25   A    I'm assuming she has overhead.

**UNITED STATES DISTRICT COURT**

658

1    Q    You looked in the bank statements; right?

2    A    Yes, sir.

3    Q    And you saw payments to individuals that worked inside the

4    office like Mr. Aguilar; right?

5    A    Yes, sir.

6    Q    You saw payments or, rather, salaries being paid to those

7    individuals; right?

8    A    Yes, sir.

9    Q    And the building or the space my -- my client utilized to

10   run her business was a rental space; right?

11   A    I believe that's true.

12   Q    And you saw checks, you know, written to the landlord for

13   the business office and premises; right?

14   A    That's correct.

15   Q    And Ezcor had a delivery truck or two; is that true?

16   A    I don't know if the delivery people drove their own trucks

17   or if they used hers.  I'm not sure.

18   Q    Did you see checks on the Ezcor accounts paid to utility

19   companies?

20   A    I don't recall any payments to utility companies.

21   Q    How about gasoline?  Did you see any Ezcor checks written

22   to gas companies?

23   A    Yes, sir.

24   Q    So when setting a price or an amount to be billed to

25   Medicare, is the DME allowed to in some way write into that

```
 1  bill the cost of overhead?

 2  A     The DME can bill whatever amount they want.

 3  Q     Now, you talked about 91,000 in one of your exhibits,

 4  91,000 in cash based on ATM withdrawals, checks written to my

 5  client and et cetera; right?

 6  A     Yes, sir.

 7  Q     Of that ninety-one --

 8  A     Actually, the 91,000 was not inclusive of the checks

 9  written to your client.  It would have been the ATM

10  withdrawals, the branch teller withdrawals, and then checks

11  written to cash.

12  Q     And how much of that 91,000 was based on ATM withdrawals?

13  A     I don't know.

14  Q     Could you give us an estimate?

15  A     I -- I really couldn't guess.

16  Q     Did you go to the bank and look at bank surveillance

17  footage to see who actually utilized those ATM cards on those

18  particular days?

19  A     No, sir.

20  Q     My client does have a husband; true?

21  A     Yes, sir.

22  Q     You met him before; right?

23  A     Yes, sir.

24  Q     And, of course, you haven't seen him in this courthouse or

25  in this courtroom; correct?
```

```
 1   A     That's correct.

 2   Q     And he is also an officer in the business; correct?

 3   A     At one time he was.

 4   Q     You mentioned Ms. Estrella in one of your exhibits today;

 5   correct?

 6   A     Yes, sir.

 7   Q     And she hasn't testified in this case; right?

 8   A     That's correct.

 9             MR. PORTER:  Objection.  Relevance.

10             THE COURT:  Overruled.

11   Q     BY MR. DARDEN:  And you mentioned Jean Aves?

12   A     I did not mention --

13   Q     Have you seen Jean Aves in this courthouse or this

14   courtroom?

15   A     No, sir.

16   Q     You also talked about the distance between Ezcor and some

17   of the beneficiaries that received wheelchairs in this case;

18   right?

19   A     Yes, sir.

20   Q     Have you ever heard the term "global economy"?

21   A     Yes, sir.

22   Q     Now, you ever watch MeTV, you know, that station where

23   older people watch all those old shows from the '70s?  Do you

24   ever watch that channel?

25   A     I watch one show on TV.
```

```
 1   Q     Not Hogan's Heroes or Gilligan's Island?

 2   A     I do not.

 3   Q     Well, you should watch those shows.

 4         Me, like you I'm sure, you probably see on television

 5   advertisements by durable medical companies all the time, don't

 6   you, especially late at night?

 7               MR. PORTER:  Relevance, Your Honor.

 8               THE COURT:  Sustained.

 9   Q     BY MR. DARDEN:  Well, is my client limited to only

10   supplying medical equipment to patients within a 25-mile radius

11   of her store?

12   A     No, sir.

13   Q     Is my client limited to only supplying medical equipment

14   to individuals who live in the County of Los Angeles?

15   A     No, sir.

16   Q     In fact, my client is free, and Medicare understands and

17   agrees that my client actually has authority to solicit

18   business throughout the western region; is that true?

19   A     I believe that's true, but it's -- it's --

20   Q     Region D.  Is that what they call it, Region D?

21   A     I honestly do not know.

22   Q     In fact, there's nothing that precludes my client from

23   soliciting business on the Internet, on television, and through

24   print advertising anyplace, anywhere in the United States;

25   true?
```

```
1    A    It is not prohibited, but it is unusual.
2    Q    And so when these stores come up with 1-800 numbers and
3    they're located in Milwaukee, on television, they're not
4    violating laws by soliciting patients in California, are they?
5              MR. PORTER:  Objection.  Calls for speculation.
6              THE COURT:  Overruled.
7              THE WITNESS:  I don't know of any law, but those are
8    generally for scooters whereas this case is about power
9    wheelchairs.
10   Q    BY MR. DARDEN:  Most people that get prescribed power
11   wheelchairs don't actually go to the DME, do they?
12   A    I think in -- in -- well, in legitimate companies, they
13   do.
14   Q    And you think that based on what?
15   A    Just my training and experience.
16   Q    Ms. Garibay -- you heard her testify today; right?  You
17   saw her testify?
18   A    Portion of it.  I was in and out.
19   Q    Okay.  Well, did you ever determine that she visited
20   Ezcor?
21   A    I don't know.
22   Q    Now, with respect to Ms. Garibay, Mr. Mendoza, and these
23   individuals who are named in Counts 2 through 6, in your
24   investigation you concluded that none of these individuals were
25   entitled to power wheelchairs according to Medicare rules;
```

```
1   correct?
2   A     I concluded that none of the power wheelchairs prescribed
3   to them were medically necessary.
4   Q     And so they were therefore not entitled to them under
5   Medicare; correct?
6   A     Yeah.  That's correct.
7   Q     And -- and they were not entitled to receive them at their
8   homes under Medicare rules; correct?
9   A     Again, what I can say is that the power wheelchairs were
10  not medically necessary.  The defendant should not have billed
11  for those power wheelchairs.  Whether they're entitled to them
12  or not, I mean, I don't -- it's kind of a vague term,
13  "entitled."  They're not medically necessary.  Medicare would
14  not have paid for those power wheelchairs had they known that
15  the patients were the way they were.  Ambulatory.
16  Q     So if Medicare had known, for instance, that Ms. Winston,
17  who was here and testified that she needed a wheel- -- a power
18  wheelchair back in 2011 because of her medical condition --
19  medical condition at the time, you're saying, even if she
20  actually needed -- believed she needed it, Medicare would not
21  have paid for it; right?
22  A     That's correct.  They would not have paid for it --
23  Q     And --
24  A     -- had they known all the facts that were presented.
25  Q     And with respect to Mr. Guzman, they wouldn't have paid
```

1    for his either, despite him having been an RN for 30 years and

2    felt that he needed some kind of wheelchair?  They wouldn't

3    have paid for one for him either?

4    A    Are you referring to Mr. Mendoza?

5    Q    Mendoza, yes.

6    A    That's correct.  Medicare would not have paid for that

7    prescription had they known that he was ambulatory.

8    Q    Is it your belief that Medicare only allows for the

9    payment of a power wheelchair when a person is not ambulatory?

10   A    They only allow the payment or the reimbursement for a

11   power wheelchair for a beneficiary who needs the power

12   wheelchair to -- to do their mobile or their daily living

13   activities within the home.

14   Q    So being ambulatory isn't really the only criteria, is it,

15   for Medicare power wheelchair eligibility; right?

16   A    Well, being ambulatory is not a criteria.

17   Q    In fact, a person can still be able to walk and receive a

18   power wheelchair paid for by Medicare; true?

19   A    I guess that could happen.  That would be very rare.

20   Q    Well, so a person has to be bedridden, paraplegic,

21   quadriplegic to get a power wheelchair from Medicare?

22   A    Again, they need to be able -- they should not be able to

23   complete their daily living activities unless they have a power

24   wheelchair.  So, for instance, if they could do it with a cane

25   or a walker, then Medicare would not prescribe or reimburse for

1    a power wheelchair.

2    Q    And so if an individual could rise out of bed, walk to

3    their bathroom located 40 feet away, and if it took 15 minutes

4    for them to get there, Medicare would still not provide a power

5    wheelchair because they were able to move?  Is that what you're

6    telling --

7              MR. PORTER:  Objection.  Incomplete hypothetical,

8    Your Honor.

9              THE COURT:  Overruled.

10             THE WITNESS:  I'm sorry.  Could you repeat the

11   question.

12   Q    BY MR. DARDEN:  So are you telling us that, if an

13   individual can actually manage to get out of bed, walk 40 feet

14   to their bathroom, whether with the use of a walker or some

15   other device, and that even though it took him 15 minutes or 20

16   minutes to walk from the bed to the bathroom, Medicare would

17   still not provide a wheelchair?

18   A    Again, what I can tell you is that Medicare would not

19   provide a power wheelchair unless they needed it in order to do

20   their daily living activities.  The time -- I mean, the

21   15-minute time constraint, I don't -- you know, the -- the

22   bottom line is they have to have it or they have to need it in

23   order to complete their daily living activities within the

24   home.

25   Q    And when you look at the Medicare guidelines and it talks

```
 1  about them being able to complete their daily activities, it
 2  says within a reasonable time; right?
 3  A    I don't know.
 4  Q    You don't know.
 5       And so your understanding is, even if it took an hour to
 6  walk that 40 feet from the bed to the bathroom, if you can
 7  manage to get there, even if you crawled on your stomach,
 8  Medicare would not provide a power wheelchair.  Is that your
 9  understanding?
10  A    If it took them an hour, I don't know.  The only thing I
11  can tell you is that the beneficiaries that I interviewed were
12  able to -- ambulatory -- they were able to ambulate.  They were
13  able to complete their daily living activities within the home.
14  So they would not -- they should not have received a power
15  wheelchair.
16  Q    Now, you saw Ms. Winston.  She required some assistance
17  today; right?
18  A    I believe she used a cane, yes.
19  Q    And you saw Ms. Garibay, who required a great deal of
20  assistance; correct?
21  A    She used a walker.
22  Q    And you saw Mr. Mendoza with his cane; correct?
23  A    Yes, sir.
24  Q    You heard Mr. Mendoza describe his medical condition back
25  when he received his power wheelchair; right?
```

```
1   A     Yes, sir.

2   Q     And did you see how slow all those people moved through

3   this courtroom?

4   A     Some of them moved slower than others.

5   Q     And all of them moved slower than you; right?

6   A     That's probably a safe assumption, yes.

7   Q     And Ms. Garibay is only, what, 57 years old, 58 years old;

8   right?

9   A     I -- I don't remember what she said.

10  Q     Is there anything unlawful, that is, about the -- in your

11  view, the checking accounts my client had both in Ezcor's name

12  and in her own?

13  A     Is it an -- is it unlawful to have a checking account?

14  Q     Right.

15  A     No, sir.

16  Q     Is it unlawful to have these checking accounts?

17  A     No, sir.

18  Q     And money was deposited directly from Medicare into some

19  of the Ezcor bank accounts; true?

20  A     Into two of them, yes, sir.

21  Q     And those accounts changed every three years or so in a

22  couple of cases; right?

23  A     Yeah.  The -- it changed once.

24  Q     And Medicare was notified; right?

25  A     Yes.
```

1  Q    My client was a signatory on those accounts; right?

2  A    Yes, sir.

3  Q    My client didn't conceal her identification or personal

4  information in opening up those bank accounts; right?

5  A    I'm sorry.  Can you ask that question again.

6  Q    Was there any indication that my client concealed her true

7  identity when she opened up those Ezcor bank accounts?

8  A    No, sir.

9  Q    Was there any indication that my client concealed her true

10  identity when she wrote checks from Ezcor bank accounts to

11  herself --

12  A    No, sir.

13  Q    -- or when she wrote checks from Ezcor for cash?

14  A    No, sir.

15  Q    At some point my client filed a termination letter with

16  Medicare, indicating that she was turning in her provider

17  number; is that right?

18  A    Yes.  She wrote a letter to Medicare requesting that she

19  withdraw from the Medicare program.

20  Q    And that was 2012?

21  A    Yes, sir.

22  Q    Approximately June 18?

23  A    I think the letter was dated April 9th of 2012.

24  Q    And even though my client submitted that letter to

25  Medicare, she was still required to produce the 100 files

1    previously requested; right?

2    A    That's correct.

3    Q    And she was still required to maintain possession of all

4    of her Medicare patient files for at least six years; right?

5    A    Yes, sir.

6    Q    And when you searched my client's office, you guys found

7    the 100 files of just about every one of the files requested in

8    that list of 100; true?

9    A    I don't know that we found all hundred, but we found a lot

10   of them.

11   Q    Was there any indication that my client had destroyed

12   files?

13   A    No.

14   Q    And even though my client submitted that termination

15   letter to Medicare -- strike that.

16        What day was it that you searched my client's business?

17   A    It was in, I think, July of 2012.

18   Q    So even though my client submitted a termination letter in

19   April of 2012, in July of 2012 you found my client at her

20   business; is that true?

21   A    She was at the -- whatever day we served the search

22   warrant, she was at the business.

23   Q    Was the business open or closed?

24   A    It was open.

25   Q    And my client, from what you could tell, did not attempt

```
 1    to flee with no intent of returning, and it was after she
 2    submitted the April 9, 2012, termination letter; correct?
 3    A     I don't know if she attempted to flee or not.
 4    Q     Well, she's still here; right?
 5    A     She was at the business, yes, sir.
 6    Q     And you even visited my client at her residence in -- in
 7    the north San Fernando Valley; right?
 8    A     In Santa -- in Santa Clarita.  I don't know if that's
 9    considered north.
10    Q     But in Santa Clarita you visited her at her home in 2012
11    in Santa Clarita?
12    A     It was eight months after the search warrant.
13    Q     Okay.  And as far as you know, she still resides at the
14    same location; correct?
15    A     I don't know if she does or not.
16    Q     Did you search the Ezcor bank accounts for wire transfers?
17    A     I looked through all of the bank accounts, and I don't --
18    trying to remember -- I don't recall seeing any wire transfers
19    specifically.
20    Q     Okay.  Did you -- and you don't recall seeing any wire
21    transfers of large amounts of money out of the country; right?
22    A     I don't recall seeing any of that.
23    Q     Now, in your analysis of my client's business, did you
24    attempt to ascertain whether or not the business was overall
25    profitable?
```

```
 1    A     I'm not sure what you mean by that.
 2    Q     Well, did you prepare a profit-and-loss statement for the
 3    business?
 4    A     No.
 5    Q     When you saw my client at her business perhaps in June or
 6    July of 2012, did you have a conversation with her?
 7    A     Yes, sir.
 8    Q     And later on after that, you saw my client at her house,
 9    and you had a conversation with her again?
10    A     Yes, sir.
11    Q     You interviewed my client, what, three times?
12    A     Yes, sir.  Twice on the day of the search warrant and once
13    at her home.
14    Q     Did you ever ask my client to produce for you any
15    additional documents or items?
16    A     I don't believe so.
17                MR. DARDEN:  Thank you.
18          That's all I have, Your Honor.
19                THE COURT:  Redirect.
20          Ladies and gentlemen, since we're leaving at
21    three o'clock, this is probably a better time to take a break,
22    rather than at 2:30.  Let's take about a ten-minute break.  We
23    are leaving a little bit early; so let's keep it a little bit
24    shorter than normal.
25          Remember the admonishment not to discuss the case among
```

1    yourselves or with anybody else or form or express any opinions

2    about the matter until it's submitted to you and you retire to

3    the jury room.

4         See you back in about ten, ten minutes.

5              THE CLERK:  All rise.

6                  (Recess taken.)

7              THE COURT:  The record will reflect that all the

8    members of the jury are in their respective seats in the jury

9    box.  The witness is on the witness stand.

10        And, Counsel, redirect.

11                      REDIRECT EXAMINATION

12   BY MR. PORTER:

13   Q    Special Agent, defense counsel was asking you about

14   whether you did anything to investigate how much defendant

15   actually paid for the power wheelchairs.  In other words, what

16   her out-of-pocket expense was for the power wheelchairs.

17        Do you remember those questions?

18   A    Yes, sir.

19   Q    Okay.  Now, let's look at Government's Exhibit 27, page

20   12.  It's up there on the screen in front of you.

21        If we can just blow up the portion there where it says --

22        Okay.  So Exhibit 27, this is a patient file for Nazario

23   Gutierrez; is that right?

24   A    You know, without my glasses, honestly, I can't tell.

25   Q    If you need to look at 27 in the binder in front of you --

1    A    I do.

2    Q    -- maybe that would help.

3             THE COURT:  You may need glasses for that too.

4             THE WITNESS:  I might.  Oh, I have my glasses.  It's

5    helpful.

6    Q    BY MR. PORTER:  So Exhibit 27, is that the Nazario

7    Gutierrez patient file?  You may not be able to look at the

8    screen.  You might need to look at the binder to see what

9    Exhibit 27 is.

10   A    Yes, sir, it is.

11   Q    Okay.  It says for Nazario Gutierrez, and in that patient

12   file there's an invoice from a Shoprider.

13       What is Shoprider?

14            MR. DARDEN:  I'm going to object.  Counsel is

15   testifying.

16            THE COURT:  Overruled.

17            THE WITNESS:  Shoprider is a wholesaler of power

18   wheelchairs.

19   Q    BY MR. PORTER:  So the portion blown up on the screen

20   here, does that show how much Ezcor paid for the power

21   wheelchair?

22   A    Yes, sir.

23   Q    How much is that?

24   A    $972.22.

25   Q    And is that consistent with what you testified in

1   cross-examination, that the supplier usually pays about $900?

2   A    I believe I said 900 to a thousand dollars.  That would be

3   consistent.

4   Q    And then the other patient files, without going through

5   them all, have you seen other invoices from suppliers?

6   A    Yes, sir.

7   Q    Based on your experience, are the numbers about the same?

8   A    Again, between 900 and a thousand dollars.

9   Q    But the defendant is then able to bill that to Medicare

10  for how much?

11  A    Up to -- when this -- depending on the model, they can

12  bill up to -- the high, about $4,100.

13  Q    Okay.  So if we go actually to Nazario Gutierrez's summary

14  slide, if we go to Government Exhibit 63, how much did they

15  bill to Medicare for the power wheelchair?

16  A    $4,733.82.

17  Q    So there is some profit margin then in billing Medicare

18  for power wheelchairs.  Is that fair to say?

19  A    Yes, sir.

20  Q    And defense counsel also asked you about the bank records

21  and mentioned the defendant's husband, Walter Eze.  Now, the

22  bank records that you looked at, was Walter Eze a signatory on

23  all those bank accounts?

24  A    Not all of them, no.

25  Q    Was the defendant a signatory on all those bank accounts?

**UNITED STATES DISTRICT COURT**

```
1    A    She was.

2    Q    Those were the bank accounts where the $91,000 was taken

3    out?

4    A    Yes, sir.

5    Q    I'm sorry.  Taken out in cash?

6    A    Yes, sir.

7    Q    And defense counsel asked you about -- I believe it was

8    Government's Exhibit 54, if we could put that up on the screen.

9    Do you remember defense counsel asking you, you know, whether

10   you're familiar with the term "global economy"?

11   A    Yes, sir.

12   Q    And defense counsel asked you if -- if she was limited to

13   only supplying medical equipment within 25 miles.  Do you

14   remember that question?

15   A    I do, yes.

16   Q    Okay.  Now, is there any law that, you know, says that she

17   can't provide DME outside of 25 miles?

18   A    No, there's not.

19   Q    All right.  Knowing that, as an investigator, seeing this

20   in the claims data, what significance did it have to you that

21   there are beneficiaries all over the state?

22             MR. DARDEN:  Objection.  Asked and answered.

23             THE COURT:  Sustained.

24   Q    BY MR. PORTER:  Defense counsel also asked you about some

25   of the beneficiaries we saw earlier this morning.
```

1    Ms. Winston, who said that she wanted a power wheelchair,

2   now, just because patient says they want a power wheelchair,

3   does that mean that Medicare is going to pay for a power

4   wheelchair?

5   A    No.

6   Q    In fact, Medicare has those guidelines that we've looked

7   at in Government's Exhibit 3; right?

8   A    Yes, sir.

9   Q    And defense counsel asked you about the Medicare audit,

10   and on the timeline, if we can just put up Government's

11   Exhibit 57 just for clarification, because I think there may

12   have been some confusion, when was the search warrant actually

13   executed in this case?

14   A    Yeah.  The search warrant was executed on May 25th, 2012.

15   Q    Okay.  And the deadline for the defendant to provide the

16   documents was when?

17   A    May 11th, 2012.

18   Q    And did the defendant provide the documents on that date?

19   A    She did not.

20   Q    Did she get an extension on that date?

21   A    She did not.

22   Q    So when you went in and executed the search warrant, you

23   were able to obtain those patient files; is that right?

24   A    Yes, sir.

25   Q    And defense counsel asked you whether -- whether defendant

1    had destroyed the files.  Remember that question?

2    A     Yes, sir.

3    Q     And files, had they been totally destroyed?

4    A     No, sir.

5    Q     With that being said, did you find evidence that some of

6    the files had been altered?

7    A     Yes, sir.

8    Q     And what types of things did you --

9              MR. DARDEN:  Objection.  Conclusion.  Motion to

10   strike.

11             THE COURT:  Overruled.

12             THE WITNESS:  For instance, I saw many files, whose

13   patients referred by Dr. Azinge-Obasi, who had duplicate

14   prescriptions in it.  He would have one prescription for just a

15   power wheelchair and then another prescription on the same

16   exact date with the exact same verbiage of a power wheelchair.

17   But in addition to that, there were additional items of DME

18   listed.

19        When I later looked at the claims data, the prescription

20   for the power wheelchair was filled, and then months later the

21   other items on that second prescription were filled.  So it

22   appeared that the -- although the prescriptions were written on

23   the same date, that -- that wouldn't have been the case.

24   Otherwise, she would have billed for all those items on that

25   first prescription on the same date.

```
1        So it appeared that the prescription, a second

2   prescription was written at a later date with all those items

3   added to it, and then she billed for the additional items on a

4   later date.

5              MR. DARDEN:  Objection.

6              THE COURT:  The last part will be stricken as to

7   what it appeared.

8   Q    BY MR. PORTER:  But that fact, the possibility of the

9   defendant altering files, is that one of the reasons why you

10  wanted to execute the search warrant in this case?

11             MR. DARDEN:  Objection.  Irrelevant.

12             THE COURT:  Overruled.

13             THE WITNESS:  Yes, sir.

14  Q    BY MR. PORTER:  And defense counsel also asked you, you

15  know -- you were able to interview the defendant on the day of

16  the search.  Was that May 25, 2012?

17  A    Yes, sir.

18  Q    And then you were able to interview her again

19  January 2013; is that right?

20  A    Yes, sir.

21  Q    Defense counsel asked you, did defendant flee?  Did she

22  flee the country?

23        Do you remember that question?

24  A    Yes, sir.

25  Q    In your experience as an investigator, do all people that
```

**UNITED STATES DISTRICT COURT**

```
 1   commit Medicare fraud flee?
 2   A     No, sir.
 3              MR. PORTER:  Nothing further, Your Honor.
 4              THE COURT:  Okay.  Recross.
 5                          RECROSS-EXAMINATION
 6   BY MR. DARDEN:
 7   Q     Is there a Medicare rule that all prescriptions have to be
 8   filled by Medicare at the same time?
 9   A     No, sir.
10   Q     Now, do you remember which file in particular or files in
11   particular had more than one prescription in them?
12   A     There were numerous ones.  They were all files of patients
13   who were referred by Dr. Azinge-Obasi.
14   Q     And there were original prescriptions in each one of those
15   files, or were they faxed prescriptions?
16   A     No.  They were -- both the -- both prescriptions, the
17   duplicate prescriptions, they were both original prescriptions.
18   Q     And when you say that they were duplicate prescriptions,
19   what you saw was, for instance, you saw a prescription for a
20   power wheelchair and a second prescription for a bed, both
21   dated the same day; correct?
22   A     No, sir.  That's not what I said.
23   Q     Well, I'm asking you.  Did you see -- when you say that
24   you saw duplicate prescriptions, did you see prescriptions for
25   different items on different prescriptions, all dated the same
```

**UNITED STATES DISTRICT COURT**

1    day?

2    A     Yes.  What I saw was --

3    Q     The answer is "yes"?

4    A     I need to explain.  I would like to explain.

5          THE COURT:  Go ahead.

6          THE WITNESS:  What I saw was two prescriptions, both

7    original prescriptions.  Both had the same date on them.  Both

8    prescriptions had "power wheelchair" written on it; so one of

9    the items is a power wheelchair.

10         And then, when you write a power wheelchair prescription,

11   you have to write additional information on there.  That

12   information was identical on both those prescriptions, and

13   I'm -- this was in numerous patient files.  So one prescription

14   just had the power wheelchair.  The other prescription again

15   had the exact same item, the power wheelchair, but then it had

16   additional items:  A knee brace, a back brace, a joint

17   stimulator.

18         THE COURT:  Okay.  Counsel, next question.

19   Q     BY MR. DARDEN:  And was the handwriting the same on each

20   of those prescriptions you just described?

21   A     Yes, sir.

22   Q     And they were both original documents; correct?

23   A     That's correct.

24   Q     And with respect to these prescriptions, did you determine

25   that my client forged a prescription?

```
1    A     No.  I didn't determine that she forged a prescription.

2    Q     And when you say that you saw these original

3    prescriptions -- one saying wheelchair, power wheelchair, the

4    other one saying power wheelchair with some additional

5    information -- these documents were both original documents;

6    right?

7    A     That's correct.

8    Q     Now, is it enough for Medicare if a doctor simply writes a

9    prescription saying, power wheelchair?  Is that enough for

10   Medicare?

11   A     No.  There has to be additional information on the

12   prescription.

13   Q     And so wouldn't it be prudent for a DME receiving a

14   prescription for a power wheelchair to contact the doctor and

15   ask the doctor to provide additional information on the

16   prescription such as a diagnosis or -- or the client's -- or

17   patient's complaints?  Wouldn't that be prudent?

18   A     Yeah, I mean, if there was information missing on the

19   prescription, you would think that the doctor would know that.

20   That would be concerning to me.

21   Q     Doctors make mistakes; right?

22   A     Sure.

23   Q     And as someone said before, a DME ought to make some

24   efforts to make sure that the power wheelchair is medically

25   necessary; right?
```

| | |
|---|---|
| 1 | A    Of course. |
| 2 | Q    Did any doctor complain to you that their signature was |
| 3 | forged on a prescription you found at Ezcor? |
| 4 | A    There was one doctor who complained that he had not |
| 5 | written a prescription, but the prescription had actually been |
| 6 | filled.  The claim was submitted to Medicare by the defendant |
| 7 | for a power wheelchair, but the doctor insisted that he never |
| 8 | wrote a prescription for a power wheelchair. |
| 9 | Q    Where is that doctor? |
| 10 | A    Well, I think -- I think he's in federal prison. |
| 11 | Q    Now, you know, taking a look at Exhibit 28, page 21 -- |
| 12 | A    I'm sorry.  Page 21 of which exhibit? |
| 13 | Q    Exhibit 28, please.  And that's Mary Winston's patient |
| 14 | file located at Ezcor? |
| 15 | A    Yes, sir. |
| 16 | Q    And this is an invoice for Revolution Mobility, a |
| 17 | wholesale supplier? |
| 18 | A    Yes, sir. |
| 19 | Q    And it indicates that wheelchairs were sold to Ezcor; is |
| 20 | that right? |
| 21 | A    I'm sorry.  I'm looking at the wrong document. |
| 22 | Q    Exhibit 28, page 21. |
| 23 | A    Okay.  I'm with you.  Could you re-ask that last question. |
| 24 | Q    This is from Revolution Mobility, and it indicates that |
| 25 | wheelchairs were sold to Ezcor; right? |

**UNITED STATES DISTRICT COURT**

```
 1  A     Yes, sir.
 2  Q     And there is a portion of page 21 of Exhibit 28 that is
 3  highlighted; is that right?
 4  A     Yes, sir.
 5  Q     Did you do that highlighting?
 6  A     No, sir.
 7  Q     Well, Exhibit 28, page 21, indicates that this power
 8  wheelchair, including flat-free tire, battery, and other items,
 9  including a lift, cost $2,609; right?
10  A     That's for three power wheelchairs.
11  Q     That's three different power wheelchairs?
12  A     Yeah.  The price is $869.99, and then she -- but she got
13  three of them.  So the total amount for all three was
14  $2,609.97.
15  Q     And then it indicates flat-free tire, 39.99; right?
16  A     Yes, sir.
17  Q     Is that on one wheelchair or all the wheelchairs?
18  A     I'm assuming it's on all three because it says ordered
19  three, quantity three.  But I -- I can't tell for sure.
20  Q     And then there are other accessories like seat belts,
21  11.99; adjustable, detachable arms, 49.99; anti-tippers, 39
22  .04; right?  Other accessories?
23  A     I see that, yes.
24  Q     So even if you bought a wheelchair for a thousand dollars
25  or so, like you say, you can add accessories to it; is that
```

**UNITED STATES DISTRICT COURT**

1   right?

2   A     Yes, sir.

3   Q     And just so we're clear, Medicare sets a price that it

4   will pay for a wheelchair; right?

5   A     It does, but then you can bill for these additional items

6   as well.

7   Q     But in terms of the wheelchair itself, you can bill them

8   $50,000 if you want to.  Medicare is only going to pay a fixed

9   amount that has already been determined; right?

10  A     They will pay 80 percent of the allowable amount, yes,

11  sir.

12  Q     Now, you know, you were asked about the Ezcor bank

13  accounts and my client's bank accounts, and you told us that

14  Mr. Walter Eze was not a signatory on all of the accounts; is

15  that right?

16  A     That's correct.

17  Q     He was a signatory on some of the accounts?

18  A     On -- on a few of them.

19  Q     And did you look to -- look at the bank records to see if

20  there was more than one ATM card issued?

21  A     No, sir.

22  Q     I believe this wheelchair is marked Government's

23  Exhibit 2.  Why don't you tell us about this wheelchair.  This

24  is not the -- or is it?  Is this the same kind of wheelchair

25  described for about a thousand dollars on Exhibit 28, page 21?

**UNITED STATES DISTRICT COURT**

1   A    Yeah.  It's considered a -- it's considered a standard

2   wheelchair.  It can be a K0821, K0822, K0823, K0825.

3              THE REPORTER:  Slow down.

4              THE WITNESS:  I'm sorry.

5       K0821, K0822, K0823 or K0825 -- all those wheelchairs are

6   extremely similar in nature.

7   Q    BY MR. DARDEN:  And does this wheelchair, Exhibit 2, does

8   it have any special features or accessories?

9   A    I think I know -- I think I remember a seat -- I can't see

10  it now, but I think there's a seat cushion on it.

11  Q    And is there anything else unique about it or -- or any

12  other -- is it accessorized any other way?  No mag wheels, no

13  22-inch rims, but is it accessorized any other way?

14  A    It's pretty standard.

15  Q    And Ezcor sent for the most part -- they -- they delivered

16  these standard kinds of wheelchairs for the most part?

17  A    They did deliver the standard wheelchairs, but then there

18  was always accessories also billed.  So if you look at the

19  claims like the claims we saw on the exhibits, there would be a

20  power wheelchair, and almost always there would be additional

21  accessories billed.

22  Q    Like a seat belt?

23  A    I don't recall specifically a seat belt but like a chair

24  back, an armrest, seat cushion, that type of thing.

25  Q    Adjustable arms?

```
 1   A     Yes.  Armrests.

 2   Q     Anti-tippers?

 3   A     Honestly, I don't remember anti-tippers.

 4   Q     Right here on Exhibit 28, page 21, there's an anti-tipper

 5   on a couple of wheelchairs; right?

 6   A     Yeah.  But what I'm saying is I don't recall seeing that

 7   in the claims data.

 8   Q     Well, these accessories I just described -- you know,

 9   batteries, flat-free tires, seat belts, anti-tippers -- I mean,

10   these are -- these are things you could certainly consider

11   necessary, perhaps, for a patient with a power wheelchair;

12   right?

13   A     It would depend on their need.  I mean, every patient is a

14   little different, obviously.

15   Q     Well, how about anti-tippers?  Can we agree that an

16   anti-tipper is a good thing if you gotta ride around in a

17   wheelchair?

18   A     Yes.  But honestly I don't remember seeing an anti-tipper

19   in any of the claims data.  I don't know if that's maybe part

20   of a standard wheelchair or not.  I'm not sure.

21             MR. DARDEN:  Thank you.  That's all I have.

22             THE COURT:  You may step down.

23             THE WITNESS:  Thank you, Your Honor.

24             THE COURT:  Next witness.

25             MS. QUINTERO:  Your Honor, the Government rests its
```

**UNITED STATES DISTRICT COURT**

```
 1    case.
 2              THE COURT:  Okay.  Reserving any Rule 28 motion,
 3    Counsel, do you have a defense at this time?
 4              MR. DARDEN:  May we reserve the motion, Your Honor.
 5              THE COURT:  Yes, certainly.
 6              MR. DARDEN:  May I confer with co-counsel for a
 7    moment, please.
 8              THE COURT:  Sure.
 9                (Defense counsel confer sotto voce.)
10              MS. NKELE:  Your Honor, may we proceed.
11              THE COURT:  Please.
12              MS. NKELE:  We would like to call (inaudible).
13              THE REPORTER:  I can't hear her, Your Honor.
14              MS. NKELE:  I would like to call our first witness.
15              THE COURT:  Okay.
16              MS. NKELE:  The defense will call Ms. Sylvia
17    Ogbenyeanu Walter-Eze to the stand.
18                    SYLVIA OGBENYEANU WALTER-EZE,
19    the defendant herein, called as a witness on her own behalf,
20    was sworn and testified as follows:
21              THE CLERK:  Please raise your right hand.  Do you
22    solemnly swear the testimony that you are about to give in the
23    matter now before the Court shall be the truth, the whole
24    truth, and nothing but the truth so help you God?
25                    THE WITNESS:  I do.
```

**UNITED STATES DISTRICT COURT**

1          THE CLERK:  Okay.  You may be seated.

2      May I please ask that you state your full name for the

3  record and spell your last name.

4          THE WITNESS:  My name is Sylvia Walter -- Sylvia

5  Ogbenyeanu Walter-Eze.  My last name is spelled W-a-l-t-e-r,

6  hyphen, E-z-e.

7          THE COURT:  You may inquire, Counsel.

8                    DIRECT EXAMINATION

9  BY MS. NKELE:

10 Q    Ms. Walter-Eze, are you currently under the influence of

11 any medications?

12 A    No.

13 Q    Are you able to recall events from your life in the past

14 ten years and relay them truthfully to the jury?

15 A    Significant events, yes, I would recall but not every

16 detail.

17 Q    Are you able to recall events from your -- from your life

18 in the past --

19          THE COURT:  Thank you, Counsel.

20 Q    BY MS. NKELE:  Are you able to recall events from your

21 last -- life in the past five years and relay them truthfully?

22 A    For the most part, yes, but not every detail still.  For

23 the most part, I would recall.

24 Q    Ms. Walter-Eze, where were you born?

25 A    I was born in a city called Port Harcourt in Nigeria,

```
 1    West Africa.
 2    Q     And when were you born?
 3                MS. QUINTERO:  Objection, Your Honor.  Relevance.
 4                THE COURT:  I'll overrule the question.
 5          You may answer this question.  When were you born?
 6                THE WITNESS:  I was born --
 7                THE COURT:  What year?
 8                THE WITNESS:  I was born in 1966, May 1st.
 9                THE COURT:  Okay.  Next question.
10    Q     BY MS. NKELE:  Where did you first start schooling?
11    A     I did my -- start my -- start my grade school at an
12    elementary school called ACU All Saints Primary School Enugu,
13    another state in Nigeria --
14    Q     Did you take --
15    A     -- in West Africa.
16    Q     Did you take any courses in English in your grade school?
17    A     Yes.  I took classes in English.
18    Q     And after you finished grade school, where did you go to
19    school next?
20    A     After grade school I went to secondary school.  It's
21    called secondary school.
22    Q     Is that the same as high school?
23    A     It's the same as high school in -- yeah, in America.
24    Q     And, again, did you take classes in English in your high
25    school?
```

```
 1   A     I did take classes in English, yes, I did.

 2   Q     After high school did you go to college?

 3   A     Yes.  I went to college.

 4   Q     And what college did you go to?

 5   A     I went to the University of Nigeria Enugu, in West -- in

 6   Nigeria, West Africa.

 7   Q     And what did you study in college?

 8   A     I studied law.

 9   Q     How long did you study law?

10   A     I studied law for a period of four years in University of

11   Nigeria Nsukka -- University of Nigeria, Enugu campus.

12   Q     And what degree did you obtain?

13   A     I obtained an LL.B. law degree.

14   Q     And after that what did you do?

15   A     After that I proceeded to the Nigerian law school in

16   Lagos, Nigeria, West Africa.

17   Q     And did you obtain any degrees from there?

18   A     I did.  I -- I did.

19   Q     And what was that?

20             THE COURT:  Counsel, we're going to move on from

21   that.  It is really irrelevant.

22             THE WITNESS:  I got --

23             THE COURT:  That means you don't answer.

24             THE WITNESS:  Okay.

25             THE COURT:  Thank you.
```

**UNITED STATES DISTRICT COURT**

```
 1   Q    BY MS. NKELE:  Okay.  After law school did you practice
 2   law at all?
 3   A    Yes, I did.
 4   Q    For how long?
 5   A    I practiced law for about two years with a law firm.
 6   Q    And what happened after that?
 7               THE COURT:  Again, Counsel, I don't see the
 8   relevancy.  We're going into areas that have nothing to do with
 9   this case.
10   Q    BY MS. NKELE:  When did you come to the United States?
11   A    I came to the -- I came to the United States in -- it was
12   significant.  I remember.  I came here through New Jersey
13   airport, and I remember it was July 18th, 1996.
14   Q    And why did you move to the United States?
15               MS. QUINTERO:  Objection, Your Honor.
16               THE COURT:  Sustained.  Not relevant.
17   Q    BY MS. NKELE:  When you moved to the United States, what
18   did you do?
19               MS. QUINTERO:  Objection, Your Honor.  I believe
20   this is going into our motion in limine scope.
21               THE COURT:  You mean what job did she take?
22               MS. NKELE:  Yes.
23               THE COURT:  Okay.  What job did you do when you came
24   to the United States?
25               THE WITNESS:  My husband is an American.  He was
```

**UNITED STATES DISTRICT COURT**

1    already -- he had a business; so I joined his business.

2    Q    BY MS. NKELE:  And what business was that?

3    A    That's Ezcor, started as Ezcor, but it wasn't incorporated

4    then.  It was just Ezcor-9000 without the incorporation.

5    Q    And at some point did you incorporate the company?

6    A    Yes.  We -- we -- we got incorporated in 1999.

7    Q    Okay.  And at that time did you do any business with

8    Medicare?

9    A    No.

10   Q    What kind of business did you do?

11   A    In 1999 we were a tel- -- telecommunication provider

12   for -- we provided services for a telecommunication company

13   located in Florida.  We're one of -- we're one of the companies

14   they use.

15   Q    I would like to show you what has been marked for the

16   purposes of identification as People's Exhibit 15, and I

17   believe it's defense -- this is Defense Exhibit U.  Is this the

18   articles of incorporation of Ezcor?

19            THE CLERK:  Counsel, what exhibit are we on?

20            THE COURT:  Exhibit 15.

21            MS. NKELE:  Your Honor, may I show it to --

22            THE COURT:  You got a copy up here, I believe.

23            MS. NKELE:  Oh.

24            THE COURT:  It's in one of those black books,

25   Exhibit 15.

**UNITED STATES DISTRICT COURT**

1          THE WITNESS:  Yes, yes.  It's the certificate of

2     incorporation of Ezcor.  Yes, it is.

3     Q     BY MS. NKELE:  And when was it incorporated?

4     A     Ezcor was incorporated in nine -- January, I believe.

5     It's January 1.  Is that January -- oh, yeah, it is January 1,

6     1999.

7     Q     And from January 1, 1999, you were in telecommunication

8     business; right?

9     A     Yes.  We were involved in telecommunication marketing

10    business, yes, we were.

11    Q     And did you say it was a marketing business?

12    A     Yes, yes.  It was a marketing business.

13    Q     So was that what you were doing for Ezcor?

14    A     Yes.  I was the sales director.

15    Q     And you did that business to -- when did you start doing

16    business with Medicare?

17    A     Two thou- -- February, I believe, 2003.  No.  2004,

18    February 18, just so we got our provider number for Medicare.

19    2004 -- no, two thousand and -- anyway, February, sometime in

20    February 2004.

21          THE COURT:  Okay.  Ladies and gentlemen, we've got

22    to break.  As I said earlier, we're going to have to break now

23    for the evening recess.  We'll have you come back in tomorrow

24    at 8:30, 8:15.  We'll get started at 8:30 and take it up at

25    that time.

**UNITED STATES DISTRICT COURT**

1        Remember the admonishment not to discuss the case among

2   yourselves or with anybody else or form or express any opinions

3   about the matter until it's submitted to you and you retire to

4   the jury room.

5                THE CLERK:  All rise.

6                (Matter adjourned at 2:59 P.M.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5       I, KHOWOONSUN CHONG, FEDERAL OFFICIAL REALTIME

6   COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

7   THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

8   PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

9   FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10  STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11  ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

12  CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

13  THE UNITED STATES.

14

15              DATED THIS 26TH DAY OF MAY, 2015.

16

17

18          /S/ KHOWOONSUN CHONG

19          _____
            KHOWOONSUN CHONG, CSR NO. 12907, CRR
20          FEDERAL OFFICIAL COURT REPORTER

21

22

23

24

25

**UNITED STATES DISTRICT COURT**